```
1               UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------
                               )
4   United States of America,  )   File No.: 22-mj-432
                               )                    (JTH)
5            Plaintiff,        )
                               )
6       vs.                    )   Preliminary Hearing
                               )
7   Abdiaziz Shafii Farah,     )   May 25, 2022
                               )   10:00 a.m.
8            Defendant.        )
                               )
9   ------------------------------------------------------------

10        BEFORE THE HONORABLE DAVID T. SCHULTZ
              UNITED STATES MAGISTRATE JUDGE
11

12           PRELIMINARY/DETENTION HEARING

13

        APPEARANCES:
14      For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                                By:  Joe Thompson, Esq. and
15                              Harry Jacobs, Esq.,
                                300 South Fourth Street
16                              Suite 600
                                Minneapolis, MN 55415
17

18      For the Defendant:      BIRRELL LAW FIRM, PLLC
                                By:  Andrew Birrell, Esq.
19                              333 South Seventh Street
                                Suite 3020
20                              Minneapolis, Minnesota 55402

21

22

23

        Court Reporter:         BRITTANY K. BLESENER, RPR
24                              300 South Fourth Street
                                Minneapolis, MN 55415
25
```

```
 1                    I N D E X

 2                                                   PAGE

 3   WITNESS--FBI Special Agent Travis Wilmer

 4   Direct Examination by Mr. Thompson                  4
     Cross-Examination by Mr. Birrell                   29
 5   Redirect Examination by Mr. Thompson               38
     Recross-Examination by Mr. Birrell                 40
 6

 7   WITNESS--Ralph Johnson

 8   Direct Examination by Mr. Birrell                  42
     Cross-Examination by Mr. Thompson                  50
 9

10                    *     *     *     *

11

12

13                    E X H I B I T S

14   NUMBER     DESCRIPTION                          PAGE

15      4       Wire Transfer Receipts to China        12

16      5       Wire Transfer Receipts to Kenya        12

17      6       WhatsApp Message                       14

18      3       Receipt for Property Seized            23

19      1       Passport Application                   22

20      2       Form DS-64                             24

21    D1        Johnson résumé                         42

22    D2        Photo                                  53

23                    *     *     *     *

24

25
```

```
 1                     P R O C E E D I N G S
 2         (In open court.)
 3              THE COURT:  All right.  Good morning, everyone.  We
 4    are on the record in the matter of the United States vs.
 5    Abdiaziz Farah.  Criminal matter of MJ No. 22-432.
 6              Counsel for the United States, if you'll note your
 7    appearances just for the record, please.
 8              MR. THOMPSON:  Good morning, Your Honor.  Joe
 9    Thompson and Harry Jacobs on behalf of the United States.
10              THE COURT:  All right.  Good morning, Mr. Thompson
11    and Mr. Jacobs.
12              Counsel for Mr. Farah, if you'll note your
13    appearance, please.
14              MR. BIRRELL:  Good morning, Your Honor.  Andy Birrell
15    appearing with Mr. Farah, who's before the Court.
16              THE COURT:  All right.  Good morning, Mr. Birrell and
17    Mr. Farah.
18              We're here on a detention hearing; is that correct,
19    Mr. Thompson?
20              MR. THOMPSON:  That's correct, Your Honor.
21              THE COURT:  Will you be presenting testimony?
22              MR. THOMPSON:  I will, Your Honor.  The Government
23    has testimony from FBI Special Agent Travis Wilmer.
24              THE COURT:  All right.  Call your witness, if you
25    will.
```

WILMER - DIRECT EXAMINATION

1          MR. THOMPSON:  Thank you, Your Honor.

2          Your Honor, the Government would call FBI Special

3  Agent Travis Wilmer.

4          THE COURT:  All right.  Come on up.

5          If you'll raise your right hand, please.

6      *(Witness sworn.)*

7          THE COURT:  All right.  Be seated.  State your full

8  name for the record and spell your last name, please.

9          THE WITNESS:  Travis Wilmer, T-R-A-V-I-S,

10  W-I-L-M-E-R.

11                     DIRECT EXAMINATION

12  BY MR. THOMPSON:

13  Q.   Good morning, Agent Wilmer.

14  A.   Good morning.

15  Q.   How are you?

16  A.   Doing well.

17  Q.   Where do you work, sir?

18  A.   I currently work as a special agent with the FBI based out

19  of the Minneapolis field office.

20  Q.   And how long have you worked for the FBI?

21  A.   I began working for the FBI June 6 of 2021 and began with

22  the Minneapolis field office November 8th of 2021.

23  Q.   After joining the FBI in June and being stationed in

24  Minneapolis in November, what were you doing?  Where were you

25  stationed?

WILMER - DIRECT EXAMINATION

1    A.    In Quantico, Virginia, completing the required training.

2    Q.    Okay.  How long is that training program?

3    A.    Roughly 20 weeks.

4    Q.    Agent Wilmer, what group are you assigned to at the FBI?

5    A.    I'm assigned to a squad that investigates public

6    corruption, civil rights, and fraud against the government.

7    Q.    And could you briefly describe your educational

8    background?

9    A.    Graduated from MIT in 2012 with a Bachelor of Science in

10   chemical -- biochemical engineering.

11   Q.    Thank you, Agent Wilmer.

12         Agent Wilmer, have you been involved in an

13   investigation into the Federal Child Nutrition Programs?

14   A.    I have.

15   Q.    And just briefly can you describe just the nature of that

16   investigation?

17   A.    Widespread fraud within the federal nutrition programs,

18   many individuals receiving funds and then misappropriating them

19   and using them for personal spending.

20   Q.    And what were these funds supposed to be used for?

21   A.    They were designated as reimbursement for meals provided

22   to children in need in the community.

23   Q.    Okay.  And what is your role in that investigation?

24   A.    I am a case agent.

25   Q.    What does that mean?

WILMER - DIRECT EXAMINATION

1  A.   One of the lead agents involved in the investigation,

2  conducting a widespread array of activities to further the

3  investigation.

4  Q.   Are there any --

5          THE COURT:  Hang on.  Hang on one second.  Agent, can

6  you move a little bit closer and speak up a little bit?

7          THE WITNESS:  Yes, sir.

8  BY MR. THOMPSON:

9  Q.   Agent Wilmer, are there other agents involved in the

10 investigation?

11 A.   There are.

12 Q.   Could you briefly describe --

13 A.   There are --

14 Q.   -- how many?

15 A.   -- four FBI special agents that serve as case agents, as

16 well as an agent from IRS and postal service.

17 Q.   Okay.  This investigation into the Federal Child Nutrition

18 Programs, when did it begin?

19 A.   It began last summer.

20 Q.   Summer of 2021?

21 A.   Yes, that's correct.

22 Q.   And at some point did the investigation become overt or

23 public?

24 A.   Yes.  It became overt January 20th, 2022, when a number of

25 search warrants were simultaneously executed across the Twin

WILMER - DIRECT EXAMINATION

1    City metro area.

2    Q.    Approximately how many search warrants were executed that

3    day?

4    A.    Over a dozen that day.

5    Q.    Okay.  Was there any press in the wake of those warrants?

6    A.    There was.

7    Q.    And some of those search warrants became unsealed; is that

8    correct?

9    A.    That is correct.

10   Q.    Okay.  Agent Wilmer, are you familiar with the defendant

11   in this case, Mr. Abdiaziz Farah?

12   A.    I am.

13   Q.    How you familiar with him?

14   A.    He is one of the subjects of the current investigation.

15   Q.    Okay.  And that's the investigation into the Federal Child

16   Nutrition Programs?

17   A.    Yes, that's correct.

18   Q.    Just generally, what was his role in that fraud scheme?

19   A.    He was involved with multiple entities that served as

20   sponsors and vendors within the Federal Nutrition Program, and

21   claimed to have provided thousands and thousands of meals and

22   received reimbursement for those.

23   Q.    Okay.  And he was owner of companies involved in that.

24   They got money; is that correct?

25   A.    That is correct.

WILMER - DIRECT EXAMINATION

1   Q.   What were some of the companies that he owned that

2   received federal money?

3   A.   Empire Cuisine & Market, Empire Enterprises, which was

4   involved with ThinkTechAct as well.

5   Q.   Okay.  Does Mr. Farah have a partner in owning Empire

6   Cuisine & Market?

7   A.   He does.

8   Q.   Who's that partner?

9   A.   Mohamed Jama Ismail.

10  Q.   Okay.  On January 20th when you and your fellow agents

11  excused all of those warrants around the Twin Cities, were any

12  of those -- or did any of those warrants relate to the

13  defendant?

14  A.   Yes.  His residence was one of the locations of the

15  warrants, as well as the business locations.

16  Q.   Okay.  And where is his residence located, just by city?

17  A.   In Savage, Minnesota.

18  Q.   Okay.  And his business, Empire Cuisine & Market, where is

19  that located?

20  A.   Also in Savage.

21  Q.   Okay.

22  A.   Or Shak- --

23  Q.   Was that in Savage or --

24  A.   Shakopee.

25  Q.   -- Shakopee?  Okay.  Was there an exe- -- a warrant

WILMER - DIRECT EXAMINATION

1   executed on his partner, Mohamed Ismail's residence as well?

2   A.   Yes, it was.

3   Q.   Okay.  I want to talk just briefly about the search of the

4   defendant's home, okay?

5   A.   Okay.

6   Q.   That was a home in Savage, Minnesota?

7   A.   That is correct.

8   Q.   What types of doc- -- generally, what kind of stuff was

9   taken during the search of this home?

10  A.   Financial documents as well as individual IDs, including

11  passports.

12  Q.   Okay.  I want to talk about some of the financial

13  documents that were taken during the house [sic].  Was there

14  any documentation regarding the transfer of money abroad?

15  A.   There was.  There was wire receipts for multiple

16  transactions to send significant funds abroad.

17  Q.   And what countries were money, funds, sent abroad to?

18  A.   China, predominantly, as well as evidence of funds going

19  to Kenya.

