UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIM. NO. 22-124 (NEB-TNL)

United States of America,

        Plaintiff,

v.

Abdiaziz Shafii Farah,

        Defendant.

**DEFENDANT FARAH'S POST-HEARING MEMORANDUM REGARDING SUPPRESSION MOTIONS**

## Introduction

Mr. Farah moved to suppress evidence obtained by search and seizure from his house and vehicles on January 20, 2022. (ECF No. 33). As the matter pertained to a search warrant signed by Magistrate Judge Leung, this motion was heard by this Court—Magistrate Judge John F. Docherty—on August 26, 2022, for a motions hearing.

At the motions hearing, the government affirmed that it wishes to introduce just two items seized from these searches and seizures in its case-in-chief—a passport booklet seized from a GMC Sierra and a passport card seized from the residence. (Transcript of August 26, 2022 Motions Hearing (Hereafter "Tr.") at 4:14-22). The defense moves the Court for an Order suppressing both.

## Factual Summary

On January 20, 2022, the government executed a search warrant at Mr. Farah's residence in Savage, Minnesota. (Tr. at 9:24-10:9). The search warrant authorized the government to search the premises of Mr. Farah's home and to seize items—mostly

documents—as potential evidence. (*Id.*) It did not authorize the search of any vehicles nor any other items located outside of the home. (Tr. at 26:3-11).

That same day, the government executed a separate seizure warrant. Relevant to Mr. Farah, it authorized seizure of a vehicle, a GMC Sierra. It did not independently authorize agents to search the vehicle, only to seize it. (Tr. at 11:22-12:5).

One witness, SA Richard Frank, testified at the August 26, 2022 motions hearing. SA Frank testified that about a dozen personnel (including himself) arrived at Mr. Farah's house to execute the search warrant. (Tr. at 11:9-11). The GMC Sierra was parked outside the house, on the driveway. (Tr. at 12:4-7). Three other vehicles were parked inside the garage. (Tr. at 23:16-18). After SA Frank and other agents cleared the residence and attempted to take a statement from Mr. Farah, they began searching for evidence. (Tr. at 22:23-23:6). SA Frank began his search by looking inside the residence, later searched the GMC, before finally returning to search other parts of the residence. (Tr. at 23:10-15).[1]

SA Frank seized a handful of items from the GMC, such as a passport, cash, a bank envelope, an Apple watch, and "some bags of documents". (Tr. at 17:1-7). These items appear to have evidentiary value to the government. SA Frank acknowledged there were "other items in the car that [law enforcement] didn't document[.]" (Tr. at 20:2-4). This included "two large boxes […] I don't remember what they were but they looked,

---

[1] The government seized a great number of items from the residence. But, as the government represented that it was seeking to offer only one item seized from the residence (the passport card) in its case-in-chief, this memorandum will not discuss the other items.

just from a quick observation, they looked very, very heavy […] it didn't look pertinent to anything." (Tr. at 20:11-15). He later clarified that there may have been only one box or there may have been two—he did not remember. (Tr. at 30:5-13). He didn't lift up the boxes or box but noted "it seemed like it would have been heavy, just based on what I recall thinking at that moment." (Tr. at 30:17-21). He did not look inside the box or boxes. (Tr. at 30:17-23). He did not know if sensitive, unique, valuable, or dangerous items were inside. (Tr. at 31:6-8). He did not remember why he chose not to look inside. (Tr. at 31:3-5).

 SA Frank also acknowledged that he did not know whether there were documents in the car that were not seized. (Tr. at 29:11-13). Likewise, he did not know if items like an insurance card, a registration card, or owner's manual were present in the GMC. (Tr. at 29:14-19). He did not know whether there were clothes in the GMC. (Tr. at 37:22-25). He did not know whether there were tools in the GMC. (Tr. at 29:24-30:1). He didn't recall if a spare tire was present and noted he didn't "think [he] would have been looking" under the bed of the truck where it would be stored. (Tr. at 29:20-23).

