UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIM. NO. 22-CR-124-1(NEB/TNL)

---

United States of America,

          Plaintiff,

v.

Abdiaziz Shafii Farah (1),

          Defendant.

**DEFENDANT ABDIAZIZ SHAFII FARAH'S MOTION FOR RECONSIDERATION OF DETENTION PURSUANT TO 18 U.S.C. 3142(f)(2)(B) AND DEMAND FOR SPEEDY TRIAL**

---

## INTRODUCTION AND SUMMARY OF ARGUMENT

About four-and-a-half months ago, Mr. Farah was charged with one count of making a false statement in a passport application. Mr. Farah self-surrendered after being told an arrest warrant was issued. This Court—both the Honorable Judge David T. Schultz and, on defendant's appeal, the Honorable Judge Nancy E. Brasel—ordered Mr. Farah detained pending trial on that count. That case appeared to be heading to trial quickly. That was a one-defendant, one-count indictment, and discovery was minimal (a few hundred pages of material). Now, and after nearly five months in jail, and with a new superseding indictment, the detention analysis has changed markedly. Mr. Farah respectfully submits the Bail Reform Act's statutory requirements and the United States Constitution both require this Court to Order him released pending trial.

The facts surrounding the unsealing of these indictments fundamentally change the detention equation. The government has yet to produce any discovery—and doesn't know when it will—but acknowledged discovery will be "millions of pages" and the demands

of the Speedy Trial Act will not be practical for it to meet (ECF No. 11). The Court recently designated the case as complex, and ordered the parties to meet and confer about a case management schedule by November. (ECF No. 125). We are very far from trial in this case despite Mr. Farah's hopes to have that trial as quickly as possible. Mr. Farah faces the prospect of languishing in a county jail for years as an American Citizen who is presumed innocent, in a case alleging nonviolent fraud where detention is *not* presumed, where he has no meaningful criminal history, no history of violence, no history of non-appearance for Court, and where he an objective assessment found he has a 1% chance of failure to appear (*See* previously-flied-objection, ECF No. 17 at 4, 11). This is striking because Mr. Farah self-surrendered when he found out an arrest warrant had been issued.

Mr. Farah respectfully submits that continued detention would not only be inappropriate under the statutory terms of the Bail Reform Act but would also violate the United States Constitution.

## ARGUMENT

1) <u>Legal Standard</u>

The Bail Reform Act anticipates a district court's reconsideration of detention orders in two ways:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required […].

18 U.S.C. § 3142(f)(2); and

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142(i)(4).

Regardless of statutes such as the Bail Reform Act, a defendant's pretrial detention must meet the demands of the Constitution—and, if it does not, the defendant must be released. *See, e.g., Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 180 (1803) ("a law repugnant to the constitution is void"); Here, release is not just required by these statutory prongs; it is required under (1) the Fifth Amendment's Due Process Clause; (2) the Sixth Amendment's Speedy Trial requirement; and (3) the Fifth Amendment's Equal Protection requirements.

2) <u>Release is appropriate under § 3142(f)(2) because the Superseding Indictment brings a "sea change" of previously unknown information.</u>

The above statutes make it clear that a Court's decision on detention may be revisited when there is new information that has a material bearing on the detention calculus. Here, there are multiple pieces of new information before the Court:

*First,* the trajectory of the original indictment is completely different than that of the superseding indictment. Instead of a straightforward one-count prosecution, Mr. Farah now faces a remarkably fact-intensive and lengthy prosecution.

Before the superseding indictment was filed, the one-count indictment against Mr. Farah appeared to be progressing toward trial. Mr. Farah had been detained more than

four months. The defense had been provided discovery, counsel had reviewed that discovery, and the pretrial motions had been made, argued, and briefed.

Now, after Mr. Farah has been superseded in an 8-defendant, 43-count indictment, the case is undoubtedly very far from trial. At this time, some of Mr. Farah's co-defendants have not even had an attorney enter an appearance in this case. Before trial is to take place: each defendant must acquire representation by one or more lawyers, the Court must issue scheduling orders, the government must produce the discovery, the lawyers and defendants must have an opportunity to review the discovery and make relevant pretrial motions, those motions must be heard and ruled upon by the Magistrate Judge, the Magistrate Judge's report and recommendation may be objected to, and, if so, those objections must be heard by the Article III Judge, expert witnesses must be retained, consulted, and have a chance to review the discovery, trial-related motions and motions *in limine* must be heard, and the schedules of this Court, eight defendants, and dozens of lawyers must be coordinated for what will likely be a very lengthy trial. Per the Court's recent Order—this process won't begin until at least November, when the parties have a meet-and-confer deadline by. (ECF No. 125).

