## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-0124 (NEB/TNL) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Abdiaziz Shafii Farah (01), | |
| Defendant. | |

This case is before the undersigned United States Magistrate Judge on Defendant Abdiaziz Shafii Farah's Motion to Suppress Evidence (Dkt. No. 33). The motion has been referred to the undersigned Magistrate Judge for a Report and Recommendation because the Magistrate Judge assigned to this case, the Honorable Tony N. Leung, signed both the search warrant and the seizure warrant at issue in the motion. (*See* Dkt. Nos. 47 and 48.) All other pretrial motions in this case remain with Magistrate Judge Leung.

A motion hearing was held on August 26, 2022. Assistant U.S. Attorneys Harry Jacobs and Joseph Thompson represented the United States. Ian Birrell and Andrew Birrell, Esqs., represented Defendant Abdiaziz Shafii Farah. One witness, FBI Special Agent Richard Frank, testified. At the hearing, the defense represented, without contradiction from the United States, that the evidence at issue in the two motions to suppress was a United States passport card found in Mr. Farah's house and a United States passport book found in a vehicle, a GMC Sierra, that was parked in the driveway of Mr. Farah's house. The challenge to the passport card can appropriately be limited, since Mr. Farah's challenge

to the seizure of the passport card is that the seizure exceeded the scope of the search warrant. Because the challenge to the passport book found in the Sierra is a challenge to the constitutionality of the entire search, however, the Court's recommendation as to the passport book extends to all evidence seized from the Sierra.

Following the hearing, further briefing was submitted by Mr. Farah (Dkt. No. 56) and the United States (Dkt. No. 87). For the reasons set forth below, the Court recommends that the Motion to Suppress be granted in part and denied in part. Specifically, the Court recommends that the portion of the motion seeking suppression of evidence seized from the Sierra be granted, but that the portion of the motion seeking suppression of evidence seized from Mr. Farah's home be denied.

## BACKGROUND

On January 20, 2022, roughly a dozen FBI agents and other personnel arrived at the Savage, Minnesota, home of Mr. Farah. (T. 9-11).[1] The FBI was investigating allegations of fraud and had arrived to search Mr. Farah's house pursuant to a search warrant and to seize several vehicles pursuant to seizure warrants, including the Sierra whose search is at issue. The parties agreed that the Court could take judicial notice of the search warrant and the search warrant return. (T. 46.) Those documents were attached to the United States' pre-hearing response to Mr. Farah's motions as Government Exhibit A (Dkt. No. 44-1) and

---

[1] "T." refers to the official transcript of the August 26, 2022 motions hearing in this case. The transcript is currently filed under seal, but neither party has requested any redactions, and in this Report and Recommendation the Court has not set forth any personal identifiers or confidential information.

Government Exhibit B (Dkt. No. 44-2). The seizure warrant for the Sierra was not offered into evidence. The Form FD-597 Receipt for Property, comprising the latter six pages of Government Exhibit A, was provided to the Court and defense counsel as a potential prosecution exhibit before the hearing; however, after a colloquy between the Court and counsel at the close of the hearing, the United States decided it would not seek the admission of the Form FD-597 Receipt for Property. (T. 46.) Counsel for the United States premised its position on the Court taking judicial notice of "the search warrant," and a search and seizure warrant for 1xxxx Hampshire Lane in Savage, Minnesota, is the first page of Government Exhibit B.

