# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-124 (NEB/TNL) |
| Plaintiff, | |
| v. | ORDER ON REPORT AND RECOMMENDATION |
| ABDIAZIZ SHAFII FARAH, | |
| Defendant. | |

Defendant Abdiaziz Shafii Farah has been charged with willfully and knowingly making a false statement in a passport application, in violation of 18 U.S.C. Section 1542. (ECF Nos. 2, 22.) Farah moved to suppress evidence obtained by a search warrant of his residence and a seizure warrant of his GMC Sierra truck on January 20, 2022. (ECF No. 33.) In a Report and Recommendation, Magistrate Judge John F. Docherty recommended denying the motion to suppress the evidence found in Farah's residence and granting the motion to suppress the evidence found in the Sierra. (ECF No. 142 ("R&R").) The government objected to the R&R's recommendation to suppress the evidence found in the Sierra. (ECF No. 150.)

The Court has reviewed the R&R *de novo*. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b)(3). Based on that *de novo* review, the Court sustains the government's objection and accepts in part and modifies in part the R&R.

**BACKGROUND**

Neither party objects to the R&R's description of the factual background, so the Court incorporates those facts by reference, (R&R at 2–7), and focuses on the facts relating to the inventory search of the GMC Sierra.

Farah moved to suppress evidence obtained by the search warrant for his residence and the inventory search of his Sierra, which was conducted after the government obtained a seizure warrant for the Sierra. Prior to the evidentiary hearing on the motion, the parties agreed that the scope of the hearing would be limited to the passport card seized from Farah's residence and the passport book seized from the Sierra. (ECF No. 55 ("Hr'g Tr.") at 4.)

At the evidentiary hearing, the government offered the testimony of FBI Special Agent ("SA") Richard Frank. SA Frank became a Special Agent in 2019 and has been involved in around 20 to 30 search-and-seizure warrant executions. (*Id.* at 8–9.) He has been a member of the FBI Minneapolis office's Evidentiary Response Team since 2021, for which he had additional training. (*Id.* at 9.)

*FBI policy.* SA Frank testified that he knew that the FBI has written policies for inventory searches of vehicles and has been trained on those policies. (*Id.* at 34–35.) He did not review the policies before executing the warrants on January 20, but he did review them to prepare for his hearing testimony. (*Id.*) According to SA Frank, the FBI's vehicle inventory policy is to always conduct an inventory search when executing a seizure

2

warrant on a vehicle, during which they look at everything that is reasonably accessible within the vehicle before turning it over to a civilian tow-truck driver to be impounded. (*Id.* at 36; *see id.* at 12–13, 35–36.) SA Frank noted three purposes of the policy: (1) protecting the defendant's rights, (2) protecting the FBI from false claims of loss or theft, and (3) safety. (*Id.* at 13, 15, 35–36, 38–39.)

SA Frank did not know if FBI policy required items collected during an inventory search be recorded on a form. (*Id.* at 41.) He noted that the FBI uses different forms when conducting an inventory search and an evidentiary search. (*Id.* at 36–37; 41–42.) SA Frank believed that using an evidentiary log to record items from an inventory search was acceptable. (*Id.* at 41–42.)

*January 20 inventory search.* SA Frank testified to an inventory search on the Sierra that was performed in accordance with his description of the FBI's inventory policy. (*See id.* at 12–15, 34.) The search was conducted while a tow truck was on its way to tow the Sierra from Farah's residence. (*Id.* at 14.) SA Frank testified that the inventory search was conducted to secure items of value in the Sierra (*e.g.*, currency), and because it was being transported out of the FBI's control, which could generate a claim. (*Id.* at 15.)

SA Frank decided what items to collect from the Sierra based on whether the item was valuable, sensitive, irreplaceable, or worthy of additional protection. (*Id.* at 18.) A passport, U.S. currency, and a bank envelope were found in the Sierra's center console, and U.S. currency was found in a briefcase or laptop bag in the back seat. (*Id.* at 17.) An

Apple watch and bags of documents were also found in the Sierra. (*Id.*) The agents did not open or collect one or two large boxes found in the Sierra's truck bed because "they looked very, very heavy and we didn't have the ability to transport those back and it didn't look pertinent to anything." (*Id.* at 20.) SA Frank did not "recall exactly what [the boxes were]," but thought that they "looked like maybe like some sort of exercise equipment or something of that nature." (*Id.* at 30.) He could not recall why they did not look inside the boxes and confirmed that if he had thought the boxes contained something valuable or dangerous, he would have looked through them. (*Id.* at 30–31, 43.)