20  Q.   Okay.  I want to show you now, Agent Wilmer, Government

21  Exhibit 5.

22  A.   Okay.

23  Q.   Do you recognize Government Exhibit 5?

24  A.   Yes.

25  Q.   And what is that?

WILMER - DIRECT EXAMINATION

1    A.    It's a wire transfer receipt from Old National Bank.

2    Q.    And are these wire transfer receipts that were recovered

3    during the search of the defendant's home on January 20th?

4    A.    Yes, they are.

5    Q.    Okay.  And Government Exhibit 5 is actually a stack of

6    wire transfer receipts; is that right?

7    A.    That is correct.

8    Q.    And these are wire transfers that were sent to China?

9    A.    Yes, that's correct.

10   Q.    And in the year 2021; is that correct?

11   A.    Correct.

12   Q.    I don't want to go through all of them, the Court has

13   them, but the first one here, the date is February 18th of

14   2021; is that correct?

15   A.    That is correct.

16   Q.    What's the amount transferred?

17   A.    $131,000, roughly.

18   Q.    Okay.  And where is the money being sent?

19   A.    Being sent to China.

20   Q.    Okay.  Qingdao Safco Tire Company; is that correct?

21   A.    That is correct.

22   Q.    On the second page, there's another wire that same day,

23   February 18th of 2021; is that correct?

24   A.    That is correct.

25   Q.    Also to China?

WILMER - DIRECT EXAMINATION

1  A.   Correct.

2  Q.   $175,000?

3  A.   Correct.

4  Q.   Okay.  And these -- this exhibit goes on to document

5  nearly a million dollars transferred to China that year,

6  correct?

7  A.   That is correct.

8  Q.   And they're transferred from companies owned by the

9  defendant; is that correct?

10  A.   That is correct.

11  Q.   Empire Cuisine & Market?

12  A.   Correct.

13  Q.   And Empire Enterprises?

14  A.   Correct.

15  Q.   You said there were also documents of transfers to Kenya;

16  is that correct?

17  A.   That is correct.

18  Q.   I'm going to show you Government Exhibit 4.  Do you

19  recognize that?

20  A.   Yes, I do.

21  Q.   And what is Government Exhibit 4?

22  A.   It's another wire transfer receipt from Old National Bank

23  going to Capital View Properties in Nairobi, Kenya.

24  Q.   Okay.

25          MR. THOMPSON:  And Your Honor, I'd move to admit both

WILMER - DIRECT EXAMINATION

1   Government Exhibits 4 and 5, just for the record.

2           THE COURT:  Any objection, Mr. Birrell?

3           MR. BIRRELL:  None for this hearing, no.

4           THE COURT:  All right.  Government Exhibits 4 and 5

5   are received.

6           MR. THOMPSON:  Thank you, Your Honor.

7   BY MR. THOMPSON:

8   Q.   Directing your attention to page 1 of Government Exhibit

9   4, this is a wire transfer from Empire Enterprises; is that

10  correct?

11  A.   That is correct.

12  Q.   That's one of the defendant's companies?

13  A.   Yes.

14  Q.   That's dated May 11th of 2011; is that correct?

15  A.   That's correct.

16  Q.   And you said it was being sent to a place called Capital

17  View Properties in Nairobi, Kenya?

18  A.   Yes.

19  Q.   Okay.  And how much is being sent to Capital View

20  Properties in Nairobi?

21  A.   $300,000 in that wire.

22  Q.   Who's the signer on the -- authorizing the transfer?

23  A.   Mr. Farah.

24  Q.   Okay.  And then page 2 of Government Exhibit 4 is a

25  receipt from a second wire transfer; is that correct?

WILMER - DIRECT EXAMINATION

1   A.   That is correct.

2   Q.   Can you briefly describe the nature of that wire transfer?

3   A.    It is a wire transfer receipt from Old National Bank dated

4   June 1st, again going to Capital View Properties in Nairobi,

5   Kenya for approximately $206,000.

6   Q.   Okay.  Again, who's authorized this wire?

7   A.   Again, Mr. Farah.

8   Q.   To be clear, Agent Wilmer, Empire Cuisine & Market and

9   Empire Enterprises, they were companies that were involved in

10  the scheme under investigation; is that correct?

11  A.   That is correct.

12  Q.   What was the role of those two companies?

13  A.   To serve as primarily a vendor, provided meals as part of

14  the federal nutrition program.

15  Q.   So the money that was sent abroad here was money that was

16  re- -- federal money received as part of the program?

17  A.   That is correct.

18  Q.   Okay.  During the search of Mr. Farah's house, did agents

19  recover a cell phone?

20  A.   They did.

21  Q.   His cell phone?

22  A.   Yes.

23  Q.   And has that cell phone been searched?

24  A.   It has, at least to some extent, yes.

25  Q.   During the search was there anything on it related to

WILMER - DIRECT EXAMINATION

1    international wire transfers?

2    A.   There was a message indicating that he had made

3    significant investments in Kenya.

4    Q.   Okay.  I'm going to show you now what has been marked as

5    Government Exhibit 6.

6              Agent Wilmer, do you recognize Government Exhibit 6?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   It is a WhatsApp message from Mr. Farah indicating that

10   he's invested $6 million in Kenya.

11   Q.   Okay.  And this came off the defendant's phone; is that

12   correct?

13   A.   That is correct.

14             MR. THOMPSON:  Your Honor, I move to admit Government

15   Exhibit 6.

16             MR. BIRRELL:  No objection for the purpose of this

17   hearing.

18             THE COURT:  All right.  Government Exhibit 6 is

19   received.

20   BY MR. THOMPSON:

21   Q.   Um, Agent Wilmer, this text message was from the

22   defendant, Mr. Farah; is that correct?

23   A.   That is correct.

24   Q.   And it's sent to Mahad Ibrahim?

25   A.   That is correct.

WILMER - DIRECT EXAMINATION

1   Q.   Are you familiar with Mr. Ibrahim?

2   A.   I am.

3   Q.   How so?

4   A.   He is also a subject involved in the current investigation

5   and is tied to commercial entities involved in the receiving

6   and using of federal funds.

7   Q.   And this is -- is there a specific company that Mr.

8   Ibrahim owned?

9   A.   ThinkTechAct.

10  Q.   And was ThinkTechAct related to Mr. Farah's companies?

11  A.   There was significant funds transferred between the two.

12  Q.   Okay.  And Mr. Farah, is he a member of board of directors

13  of ThinkTechAct?

14  A.   He is.

15  Q.   And what's Mr. Ibrahim's role or relationship with

16  ThinkTechAct?

17  A.   The -- essentially director of -- owner of ThinkTechAct.

18  Q.   Okay.  He owns it.

19       Okay.  To the text message itself, it is sent on

20  December 28th of 2021; is that correct?

21  A.   Yes, that's correct.

22  Q.   And it says, "Bro we can walahi, and I got this...I

23  invested $6 million in Kenya with in 3 years and it's growing

24  bro."  Is that correct?

25  A.   That is correct.

WILMER - DIRECT EXAMINATION

1   Q.   That's the defendant speaking to his business partner?

2   A.   Correct.

3   Q.   There's a phrase "walahi."  It's not English.  Do you know

4   what "walahi" means?

5   A.   I swear to God.

6   Q.   And that's Arabic; is that correct?

7   A.   Correct.

8   Q.   Agent Wilmer, you mentioned that during the search of the

9   defendant's home on January 20th, that agents recovered some

10  personal documents and identification?

11  A.   That is correct.

12  Q.   What type of documents?

13  A.   Personal IDs and documentation including passport cards

14  and passport books.

15  Q.   Okay.  Let's talk about the passports.  Did agents recover

16  the passport of the defendant during the search of his home?

17  A.   They did.

18  Q.   What specifically did they recover?

19  A.   They recovered a current passport card within the home,

20  and a current passport book in the console of his vehicle.

21  Q.   Okay.  So passport card and passport books are different;

22  is that correct?

23  A.   That's correct.  Two different documents.

24  Q.   Okay.  The passport card of the defendant, where was that

25  recovered from?

WILMER - DIRECT EXAMINATION

1    A.    From inside his residence.

2    Q.    Okay.  The -- when agents left the search of the

3    defendant's residence, did they provide him a receipt of the

4    items taken?

5    A.    Yes.  They provided a receipt for property of listed items

6    taken during the search.

7    Q.    Is that a standard part of the search warrant process?

8    A.    Yes, it is.

9    Q.    Why do agents provide receipts after they search a

10   premises?

11   A.    So that the owner of the premises has a documentation

12   showing what items were taken during the search.

13   Q.    I'm going to show you now, Agent Wilmer, Government

14   Exhibit 3.

15           Is this the receipt that was provided following the

16   search of the defendant's home on January 20th?

17   A.    Yes, it is.

18   Q.    Okay.  And here it identifies the location searched; is

19   that correct?

20   A.    Yes, that is correct.

21   Q.    Okay.  Says here that these are the items -- the items

22   listed below were collected or seized; is that correct?

23   A.    That is correct.

24   Q.    So on the first page here it talks about a passport of

25   Ms. Dubat; is that correct?

WILMER - DIRECT EXAMINATION

1    A.    Correct.

2    Q.    Is that the defendant's wife?

3    A.    Correct.

4    Q.    And down here about halfway down the first page, it says

5    that a U.S. passport for Mr. Farah was taken; is that correct?

6    A.    That is correct.

7    Q.    Okay.  And down at the bottom of the first page it says

8    another U.S. passport for Mr. Farah was taken; is that correct?

9    A.    That is correct.

10   Q.    Okay.  And on page 3 of Government Exhibit 3, the list

11   continues; is that correct?

12   A.    Correct.

13   Q.    And it says that a U.S. passport card for the defendant

14   was taken; is that correct?

15   A.    That is correct.

16   Q.    And the numbers on the passport book or passport card are

17   provided; is that correct?

18   A.    That is correct.

19   Q.    On the bottom of each page there's an indication that --

20   of who this list was provided to; is that correct?