 SA Frank acknowledged that the FBI has guidance—written policies and procedures—on how to conduct inventory searches. (Tr. at 34:19-21). He acknowledged that he reviewed these policies before testifying but did not review them before conducting his search that day. (Tr. at 35:1-6). He acknowledged the guidance was to "look at everything that's reasonably accessible within the vehicle" (Tr. at 36:13-15). He was unclear about other parts of the guidance. For example, he did not know whether or not the policy mandated that agents "have to complete a written summary of the results of

3

an inventory search". (Tr. at 41:10-13). He was also unsure when asked "how you're supposed to record the evidence or record the information, the objects within the vehicle"—he acknowledged there was guidance and testified he "believe[d] that there's a form," he didn't "remember the number off the top of [his] head", and that he "believed" the guidance "said it can be used". (Tr. at 36:16-25). He acknowledged law enforcement could have printed out this form but just didn't have one that day. (Tr. at 37:1-6). They thus chose to use not just the same type of form used in search warrants generally, but the same exact evidence log being utilized when cataloging items recovered under the residential search warrant. (Tr. at 27:11-18).

SA Frank acknowledged that when he or other agents identified an item *inside the house* they wanted to log as potential evidence, they would use a marker to identify what it was, take a photograph of it, and bring it to another agent inside the home (SA Chandler) who would process it on an "evidence collected item log." When SA Frank seized items from *the vehicle*, he followed the exact same process—marking the item, bringing it inside the house, and giving it to SA Chandler, who would log it on the same document. (Tr. at 34:4-18). He acknowledged that the items were in that way "intermingle[d]." (Tr. at 28:14-15).

This guidance is not in the record before the Court. Nor are other FBI policy and procedure documents relating to inventory searches.

## Argument

1. **The government search of Mr. Farah's vehicle was a warrantless search the government has *post-hoc* wrongly attempted to justify as an inventory search.**

**Because the search of the vehicle was without warrant and no exception applied, the passport seized therein should be suppressed.**

A. *Legal Standard – Warrantless Inventory Searches*

The government had a search warrant for Mr. Farah's residence, but (as it acknowledges) that warrant did not authorize law enforcement to search Mr. Farah's GMC parked in the driveway. Accordingly, that search was a warrantless search.

The Fourth Amendment jurisprudence is well established. "The 'cardinal principle' in Fourth Amendment search and seizure jurisprudence is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Riedesel*, 987 F.2d 1383, 1388 (8th Cir. 1993) (quoting *Mincey v. Arizona,* 437 U.S. 385, 390 (1978)).

The government justifies the search exclusively by relying on the inventory exception to the warrant requirement. (ECF 44 at 3). In *United States v. Caskey*, Criminal No. 11-301 (JRT/LIB) (D. Minn. Jan. 3, 2013), Chief Judge Tunheim discussed, in some detail, the law around inventory searches. He acknowledged that "[t]he inventory search exception 'permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search.'" *Id*. at *7 (quoting *United States v. Garreau,* 658 F.3d 854, 857 (8th Cir. 2011)). However—as with other exceptions to the warrant requirement—the government bears the burden of showing the exception applies. For inventory searches, this is a two-part burden. "The United States bears the burden of producing evidence that impoundment and permissible

5

inventory search procedures were in place and that law enforcement complied with those procedures." *Id*. at *8; *accord United States v. Kennedy*, 427 F.3d 1136, 1144 (8th Cir. 2005). Notably, while the search need not "be made in a 'totally mechanical' fashion." *Id*. at 1143 (citation omitted), "the police may not raise the inventory-search banner in an after-the-fact attempt to justify what was, […] purely and simply a search for incriminating evidence." *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993). This is exactly the case here.

> B. *The government has failed to meet its burden of proving both that inventory search procedures were in place and that those procedures were complied with*

Rather than meeting its burden, the government has essentially repeatedly asserted that the search in question was an inventory search. But this assertion does not make it so as courts need to be able to exercise their judicial oversight function. The government has not presented information to allow the Court to affirm that its conduct was proper.