The duration of the prosecution is especially worrisome here given this case appears to be one of the more complex, fact-intensive cases in the history of the district. On September 27, 2022, the government moved to designate the case against Mr. Farah and his new co-defendants as complex. The government noted that discovery in this case will be incredibly voluminous and will eventually include:

- more than 600 grand jury subpoenas, including subpoenas for financial statements, hundreds of bank accounts and credit card merchant accounts;

- hundreds of reports documenting interviews of hundreds of witnesses;

- records surrounding physical search warrants for 32 businesses and residences in which approximately 380 electronic devices were seized;

- records from more than 45 email accounts—searched pursuant to warrant—in which the government obtained more than a quarter-million emails.

- The government acknowledged "In all, the government will be producing millions of pages of discovery."

The government has not yet produced any discovery, so the defense cannot say how many millions of pages will eventually be produced or when that production will take place. But all of these trial-related considerations are material factors new since the Court issued its detention order.

Another new material fact is the status of the co-defendants. On September 20, 2022, the government unsealed indictments against a total of 47 defendants. In summary, the government alleged the 47 people had roles "in a $250 million fraud scheme that exploited a federal-funded child nutrition program during the COVID-19 pandemic." This was headlined by the allegations against Aimee Bock, "the founder and executive director of Feeding Our Future […who allegedly] oversaw the $240 million fraud scheme carried out by sites[…]." US DEPARTMENT OF JUSTICE, *Press Release*, Sep. 20, 2022 (available at https://www.justice.gov/opa/pr/us-attorney-announces-federal-charges-against-47-defendants-250-million-feeding-our-future). Despite these allegations, Ms. Bock—who appears to be Caucasian—was released pending trial (indeed, the Court did not even impose location monitoring requirements). In total, it appears that of the 47

charged defendants, only 2 have been detained. These are material new factors not known to the Court when making its initial detention decision.

Also notable is that Mr. Farah has already spent time in detention. Over the last four-plus months, 45 of these individuals were free, while Mr. Farah was sitting in jail preparing for a trial that is now indefinitely continued. Given that defendants charged together in a conspiracy are almost always tried together, this new indictment effectively "resets" Mr. Farah's progress. *See, e.g., United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002) ("it will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators."). The Court, of course, did not know this at the time it issued its detention order.

3) *Multiple Constitutional provisions mandate Mr. Farah be released.*

Mr. Farah's release is not just appropriate under the statutory framework of the Bail Reform Act. It is mandated by multiple fundamental constitutional rights.

    a. *Continued detention violates Mr. Farah's Fifth Amendment's Due Process liberty protections.*

Combining the government's two positions—one, that Mr. Farah should be in jail until trial occurs, and two, that the case is so complex that a speedy-trial is just not tenable—produces a simple logical result. That Mr. Farah, a presumptively innocent American citizen,[1] will be in jail for a very long time without a finding of guilt. This violates the Fifth Amendment's due process clause.

---

[1] *See* 18 U.S.C. § 3142(i) ("Nothing in this section [the Bail Reform Act] shall be construed as modifying or limiting the presumption of innocence.")

Liberty is the norm in our society when someone has been accused of a crime. "These long periods of pretrial detention are anathema to our basic notions of due process." *United States v. Gallo*, 653 F. Supp. 320, 343 (E.D.N.Y. 1986). Indeed "a pretrial detainee has a right under the Due Process Clause to be free from punishment before his guilt is adjudicated." *Tate v. Parks*, 791 F.App'x. 387, 390 (4th Cir. 2019). Pretrial detention, when it lasts sufficiently long, becomes an unconstitutional form of punishment. *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986).

Federal Appeals Courts have found there is not a specific bright-line limit on how long a person must be jailed before it is unconstitutional. *See, e.g., United States v. Taylor*, 602 F.App'x. 713, 717 (10th Cir. 2015); *United States v. Briggs*, 697 F.3d 98, 101 (2d. Cir. 2012). Courts instead take a case-by-case review. The Eleventh Circuit has acknowledged "at some point and under some circumstances, the duration of pretrial detention becomes unconstitutional." *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) (quotation omitted).

Again, Mr. Farah has already been in jail for more than four months which is a significant amount of time. It is already longer than Congress contemplated in drafting the Speedy Trial Act):

> The Court begins by observing that "Congress expressed in the Speedy Trial Act a preference that the trial of incarcerated defendants should begin within ninety days after the start of detention." *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir.1986) (citing 18 U.S.C. § 3164(b)). Although Congress has excluded certain types of delay from this ninety-day limit, *see* 18 U.S.C. § 3161(h) & 3164(b), this three-month period, "representing the considered view of the Congress as to the normal limit on pretrial detention, provides at least a point of reference in [the Court's]

7

consideration of the constitutional limit on such detention." *Gonzales Claudio*, 806 F.2d at 340-41.