Among the FBI agents searching the house and seizing the Sierra on January 20 was Special Agent Richard Frank, who was the sole witness at the motions hearing. Special Agent Frank testified that he began his FBI career as an analyst in 2015 and became a Special Agent in 2019. (T. 8–9.) He is now assigned to a cybercrime squad in the Minneapolis FBI office. (T. 8.) He estimated that he has been involved in 20 to 30 search and seizure warrant executions during his time with the FBI. (T. 9.) Over and above his regular duties, since 2021 Agent Frank has been a member of the FBI Minneapolis Division's Evidentiary Response Team, meaning he has had additional training in search and seizure and is on call for evidence collection in situations requiring extra personnel. (*Id.*)

Special Agent Frank testified that he participated in the execution of both the search warrant for the house and the seizure warrant for the Sierra. Although he was aware that the FBI has written procedures that govern inventory searches of vehicles, and has been

trained on those policies, he did not review those policies before January 20, but did review them in preparation for his motions hearing testimony. (T. 34–35.) Special Agent Frank described the FBI's vehicle inventory policy as "to look at everything that's reasonably accessible within the vehicle" with the three goals in mind of protecting the defendant's rights, protecting the FBI from false claims of loss or theft, and safety. (Agent Frank illustrated the objective of safety by using the example of a vehicle with a loaded gun inside.) (T. 35–36, 38–39.) Once the vehicle's contents were inventoried, the vehicle was turned over to a civilian tow truck driver to be taken to an impound lot. Special Agent Frank testified that the FBI has one form for documenting evidence seized pursuant to a search warrant, and a different form for documenting items collected during an inventory search. (T. 36–37.) To obtain an inventory form, it appears it is simply necessary to print one. (T. 37.) Neither Special Agent Frank nor any other law enforcement officer did so, and therefore, everything collected on January 20, whether from the house or from a vehicle, was recorded on a single form he described as "an evidence collected item log." (T. 19, 36–37.) Notwithstanding the existence of an inventory-specific form on which to list items collected during an inventory, Special Agent Frank testified that he did not know whether it was FBI policy that items collected during an inventory be recorded at all. Then, in response to several questions from the prosecutor, Special Agent Frank stated that he was "absolutely" sure that using an evidentiary log to document what had been collected during an inventory was acceptable. (T. 41–42.)

Special Agent Frank recalled the temperature on January 20 being so bitterly cold that it was difficult for FBI personnel to operate outside for any extended time. (T. 11.)

4

Special Agent Frank began searching in the residence, and then, mostly because of the cold weather, alternated between the warm house and the cold Sierra. (T. 23, 25, 40–41.) Whenever he found an item he thought should be collected, whether in the house or the vehicle, Special Agent Frank followed the same protocol; he had a photographer take a picture of the item in place, then he bagged the items and brought them to a Special Agent he identified as "Agent Chandler," who was inside the house and who processed all items seized on January 20. (T. 27, 32.) None of the photographs taken at Special Agent Frank's direction were introduced into evidence. For the reasons explained above, the evidence collection log was also not introduced into evidence, though it was described in Special Agent Frank's testimony as a document approximately seven pages in length. (T. 27.) Among the items found in the Sierra, according to Special Agent Frank's testimony, were an Apple Watch; bags of documents; U.S. currency, a bank envelope, and a passport in the center console; and U.S. currency in a briefcase or laptop bag in the rear passenger compartment. (T. 17.)

All items seized on January 20—whether from the house, the Sierra, or another vehicle—were recorded on a single evidence collection log. Items were recorded on the log in the order they were brought to Special Agent Chandler. (T. 28.) On cross-examination, Special Agent Frank agreed with defense counsel that descriptions of items seized from the house were "interspersed" or "intermingled" with items seized from the cars on the single evidence collection form. (T. 27–28.) The Court takes this testimony to mean that where an item was found does not appear on the evidentiary log. As a member of the Evidentiary Response Team, Special Agent Frank learned how to collect evidence,

and he used those techniques even when he was just doing an inventory, rather than conducting an evidentiary search, because using those techniques "tends to avoid issues later." (T. 34.) Consistent with this, he collected items from the Sierra in the same way that he seized items from the house, first putting a numbered, yellow, evidentiary tag beside the item, then having the photographer take a picture of it, and finally taking the item to Agent Chandler to be logged. (T. 32–34.) The mere fact that an item was recorded on a form meant for recording the collection of evidence did not mean, to Special Agent Frank, that the item was necessarily evidence. (T. 19).