SA Frank alternated between searching Farah's residence and the Sierra because of the bitterly cold weather that day, making the Sierra search difficult. (*Id.* at 23, 25, 40–41.) In doing so, he followed the same process for collecting items for the evidentiary search of Farah's residence and the inventory search of the Sierra: (1) he placed a numbered, yellow evidentiary tag beside the item; (2) he had a photographer take a picture of the item in place; then (3) he bagged the items and brought them to another agent in the residence who logged the items. (*Id.* at 27, 32–34.) SA Frank uses this process when doing an inventory search because it "tends to avoid issues later." (*Id.* at 34.)

Though each item collected was tagged and photographed, the FBI did not complete a separate inventory search form for the items collected from the Sierra. The inventoried items from the Sierra were "interspersed" or "intermingled" with evidence

collected from Farah's residence on the same "evidence collected item log." (*Id.* at 27–28; *see id.* at 36–37.)

*The R&R.* The R&R concludes that the government failed to prove that the inventory search of the Sierra was done according to established inventory procedures and that the FBI had an investigatory motive for searching the Sierra, and thus recommends that the Court grant Farah's motion to suppress evidence found in the Sierra. The government objects to these conclusions and recommendation.[1]

## ANALYSIS

### I.    FBI Inventory Policy

"The inventory search exception to the Fourth Amendment's warrant requirement permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). "An inventory generally serves three purposes: 'the protection of the [vehicle] owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger.'" *Id.* (alteration in original) (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). "The Government bears the burden of showing that its conduct complied with the inventory search exception to the warrant requirement." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir.

---

[1] The R&R also recommends denying Farah's motion to suppress the passport card recovered during the search of his residence. Neither party objects to this recommendation.

2011). Courts "review the propriety of an inventory search under a totality-of-the-circumstances test." *United States v. Long*, 906 F.3d 720, 725 (8th Cir. 2018).

The parties agree that the seizure warrant for the Sierra was valid and that the FBI has a policy of conducting inventory searches of seized vehicles. The issue is whether the government has proved that its conduct complied with the inventory search exception. The R&R concludes that it did not. The government objects to the R&R's conclusion that (1) the government failed to show that the evidence[2] was found during a valid inventory search, and (2) there was an investigatory motive for the search that negated the reasonableness of the inventory search. The Court addresses each conclusion in turn.

### A. Evidence of FBI Policy

"An inventory search is reasonable and constitutional if it is conducted according to standardized police procedures." *Garreau*, 658 F.3d at 857. The R&R found that it was impossible to compare the FBI's actions to its inventory policy because the government did not admit the policy into evidence, and that SA Frank failed to "close the gap" because "his testimony was at a general level." (R&R at 12.)

The Court agrees that the FBI's written policy would have been helpful, but the lack of such evidence need not doom the inventory search. In *United States v. Hartje*, 251

---

[2] The R&R suggests that its recommendation as to the passport book found in the Sierra be extended to all evidence seized from the Sierra. (R&R at 2.) The Court declines to do so. The parties agreed to limit the scope of the hearing to the passport book and passport card, as the government only seeks to offer these two items from the searches in its case-in-chief. (Hr'g Tr. at 4.)

F.3d 771 (8th Cir. 2001), the defendant moved to suppress evidence found in the trunk of his vehicle because the officers allegedly searched the trunk for incriminating evidence rather than to inventory its contents. *Id.* at 775. An officer testified that the "'policy of Conway Police Department is that anytime a vehicle is towed, that an inventory, a complete inventory be done on that vehicle before the wrecker service takes the vehicle,' and that 'during training, this was what we were shown to do and how to do it.'" *Id.* at 776. The district court found that the vehicle was inventoried pursuant to the standard police procedure. *Id.* The Eighth Circuit rejected the defendant's argument that the district court erred because the testifying officers "failed to outline more of the specifics of the towing policy." *Id.* (affirming defendant's conviction); *see also United States v. May*, 440 F.Supp.2d 1016, 1037–38 (D. Minn. 2006) (rejecting the argument that the government failed to establish the reasonableness of an inventory search because the government did not submit the police department's policy, where an officer testified to the standard inventory-search policy, that the policy was in writing, and that the vehicle search was conducted according to that policy).