21   A.    That is correct.

22   Q.    Who did the agents provide this receipt to?

23   A.    Mr. Farah.

24   Q.    It says here that he refused to sign it; is that correct?

25   A.    That is correct.

WILMER - DIRECT EXAMINATION

1    Q.   But he did receive it?

2    A.   Correct.

3    Q.   You said that agents also recovered -- they recovered the

4    passport card from his house, but they also recovered a

5    passport book; is that correct?

6    A.   That is correct.

7    Q.   Where did agents find Mr. Farah's passport book?

8    A.   Inside a console in his GMC pickup truck.

9    Q.   Okay.  And what brought them to find it -- how did they

10   find it in the console of his GMC pickup truck?

11   A.   His GMC truck was seized, and as part of the seizure, it's

12   standard procedure to inventory all items contained within.

13   Q.   When the agents inventoried -- well, first of off, why do

14   they inventory the contents of a truck after seizing it?

15   A.   To make sure there's not anything that would be of danger

16   to the agents or other individuals in the area.

17   Q.   Do they also want to provide some sort of record to the

18   owner of the property?

19   A.   Yes, that's correct.

20   Q.   And to be clear, why -- in what context was that GMC

21   pickup being seized?

22   A.   It was seized because it was purchased with funds that

23   were part of the investigation of the federal nutrition

24   program.

25   Q.   So there was a federal seizure warrant authorizing the

WILMER - DIRECT EXAMINATION

1    taking of the truck?

2    A.   That is correct.

3    Q.   Okay.  You said this was found in the center console?

4    A.   Yes, the console in the backseat, center of the vehicle.

5    Q.   And what was found in that console?

6    A.   There was a passport book for Mr. Farah, as well as an

7    envelope containing a large sum of cash.

8    Q.   How much cash was found along with his passport?

9    A.   $18,000 in that envelope, and then a separate bag in the

10   backseat that contained another $42,000 in cash.

11   Q.   So a total of $60,000 was in the defendant's truck with

12   his passport?

13   A.   That is correct.

14   Q.   Okay.  On January 20th, did the Government obtain and

15   execute other seizure warrants related to assets owned or

16   controlled by the defendant?

17   A.   Yes, they did.

18   Q.   Generally, what kind of seizure warrants?

19   A.   For bank accounts with -- they contained funds as well as

20   personal items, largely vehicles that had been purchased with

21   federal funds.

22   Q.   Quite a few cars; is that correct?

23   A.   That is correct.

24   Q.   And those are some of the cars that are documented in the

25   complaint affidavit?

WILMER - DIRECT EXAMINATION

1   A.   Correct.

2   Q.   How much -- you said bank accounts were seized as well?

3   A.   That's correct.

4   Q.   Were those personal and business accounts that were

5   controlled by the defendant?

6   A.   That is correct.

7   Q.   Approximately how much was seized from the defendant's

8   personal and business bank accounts on January 20th?

9   A.   Approximately $6 million.

10  Q.   Okay.  That house that was searched in Savage, did the

11  Government take any action with respect to it on or about

12  January 20th?

13  A.   Yes, they did.

14  Q.   What kind of action?

15  A.   Filed a civil complaint against the house.

16  Q.   A civil forfeiture complaint?

17  A.   Yes, that is correct.

18  Q.   And what general allegations were made?

19  A.   That the home was purchased with funds that were meant to

20  be part of the nutrition program.

21  Q.   And it was therefore subject to forfeiture?

22  A.   That is correct.

23  Q.   Okay.

24       THE COURT:  Mr. Thompson, slow down just a little bit

25  for the court reporter.

WILMER - DIRECT EXAMINATION

```
 1              MR. THOMPSON:  Yes, Your Honor.

 2              THE COURT:  Thank you.

 3   BY MR. THOMPSON:

 4   Q.   Agent Wilmer, did you later learn that following the

 5   execution of the search of the defendant's home that he applied

 6   for a passport?

 7   A.   Yes, that is correct.

 8   Q.   Can you tell us about that passport application?

 9   A.   He applied for a passport on March 22nd with the

10   Minneapolis passport authority and received it same day.

11   Q.   Okay.  I'm going to show you now Government Exhibit 1.  Do

12   you recognize Government Exhibit 1?

13   A.   I do.

14   Q.   What is it?

15   A.   It is his passport application.

16   Q.   Okay.

17              MR. THOMPSON:  Your Honor, I'd move to admit

18   Government Exhibit 1.

19              MR. BIRRELL:  No objection for the purpose of this

20   hearing.

21              THE COURT:  Exhibit 1 is received.  Counsel, you also

22   have not moved, to my knowledge, for the admission of Exhibit

23   3.  Do you wish to do so?

24              MR. THOMPSON:  I do, Your Honor.

25              MR. BIRRELL:  No objection for the purpose of this
```

WILMER - DIRECT EXAMINATION

1   hearing.

2           THE COURT:  All right.  Exhibit 3 is also received.

3           MR. THOMPSON:  Thank you, Your Honor.

4   BY MR. THOMPSON:

5   Q.  Agent Wilmer, I'm directing your attention to the first

6   page.  This is the application for a U.S. passport submitted by

7   the defendant; is that correct?

8   A.  That is correct.

9   Q.  And it lists his address; is that correct?

10  A.  Correct.

11  Q.  That's the house that was searched that day?

12  A.  Yes, it is.

13  Q.  There's an indication of when this was submitted?

14  A.  Yes, March 22nd, 2022.

15  Q.  Okay.  And the second page of Government Exhibit 1, there

16  is a question that asks, "Have you ever applied for or been

17  issued a U.S. passport book or passport card?"

18  A.  That is correct.

19  Q.  What's the indication there?

20  A.  That he had previously been issued one.

21  Q.  Okay.  And does it indicate what happened to -- well, it

22  says there's both a passport book and a passport card; is that

23  correct?

24  A.  That is correct.

25  Q.  And what did it indicate had happened to the passport

WILMER - DIRECT EXAMINATION

1  book?

2  A.   That it had been lost.

3  Q.   Okay.  Did Mr. Farah submit some documentation related to

4  the loss of his existing passport book and passport card?

5  A.   Yes, he did.  He submitted a DS-64.

6  Q.   Is that what's been marked as Government Exhibit 2?

7  A.   Yes, that is correct.

8         MR. THOMPSON:  Your Honor, I move to admit Government

9  Exhibit 2.

10         MR. BIRRELL:  No objection for the purpose of this

11  hearing.

12         THE COURT:  Government Exhibit 2 is received.

13  BY MR. THOMPSON:

14  Q.   Now, Agent Wilmer, you said this is known as a form DS-64?

15  A.   That is correct.

16  Q.   What is a -- the form DS-64?

17  A.   It's a statement regarding the valid lost or stolen U.S.

18  passport.  So it's submitted in conjunction with the passport

19  application if you indicate that your previous passport had

20  been lost.

21  Q.   Okay.  And I think there's an explanation at the

22  beginning, that's because you're not allowed to have more than

23  one passport at a time; is that correct?

24  A.   That is correct.

25  Q.   At the very top it says, "Please select the document or

WILMER - DIRECT EXAMINATION

1  documents that you are reporting and its status."  Is that

2  correct?

3  A.   That's correct.

4  Q.   What did the defendant indicate with respect to this

5  section?

6  A.   That both the passport book and card had been lost.

7  Q.   Okay.  There's a section below, section 2, that asks for

8  information about how it was lost; is that correct?

9  A.   That is correct.

10 Q.   And it says, "Answer all questions completely.  If you do

11 not know the answer in detail, be as exact as possible."  Is

12 that correct?

13 A.   That is correct.

14 Q.   With respect to the portion that asks him to explain in

15 detail how his valid U.S. passport book or card was lost or

16 stolen, what did the defendant say on this form?

17 A.   "I could not find anywhere in my home or car."

18 Q.   Okay.  Then it says, "Explain where the lost or theft

19 occurred.  Provide the address if known."  How did he

20 indicate -- what did he indicate on there?

21 A.   "Unknown."

22 Q.   "On what date was your valid U.S. passport book/card lost

23 or stolen?"  What did the defendant say?

24 A.   Also "unknown."

25 Q.   Was that true?

WILMER - DIRECT EXAMINATION

1   A.   No.

2   Q.   Why do you say that?

3   A.   Because it had been seized as part of the federal search

4   warrant and had been indicated as such on the receipt for

5   property that was received that day.

6   Q.   Thank you.

7            Now, Agent, you had mentioned that the defendant

8   applied for this in person; is that correct?

9   A.   That is correct.

10  Q.   Where did he apply for the passport?

11  A.   The Minneapolis Passport Agency.

12  Q.   That's just across the street here, right?

13  A.   That is correct.

14  Q.   The old federal building?

15  A.   Correct.

16  Q.   When did he submit this application?

17  A.   On March 22nd, 2022.

18  Q.   Okay.  Did anyone else submit a false passport application

19  that day?

20  A.   Yes.  Mohamed Jama Ismail, also applied and received a

21  passport the same place, the same day.

22  Q.   And that's the defendant's -- the partner, the co-owner of

23  Empire Cuisine & Market?

24  A.   That is correct.

25  Q.   Okay.  What did Mr. Ismail indicate -- well, what did he

WILMER - DIRECT EXAMINATION

1  indicate on his passport application?

2  A.   Also that he had a previous passport that had been lost.

3  Q.   Was that true?

4  A.   It was not.

5  Q.   What had happened to his prior passport?

6  A.   His prior passport had also been seized during a federal

7  search warrant executed at his residence on January 20th of

8  2022.

9  Q.   Okay.  The defendant, around the time of his passport

10  application, booked a flight; is that correct?

11  A.   That is correct.

12  Q.   Could you tell us about that flight?

13  A.   He booked a flight from Minneapolis/St. Paul to Nairobi,

14  Kenya.

15  Q.   When did he book that flight?

16  A.   On March 16th, 2022.

17  Q.   When was it scheduled to depart?

18  A.   March 24th of 2022.

19  Q.   Did the defendant get on that flight?

20  A.   He did not.

21  Q.   Okay.  How about Mr. Ismail, his partner?  Did Mr. Ismail

22  at some point book a flight?

23  A.   Yes, he did.

24  Q.   Where did he book a flight to?

25  A.   He booked a flight from Rochester to Nairobi, Kenya, as

1    well.