The government informed the Court that there were written FBI policies and procedures in place governing inventory searches but has not put those policies in the record or otherwise provided those policies to the Court. While Courts have—at times—affirmed inventory searches done pursuant to *unwritten* policies, Counsel has not identified any precedential cases where a Court affirmed an inventory search done pursuant to a *written* policy when that policy was not provided to the Court.

The Court was only informed of those policies through one Agent's testimony—an Agent who candidly expressed that he did not know the details of those policies and was only able to testify about it generally. If the Agent did not know, for example,

6

whether the policy mandated that agents "have to complete a written summary of the results of an inventory search", (Tr. at 41:10-13), how can the Court know what is in the policy? The paucity of information means the Court cannot even take the first step necessary to affirm an inventory search: it cannot clearly articulate what the procedures to be followed were. By even stronger logic, then, the Court cannot conclude that the government met its burden of showing that law enforcement properly complied with the procedures. Instead, we know that in at least one way the policy was *not* followed as SA Frank agreed that "the guidance is to look at everything that's reasonably accessible within the vehicle" (Tr. at 36:13-15). SA Frank did not even do that.

Even if the search that happened actually *was* an inventory search, the government has not provided the Court the information it needs to reach that conclusion.

C. *The search was an evidentiary search*

But, on the record, it is instead clear that the search that took place was not an inventory search. The record shows the search of the GMC was a *de facto* extension of the residence search. The vehicle search was conducted at the same time, by the same agents, in the same manner, seeking the same evidence, as the residence search.

The time the search of the GMC took place at, while perhaps not fatal for the government, is telling of the motivation for the search. SA Frank acknowledged that he and other agents began searching the house. At some point during the execution of the search warrant, he left the house and began searching the GMC on the driveway. When he completed that search he went back inside the house to continue searching for evidence. The government's proffered explanation for this sequence of events—that SA

7

Frank began searching for evidence, ceased that search to conduct an inventory search, then after that inventory search resumed searching for evidence—is not logical. It is instead logical to conclude SA Frank was searching for evidence during this entire period.

While searching the GMC, SA Frank made decisions on what would be seized and catalogued and what would not. When he saw an object in the GMC and decided not to seize it, he did not even record on any documentation that the object was present. He simply ignored it. The decisions he made regarding what to seize and what to ignore also show the search was evidentiary in nature. SA Frank seized cash, a passport, and banking records—all items identified in the residential search warrant as potential evidence—as well as "a copious amount of documents." On the other hand, he saw two large boxes in the back (or possibly one, he could not remember) and just let them be. He did not even look in the boxes despite acknowledging there could be sensitive, unique, or valuable items inside. He also did not know whether the GMC contained items such as tools, clothing, insurance, and registration information. These actions are consistent with an evidentiary search and inconsistent with an inventory search. The *bare minimum function* of an inventory search is to identify what items are present—the fact that SA Frank did not know, and cannot now say, what was in the vehicle is telling.

Further, if law enforcement truly was motivated about safety and protecting valuable items, they would have been *especially* concerned about items like large heavy

boxes stored in the back of the vehicle.[2] The fact that they were more concerned about stacks of documents shows that agents were looking for evidence of fraud.

Further, SA Frank's actions before and during the search show that his intention when searching the vehicle was to look for evidence, not to conduct an inventory. SA Frank did not review the FBI guidance for conducting inventory searches before executing the search. He chose not to print off the standardized form that can be used for inventory searches and instead logged the items seized on an "evidence collected item log." This was not just the same *type* of form used for evidence collected pursuant to the residential search warrant; it was the same actual document, and SA Frank "intermingled" the entries together regardless of whether the documents were seized from the house or the GMC.

Finally, the actual process of seizure was exactly that of an evidentiary search. When agents seized an item from the home pursuant to the search warrant, they would identify the item with a marker, photograph it, and bring it to SA Chandler, who would catalogue the item. It was just the same when SA Frank seized an item from the GMC– he would mark it, photograph it, and bring it inside the house to SA Chandler, who would catalogue it in the same manner on the same document. All the items would then be stored together. The searches were the same.