*United States v. Hofstetter*, No. 3:15-CR-27-TAV-CCS, at *10-11 (E.D. Tenn. Sep. 14, 2017). Mr. Farah has already been jailed longer than that considered view thought appropriate. Given that trial will be a long time from now, the Constitution will be violated if the Court does not act.

> b. <u>Continued detention will violate Mr. Farah's Sixth Amendment Speedy trial rights.</u>

Mr. Farah fully asserts his Speedy Trial rights under the Sixth Amendment to the United States Constitution, which affirms "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. AMEND. VI. This right is separate, distinct, and greater than the statutory speedy trial analysis. The leading Supreme Court case discussing this case is *Barker v. Wingo*, 407 U.S. 514 (1972). There, the Court identified a four-factor inquiry to determine whether the Sixth Amendment was violated:

> (1) whether delay before trial was uncommonly long; (2) whether the government or the criminal defendant is more to blame for the delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether he suffered prejudice as a result of the delay.

*Id*. at 150 (as summarized in *Doggett v. United States*, 505 U.S. 647, 651 (1992)).

The defense submits that this four-factor inquiry strongly supports release. As to factors one to three: the delay in this case is very likely to be uncommonly long, the defendant has not contributed to the delay (the timing of the indictment, for example, is

8

entirely the responsibility of the government; as is its inability to provide discovery) and Mr. Farah is fully asserting his right to a speedy trial.

As to the fourth factor –"prejudice to the defendant [which] is the most important factor[,]" *Balderas v. State*, Civ. No. 07-1311 (JNE/JSM) (D. Minn. Jan. 23, 2008), here *Barker* speaks loudly. It identified three specific interests "which the speedy trial right was designed to protect […] (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532.

Pretrial proceedings like these are exactly what the founders had in mind when they drafted the Sixth Amendment. The reality of "oppressive pretrial incarceration" in a local county jail looms large. Mr. Farah's anxiety and concern are immense as he faces this highly public prosecution with his wife and two young children waiting at home. And while officials at Sherburne County Jail dutifully *try* to help jailed people have reasonable access to their case materials, the Jail does not have the multimedia capacity to manage—for just one of its many incarcerated people—electronic copies of 380 electronic devices, more than a quarter-million emails across 45+ email accounts, and "millions" of pages of discovery.

Mr. Farah's inability to meaningfully participate in formulating his defense is a grave constitutional matter under the Sixth Amendment. Chief Judge Weinstein has previously noted:

> The quality of the detainee's legal defense is likely to diminish dramatically as long as he or she is incarcerated. The interlude between arraignment and trial is "perhaps the most critical period of the proceedings . . . when

9

consultation, thoroughgoing investigation and preparation. . . . [are] vitally important. . . ."

*U.S. v. Gallo*, 653 F. Supp. 320, 337 (E.D.N.Y. 1986) (*quoting Powell v. Alabama,* 287 U.S. 45, 57 (1932)). The Supreme Court has recently made clear that the Sixth Amendment's right to the assistance of counsel is a *personal* right which in "grant[ing] to the accused personally the right to make his defense," is clear that the defendant is the one who leads his defense: the Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." (*McCoy v. Louisiana*, 138 S.Ct. 1500, 1508 (2018) (*quoting Faretta v. California*, 422 U.S. 806 (1975)). The Sixth Amendment's Speedy Trial requirement thus requires release.

   c. <u>Continued detention violates Mr. Farah's Fifth Amendment Rights to be free from discrimination and to enjoy equal protection under the law.</u>

Mr. Farah is a naturalized United States citizen who was born in Somalia in 1988, was brought to a Kenyan refugee camp in about 1990, and immigrated to Minnesota in 2005. He has lived here since. But the prosecution explicitly used Mr. Farah's national origin as a weapon in support of its detention argument, arguing:

> "[…] most of us have nowhere to go. You know, you can't just move or no one wants to just move to some country they've never been to, where they don't speak the language, where they don't know anyone, where they've never been, to be a fugitive. That's not what the situation is here. Mr. Farah was raised in Kenya. His father is in Kenya. […] He has a place to go, which is unlike almost -- probably 99 or more percent of the defendants that appear before Your Honor, he has somewhere to go. And it's a place where if he went, we could not get him back. The odds of extraditing from Kenya are miniscule. It's not -- it just doesn't happen. When we have people flee to that part of the world, we don't get them back[…]"

10

(Transcript of May 25, 2022 Detention Hearing before Magistrate Judge Schultz; ECF No. 15, p.58:2-19).