Special Agent Frank agreed with the Assistant U.S. Attorney that his principle for deciding whether to collect an item from the Sierra was whether it was "valuable or sensitive or irreplaceable or worthy of additional protection."[2] (T. 18.) He also collected a "copious" quantity of documents from the Sierra without specifying their significance on the log. (T. 29.) The FBI also decided to leave in the vehicle one or two large, heavy boxes found in the truck's bed because "they looked very, very heavy and we didn't have the ability to transport those back and it didn't look pertinent to anything." (T. 20, 30.) Law enforcement did not look inside the boxes, for reasons that Special Agent Frank could no longer remember. (T. 31.) In any event, they were not opened, and law enforcement did not find out what they contained, though they could have contained something "sensitive or unique or valuable." (T. 31.) The boxes were left in the Sierra and presumably went with

---

[2]  He also testified that he would collect items that could be dangerous (T. 12), though no such items were identified at the hearing.

the Sierra when it was towed away. (T. 20.) Special Agent Frank did not photograph the

boxes, though another agent may have. (T. 30.)

Turning to the search warrant for the house, it authorized law enforcement to search

for and seize, if found, "[r]ecords reflecting business or personal travel, including

*passports*." (Gov't Ex. B ¶ 6) (emphasis added).  A United States passport *card* was seized

under the authority of this search warrant. The defense seeks the suppression of that

passport card, on the grounds that a passport card (as opposed to a passport book) does not

"reflect business or personal travel" and therefore the passport card's seizure by law

enforcement exceeded the authority of the search warrant.

## LEGAL STANDARDS

### THE INVENTORY OF THE SIERRA

The parties do not disagree over the constitutionality of the seizure of the GMC

Sierra; in other words, the defense raises no claim that the seizure warrant issued by a

magistrate judge of this Court was in any way deficient. For its part, the United States does

not contest the defense's claim that the seizure warrant for the Sierra authorized only its

seizure and did not authorize a search of the Sierra, nor did the search warrant for the

residence list the Sierra as a location to be searched pursuant to that warrant. When it comes

to the Sierra, therefore, the issue is the narrow one of whether its search violated the

Constitution.

The Fourth Amendment provides that:

[t]he right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures, shall not be violated, and
no Warrants shall issue, but upon probable cause, supported by Oath or

7

affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

The Fourth Amendment proscribes only "unreasonable" searches and seizures. It is a cardinal principle that a search conducted without the authority of a judicially authorized search warrant is presumptively unreasonable unless that search falls into one of several well-recognized exceptions to the Fourth Amendment's warrant clause. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[O]ur analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.'" (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)). "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." *United States v. Riedesel*, 987 F.2d 1383, 1388 (8th Cir. 1993).

In this case, the United States seeks to justify the search of the Sierra as an "inventory search." The routine inventorying of the contents of a vehicle when it comes into law enforcement custody is a recognized exception to the warrant requirement. *United States v. Frasher*, 632 F.3d 450, 454 (8th Cir. 2011) ("Inventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment").

Gathering up the items in a vehicle when law enforcement takes custody and responsibility of that vehicle, and making a list, or inventory, of those items, serves three purposes.  First, an accurate catalogue of the vehicle's contents protects the property of the vehicle owner; second, it protects law enforcement from false claims of theft or loss of an item in the vehicle; and third, it protects law enforcement (and others, such as the tow truck driver who will actually collect the vehicle, *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993)), from danger, if, for example, a seized vehicle contained a loaded gun, or volatile chemicals. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (describing routine inventory procedures as being developed to meet the "three distinct needs" enumerated above).