The passport book was found inside the Sierra's center console, and so the R&R questions whether the FBI inventory policy allows agents to open closed containers. (R&R at 13–14; *see* Hr'g Tr. at 17, 21.) The R&R cites *Colorado v. Bertine*, 479 U.S. 367 (1987), which addressed the reasonableness of a warrantless inventory search of a van containing a backpack and canisters within the backpack. *Id.* at 372. In concluding that "reasonable

police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," the Supreme Court noted that "the Police Department's procedures mandated the opening of closed containers and the listing of their contents." *Id.* at 374 & n.6; *see id.* ("Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria."). As is noted in the cases cited above, evidence of an inventory policy need not be in written form; oral testimony may suffice. *See also United States v. Le*, 474 F.3d 511, 515 (8th Cir. 2007) ("Trooper Vance testified that he was trained to open closed containers during inventory searches and that it is his standard practice to do so. Such oral testimony is sufficient to establish the requisite standardized procedures required to comport with the Fourth Amendment."). Nor does the policy need to address specifically closed containers where it requires the inventory of an entire vehicle. *See United States v. Morris*, 915 F.3d 552, 556–57 (8th Cir. 2019) ("Because the policy required an inventory of the entire vehicle, it was reasonable for the deputies to open containers believed to have items valued at $25 or more.").

Having reviewed the transcript of the evidentiary hearing, the Court finds that SA Frank's training and experience qualify him to testify about the FBI's policy on inventory searches. (*See* Hr'g Tr. at 8–9.) SA Frank testified that the FBI has written policies for conducting inventory searches, and that he had reviewed those policies before the hearing. (*Id.* at 34–35.) By FBI policy, he always conducts an inventory search when executing a seizure warrant on a vehicle. (*Id.* at 12–13, 36.) When executing such a

warrant, the FBI agents "secure" the vehicle, "mak[e] sure it's safe for transport," and "secure anything in there that's of value." (*Id.* at 12–13; *see also id.* at 13.)

But SA Frank's testimony does not sufficiently describe the FBI inventory policy on the search of closed containers. SA Frank did acknowledge that the guidance is to look at everything that is reasonably accessible within the vehicle. (*Id.* at 36.) The government does not argue that this testimony addresses the FBI's inventory policy regarding closed containers. Given that the only evidence at issue—the passport book—was found inside the Sierra's closed center console, the government's failure to address this aspect of the inventory policy in its objection is troubling. *See generally Florida v. Wells*, 495 U.S. 1, 4 (1990) ("Our view that standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

The R&R also questions the intermingling of items recovered from the seizure of the Sierra and the search of Farah's residence on the same evidence log. SA Frank described the inventory procedure: (1) they photographed the items in place with numbered markers next to them; (2) they bagged the items; and (3) they brought the items to an agent who listed them on an evidence-collected log. (Hr'g Tr. at 17, 32–33.) SA Frank noted that items recovered during other seizure warrants and search warrants have been collected the same way. (*Id.* at 19, 34.) The FBI has a form that "can be used" to log items

collected during an inventory search, but agents are not required to use that form. (*See id.* at 36, 41–42) (attesting that agents can also use FBI form FD-597, "Receipt for Property"). SA Frank also explained that the agents logged items from both searches on the same form[3] and that the severely cold temperature led to agents alternating between searching the residence and the Sierra to keep warm. (*Id.* at 28, 40–41.) But the record is unclear as to whether FBI policy allows agents to intermingle items collected from different warrants on the same form.[4]

So the Court observes two concerns with the FBI's inventory policy: (1) the unclear evidence about the policy on opening containers within a vehicle during an inventory search; and (2) the logging of items from two different types of searches on the same form. Considered alone or together, these concerns do not doom the inventory search for three reasons. First, the FBI inventory policy, which is written and standardized as described by SA Frank, requires agents to look at everything that is reasonably accessible within the vehicle and secure anything of value. (*Id.* at 13, 36.) This arguably incorporates a search of containers such as a console because items of value would likely be found in

---

[3] FBI agents used the Receipt for Property form on January 20. (*See* ECF No. 44-1 at 2–5.)

[4] The government does not claim that the intermingling the items collected from different searches on the same evidence log complied with FBI policy. It asserts that inventory searches need not be conducted in a "totally mechanical 'all or nothing' fashion." (Obj. at 4 (citing *Wells*, 495 U.S. at 4).) Even if the agents failed to adhere to FBI policy by intermingling items on the same form, their search may be reasonable "provided it [wa]s not a pretext for an investigatory search." *Taylor*, 636 F.3d at 465.

such places. So, it is not unreasonable for SA Frank to interpret the policy as allowing a search of the console.

Second, the logging of the evidence on different forms did not result in any confusion over where an item was found (indeed, the parties here determined that the passport card was found in the house and the passport book was found in the vehicle). SA Frank followed a standardized procedure in logging the items: each one was photographed and labeled.

Third, even if standardized procedures were not followed to the letter, whether standardized procedures were followed is only part of the standard the Court considers. "[A] failure to follow standard procedures does not ineluctably render a search unreasonable." *United States v. Morris*, 995 F.3d 665, 670 (8th Cir. 2021). "[T]here must be something else; something to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Id.* (citation omitted); *see United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993) (holding that "the absence of standardized procedures in this case, *coupled with* the substantial evidence of an investigatory motive on the part of the police" rendered the search of a vehicle unreasonable under the Fourth Amendment (emphasis added)); *see generally Whren v. United States*, 517 U.S. 806, 816 (1996) ("[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the

proposition that failure to follow regular procedures proves (or is an operational substitute for) pretext.").