2    Q.    Rochester, Minnesota?

3    A.    Correct.

4    Q.    I assume there's not a direct flight?

5    A.    No.  It went through Minneapolis/St. Paul, and then

6    Amsterdam, and then a final destination of Kenya.

7    Q.    Did Mr. Ismail get on his flight in Rochester, Minnesota?

8    A.    He did.

9    Q.    Did he ultimately make it to Nairobi?

10   A.    He did not.

11   Q.    What happened?

12   A.    He was arrested on the jetway boarding his international

13   flight from Minneapolis/St. Paul.

14   Q.    And was he charged?

15   A.    Yes, he was.

16   Q.    What was he charged with?

17   A.    1542, passport fraud.

18   Q.    Okay.  Now, Agent Wilmer, in the wake of Mr. Ismail's

19   arrest and subsequent detention -- is that correct?

20   A.    That is correct.

21   Q.    -- did the FBI then learn about Mr. Farah's, the

22   defendant's, passport application?

23   A.    That is correct.

24   Q.    And how -- after learning of the defendant's fraudulent

25   passport application, what did you and your fellow agents do?

WILMER - CROSS-EXAMINATION

1    A.   We ended up getting a complaint and arrest warrant for Mr.

2    Farah.

3    Q.   Okay.  And prior to doing that, did you conduct

4    surveillance or have surveillance conducted by other agents?

5    A.   Yes, we did.

6    Q.   Where was that surveillance conducted?

7    A.   May 19th at the Empire Cuisine & Market business.

8    Q.   Okay.  And it wasn't the agents on this team that were

9    conducting surveillance; is that right?

10   A.   That's correct.  It was a separate surveillance team.

11   Q.   Okay.  And did they see anything of note during their

12   surveillance of Empire Cuisine & Market?

13   A.   Yes.  On May 19th, they documented they saw Mr. Farah

14   enter the business.  Shortly after, an unknown male entered

15   with what appeared to be a stack of passports in hand.

16   Q.   Okay.  How many passports did that man have in his hand?

17   A.   Not sure of the exact number, but it was multiple.

18   Q.   Okay.

19            MR. THOMPSON:  One moment, Your Honor.

20            No further questions, Your Honor.

21            THE COURT:  Thank you, Mr. Thompson.

22            Mr. Birrell?

23                      CROSS-EXAMINATION

24   BY MR. BIRRELL:

25   Q.   Good morning, Agent.

WILMER - CROSS-EXAMINATION

1    A.    Good morning.

2    Q.    I want to clear a few things up here.  Mr. Ismail, Mohamed

3    Ismail, was arrested on April 21st; is that right?

4    A.    It was the end of April.  I don't remember the exact date.

5    Q.    All right.  And he had tried to get on an airplane

6    April 20th?

7    A.    That's correct.

8    Q.    Okay.  Which was about a month after this flight that Mr.

9    Farah, you say, didn't get on, which was March 24th?

10   A.    That is correct.

11   Q.    All right.  And it was- -- you did not get a complaint in

12   this case until May 20th?

13   A.    That is correct.

14   Q.    And that was after you saw somebody or somebody saw what

15   they thought was a person walking into Mr. Farah's business

16   with passports?

17   A.    That is correct.  We had also learned of Mr. Farah's

18   passport at that time.

19   Q.    Well, you said you learned of his passport back in April

20   sometime?

21   A.    That is not correct.

22   Q.    All right.  When did you learn about it?

23   A.    We learned of his new passport that was issued in March in

24   the month of May.

25   Q.    When in May did you learn about it?

WILMER - CROSS-EXAMINATION

1    A.    Roughly a week ago.

2    Q.    All right.  And is that why you had a surveillance unit in

3    front of this Empire business?

4    A.    That is correct.

5    Q.    You didn't have any complaint, though, when you were doing

6    this surveillance?

7    A.    Not yet.

8    Q.    Well, you didn't, right?

9    A.    That's correct.

10   Q.    All right.  And the reason you went and got a complaint

11   was that you saw this person come in with what you thought was

12   a handful of passports?

13   A.    Also we saw Mr. Farah, which was what we were really

14   looking for.

15   Q.    You saw him?

16   A.    Yes, we wanted to ensure that he was still in the area and

17   hadn't already left.

18   Q.    Well, when you went to the magistrate judge, one of the

19   things -- in fact, the last thing you told the magistrate judge

20   in support of your complaint for -- your complaint and arrest

21   warrant was that, "On or about May 19th, 2020, federal agents

22   conducted surveillance at Farah's store, Empire Cuisine &

23   Market.  At about 11:00 a.m. May 19th, 2022, agents observed

24   Farah in the store.  Approximately 12:15 p.m. agents observed

25   an unidentified man enter the store.  The man appeared to be

WILMER - CROSS-EXAMINATION

1    carrying a stack of passports."

2    A.   Yes, that is correct.

3    Q.   And that's -- that's why you went and got the warrant?

4    A.   It was a supporting factor in getting it.

5    Q.   All right.  And it is not true that the --

6         MR. BIRRELL:  Excuse me, Your Honor.

7    BY MR. BIRRELL:

8    Q.   In the pretrial services report addendum, the last

9    sentence says, "Additionally, at the time of Farah's arrest for

10   the instant offense, arresting agents observed an unidentified

11   man entering Farah's store, Empire Cuisine & Market, carrying

12   what appeared to be a stack of passports."

13        That's not true, is it?

14   A.   That was not at time of arrest.

15   Q.   No.  What actually happened was that you had a

16   surveillance team down on Thursday, May 19th?

17   A.   Correct.

18   Q.   And -- were you there?

19   A.   I was not.

20   Q.   All right.  But there were people in a gray van, is that

21   what it was?

22   A.   I don't know the specific vehicle, but it was federal

23   surveillance.

24   Q.   All right.  And they were there to watch and see what they

25   could see, right?

WILMER - CROSS-EXAMINATION

1   A.   Correct.

2   Q.   All right.  What they saw was a car pull up with an older

3   gentleman, a young woman and a young man, go into the

4   restaurant?

5   A.   Correct.

6   Q.   And somebody took a picture while this older gentleman was

7   in the car of him apparently holding what appeared to be

8   perhaps three or four passports?

9   A.   Yes, that's what it appears to be.

10  Q.   All right.  And then what happened is that the agents,

11  surveilling agents, watched this older gentleman and the two

12  younger folks go into the restaurant, right?

13  A.   Yes, they entered the restaurant.

14  Q.   Could they see what was going on in the restaurant?

15  A.   No.

16  Q.   All right.  Then they stayed there, everyone was staying

17  there.  Then the older fellow got out and went to the next-door

18  business, right?

19  A.   I'm not sure.

20  Q.   All right.  And then what happened was the agent saw the

21  older guy come into -- come out and get in his car with two

22  bags?

23  A.   I'm not sure.

24  Q.   And he saw -- they saw the younger woman and the man,

25  younger guy, get in the car?

1   A.   Not sure.

2   Q.   All right.  And then what happens is Mr. Farah arrived at

3   the restaurant?

4   A.   That is not correct.  My understanding was Mr. Farah had

5   arrived previous to the man being pictured with the passports.

6   Q.   All right.  That's what your surveilling agents told you?

7   A.   Correct.

8   Q.   All right.  Well, we'll see about that, but what happens

9   then is that the older fellow goes back from his car into the

10  restaurant for a couple of minutes?

11  A.   Again, I'm not sure on all the other details surrounding

12  that.

13  Q.   All right.  Well, this was the precipitating event in

14  getting the arrest warrant, right, and the complaint?

15  A.   It was one supporting factor.

16  Q.   Well, you put it in there.

17       Okay.  Um, now, the agents, surveilling agents,

18  noticed this car with the people who arrived with the

19  passports, right?

20  A.   Correct.

21  Q.   And they -- they discovered what the license plate number

22  was?

23  A.   Correct.

24  Q.   And they learned that this car was owned by a woman named

25  Selma Seline Hussein (phonetic); is that right?

WILMER - CROSS-EXAMINATION

1   A.   I do not remember the specifics of the detail of the

2   ownership.

3   Q.   Well, they learned who owned the car that was there with

4   the guy that they thought had the passports?

5   A.   Correct.

6   Q.   And then did they go and speak with her?

7   A.   Not to my knowledge.

8   Q.   All right.  Did they make any effort to try to find out

9   what was actually going on when this person showed up with

10  these passports?

11  A.   No.  Their role was just to surveil.

12  Q.   And so when you appeared in front of the -- did you go to

13  the magistrate judge or do this online?

14  A.   Via tele- -- telephonic means.

15  Q.   Okay.  You wrote this affidavit and put in this business

16  about the passports, that the person showed up with the

17  passports, what appeared to be passports?

18  A.   That's correct.

19  Q.   And the only other entry before that in the affidavit was

20  more than two months -- two months before?

21  A.   I'm not sure what you're asking.

22  Q.   Well, on paragraph 104, it says, "On...March 16th, Farah

23  booked a one-way flight from Minneapolis-St. Paul International

24  Airport to Nairobi, Kenya...the flight was scheduled to depart

25  on March 24th...[Mr.] Farah did not board the flight."  Right?

WILMER - CROSS-EXAMINATION

1  A.   That's correct.

2  Q.   All right.  And then the next thing you talk about is "On

3  or about May 19th" -- so it was May 19th, correct?

4  A.   Correct.

5  Q.   "The agents conducted surveillance [of Mr.] Farah's

6  store."

7  A.   Correct.

8  Q.   All right.  So is it your testimony you had been looking

9  for him for two months and couldn't find him?

10 A.   We were not actively looking that full two months.

11 Q.   All right.  Because you weren't worried about anything

12 until you saw these guys show up with the passports, right?

13 A.   We weren't worried until we found out that he had received

14 another passport.

15 Q.   Yeah.  All right.  And the reason that you put this

16 information about this person showing up with the passports was

17 to create the impression that this was something that Mr. Farah

18 was going to use to flee, right?

19 A.   Also he had been issued a valid U.S. passport, which could

20 have been used to flee.