---

[2] SA Frank testified, for example, that inventory searches are made in part because "We never know what's in there. I mean, we've encountered loaded firearms before. And, like, if it's a certain type of firearm and it's -- if you, as I was trained, if it's like an assault rifle and it's involved in an accident, it can actually discharge and go through that vehicle into another vehicle into another vehicle, et cetera, et cetera, and that would not be at all what we would want either."

Precedent shows this Court would be on solid ground if it orders the evidence obtained from the vehicle suppressed. *See, e.g., United States v. Kennedy*, 427 F.3d 1136, 1144-45 (8th Cir. 2005) (suppressing evidence where government established that written policies were in place and provided them to the Court, but the Court concluded agents did not comply with the policies); *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) (suppressing evidence where officer did not create a detailed inventory of the items found in the vehicle, when there was also evidence of investigatory intent); *Caskey*, *supra* p.5 at *13 (suppressing evidence where government failure to show substantial compliance with written policies, noting "the United States asks the Court to draw too many assumptions on its behalf… The Court is not permitted to assume that the United States could meet its burden of showing compliance with inventory search procedures[.]").

Here, suppression is warranted under even stronger reasoning. Not only has the government failed to meet its burden of proving that standardized inventory procedures were dutifully followed, the record shows this was a search for evidence. In the morning of January 20, 2022, SA Frank did not review the procedures for conducting an inventory search. He did not even think to bring the forms typically utilized for an inventory search. He searched the vehicle literally *in the midst of* searching the house. He searched the vehicle in the same manner he searched the house. When he found evidence from the vehicle he recorded it in the same manner and on the same form as he did when conducting an evidentiary search. He seized exactly the kind of evidence the government was looking for elsewhere—e.g., documents and a passport—while not even looking in large, heavy boxes and not thinking to record whether tools, clothing, or anything else

was present. This was a warrantless search for evidence and suppression of the evidence obtained from the vehicle—specifically, Mr. Farah's passport—is appropriate.

2. **The government's seizure of a passport card from Mr. Farah's residence was beyond the authority provided by the warrant, that passport card should be suppressed.**

Counsel, in Mr. Farah's pre-hearing memorandum, presented the argument that law enforcement exceeded the scope of the residential search warrant when it seized his passport card. The defense argued that the search warrant only authorized seizure of "Records reflecting business or personal travel, including passports" and a *passport card* does not fall into this category because it does not reflect business or personal travel (a passport booklet shows where a person has been but a passport card does not). Further, a passport card has a different form than a passport (as a passport card is only a small plastic card with a few pieces of identifying information) and a different function (as a passport card essentially only allows travel between Canadian/Mexican borders). At the motions hearing this was presented as a purely legal argument—no facts were adduced.

Since the hearing, Counsel has identified *United States v. Torres*, 920 F.3d 1215 (8th Cir. 2019). The defendant in that case sold a passport card and received an enhanced sentence for a guidelines prong referencing "fraudulently obtain[ing] or us[ing] … a United States Passport." She presented the argument that a passport card was not a passport, as "the phrase 'a United States Passport' refers only to a passport book." The Eighth Circuit disagreed, holding that "despite its different physical appearance, a passport card is as much a 'United States passport' as its blue-covered counterpart." *Id*. at 1217.

The defense but recognizes that binding Eighth Circuit authority is contrary to our legal position, but the defense persists in our argument as we believe the *Torres* panel erred and wish to preserve the issue for further judicial review. Accordingly, we persist in the motion.

## Conclusion

For the foregoing reasons, the defense respectfully submits the evidence in question should be suppressed.

Respectfully submitted,

Dated:   September 8, 2022

/s/ Ian S. Birrell
Andrew S. Birrell (Attorney No. 133760)
Ian S. Birrell (Attorney No. 0396379)
**Birrell Law Firm PLLC**
333 South 7th Street, Suite 3020
Minneapolis, MN 55402
Phone: (612) 238-1939
andy@birrell.law | ian@birrell.law
*Attorneys for Defendant*