Notably, the prosecution has the facts blatantly wrong—not only does the United States have an extradition treaty with Kenya, court records show multiple extraditions from Kenya to the United States (*see, e.g., United States v. Abdalla*, 317 F.Supp.3d 786, 789 (S.D.N.Y. 2018) (two brothers arrested in Kenya and extradited); *United States v. Henry*, 821 F. Supp. 2d 249, 252 (D.D.C. 2011) ("Henry was arrested in Kenya on September 20, 2002 and extradited to the United States[.]")). Indeed—just last year—the United States Attorney for the Southern District of New York issued a press release discussing how a Kenyan national was arrested by Kenyan authorities and was being extradited to the Southern District for trial. US ATTORNEYS OFFICE: SOUTHERN DISTRICT OF NEW YORK, *Press Release*, Jan. 25, 2021 (available at https://www.justice.gov/usao-sdny/pr/us-attorney-announces-extradition-kenyan-national-large-scale-trafficking-rhinoceros). It is unclear what basis the prosecution had for the claims above.

The most fundamental right of a United States Citizen, whether naturalized or native-born, is their right to liberty. Using the fact that a citizen was raised in another country, in a "part of the world" where "[w]hen we have people flee[…]we don't get them back" as a reason to constrain his liberty violates that citizen's equal protection rights. Mr. Farah fully asserts those rights. It is not surprising that Mr. Farah still has family members in Kenya. He immigrated from there before becoming a citizen. What is, instead, surprising is the fact that the government has weaponized the fact that he was born abroad in its detention argument.

Furtherr, the lead defendant in the case (Ms. Bock), who—according to the government "oversaw" the operation—and who does not appear to have foreign national origin ties—is not detained (and not subject to location monitoring).

The Fifth Amendment equal protection rights (as summarized by a District Court in Arkansas this August) are well established in the Eighth Circuit and across the United States.

> The Fifth Amendment does not contain an explicit equal protection clause, like the one found in the Fourteenth Amendment. Nevertheless, it is "settled that the concept of due process of law prohibits the federal government from discriminating against any person on such irrelevant and invidious grounds as race, color, religion, or national origin." *Johnson v. Alexander*, 572 F.2d 1219, 1220 (8th Cir. 1978) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). The Eighth Circuit refers to this as the "equal protection component of the Fifth Amendment due process clause," *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 952 (8th Cir. 2004)[.]

*Hendley v. Weaver*, 2:20-CV-00044-BSM-JTR, at *1 n.4 (E.D. Ark. Aug. 1, 2022).

These issues fall squarely into the national origin category: the Minnesota Human Rights Act, for example, "defines 'national origin' as 'the place of birth of an individual or of any of the individual's lineal ancestors.'" *Udoeyop v. Accessible Space, Inc.*, Civil No. 08-4743 (JNE/JJK) (D. Minn. Oct. 21, 2008) (*citing* Minn. Stat. § 363A.03, subd. 25). It would be wrong and unlawful to use the fact that Mr. Farah is from Kenya and has relatives in Kenya in an employment context, or to deny him other opportunities in the law. It would likewise offend the Fifth Amendment to use it against him in detention analysis.

> 4) *Release is appropriate under § 3142(i) because Mr. Farah, given the unique facts of the case, cannot fully participate in his defense while detained.*

Mr. Farah's continued detention impairs his ability to defend himself. This compels release under both the Sixth Amendment and under 18 U.S.C. § 3142(i). In order to vindicate these rights, he must be afforded the opportunity to fully participate in his own defense. The alternative, his attorneys reviewing millions of pages of documents with him over Zoom, is just not realistic.

## CONCLUSION

The Court is aware of Mr. Farah's personal factors and this memorandum will not rehash them in detail. But a quick overview of them shows that Mr. Farah's motion for release is not just supported by statutes and constitutional provisions—it is also fair.

Mr. Farah has lived in the United States for over fifteen years. He is a University of Minnesota graduate and, until his incarceration, lived in Savage with his wife and two young children. He has no real criminal history, no history of nonappearance, no history of violence. He has been working with lawyers and private investigators to conduct a parallel investigation and defend himself against these charges since January. In these eight months he has not attempted to flee—instead, when he found out there was a warrant out for his arrest he returned to Minneapolis and surrendered to the United States Marshals despite knowing the government would seek to keep him in jail pending trial. The pretrial risk assessment—"an objective, quantifiable instrument that provides a consistent and valid method of predicting risk"—places him at the lowest risk category, with a 1% chance of failure to appear.

The proposition that Mr. Farah will act differently next time—abandoning his wife and children to flee his home, even though the last free action he took was to surrender himself to the United States Marshals—is not supported by the facts. In this case, which is not a presumed detention case, release subject to conditions (such as location monitoring) is required under the statutory analysis and required by the United States Constitution.

Respectfully submitted,

Dated:   October 3, 2022

/s/ Andrew S. Birrell
Andrew S. Birrell (Attorney No. 133760)
Ian S. Birrell (Attorney No. 0396379)
**Birrell Law Firm PLLC**
333 South 7th Street, Suite 3020
Minneapolis, MN 55402
Phone: (612) 238-1939
andy@birrell.law | ian@birrell.law
*Attorneys for Defendant*