A properly conducted inventory will be upheld against Fourth Amendment challenges because an inventory is not merely a reasonable search; it is, in a sense, not really a search at all. According to the Oxford English Dictionary, a "search" is "looking carefully for someone or something; the action of attempting to find something one seeks," while an "inventory" is "a list, catalogue; a detailed account." Oxford English Dictionary, https://www.oed.com. Thus, when one searches, one actively chooses to look in places (a glove box, a spare tire compartment) where the thing one is searching for (documents that are evidence of fraud, for example) might be. When one inventories, by comparison, one simply lists all the things present, without actively looking for anything in particular.[3]

---

[3] While it might be more accurate, because of this difference in daily English usage between a "search" and an "inventory," not to use the term "inventory search," in legal usage an inventory of the kind at issue in this case is still a search because, "[r]outine inventories of automobiles intrude upon an area in which the private citizen has a 'reasonable expectation

To prevent an inventory from degenerating into a general search for evidence, the inventory must be conducted in accordance with standard procedures and policies of the law enforcement agency compiling the inventory. *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993) ("To pass constitutional muster, the [inventory] search also must be conducted pursuant to standard police procedures") (quotation omitted). Adhering to this requirement ensures that an officer conducting an inventory does not purposefully seek evidence of a crime. If the policy says the officer should open the glove box, she will open it, and if the policy says the glove box shall remain closed, she will not open it. The decision to open the glove box will be made by departmental policy, and will not be the officer's discretionary decision, based on the officer's inference that incriminating evidence might be in the glove box.

 "This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime." *Colorado v. Bertine*, 479 U.S. 367, 376 (1987) (Blackmun, J. concurring). "Inventory searches, however, are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present." *Opperman*, 428 U.S. at 383 (Powell, J., concurring). The chief rationale for the warrant requirement is that inferences about where evidence might be found must be made by a "neutral and detached magistrate," not by a law enforcement officer whose investigation "rightly engage[s] their single-minded attention." *Johnson v. United States*, 333 U.S. 10,

---

of privacy'" and therefore "despite their benign purpose" they are searches when conducted by government officials. *Opperman*, 428 U.S. at 377 n.1 (Powell, J. concurring).

13–14 (1948) (Jackson, J.), *quoted in Coolidge v. New Hampshire*, 403 U.S. 443, 453 (1971) (referring to Justice Jackson's "classic statement" in *Johnson* "of the policy underlying the warrant requirement"). An agent inventorying a vehicle is not drawing any inferences about where evidence may be found and then deciding to search that place; the agent's decisions are being made for her, by the policy she is following.

Incriminating evidence is sometimes found during inventories, and when that happens, the evidence is admissible despite the lack of a warrant, so long as the evidence was found by an officer who conducted the inventory in accordance with policy. That the officer did not follow the policy exactly will not require exclusion of the evidence. The officer need not act mechanically. But the officer must adhere to departmental inventory policy to a degree sufficient to vitiate concerns that the label "inventory" was a cover for an evidentiary search. *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) ("Standardized police procedures are necessary to ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence.") (cleaned up); *United States v. Caskey*, No. 11-cr-301 (JRT/LIB), 2013 WL 50450, at *4 (D. Minn. Jan. 3, 2013). When noncompliance with standardized procedures is combined with some evidence of an investigatory motive, however, "suppression is appropriate." *Id.*

## THE SEARCH WARRANT FOR THE RESIDENCE

Turning to the seizure of the passport card from the house, the Fourth Amendment's requirement that "things to be seized" be "particularly" described prevents a warranted search from becoming "a general, exploratory rummaging of a person's belongings." *United States v. Saunders*, 957 F, 2d 1488, 1491 (8th Cir. 1992) (quoted in *United States*

*v. Sigillito*, 759 F. 3d 913, 923 (8th Cir. 2014)). To satisfy the particularity clause, a "warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007). This standard is one of "practical accuracy, not hypertechnicality." *Sigillito*, 759 F. 3d at 924.

## ANALYSIS

### EVIDENCE FOUND IN THE GMC SIERRA

Evidence found in the GMC Sierra should be suppressed because the United States has failed to meet its burden of showing that the evidence was found during a valid inventory and there was an investigatory motive for the search. The evidence at the hearing shows that the FBI conducted an evidentiary search of the GMC Sierra, notwithstanding its categorization by the prosecution as an "inventory."