Thus, under this standard, the Court considers whether substantial evidence of an investigatory motive is found in the record.

### B. Investigatory Motive

The R&R identifies four reasons for finding "ample evidence" of investigatory motive. (R&R at 15.) First, it points to SA Frank's failure to review the FBI inventory policy before conducting the inventory search on January 20. (*Id.*) The Court does not find this to be evidence of investigatory motive. SA Frank was trained and experienced in conducting inventory searches, and he testified about the policy and how he followed it. The Court is unaware of any rule requiring experienced agents to review a written inventory policy before executing a seizure warrant.

Second, the R&R notes that SA Frank knew that a specific form "was to be used for inventories . . . but did not do so." (R&R at 15.) But SA Frank did not testify that the FBI mandates the use of a particular form for inventories; instead, he testified that the form (FD-653) "can be used," but that agents also use other forms, including the FD-597 form that the FBI used on January 20. (Hr'g Tr. at 36; *see id.* at 41–24.) The record does not suggest that SA Frank was being untruthful about the use of these forms.

Third, the R&R relies on the fact that the agents "'intermingled' all the evidence seized from five different locations (the house plus four vehicles) onto a single evidence

collection form, making any inventory of the Sierra pointless, since (at least on the limited record before the Court) one could not possibly discern what items had been in the Sierra." (R&R at 15.) Prior to the evidentiary hearing, the parties had agreed that the only evidence at issue was the passport book found in the Sierra and the passport card found in the residence. Thus, there was no need to present evidence about where these items were found or about the other items collected. Moreover, SA Frank explained that agents switched off between the inventory search of the Sierra and the evidentiary search of the residence due to the bitterly cold weather that day. The R&R—and this Court—attaches no significance to the agents' decision to switch between searches, or the fact SA Frank used the same multi-step procedure to collect and log the items from both searches. (*Id.* at 15–16.) The Court does not view the decision to log the items collected under different warrants on one form to be an "after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Morris*, 995 F.3d at 670 (citation omitted); *see Garreau*, 658 F.3d at 858 (holding that an officer's "alleged minor deviation from the policy [by failing to list a firearm on the inventory form] was not sufficient to render the [inventory] search unlawful"); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) (affirming district court's finding that an inventory search was not "a pretext or ruse for a general search for incriminating evidence" even though "the inventory list started at the scene was not completed as it should have been," and "the seized items were listed on an evidence form later").

Finally, the R&R questions the FBI's decision to collect miscellaneous documents but leave the heavy boxes in the truck bed unchecked. (R&R at 15.) This decision, standing alone, does not suggest an investigatory motive warranting the suppression of the passport book. SA Frank explained that at the time of the inventory search, he did not think the boxes fell into one of the three categories requiring that they be inventoried, and that if he had thought that the boxes contained something valuable or dangerous, he would have looked through them. (Hr'g Tr. at 43.) He also noted that the boxes were "very, very heavy" and the agents had no way to transport them. (*Id.* at 20.) As for the documents collected from the Sierra, SA Frank testified that they were listed as "documents" on the log because he could not review every piece of paper during the collection due to the cold weather, (*id.* at 28), but that they fell into one of the three categories. (*Id.* at 42.) Given the totality of the circumstances, the Court concludes that the inventory search of the Sierra was not a pretext for an evidentiary search. Thus, the motion to suppress the passport book found in the Sierra is denied.

## II.     Search of Farah's Residence

The R&R recommends denying the motion to suppress the passport card recovered during the execution of the search warrant for Farah's residence. No party objects to this aspect of the R&R. The Court has reviewed, and agrees with, the R&R's conclusions about the passport card. *See United States v. Torres*, 920 F.3d 1215, 1216–17 (8th Cir. 2019) (rejecting the argument that a passport card is not a United States

passport). The Court thus accepts the R&R's recommendation to deny the motion to suppress the passport card found in the residence.

## CONCLUSION

Based on all the files, records, and proceedings in this case, IT IS HEREBY ORDERED THAT:

1.     The government's objection (ECF No. 150) is SUSTAINED;

2.     The Report and Recommendation (ECF No. 142) is ACCEPTED IN PART and MODIFIED IN PART; and

3.     Farah's Motion to Suppress Evidence (ECF No. 33) is DENIED.


Dated: December 9, 2022                    BY THE COURT:

                                           s/Nancy E. Brasel
                                           Nancy E. Brasel
                                           United States District Judge