21 Q.   I understand, but maybe you could just answer the

22 question.

23         The reason you put paragraph 105 in there about this

24 person showing up with passports was to create the impression

25 that this was part of a scheme for Mr. Farah to flee, right?

WILMER - CROSS-EXAMINATION

1    A.   Correct.

2    Q.   And that's -- that's what you wanted the magistrate to

3    conclude when you gave him the warrant?

4             MR. THOMPSON:  Objection, Your Honor, argumentative.

5             THE COURT:  Sustained.

6             MR. BIRRELL:  All right.

7    BY MR. BIRRELL:

8    Q.   Okay.  Now, what actually happened was that you went to

9    the magistrate judge, or worked with him, on Friday, May 20th,

10   and this arrest warrant was issued?

11   A.   That is correct.

12   Q.   And the plan was to wait to execute the warrant?

13   A.   Until we saw Mr. Farah, correct.

14   Q.   All right.  So what ended up happening was that a state

15   court's police officer from Savage somehow saw your warrant on

16   your -- the FBI bulletin board or whatever it is, and went to

17   see Mr. Farah's family at 12:30 in the morning on Saturday.

18   Right?

19   A.   That is correct.

20   Q.   Okay.  And you know he left the card with Mr. Farah's

21   wife?

22   A.   I was not aware of that.  I know that he spoke with her,

23   though.

24   Q.   All right.  And you know that, subsequently, I called Mr.

25   Thompson up on Saturday morning?

WILMER - REDIRECT EXAMINATION

1   A.   That is correct.

2   Q.   Okay.  And he and I talked and he explained that we needed

3   to -- well, we agreed that Mr. Farah could surrender

4   voluntarily Monday morning at 10:00 in front of this

5   courthouse?

6   A.   That is correct.

7   Q.   And in fact, he and I and Mr. Ostrom appeared at 9:55, a

8   little early, and met with you and surrendered Mr. Farah?

9   A.   That is correct.

10  Q.   Okay.  And he came and went peacefully and, in fact, I

11  believe you were courteous enough not even to handcuff him.

12  A.   He was handcuffed prior to entering the vehicle.  But,

13  yes, he was cooperative.

14  Q.   Okay.  All right.

15          MR. BIRRELL:  I don't have any other questions right

16  now.  Thank you.

17          THE COURT:  Very well.

18          Mr. Thompson, any redirect?

19          MR. THOMPSON:  Thank you, Your Honor.  I'm not sure

20  this really matters, but I'll just clear it up.

21                      REDIRECT EXAMINATION

22  BY MR. BIRRELL:

23  Q.   Agent Wilmer, when did you learn about -- you and your

24  fellow agents learn that the defendant had submitted this

25  fraudulent passport application?

WILMER - REDIRECT EXAMINATION

1   A.   Roughly a week ago.

2   Q.   Okay.  And how did you learn?

3   A.   We inquired with the Department of State.

4   Q.   Okay.  And why did you inquire with the Department of

5   State?

6   A.   Because his business associate had received a passport

7   previous to that.

8   Q.   Okay.  And why did you wait until last week?

9   A.   Um, I don't have a good reason for that.

10  Q.   Did I ask one of your fellow agents to do it?

11  A.   Yes, correct.

12  Q.   Okay.  It wasn't you, though; it was someone else?

13  A.   Correct.

14  Q.   Okay.  After we learned about that, after the Government

15  learned about that, what was the intent?

16  A.   To identify if Mr. Farah was still in the area.

17  Q.   With what in mind?

18  A.   Getting a complaint for his arrest if he was.

19  Q.   Okay.  So Mr. Birrell in his questions suggested the

20  complaint was only obtained and the plan was made to arrest him

21  and charge him only after agents saw this person walk into the

22  place with those passports.  Was that true?

23  A.   No, it is not.

24  Q.   What was the plan all along?

25  A.   To get a complaint for his arrest once we identified if he

1   was in the area.

2   Q.   Okay.  And there was a delay from Mr. Ismail -- Mr. Farah

3   and Ismail's obtaining their fraudulent passports on

4   March 22nd?

5   A.   That is correct.

6   Q.   And then Ismail -- Mr. Ismail's arrest and detention to

7   the time in which you decided to get the complaint, and that

8   delay was due to not knowing that Mr. Farah had obtained that

9   fraudulent passport?

10   A.   That is correct.

11   Q.   Thank you, Agent Wilmer.

12          MR. THOMPSON:  No further questions.

13          THE COURT:  Thank you, Mr. Thompson.

14          Mr. Birrell?

15                    RECROSS-EXAMINATION

16   BY MR. BIRRELL:

17   Q.   You don't need to know where somebody is to go get a

18   criminal complaint, do you?

19   A.   No, you do not.

20   Q.   And if the agents were concerned about whether he would

21   flee, they could have arrested him when they saw him on

22   May 19th, right?

23   A.   That is correct.

24   Q.   And they didn't do that?

25   A.   They did not.

```
1   Q.   All right.  And -- that's fine.

2            MR. BIRRELL:  I don't have any other questions.

3   Thank you.

4            THE COURT:  Mr. Thompson, any redirect?

5            MR. THOMPSON:  No, Your Honor.  Thank you.

6            THE COURT:  All right.  Thank you.

7            Mr. Birrell, you are concluded with this witness?

8            MR. BIRRELL:  I am.  Thank you, Your Honor.

9            THE COURT:  All right.  Agent, thank you.  You may

10  step down.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  Mr. Thompson, any further witnesses for

13  the Government?

14           MR. THOMPSON:  No, Your Honor.  Thank you.

15           THE COURT:  All right.  Thank you.

16           Mr. Birrell, do you intend to call any witnesses on

17  behalf of the defense?

18           MR. BIRRELL:  I do.  I'm going to call Ralph Johnson

19  and they'll retrieve him from the hall.

20           THE COURT:  Thank you.

21           Just a word of caution to the lawyers.  Please just

22  keep your voices up and slow down a little bit.

23           Come on up, Mr. Johnson, if you will.  Raise your

24  right hand, please.

25       (Witness sworn.)
```

JOHNSON - DIRECT EXAMINATION

1        THE COURT:  Go ahead and be seated.  State your full

2   name for the record and spell your last name, please.

3        THE WITNESS:  My name is Ralph Johnson.  Last name is

4   spelled J-O-H-N-S-O-N.

5        THE COURT:  Go ahead, Mr. Birrell.

6        MR. BIRRELL:  Thank you.

7                   DIRECT EXAMINATION

8   BY MR. BIRRELL:

9   Q.   Mr. Johnson, earlier today or yesterday you gave me a

10  three-page résumé; is that right?

11  A.   Yes, sir.

12  Q.   All right.

13       MR. BIRRELL:  Your Honor, I marked that as Defendant

14  1.  I'd move admission of Defendant 1 at this time.

15       MR. THOMPSON:  No objection, Your Honor.

16       THE COURT:  Defense Exhibit 1 is received.

17  BY MR. BIRRELL

18  Q.   Just a little background so the Court can understand who

19  is speaking here, Mr. Johnson, what is your work history, in

20  summary, here?

21  A.   So currently I work for a company called WayPoint, W-A-Y,

22  capital P-O-I-N-T.  I work as a private investigator with that

23  firm.  I've been there since September of 2018.  I guess, from

24  the very beginning --

25  Q.   So just so the Court understands, WayPoint is a group of

1   retired federal and state law enforcement officers who do

2   various kinds of work for -- in legal matters; is that right?

3   A.   That's correct, yes.

4   Q.   And before that, you had a number of jobs that were --

5   that are listed on your résumé, right?

6   A.   Yes, sir.

7   Q.   And then from September 1977 through June -- well, through

8   October 2002, you were a special agent with the Internal

9   Revenue Service; is that right?

10  A.   That's correct, in the criminal investigation division.

11  Q.   All right.  Now, in connection with this matter, the

12  complaint was unsealed at the first appearance on Monday; is

13  that right?

14  A.   That's my understanding, yes.

15  Q.   All right.  And then you were asked to go to Mr. Farah's

16  business, Empire business, to see whether you could find any

17  surveillance footage from cameras?

18  A.   That's correct.

19  Q.   And you did find some?

20  A.   Yes.

21  Q.   And one -- I'm trying to expedite this a bit.  One of the

22  things that was discovered on the surveillance was a car that

23  arrived with an older gentleman and a young woman and a man; is

24  that right?

25  A.   That's correct.

JOHNSON - DIRECT EXAMINATION

1   Q.   And you were able to determine the license plate number

2   from the surveillance?

3   A.   Actually, I did not.  That was another employee from

4   WayPoint that saw the license plate number on the video.

5   Q.   Okay.  All right.  Fair enough.

6            And with that information, it was determined that the

7   car was owned by a woman named Selma Hussein?

8   A.   That's correct.

9   Q.   And that she had a father whose name was Sulemon Hussein

10  (phonetic)?

11  A.   Yes.

12  Q.   And then you went back to the store to inquire whether

13  these folks were known to people at the store?

14  A.   Yes.

15  Q.   Okay.  And eventually what happened was that you were able

16  to arrange a meeting with -- two meetings.  First, was it with

17  Mr. Hussein?

18  A.   That's correct.

19  Q.   And he doesn't speak English.  He speaks Somali?

20  A.   That's correct.

21  Q.   So someone from the store went with you?

22  A.   Yes.

23  Q.   And the first time you talked with him was -- how long did

24  you talk to him?

25  A.   Probably about 40 minutes.

JOHNSON - DIRECT EXAMINATION

1  Q.   All right.  And basically what he told you was he didn't

2  know what you were talking about?

3  A.   That's correct.

4  Q.   All right.  And then -- when did that happen?

5  A.   Um, I'd say early afternoon, around 3:00, maybe.

6  Q.   Yesterday?

7  A.   Yesterday.  I'm sorry.

8  Q.   All right.  And then you were invited back to his home

9  again, right?

10  A.   Yes.

11  Q.   And who did you meet with when you went back?

12  A.   There were a number of family members present at the time,

13  plus a few of the employees from the store --

14  Q.   Okay.

15  A.   -- facilitate it, so....

16  Q.   And was his daughter Selma there?

17  A.   Yes, she was.

18  Q.   Okay.  And tell the Court what happened when you went back

19  for the second meeting.