Inventories are valid if they comport with departmental policy. *See Bertine*, 479 U.S. at 374. It is impossible for the Court to compare the FBI's actions in this case to the FBI's inventory policy because the United States did not admit the policy into evidence. Nor does Agent Frank's testimony about the policy close the gap, because his testimony was at a general level, stating the three reasons for an inventory (protection of the vehicle owner's possessions, protection of the FBI from false claims of loss or theft, and safety) and stating that any item "reasonably accessible" should be examined to see whether its collection was mandated by any of the three goals of the FBI's inventory policy. Agent Frank did not, however, review the FBI inventory policy as part of his pre-execution preparation, could not remember whether the policy required the preparation of a written

12

summary of the items collected, and in some ways acted contrary even to the policy he described in general terms. For example, the FBI neither looked inside nor collected the two heavy boxes in the Sierra's bed, even though their collection might have been required if the boxes contained items that were valuable or dangerous, but the FBI did collect "copious" numbers of items described only as "documents." In a fraud case, this is a difference in behavior that raises concerns.

Agent Frank testified that the center console had a lid on it. (T. 21.) But the Court does not know whether FBI policy required closed compartments such as the center console to be opened because the United States chose not to put the policy into evidence. It is possible that the FBI's inventory policy required the center console to be opened, but the United States cannot meet its burden by asking the Court to make assumptions about what the FBI policy *must* say if it is to be a sensible policy.

In its post-hearing memorandum, perhaps anticipating that the opening of the center console might be at issue, the United States points out that both the Eighth Circuit and the Supreme Court have upheld inventories in which "compartments within a vehicle" were opened. (Pl.'s Post-Hr'g Mem. at 5.) But this misses the point. The opinion in the controlling case cited by the prosecution, *Colorado v. Bertine*, 479 U.S. 367, 369 (1987), stresses that the containers were opened in accordance with the police department's inventory policy. In *Bertine*, police arrested the driver of a van. *Id.* at 368. The van's contents were inventoried by a backup officer, who found incriminating evidence in a backpack that was in the van. *Id.* at 369. The backup officer also opened two metal containers that were inside a nylon bag and found incriminating evidence in the metal

13

containers. *Id.* The *Bertine* Court emphasized that "the trial court found that the Police Department's procedures mandated the opening of closed containers and the listing of their contents." *Bertine*, 479 U.S. at 374 n.6; *see also Bertine* at 376 (Powell, J., joined by O'Connor and Blackmun, JJs., concurring) ("I . . . write separately to underscore the importance of having such inventories conducted only pursuant to standardized police procedures.").[4]

In its post-hearing brief, the United States also asserts, without specifics, that "the unrefuted evidence further demonstrates that the inventory search was conducted pursuant to FBI policy." (Pl.'s Post-Hr'g Mem. at 6.) That is an unsupportable statement. The Court does not have the policy; the United States has not quoted the policy; and Special Agent Frank described the policy generally, could not remember whether the policy required a written record to be made, and described a search that in several respects did not conform to even the policy he described in general terms.

In addition, the purpose of an inventory is to catalogue the items in a vehicle. It is impossible, though, to set forth a list of what items were in the Sierra because all the items taken into FBI custody on January 20, whether collected pursuant to the search warrant of the house or during an inventory of any one of *four* different vehicles, were—according to Special Agent Frank's testimony—"intermingled" on a single evidence log. On the record before this Court, it is not possible to recreate the contents of the Sierra, or of any of the

---

[4] The prosecution's reliance on *United States v. Dunn*, 928 F.3d 688, 692 (8th Cir. 2019), is puzzling, since that opinion does not say whether containers were opened or not but does point out that the inventory was conducted in accordance with Minneapolis Police Department policy. 928 F.3d at 690–91.

other three vehicles, or of the house. Perhaps reference to the photographs the FBI took, or to the evidence collection log itself, would provide clarity, but neither the photographs nor the log are in evidence.