20  A.   Okay.  So I met with Selma.  I asked about whether or not

21  there were passports that were taken into the store that was

22  apparent on the videos that we looked at.

23  Q.   Mm-hmm.

24  A.   She indicated that, yes, they did take pass- -- or the

25  father had taken passports into the restaurant area.  They had

JOHNSON - DIRECT EXAMINATION

1  just come from a showing for an apartment that they were trying

2  to lease.  The apartment required photo identifications as part

3  of the lease agreement, so they brought the passports of the

4  individuals who were going to look at the apartment, as well as

5  the people that were going to be staying at the apartment.

6        They indicated they did not have any -- not all of

7  them had Minnesota identifications, so they used the passports

8  for purposes of identification.

9  Q.   Okay.  So --

10        MR. BIRRELL:  May I approach the witness?

11        THE COURT:  You may.

12        MR. BIRRELL:  Thank you.

13  BY MR. BIRRELL

14  Q.   So I'm going to show you Exhibit 2, which I previously

15  provided the Court and counsel.  Is that a picture you took?

16  A.   Yes, sir, I took that picture.

17  Q.   Would you tell the judge about the taking of the picture,

18  what was -- how it came about and what was seen?

19  A.   Well, I asked them if they still had the passports

20  available, and they said, yes, they did.  So Ms. Hussein handed

21  me the passports, and then I placed them on my notebook and I

22  took a picture of them, of the exteriors.

23  Q.   Now, some of the passports, looks like, had red covers and

24  one has no cover and one has a darker, maybe, blue or black?

25  A.   Right.  They're all protractive covers for the passports.

JOHNSON - DIRECT EXAMINATION

1  Q.   Okay.  Are these all United States passports?

2  A.   Yes, they are.

3  Q.   Now, you've looked at each one of these passports?

4  A.   Yes, I did.

5  Q.   And whose passports were they?

6  A.   They were all members of the fam- -- of the same family.

7  Q.   The people who were there?

8  A.   Yes.

9  Q.   Um, they did not want you to photograph their passports?

10 A.   Yes.  They were reluctant to have me take a picture of

11 their identifying information within the passport.

12 Q.   Of course they never met you before.

13 A.   This is true.

14 Q.   Um, did you talk with, um -- so this was like last evening

15 some time?

16 A.   Probably 6:30 yesterday.

17 Q.   Okay.  Did you explain that there was going to be a court

18 hearing today?

19 A.   Yes, I did.

20 Q.   Did you talk with them about the possibility of their

21 coming to court?

22 A.   Yes.

23 Q.   What did they say?

24 A.   Um, well, I asked them if they would be available to come.

25 Both of them had -- both Ms. Hussein and Mr. Hussein had doctor

JOHNSON - DIRECT EXAMINATION

 1  appointments this morning, so they were reluctant to cancel

 2  those doctor appointments.

 3  Q.   And we don't know what they were for, so we didn't --

 4  A.   No.

 5  Q.   All right.  So you looked at some of the surveillance

 6  photos?

 7  A.   The videos, yes.

 8  Q.   Videos, sorry.

 9  A.   Yes.

10  Q.   And can you tell the Court what you saw kind of in summary

11  so we can understand what happened with the people coming in

12  and what was going on?

13  A.   Okay.  So the vehicle pulled up to the -- in front of the

14  restaurant area.  The restaurant and market are side by side,

15  but they do not share a common entrance.  So they'd have to

16  walk into the restaurant.  They went in, ordered some food.

17  Mr. Hussein was seated at a booth for a while.  He pretty much

18  had the passports in his hand or on the table.

19  Q.   Just so I'm -- I want to just interrupt.

20        So there's cameras that show the outside and the

21  inside of both the restaurant and then the next store which is

22  a --

23  A.   The market.

24  Q.   -- convenience store?  Okay.

25  A.   Yup.

JOHNSON - DIRECT EXAMINATION

1    Q.    Thank you.  Sorry.  Go ahead.

2    A.    That's fine.

3          So he was seated at the -- at a booth.  After the

4    children had purchased some food, he went up carrying the

5    passports with him, asked the clerk to give him a plastic bag,

6    put the passports in a plastic bag, then they left the

7    restaurant area.  They then went outside, walked into the

8    market area, and then he purchased some Nescafé instant coffee.

9          At that point they gave him a -- put the Nescafé in a

10   bag, so he walked out of there with two bags in his hand.  Went

11   back to his vehicle, put the bags in the vehicle.  I don't

12   remember if he actually made it into the vehicle or just placed

13   it into the vehicle.  Then he walked back into the restaurant

14   area again.

15         By that time, Mr. Farah was in the restaurant area.

16   He walked toward Mr. Farah, they greeted each other.  Both of

17   them had empty hands at that point, nothing in their hands.  A

18   brief encounter, maybe a minute or two.  They were hugging.

19   Just a very respectful greeting, I guess.  And then Mr. Hussein

20   left the restaurant and Mr. Farah sat back down at the booth.

21   Q.    Does -- did your review of the videos show when Mr. Farah

22   arrived?

23   A.    He arrived while Mr. Hussein was in the market.

24   Q.    So Mr. Hussein had already arrived before Mr. Farah

25   arrived?

JOHNSON - CROSS-EXAMINATION

1    A.    Correct.

2    Q.    All right.

3             MR. BIRRELL:  Excuse me for a second, Your Honor.

4             Thank you, Your Honor.  I don't have any other

5    questions.

6             THE COURT:  Mr. Thompson?

7             MR. THOMPSON:  Thank you, Your Honor.

8                       CROSS-EXAMINATION

9    BY MR. THOMPSON

10   Q.    Good morning, Mr. Johnson.  How are you?

11   A.    I'm fine.

12   Q.    You are a retired IRS agent; is that right?

13   A.    That's correct.

14   Q.    25 years with the IRS?

15   A.    Yes, sir.

16   Q.    Here in -- both in St. Paul and in Fargo; is that correct?

17   A.    The St. Paul metro area, yes.

18   Q.    Okay.  After retiring from the IRS, you went to work at

19   U.S. Bank; is that correct?

20   A.    For a perio- -- for about two years, yes.

21   Q.    You were an investigator there?

22   A.    Yes.

23   Q.    Investigating as part of their anti-money laundering

24   department; is that correct?

25   A.    That's correct.

JOHNSON - CROSS-EXAMINATION

1  Q.   And you did similar anti-money laundering work at TCF

2  Bank; is that correct?

3  A.   That's correct.

4  Q.   Okay.  Now for several years, you've been at WayPoint?

5  A.   Um, three years -- or 2019.

6  Q.   Mr. Johnson, you weren't here earlier.  We talked about

7  the defendant's passport itself.  And you don't -- you didn't

8  do any investigation into the circumstances of his passport,

9  did you?

10  A.   No.

11  Q.   Okay.  You were just talking about these other people's

12  passports?

13  A.   Correct.

14  Q.   Okay.  And you -- again, you weren't here earlier today.

15  We had testimony about international wire transfer receipts

16  that were found in the defendant's home.  Did you do any

17  investigation into those?

18  A.   No, sir.

19  Q.   So were you asked to investigate the international wire

20  transfers that he made to China last year?

21  A.   No, sir.

22  Q.   Were you asked to look into or investigate the nature of

23  international wire transfers that the defendant made to Kenya

24  last year?

25  A.   No.

```
 1    Q.   Okay.  You are just here to talk about these four people's

 2    passports?

 3    A.   Correct.

 4    Q.   Okay.

 5              MR. THOMPSON:  No further questions.  Thank you, Your

 6    Honor.

 7              THE COURT:  Thank you, Mr. Thompson.

 8              Mr. Birrell, anything further?

 9              MR. BIRRELL:  No.  Thank you, Your Honor.

10              THE COURT:  All right.  Thank you, Mr. Johnson.  You

11    may be excused.

12              Any further witnesses, Mr. Birrell?

13              MR. BIRRELL:  No, thank you.

14              THE COURT:  All right.  Not that there's any rebuttal

15    here, but any rebuttal witnesses.

16              MR. THOMPSON:  Your Honor, we don't.  You'll have to

17    indulge us.  You know, we've been doing court via Zoom for a

18    long time and it's fun for us to get out every now and again.

19              THE COURT:  Understood.

20              MR. THOMPSON:  Maybe less fun for you.

21              THE COURT:  So Mr. Birrell, are you going to move the

22    admission of Defense Exhibit 2?

23              MR. BIRRELL:  I'm sorry.  I forgot to do that.  Yes,

24    I would.  Thank you.

25              THE COURT:  Okay.
```

1          MR. THOMPSON:  No objection, Your Honor.

2          THE COURT:  All right.  Exhibit 2 is received.

3          All right.  The question, at least my understanding

4    is, we haven't resolved this by stipulation.  On the question

5    of probable cause, do you wish to make argument, Mr. Thompson?

6          MR. THOMPSON:  No, Your Honor.  With respect to

7    probable cause?

8          THE COURT:  Yes.

9          MR. THOMPSON:  I'm happy to if you'd like me to, Your

10   Honor.

11         THE COURT:  Go ahead.

12         MR. THOMPSON:  Your Honor, I'll be brief.  The

13   defendant, after his passport was seized from his house and his

14   car in January by federal agents during the execution of a

15   search warrant, he applied for a new one on March 22nd, along

16   with his business partner whose passport was also seized in

17   January as part of the same investigation.

18         On that passport application, he lied.  He said that

19   his passport and his -- book and passport card had been lost.

20   That was not true.  Actually, as he knew, it had been seized by

21   federal agents in January.  There's actually things on the

22   application itself that indicate he knew that.  In fact, on the

23   statement about the lost passport, he says that "I cannot find

24   them in my house or my car," which is interesting because his

25   passport card was seized from his house and his passport book

1    was seized from his car.  Also notable, as you saw, the

2    inventory receipts specifically identified those items that

3    were taken with his name and passport number.