In short, the Court finds that the United States has not met its burden of demonstrating that the Sierra was inventoried in accordance with standard FBI policies. The Court also finds ample evidence of an investigatory motive. An FBI agent, specially trained in evidence collection, did not review his agency's inventory policy before conducting an inventory. He knew that the FBI had a specific form that was to be used for inventories, and knew that he could print out such a form, but did not do so. Most importantly to the Court,  on January 20 the FBI "intermingled" all evidence seized from five different locations (the house plus four vehicles) onto a single evidence collection form, making any inventory of the Sierra pointless, since (at least on the limited record before the Court) one could not possibly discern what items had been in the Sierra. Finally, the FBI collected "copious" quantities of miscellaneous documents but left two large, heavy boxes alone, unopened, and unphotographed, which is consistent with an investigatory motive to uncover evidence of fraud and inconsistent with the three rationales for an inventory.

The Court does not find, however, that Agent Frank switching between searching the house and inventorying the Sierra has any bearing on whether the inventory of the Sierra was an evidentiary search. The defense claims that it is "not logical" to switch back and forth between the two activities. To the contrary, the Court finds this behavior is highly logical on a "severely cold" day when FBI personnel could protect their hands from the

elements with only thin, latex gloves. (*See* T. 40–41.) Nor will the Court draw a negative inference from the fact, pointed out by the defense, that law enforcement's collection methodology was the same for the house and the Sierra. In both locations, an item had an evidence "tent" placed beside it, was photographed, and then was taken into the house to be logged by Agent Chandler. Special Agent Frank testified that he had been taught a particular way of collecting items when he was trained as a member of the Evidentiary Response Team, and that he used that method even when he was just doing an inventory because he had learned it "avoided issues" to do so. The Court takes Special Agent Frank at his word and attaches no significance to his going above and beyond the minimum rigor required when collecting items during an inventory.

The Court emphasizes that it does not find that the FBI or the prosecution were engaged in any effort to mislead. From the record it appears that all concerned genuinely believed that they carried out a proper inventory search of the Sierra. But in this they were mistaken.

The United States does not advance any justification for admission of evidence from the Sierra other than that the evidence was found during an inventory. There is no claim that the search warrant for the residence included within its scope the vehicles parked at the residence. The admissibility of items found in the Sierra rises or falls on whether the Sierra was constitutionally inventoried, and on that standard, it falls. The FBI's inventory policy was not introduced into evidence, nor was the evidence log. From what the Court can glean generally of FBI policy from the limited record, it appears not to have been followed in several material ways. There is evidence of an investigatory motive. The Sierra

16

was searched for evidence, not inventoried, and the undersigned therefore recommends that evidence found in the Sierra be suppressed.

## THE PASSPORT CARD FOUND IN THE HOUSE

Mr. Farah claims that the passport card found in the house should be suppressed because it was seized pursuant to a warrant that allowed the seizure of documents evincing domestic and international travel, including "passports." The defense asserts that a passport card is not a passport and that a passport card, as distinct from a passport book, does not show the countries the holder has visited. Mr. Farah forthrightly concedes that the Eighth Circuit has held that a passport card and a passport book are indistinguishable. *United States v. Torres*, 920 F.3d 1215, 1217 (8th Cir. 2019) (quoting State Department regulations describing a passport card as "a U.S. passport issued in card format"). The Court therefore recommends that the motion seeking suppression of the passport card be denied.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED THAT** Defendant Abdiaziz Shafii Farah's Motion to Suppress Evidence (Dkt. No. 33) be **GRANTED IN PART AND DENIED IN PART**, as follows:

1. The Motion be **GRANTED** as to any evidence found in the GMC Sierra; and

2. The Motion be **DENIED** as to the passport book found in the residence.

Date:  October 14, 2022          *s/ John F. Docherty*
                                            JOHN F. DOCHERTY
                                            United States Magistrate Judge

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).