4              The defendant knew that what he was saying was false.

5    He said it anyway.  The form was signed under penalty of

6    perjury.  There's definitely probable cause.

7              Thank you, Your Honor.

8              THE COURT:  All right.  Thank you, Mr. Thompson.

9              Mr. Birrell, do you wish to be heard on the subject

10   of probable cause?

11             MR. BIRRELL:  We'll submit probable cause on the

12   record, Your Honor.

13             THE COURT:  All right.  Very well.  The Court finds

14   that there is probable cause to believe the defendant may have

15   committed the crime alleged in the complaint, which is Title 18

16   U.S.C., Section 1542, willingly and knowingly making a false

17   statement in an application for a passport.

18             All right.  On the subject of detention, Mr.

19   Thompson, do you wish to be heard?

20             MR. THOMPSON:  Yes, Your Honor.

21             THE COURT:  All right.  Come on up.  This is not a

22   presumption case, correct?

23             MR. THOMPSON:  That's correct, Your Honor.

24             THE COURT:  And you have the burden, right?

25             MR. THOMPSON:  That's correct, Your Honor.

1          THE COURT:  Okay.  Go ahead.

2          MR. THOMPSON:  Your Honor, the Government agrees with

3     the pretrial services office that there are no conditions or

4     combination of conditions that would reasonably assure the

5     defendant's appearance here in this matter.

6          This is a risk of flight case.  And I understand,

7     Your Honor, normally in cases like this we don't detain

8     defendants on the basis of, say, danger to the community.  But

9     this is a risk of flight case and it's a risk of international

10    flight, which is a sort of binary thing.  This is not a

11    situation with a defendant who just might not appear in court

12    and we'll arrest him at home a week or two or a month later or

13    at a friend's house, something like that.  This is risk of

14    international flight and it is incredibly serious in this case.

15         The defendant has a significant motive to flee.  He

16    is the target of a massive fraud investigation, one that's been

17    on the front page of the paper, basically on a weekly basis for

18    the past four months.  As set forth in the complaint and many

19    press articles, he and his companies received over $30 million

20    in Federal Child Nutrition Program funds.  These were funds

21    that were intended to be reimbursements for the cost of

22    providing meals to disadvantaged children, especially during

23    the COVID pandemic.

24         And as indicated in the complaint, that's not where

25    most of this money went.  He bought house after house after

1    house, six cars, I think, in the -- in 2021 alone.  Hundreds of

2    thousands of dollars' worth of cars.  Millions of dollars'

3    worth of properties.  He sent, you know, 700,000-plus dollars

4    to Nairobi, Kenya, apparently to buy a house or some sort of

5    property, and that's of course where he is originally from or

6    where he grew up as a child.

7         And it's this looming investigation.  His bank

8    accounts have been seized as part of that.  More than

9    $6 million were seized from his personal and business bank

10   accounts.  His house has a lis pendens file against it as well

11   as civil forfeiture complaint.  Six or so of his cars have been

12   seized by the Government.  These are brand new cars.  So he has

13   an incredible motive to flee.  And we saw that he did.

14        His passport was taken in January and two months

15   later, he and his partner, also involved in this investigation,

16   Mohamed Ismail, went to the Minneapolis Passport Agency right

17   over there (indicating), the old federal building, and they

18   applied in person.  And they knew what they were doing.  They

19   booked a flight, which allowed them to go and get a same-day

20   passport saying their old one had been lost.  They indicated

21   that their existing passport had been lost.  We all know if you

22   want to travel abroad, generally, you apply for a passport and

23   it takes some weeks or months to get it.  But if you say it was

24   lost and you say you have a trip booked, you can get it same

25   day.

1        And that's what they did.  They both did the same

2   thing, the both did it at the same time, and they both lied in

3   the same way.  It's -- obviously he knew he was lying and we

4   know why he was lying.  He knew or had reason to know that had

5   he indicated that his prior passport book and card had been

6   seized by federal agents, two things would have happened; one,

7   he wouldn't have gotten a passport that day, and, two, the

8   folks at the state department and the passport agency would

9   have called the federal agents and said, Your target, your

10  subject, this person from whom you seized his passport is

11  applying for a new one.  And we would have known.  He didn't do

12  that, and it's obvious why.  He wanted to have that passport so

13  he could potentially leave and he has the option to leave.

14       Unlike so many defendants, Your Honor, the defendant

15  has the means to flee, both the financial means to flee and a

16  place to flee to.  And they're both very significant.  Most

17  defendants that come before Your Honor have essentially no

18  financial means.  They have no way to fund a trip to -- book a

19  flight, say, to Nairobi.

20       The defendant here has stolen millions of dollars.

21  We saw the property he purchased and the cars you've seen in

22  the complaint.  He sent at least $700,000 to Nairobi.  He sent

23  almost a million dollars to China last year alone.  This is all

24  federal money.  He has the means to go.  And most importantly,

25  I think, he has a place to go.  And this is the most

1    significant because it's easy to think about, oh, if I got

2    charged with a crime, I would flee.  But most of us have

3    nowhere to go.  You know, you can't just move or no one wants

4    to just move to some country they've never been to, where they

5    don't speak the language, where they don't know anyone, where

6    they've never been, to be a fugitive.

7            That's not what the situation is here.  Mr. Farah was

8    raised in Kenya.  His father is in Kenya.  He has investments

9    there.  In fact, in his -- the text message that Your Honor saw

10   sent to Mr. Ibrahim, one of the people involved in this scheme

11   with him, he bragged that he had over $6 million invested in

12   Kenya.  That's significant.  That's the place he booked the

13   flight to.  He has a place to go, which is unlike almost --

14   probably 99 or more percent of the defendants that appear

15   before Your Honor, he has somewhere to go.  And it's a place

16   where if he went, we could not get him back.  The odds of

17   extraditing from Kenya are miniscule.  It's not -- it just

18   doesn't happen.  When we have people flee to that part of the

19   world, we don't get them back.  And he knows that.  And Mr.

20   Ismail knew that.  He tried to leave a couple weeks ago and got

21   arrested and ultimately detained.

22           Your Honor, this is a case that's hard, I know.

23   International flight cases are difficult.  It's hard because

24   you -- I know Your Honor is thinking, normally, we don't detain

25   someone in this situation.  This is a white collar crime.  This

1    is someone we'll put on bond or put on an ankle bracelet, or

2    halfway house, all those things.

3           The problem is in a situation with such an extreme

4    risk of international flight, the means to flee, financial, a

5    place to go, and a huge motive to do so, that doesn't work.  If

6    someone cuts an ankle bracelet, we don't -- we don't get a --

7    our beepers don't go off.  We tend to learn about it a day or

8    so later.  The Canadian border is -- it's 7 hours to Winnipeg,

9    Your Honor.  That's just -- they just cannot do it.

10          And that's why pretrial's saying, recommending

11   detention.  They normally don't in cases.  They don't want to.

12   They do it as a last resort.  But they have to here.  They're

13   acknowledging that they can't reasonably assure his appearance

14   in court.  If he's released, who knows?  All bets are off.  He

15   has a reason to go.  He's taken some steps.  And I think it's

16   very significant, Your Honor, that we're not here in a vacuum.

17          We aren't -- we didn't charge the fraud case, the

18   underlying fraud case, and then ask -- I'm not asking for

19   detention just based purely on his ties abroad.  He submitted a

20   false passport application.  He did so in a way to hide the

21   fact from the Government that he was doing that.  And he didn't

22   do what so many defendants have done in this case, who retained

23   counsel and then ask their lawyer, Can I get my passport back?

24   And they called us up and they ask, Can my client get his

25   passport back?  And his wife get his [sic] passport back?  You

1  took his kids' passport.  Can you have that back?  He wants to

2  take a trip abroad.  Can he get his passport back for a couple

3  weeks?  Can we talk about this?

4          And when lawyers do that, we have those

5  conversations.  And sometimes we agree, and sometimes we don't.

6  But we have those conversations.  I'm certain that Mr. Farah

7  didn't talk to Mr. Birrell before he did this.  Obviously he

8  doesn't have to answer that.  He didn't do that because he

9  didn't want anyone to know.  That's why he lied in his passport

10  application.  That's why Mr. Ismail, his co-defendant -- or

11  his -- I guess not co-defendant, but his co-conspirator, his

12  business partner, did the same thing, at the same time, on the

13  same day, and the same place, and for the same reason, Your

14  Honor.  They wanted the option to leave the country and flee

15  these charges.

16          Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Thompson.

18          Mr. Birrell?

19          MR. BIRRELL:  Well, I'll begin with the pretrial

20  services report as the Government did.

21          Your Honor, the pretrial services report addendum in

22  its recommendation labors under a terrible misapprehension of

23  facts.  The last sentence in that says, "Additionally" -- first

24  of all, she begins by acknowledging this is a very difficult

25  choice for her.  That's how I read it.

1          Then she says at the end, "Additionally, at the time

2     of Farah's arrest for the instant offense, arresting agents

3     observed the unidentified man entering Farah's store, Empire

4     Cuisine & Market, carrying what appeared to be a stack of

5     passports."

6          That is not anywhere close to what actually happened.

7     First of all, Your Honor, he didn't get arrested at the store.

8     They made a deliberate decision not to arrest him, even though

9     they could have.  They had been -- had surveillance on his

10    place.  They didn't arrest him.  This person didn't show up

11    with a mitt full of passports for him and then they arrested

12    him.  I mean, I -- in 36 hours, I've done my best I can to

13    dismantle the false impression that was created in the

14    affidavit about these passports showing up at the store.

15         I mean, this was a completely, absolutely, innocuous

16    event.  And the FBI could have figured it out because they knew

17    whose car it was.  All they had to do was do exactly what I

18    did, which was have somebody go and talk to these people.  And

19    they would have discovered that these were just people that

20    were out looking for an apartment who had no other

21    identification and took it with them when they went to the

22    store, that the passports were back in the car, before the old

23    gentleman came back and greeted Mr. Farah out of, apparently,

24    some sort of respect.

25         So these passports that the person who wrote this

1    addendum appears to rely on had nothing to do with flight.

2    They did not occur at the time of the arrest.  Instead what

3    happened is that when the Savage police officer showed up at

4    the house in the middle of the night, he left his number, I

5    called him up, I asked him what was going on.

6              He said, Well, the FBI has an arrest warrant out for

7    your client, which I was quite surprised to hear.  I called Mr.

8    Thompson up on Saturday.  He called me back.  I said, All

9    right.  Well, we'll surrender him.  What do you want to do?  He

10   said, you know, he was out of the town.  I said, I'll have

11   him -- I told Joe that, Mr. Thompson.  I said, I'll have him

12   come back.  He said, Fine.  We'll meet you Monday morning,

13   10:00 -- or I don't think we knew at that time.  But sometime

14   Monday morning.

15             Get back here, he came back.  He knew what was going

16   to happen when he came back here.  He knew he was going to get

17   arrested.  He knew the Government was going to try to get him

18   detained, and he came back here anyways.  So on Monday morning,

19   we walked over, surrendered, and that's how we got here.

20   That's nothing like what the analysis in the pretrial services

21   report says, and I don't think that it's fair to rely on it,

22   given the information that has been produced at this hearing.

23             You know, what you've got here is a man who's a U.S.

24   citizen, who has a wife.  You can see from the report he has a

25   wife.  He's lived -- he's lived here since he was 2 years old.

1   Emigrated to Minnesota in 2005, has a business.  He has a

2   residence.  Has a wife, has two children; a baby, one month

3   old, and 3 years.  He also has a mother-in-law who has three

4   children who lives with him.

5        He has known since this execution of the search

6   warrant, which was January something, that, you know, the

7   federal government thought he did something very wrong.  I've

8   been representing him since January.  I've been working with

9   WayPoint since January.

10       The Government has its theory of the case, and we

11   absolutely adamantly dispute the Government's theory of the

12   case.  So the fact that 30 or so of the 34 pages in the

13   complaint are devoted to a case not charged under the theory

14   that, well, the defendant knows that he has this problem and

15   therefore has a motive to flee is wrong.  Because we don't see

16   the case the way the Government does.  It's not illegal in the

17   United States to make money.  It's not illegal to spend money.

18   It's not illegal to send money places.  You know, it's all

19   about how did you get the money.  And there's previous little

20   about that in the complaint affidavit.  And I would submit to

21   you there is nothing in there that shows this giant fraud

22   that's being alleged.

23       The point, though, for the detention is, Your Honor,

24   he doesn't have a motive to flee.  He has a motive to stay here

25   and fight, because that's what we're going to do.  We've spent

1    months preparing to fight, and that's what we're going to do.

2            You know, there are these civil In Rem actions that

3    are being instituted that were discussed.  He's hired counsel.

4    He's hired Tim Schupp at Meagher & Geer and they're handling

5    that.  They've answered -- or whatever you do.  I don't know.

6    They've initiated the process with the United States.

7            He has -- and that's important because as the Court

8    well knows, in a civil case you proceed at your own peril,

9    given the potential adverse inferences from not producing

10   evidence and the potential consequences from producing

11   evidence.

12           And so what's going on here is, you know, the

13   evidence that we have is that he's not going anywhere.

14   Assuming for the sake of argument that they've made probable

15   cause -- well, the Court has ruled probable cause.  Since they

16   have probable cause on the complaint, that's something we can

17   deal with.  But the fact is that his partner in some business

18   got on an -- tried to get on an airplane with seven bags in

19   April, which is very long after this ticket for Mr. Farah was

20   in place, which is important because you can't reach the

21   conclusion that he learned from what happened to the -- to Mr.

22   Ismail and therefore decided not to get on the plane.  Because

23   his ticket, which was never used, was about a month, give or

24   take a couple days, before Ismail got -- tried to get on a

25   plane and got arrested.  That's is what happened to him.

1          This is not like Ismail's case.  It's unfair to try

2    to paint Mr. Farah with the same brush because they apparently

3    had a business relationship.  But there's no evidence they went

4    down to the passport office together.  There's no evidence that

5    Mr. Farah ever tried to get on any plane.

6          And to point out some of the -- what I'd say are

7    fallacies in the Government's logic, yeah, you can get to

8    Winnipeg in seven hours from here.  If he wanted to go to

9    Winnipeg, he could have gone in three months.  Because as they

10   pointed out, he's got a place to go and a way to get there, I

11   guess.  But he didn't.  That's what we know, he didn't.  He

12   hasn't gone anywhere.  He's taken every conceivable step to try

13   to put himself in a position to defend these claims, and that's

14   what he wants to do.  He doesn't want to go anywhere.

15         And I would say in terms of his counsel, it would be

16   very much more beneficial to -- to vindicate his Sixth

17   Amendment right to counsel if he's available to me to help me

18   with the case, rather than sitting in the COVID cauldron out

19   there in Sherburne County talking to me on TV once in a while.

20   Maybe that was a little bit too dramatic.  But, you know, I

21   have a strong feeling about it.

22         He could have turned his car around on Saturday when

23   I talked to him and gone anywhere he wanted.  And what he did,

24   Judge, is he came back here like he promised to and turned

25   himself in.

1        And so the Government has not met anything like their

2    burden.  This is not a presumptive case.  They have the burden

3    to prove that there's a substantial likelihood that he's going

4    to flee.  They can't because if he was going to, he'd be gone.

5    He wouldn't be here today.  So thank you very much, Your Honor.

6        THE COURT:  All right.  Thank you, Mr. Birrell.

7        Mr. Thompson, since you have the burden, I'll give

8    you the last word, if you want it.

9        MR. THOMPSON:  Thank you, Your Honor.

10        Of course, it's all well and good that Mr. Farah now

11    today says he wants to fight.  Of course that doesn't explain

12    why he submitted a fraudulent passport application, and it's --

13    it's ironic, I suppose, that the Government is faulted for not

14    taking action immediately after he applied for the false

15    passport on March 22nd when the very nature of the lies that

16    the defendant's misstatements that he made on his passport

17    application were designed to achieve just that end.

18        Had he admitted it on March 22nd on the statement

19    regarding his lost passport that his prior, his preexisting

20    passport book and passport card had been seized by federal

21    agents during the execution of a federal search warrant, we

22    would have learned about it on March 22nd or 23rd, not two

23    months later.  He didn't.  He lied on it so we wouldn't find

24    out about it.  Thank you, Your Honor.

25        THE COURT:  All right.  Very well.  Thank you.

1          All right.  Here's what we're going to do.  I will

2     tell you my ruling on the issue of detention and I'll give you

3     some of the rationale for it, and then that will be followed

4     up, of course, by a written order.

5          First -- well, I am going to order that the defendant

6     be detained.  I am persuaded by the Government's argument that

7     Mr. Farah has a unique motive, unique means, and a place to go,

8     all of which make him, in the Court's judgment, a serious risk

9     of flight.  And I will comment on some of the issues in a

10    second.

11         I do not find and the Government hasn't argued nor

12    presented evidence on the question of whether there is a

13    condition or series of conditions that the Court could impose

14    that would reasonably assure the safety of the community, so my

15    order for detention is not based on danger to the community.

16    It is based entirely on assuring Mr. Farah's appearance at

17    future court proceedings so that he may, in fact, defend

18    himself on the charges.

19         Now, a couple of responses to things.  I do

20    acknowledge that the defendant has significant ties to the

21    community, but in this case on this evidence, I don't find that

22    those are enough, either in and of themselves or in combination

23    with the other evidence, to suggest that I can impose

24    conditions that will reasonably assure Mr. Farah's appearance.

25         And as to the four passports that are, at least

1   according to the evidence before the Court, the property of the
2   Hussein family, they are -- even if those are taken out of the
3   equation, and, frankly, I do take them out of the equation,
4   that does not, again, persuade the Court that I can impose
5   conditions sufficient to guarantee Mr. Farah's appearance,
6   because, really, the operative issue or the biggest issue with
7   the evidence is that Mr. Farah did apply for a passport, did
8   obtain a passport under, arguably -- and I'm not finding this,
9   obviously, he has a right to a trial on this charge -- but
10  arguably false pretenses obtained a passport, and that is the
11  far more compelling evidence before the Court.
12          And as to, you know, whether or not it's fair to
13  consider in this context Mr. Ismail's conduct, the evidence is
14  not -- on that point is not, again, at the heart of the matter,
15  though there is some evidence to suggest that Mr. Ismail and
16  Mr. Farah were coordinating efforts, and in that context, Mr.
17  Ismail's conduct is of some relevance to the Court's decision
18  here.
19          Lastly, I acknowledge that continued detention does
20  put a burden on the defense in terms of its ability to prepare
21  for trial.  It is always easier if the defendant is not
22  detained, but it is also not a violation nor an infringement on
23  his right to counsel or on his ability to prepare the case for
24  trial.
25          So with that, I am finding that there is no set of --

1    there are no conditions or set of conditions that I can impose

2    at this time that will reasonably assure Mr. Farah's appearance

3    at future court proceedings.

4            Mr. Thompson, I would ask in light of the Court's

5    comments and the evidence that the Government prepare an order

6    reflecting those findings.  And of course the Court will review

7    and edit as appropriate.

8            MR. THOMPSON:  Yes, Your Honor.  Thank you.

9            THE COURT:  All right.  Anything further for the

10   Government today, Mr. Thompson?

11           MR. THOMPSON:  Not from the Government, Your Honor.

12   Thank you.

13           THE COURT:  Anything further for the defendant, Mr.

14   Birrell?

15           MR. BIRRELL:  No, Your Honor.

16           THE COURT:  All right.  Thank you, everyone.  Court

17   is in recess.

18       *(WHEREUPON, the proceedings were adjourned at 11:31 a.m.)*

19       I, Brittany K. Blesener, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter, that the proceedings were recorded in

22   stenotype by myself and transcribed into writing by

23   computer-aided transcription, and that the transcript is a true

24   record of the testimony given to the best of my ability;

25                           Certified by: /s/Brittany K. Blesener
                                           Brittany K. Blesener, RPR

Brittany K. Blesener, RPR
651-808-7134