UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-124 (NEB/TNL)

UNITED STATES OF AMERICA,

Plaintiff,

v.

ABDIAZIZ SHAFII FARAH, ET AL.,

Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, Joseph H. Thompson, Harry M. Jacobs, Matthew S. Ebert, and Chelsea A. Walcker, Assistant U.S. Attorneys, respectfully submits the following consolidated response to defendants' pretrial motions.

TABLE OF CONTENTS

I.    BACKGROUND ....................................................................................... 1

      A.    The Scheme...................................................................................... 1

      B.    The Superseding Indictment ......................................................... 1

      C.    The Discovery Productions ............................................................ 3

II.   THE DEFENDANTS' DISCOVERY MOTIONS................................... 3

      A.    Defendants' Joint Motions for Discovery (Dkt. ##229, 231, 239) ........... 3

      B.    Defendants' Joint Motion for Disclosure of *Brady* Evidence
            (Dkt. #230) ..................................................................................... 4

      C.    Defendants' Motion to Disclose and Make Informant Available for
            Interview (Dkt. ##233, 234, 246) ............................................... 13

      D.    Defendants' Joint Motion for Discovery Relief (Dkt. #241) ................ 13

III.  DEFENDANTS' MOTIONS FOR BILL OF PARTICULARS
      (Dkt. ##255, 236)................................................................................. 16

      A.    The Superseding Indictment Contains a Detailed Description of the
            Charged Crimes............................................................................. 18

      B.    The Motions Should Be Denied Because a Bill of Particulars is
            Not a Discovery Device ................................................................ 25

IV.   DEFENDANTS' MOTIONS TO CHANGE VENUE (Dkt. #260) ................... 28

      A.    There Is No Presumption of Prejudice Under the Facts of this Case and
            Transfer Would Be Inappropriate .............................................. 29

V.    DEFENDANTS' MOTIONS TO SEVER
      (Dkt. ##242, 243, 245, 248, 252, 253, 257, 259, 263) ...................... 42

      A.    The Defendants Should Be Tried Jointly with All Co-Defendants ..... 44

      B.    All Counts in the Superseding Indictment Should Properly Be Heard
            in the Same Trial........................................................................... 47

C.    A Joint Trial Will Not Violate the Defendants' Right to
Confrontation............................................................................. 50

VI.   MOTION TO SUPPRESS DEFENDANT'S STATEMENT (Dkt. #250) ......... 50

VII.  CONCLUSION ................................................................................ 53

# I.   BACKGROUND

The defendants carried out a scheme that defrauded the Federal Child Nutrition Program, a government aid program designed to provide free meals to children in need. The defendants exploited the Covid-19 pandemic to obtain, misappropriate, and launder tens of millions of dollars in program funds that were intended as reimbursements for the cost of serving meals and food to children. In all, the defendants fraudulently misappropriated more than $40 million in Federal Child Nutrition Program funds.

## A.   The Fraud Scheme

The Federal Child Nutrition Program is a federal program established to ensure that children receive nutritious meals free of charge in low-income areas. At the onset of the Covid-19 pandemic, the program requirements for the Federal Child Nutrition Program were loosened, to help ensure that children continued to receive meals during the unprecedented situation. The defendants exploited these changes, and in the process falsely claimed to be serving meals to tens of thousands of children each day throughout Minnesota. The defendants received tens of millions of dollars in federal funds as reimbursements for purportedly serving these meals.

## B.   The Superseding Indictment

On September 13, 2022, a grand jury charged eight defendants with engaging in this fraud scheme. *United States v. Farah, et al.*, 22-cr-124 (NEB/TNL). The superseding indictment charged all defendants with conspiracy to commit wire fraud (Count 1), in violation of 18 U.S.C. §§ 371 and 1342. Individual defendants were also charged with 11 counts of wire fraud, in violation of 18 U.S.C. § 1343, one count of

conspiracy to commit federal programs bribery, in violation of 18 U.S.C. § 666, six counts of federal programs bribery, in violation of 18 U.S.C. § 666, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a), 22 counts of money laundering, in violation of 18 U.S.C. § 1957, and one count of false statement in a passport application, in violation of 18 U.S.C. § 1542.

### C.    The Discovery Productions

In light of the size of the case and volume of discovery, and on the motion of the defendants, the Court appointed John C. Ellis, Jr. as coordinating discovery attorney. Dkt. #172. The coordinating discovery attorney was appointed to manage and distribute discovery to defendants and provide training and support services to the defense teams as a group and individually. *Id.* at 2-3.

The government made its initial discovery productions to Mr. Ellis as well as the defendants who were not directly partaking in the services of the coordinating discovery attorney in two waves, first on December 6, 2022 and again on April 28, 2023.

The government's productions far exceed the requirements of Rule 16. The government has produced to defense counsel essentially everything it has collected during the case, including reports of all witness interviews, transcripts of all grand jury testimony, and returns obtained from hundreds of grand jury subpoenas. Each type of evidence received a specific bates prefix to aid in identification. For example, interview reports were produced with the bates prefix "Reports_." The government also produced detailed indexes of its discovery production to aid defense counsel in their review of the discovery materials.

To further aid in defense counsel's review, Mr. Ellis uploaded the government's discovery into a commercial document review software program. All participating defense counsel have access to the project. Mr. Ellis and his office are available on an ongoing basis to answer any questions and assist in locating materials in the discovery project.

## II.    DEFENDANTS' DISCOVERY MOTIONS

In its initial scheduling order, the Court "proactively address[ed]" various "boilerplate" discovery motions by directing the government to produce materials already required under the federal rules without the need for the parties to file motions on each of the issues. The defendants filed several other non-boilerplate discovery motions.

### A.    Defendants' Joint Motions for Discovery (Dkt. ##229, 231, 239)

Defendants move the court for an order requiring the government to provide discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The government does not oppose defendants' motions insofar as they comport with the requirements of Rule 16(a)(1). On December 6, 2022, the government made its initial discovery production to the defendant. On April 28, 2023, the government made a second discovery production to the defense. Between these two productions, the government disclosed all materials relevant to Rule 16(a)(1) in its possession, custody, or control and has supplemented those disclosures with additional materials subsequently acquired. The government is aware of its continuing duty to disclose and will comply with that duty. The government, however, objects to any discovery order that exceeds the requirements of Rule 16.

3

**B.    Defendants' Joint Motion for Disclosure of *Brady* Evidence (Dkt. #230)**

Defendants have moved for disclosure of exculpatory, favorable, and impeaching information under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The government understands, has complied with, and will continue to comply with, its *Brady* and *Giglio* obligations to produce exculpatory and impeachment evidence to the defense. Each of the defendants list multiple categories of documents and information that they claim constitute *Brady* or *Giglio* materials. Any evidence in the government's possession bearing on these topics has already been disclosed. The prosecution has produced all materials it received from the Minnesota Department of Education and other government agencies. If any additional such evidence comes to the government's attention, it will be turned over promptly.

Defendants also seek an order requiring the government to obtain and search the files of the several other state and federal agencies for exculpatory material, including the Minnesota Department of Education (MDE), the Department of Justice Covid-19 Fraud Enforcement Task Force, the Office of the Minnesota Attorney General, the U.S. Department of Agriculture, and the U.S. Food and Nutrition Service. They argue that these agencies are part of the "prosecution team" and therefore the prosecution's discovery obligations extend to materials possessed by these agencies, regardless of whether the prosecution has possession of, or access to, those materials. As explained below, while MDE and the Minnesota Attorney General's Office were the defendants in a civil lawsuit brought by Feeding Our

Future, neither they nor the other named entities were part of the prosecution team for the criminal case. Accordingly, defendants' request should be denied.

The government's disclosure obligations arise from several sources, including the Federal Rules of Criminal Procedure, the Jencks Act (18 U.S.C. § 3500), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

Rule 16 of the Federal Rules of Criminal Procedure requires prosecutors to disclose specific items including documents and data "within the government's possession, custody, or control" where:

(1) the item is material to preparing the defense;

(2) the government intends to use the item in its case-in-chief at trial; or

(3) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Under *Brady* and its progeny, a prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This requirement extends not only to materials possessed by the prosecutor but also to materials possessed by agents and agencies involved in its investigation. However, "[t]his requirement is limited to production of statements 'possessed by the prosecutorial arm of the federal government.'" *United States v. Georgiou*, 777 F.3d 125, 142 (3d Cir. 2015) (quoting *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003)). A prosecutor is not required to "discover information not in its possession or of which it was not aware." *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008); *see also United States v.*

*Jones*, 34 F.3d 596, 599 (8th Cir. 1994) ("The government has no affirmative duty to take action to discovery information which it does not possess.").

A prosecutor is not obligated to search for material in the control of another government agency unless that agency was so closely aligned with the prosecution that it should be considered to be "part of the prosecution team" or "an arm of the prosecutor." *See, e.g.*, *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014); *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) ("As with the Jencks Act, Brady 'applies only to information possessed by the prosecutor or anyone over whom he has authority.'"); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) ("[T]he prosecution must disclose documents material to the defense (1) that it has actually reviewed, or (2) that are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the 'prosecution team.'"); *United States v. Nallani*, No. 11-20365, 2015 WL 400903, *3 (E.D. Mich. Jan. 28, 2015) (defining the "government" under Rule 16 as being limited to "the actual prosecution team, and the agency that participated in the prosecution or investigation, and substantially aided or counseled the prosecution team").

In determining whether a regulatory agency is part of the prosecution team, courts do not take a "monolithic view of government." *United States v. Connelly*, No. 1:16-cr-00370 (CM), 2017 WL 945934, *4 (S.D.N.Y. March 2, 2017) (quoting *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 n.3 (S.D.N.Y. 2006)); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Volpe*, 42 F.Supp.2d 204,

221 (E.D.N.Y. 1999) ("Courts have construed the term 'government' in this rule narrowly to mean the prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the 'government' in general."). Rather, courts conduct a fact-specific analysis to determine whether the level of involvement between the prosecutor and the other agency demonstrates that the agency was a "part of the prosecution team." *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007). "The key to this analysis . . . is the level of involvement between the United States Attorney's Office and the other agencies." *Connolly*, 2017 WL 945934 at *4 (quoting *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994)). "The mere fact that the Government may have requested and received documents from [another agency] in the course of its investigation does not convert the investigation into a joint one." *Connolly*, 2017 WL 945934 at *4 (quoting *Finnerty*, 411 F. Supp. 2d at 433); *see also United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007) (same).

Here, the U.S. Attorney's Office in Minneapolis conducted a grand jury investigation into defendants' fraud scheme. Agents from the FBI, the IRS-Criminal Investigation Division, and the U.S. Postal Inspection Service were a part of the investigatory team. All interview reports and other discovery evidence in possession of these law enforcement agencies has been (or will be) produced during the government's ongoing discovery obligations.

The other state and federal agencies listed by the defendants were not involved in the criminal investigation.

The Department of Justice's Covid-19 Fraud Enforcement Task Force was not involved in the investigation. The Director of the Covid-19 Fraud Enforcement Task Force participated in the press conference to raise awareness of the Department of Justice's ongoing efforts to combat and prosecuted Covid-19 fraud schemes. The Task Force was not involved in the investigation, and the assigned AUSAs and agents who conducted the investigation are not part of the Task Force.

The Minnesota Attorney General's Office was not involved in the criminal investigation. The Minnesota Attorney General's Office did not criminally investigate potential fraud by Feeding Our Future and other entities involved in the Federal Child Nutrition Program. Rather, they represented MDE after it was sued by Feeding Our Future in a civil lawsuit filed in state court.

In November 2020, Feeding Our Future filed the lawsuit after MDE raised questions about the number of sites and amount of claims being submitted by Feeding Our Future and sites under its sponsorship and denied Feeding Our Future site applications. In the lawsuit, Feeding Our Future accused MDE of denying the site applications due to racial animus in violation of the Minnesota Human Rights Act. In a related indictment, the government alleged that this lawsuit was filed as part of a fraudulent scheme. *See United States v. Aimee Bock et al.*, 22 CR 223 (NEB/TNL), Dkt. #1, at ¶¶33-34. During this litigation, MDE and the Attorney General's Office contacted the FBI about the potential fraud carried out by Feeding Our Future and sites under its sponsorship.

The Attorney General's representation of MDE as a defendant in a civil lawsuit does not render it part of the prosecution team because it was not part of the criminal investigation. No prosecutors, agents, or investigators from the Minnesota Attorney General's Office participated in the investigation. They did not, for example, conduct interviews or gather evidence as part of the criminal investigation. Nor did they have access to, or knowledge of, the interview reports and other evidence obtained as part of the federal grand jury investigation that led to the charges filed.

The fact that the Minnesota Attorney General issued a press release after the indictments were unsealed does not make the Minnesota Attorney General or his office part of the prosecution team. After the federal indictments were unsealed and announced at a press conference at which he was not a participant, the Minnesota Attorney General issued a press issue touting his office's role in alerting FBI to possible fraud involving Feeding Our Future. According to the release, "[t]he Attorney General's Office worked closely with the Minnesota Department of Education as they provided suspicions of fraud and other evidence and information to the FBI, which directly led to the federal investigation and indictments of Feeding Our Future and its founder Aimee Bock."[1] These actions—referring a case to the FBI and later providing information pursuant to a grand jury subpoena—did not make the Attorney General's Office part of the prosecution team. Indeed, the press release acknowledges as much, stating only that the Attorney General's Office and MDE "flagg[ed] the

---

[1] *See* Office of Minnesota Attorney General press release dated September 26, 2022, available at https://www.ag.state.mn.us/Office/Communications/2022/09/26_FeedingOurFuture.asp (last accessed July 6, 2023).

fraud and turn[ed] it over to the *criminal investigative power of the federal government*." *Id.* (emphasis added). This is no different than any case in which a victim entity refers a case for potential investigation and later provides documents pursuant to a grand jury subpoena.

Nor was MDE involved in the investigation or part of the prosecution team. An MDE employee contacted the FBI in 2021 to report suspicions that sites under the sponsorship of Feeding Our Future were submitting fraudulent federal child nutrition program claims. In the wake of the referral, the FBI and the U.S. Attorney's Office opened a federal grand jury investigation. During that investigation, the government subpoenaed MDE for records related to the fraud scheme. Those records have been produced in discovery. The government also interviewed several MDE employees during its investigation. Reports of those interviews have been produced in discovery.

MDE employees were not part of the investigation or prosecution team. Indeed, far from being part of the grand jury investigation, they were subjects of it. They did not conduct interviews; they were the persons being interviewed. They did not gather evidence; they produced it (pursuant to grand jury subpoenas). The materials that the government obtained in response to those grand jury subpoenas has been produced to the defendants in the criminal case. MDE, on the other hand, has never seen or had access to these grand jury materials.

Neither the U.S. Department of Agriculture (USDA) nor its component Food and Nutrition Service agency were involved in the investigation. As explained in the

10

superseding indictment, the Food and Nutrition Service is an agency of the USDA that administers the federal child nutrition programs. Dkt. #57 at 2. The Food and Nutrition Service "administers the programs at the national and regional levels by distributing federal funds to state governments." *Id.* In other words, the USDA provides the federal funds that support the federal child nutrition programs. While the USDA has an Office of Inspector General, it was not involved in this investigation in any way. They did not, for example, participate in interviews or meetings on the case. They did not have access to, or knowledge or, the evidence obtained during the investigation. Simply put, they played no role in the case. And any documents that the agents involved in the case obtained from the USDA or the Food and Nutrition Service during the investigation have been produced in discovery.

Because the USDA and FNS did not work together with the U.S. Attorney's Office, it was not part of the prosecution team in this case. Accordingly, while the prosecution must produce—and has produced—everything it received from these entities, it is not required to search through files of USDA or FNS offices around the country looking for information or materials that it does not possess and to which it does not have access. *United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) (holding that the prosecutor's office has no duty to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue). Indeed, such an exercise would be nearly impossible. According to its website, the USDA "is made up of 29 agencies and offices with nearly 100,000 employees who serve the American people at more than 4,500 locations across the country and

abroad." *See* https://www.usda.gov/our-agency (last accessed on July 6, 2023). The USDA has an annual budget of approximately $200 billion. In 2022, more than $140 billion of that budget went to the FNS program. *See* "USDA FY 2022 Budget Summary," available at https://www.usda.gov/sites/default/files/documents/2022-budget-summary.pdf (last accessed July 6, 2023).

During the criminal investigation, the USAO issued more than 700 grand jury subpoenas, including subpoenas to MDE. While these documents have been produced to the defendants, Rule 6(e) of the Federal Rules of Criminal Procedure prevented the U.S. Attorney's Office from providing these materials to (or even discussing them with) MDE, the Minnesota Attorney General's Office, or the other entities identified by the defendants.

The prosecution also conducted more than 150 witness interviews during the criminal investigation. No representatives from MDE, the Minnesota Attorney General's Office, USDA, FNS, or the other entities were present for any of these interviews. These interviews were conducted without these entities' presence, involvement, or even knowledge (except for those interviews conducted of MDE employees). *See, e.g.*, *United States v. Stein*, No. 11-80205-CR, 2012 WL 12946757, *1 (S.D. Fla. Sept. 26, 2012) (holding that SEC was not part of the prosecution team where SEC and DOJ only conducted 4 joint interviews); *Connolly*, 2017 WL 945934 at *7 (holding that federal agency was not part of prosecution team where agency only participated in 13 of 34 interviews).

Finally, several witnesses testified before the grand jury during the criminal investigation. Again, in accordance with the grand jury secrecy rules in Rule 6(e) of the Federal Rules of Criminal Procedure, the entities cited by the defendants were not involved in that process, were not aware of that process, and had no access to the resulting transcripts.

Because these agencies were not part of the criminal prosecution team, defendants' motion for an order requiring the government to obtain and produce material in their possession should be denied.

### C.    Motion to Disclose and Make Informant Available for Interview (Dkt. ##233, 234, 246)

Defendants have moved for an order requiring the government to disclose the identity of any informants and cooperating individuals who were working with law enforcement during the investigation and make them available for an interview with the defense. The government did not utilize any confidential informants or cooperating witnesses whose identities are unknown to the defendants as contemplated by *Rovario v. United States*, 353 U.S. 53, 59 (1957). Accordingly, the motions should be denied as moot.

### D.    Defendants' Joint Motion for Discovery Relief (Dkt. #241)

While moving for an order requiring the government to obtain and produce files of federal and state agencies that were not involved in the criminal investigation, defendants simultaneously complain about the volume of the discovery produced in the case. They argue that they are entitled to some form "discovery relief" in light of the amount of discovery materials. Because the Court has already taken steps to

13

address this issue, including through the appointment of a coordinating discovery counsel, the defendants' motion should be denied.

While the defendants' fraud scheme was large and took time to unravel, it is not difficult to comprehend. The defendants created shell companies. They enrolled those shell companies in the federal child nutrition program. They then submitted fake invoices falsely claiming that they were entitled to millions of dollars in reimbursements for serving meals to thousands of children daily. The defendants' scheme, and the government's evidence of the scheme, was summarized in detailed search warrant applications, many of which ran over 50 pages. *See, e.g.*, 22-mj-008, 22-mj-009, 22-mj-010, 22-mj-011, 22-mj-84, 22-mj-087, 22-mj-118, 22-mj-491. These search warrant applications have been produced in discovery. The nature of the scheme is no secret to the defendants and has been extensively set forth by the government.

More to the point, it was the *defendants'* scheme. They devised the scheme. They carried it out. The scheme is well known to the defendants because they originated it. Similarly, the records that the government gathered and traced—the volume of records the defendants now complain about—were largely records created by the defendants in carrying out their fraud. The sheer volume of these records reflects the nature of the defendants' fraud scheme—broad in scope, financial in nature, utilizing shell companies and fake documents to "paper over" the fraud. In gathering and producing discovery, the government was tracking the fraud scheme as devised by the defendants.

The government produced the evidence it gathered in the course of discovery. While the discovery is substantial, the bulk of discovery consists of voluminous bank records from the companies the defendants used to carry out their scheme. Bank records are different from interview reports insofar as counsel typically does not read these records page by page but rather relies on financial experts to digest and summarize these accounts. Discovery also includes more than 150 interview reports, emails obtained pursuant to federal search warrants, and fraudulent claims submitted by the defendants.

When the government produced these materials, the government also produced a detailed discovery index to aid the defendants in digesting the discovery documents. The government bates stamped the materials with prefixes to indicate the source of the discovery materials. The government has made itself available for individual conversations with defendants concerning their roles in the fraud scheme. The volume of discovery and manner in which it was produced is similar to that in other large cases in this district. *See, e.g., United States v. Rahm et al.,* 20 CR 232 (JRT/BRT), *United States v. Morris et al.*, 17 CR 107 (DWF/TNL), *United States v. Gilbertson et al.*, 17 CR 66 (PJS/HB).

To further assist defendants in their review of the discovery, the Court granted defendant Shariff's motion to appoint a coordinating discovery counsel. Dkt. #172. The coordinating discovery counsel has received the government's discovery and put it into a searchable online discovery review platform. Among other things, he has been charged with: (1) "[a]ssessing the needs of court-appointed defense counsel and

further identifying any additional vendor support that may be appropriate—including copying, scanning, forensic imaging, data processing, data hosting, trial presentation, and other technology depending on the nature of the case"; (2) "[i]dentifying any additional human resources that may be needed by court-appointed defense counsel for the organization and substantive review of information; and (3) "[p]roviding training services to court-appointed defense counsel as a group and individually." Dkt. #172. The government does not have access to the online discovery review database set up by the coordinating discovery attorney, but it is the government's understanding that the online discovery project is well-organized, easily accessible, and easily searchable.

Finally, it is unclear what defendants are requesting. At least some of the relief that defense appears to request—for example, specifically identifying documents directly relevant to charges—is largely contained in the discovery indexes and detailed search warrant applications. As in every case, the government will turn over witness and exhibit lists in advance of trial and in accordance with the district court's trial scheduling order. And, as in every case, if defendants have additional questions about the nature of the discovery, or the government's evidence, they are welcome to contact the prosecutors with those questions about the discovery or the government's evidence. Insofar as defendants request novel relief that goes well beyond the rules, the set practice in this district, and the considerable accommodations that have been made by the government and the Court, their requests should be denied.

III.    **DEFENDANTS' MOTIONS FOR BILL OF PARTICULARS (DKT. ##255, 236)**

Defendants Mukhtar Mohamed Shariff and Mahid Ibrahim have moved for a bill of particulars. Because the superseding indictment adequately informs the defendants of the charges against them, their motions should be denied.

The purpose of a bill of particulars is to inform a defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial. *United States v. Beasley*, 688 F.3d 523, 532 (8th Cir. 2012). A bill of particulars is not intended to provide a defendant with evidentiary detail or discovery regarding the defendant's case. *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990). Rather, it is required only when necessary to inform a defendant of the charges against him with sufficient clarity to enable him to prepare his defense, to minimize the element of surprise at trial, and to protect himself against a second prosecution for an inadequately described offense. *United States v. Wessels*, 12 F. 3d 746, 750 (8th Cir. 1993).

Rule 7 requires a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is "legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *Wessels*, 12 F. 3d at 750 (*citing United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)). An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense" with which the defendant is charged. *United*

*States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). As a general matter, an indictment will be held sufficient if it tracks the language of the charging statute. *Id.*

**A.    The Superseding Indictment Contains a Detailed Description of the Charged Crimes**

At the outset, the superseding indictment in this case tracks the language of the charging statutes. In doing so, the superseding indictment informs the defendants of the nature of the charges against them and provides them the opportunity to prepare a defense at trial. On that basis alone, the superseding indictment is legally sufficient and the motions for a bill of particulars should be denied.

But the superseding indictment in this case goes far beyond what is legally required. The superseding indictment charges defendants Shariff and Ibrahim with wire fraud conspiracy, wire fraud, conspiracy to commit money laundering, and money laundering. In addition, defendant Shariff is charged with conspiracy to commit federal programs bribery and federal programs bribery. The 48-page superseding indictment is lengthy and detailed. It alleges that the defendants "devised and carried out a $40 million scheme to defraud the federal child nutrition program," and to have "obtained, misappropriated, and laundered millions of dollars in program funds that were intended as reimbursements for the cost of serving meals to children." Dkt. #57 at ¶1.

The superseding indictment explains the specific roles both defendants played in the charged crimes. The superseding indictment alleges that defendant Ibrahim was the president and owner of ThinkTechAct Foundation ("ThinkTechAct"), a Minnesota non-profit organization that also operated under the name Mind Foundry

Learning Foundation ("Mind Foundry"). *Id*. At ¶21. The superseding indictment further alleges that Ibrahim's "ThinkTechAct and Mind Foundry created more than two dozen Federal Child Nutrition Program sites throughout the State of Minnesota," which "operated under the sponsorship of both Sponsor A and Feeding Our Future." *Id*. At ¶22. As explained in the superseding indictment, "[a]t various times, ThinkTechAct and Mind Foundry claimed to be serving meals to more than 25,000 children a day at their sites," and [i]n all, between in or about February 2021 and January 2022, ThinkTechAct received more than $18 million in Federal Child Nutrition Program funds from Sponsor A and another $3.7 million from Feeding Our Future." *Id*.

In addition, the superseding indictment details that Ibrahim "also owned MIB Holdings LLC, a shell company he used to receive and launder Federal Child Nutrition Program funds from Empire Cuisine and Market, Empire Enterprises, and other companies involved in the scheme to defraud." *Id*. At ¶23. As explained in the superseding indictment, "Ibrahim used MIB Holdings to receive and launder more than $2 million in Federal Child Nutrition Program funds." *Id*.

As for defendant Shariff, the superseding indictment alleges that he "participated in the fraudulent scheme by, among other things, submitting fraudulent meal count sheets, invoices, and rosters claiming that he and others were serving meals to as many as 3,500 children a day at a site in Bloomington, Minnesota." *Id*. at ¶27. The superseding indictment alleges that "Shariff was also the CEO of Afrique Hospitality Group LLC, a company that he created in January 2021

19

and used to receive and launder Federal Child Nutrition Program funds." *Id*. The superseding indictment further explains that Shariff "was the chief executive officer of Afrique Hospitality Group," and that "Shariff and his co-conspirators used Afrique Hospitality Group as a shell company to fraudulently obtain Federal Child Nutrition Program funds." *Id*. at ¶¶127-28.

The superseding indictment goes on to detail how the defendants and others carried out the alleged crimes. According to the superseding indictment, "many of the sites operating under the sponsorship of Sponsor A fraudulently inflated their claims in order to appear that they were providing more food to children than was true." *Id*. at ¶17. As a result, all defendants in the superseding indictment collectively "claimed to be serving meals to tens of thousands of children each day throughout the State of Minnesota, for which they fraudulently claimed and received millions of dollars in Federal Child Nutrition Program funds." *Id*. The superseding indictment further explains that conspirators "created and submitted fake meal count sheets and attendance rosters purporting to list the names of children who received meals at their sites," but that "[i]n reality, the rosters and other paperwork were fake." *Id*. at ¶39. Moreover, the "defendants also created fake invoices purporting to document the purchase of food and other services from Empire Cuisine and Market and related companies." *Id*. According to the superseding indictment, there were "payments purported to be for the purchase of food and meals to be served at the sites," but "[i]n reality, the defendants used Empire Cuisine and Market and other companies to

divert Federal Child Nutrition Program funds and convert them for their own use." *Id*. at ¶41.

As it relates to Ibrahim, the superseding indictment specifically alleges that "on or about February 22, 2021," Ibrahim "sent an email to Aimee Bock and Hadith Ahmed notifying them of ThinkTechAct's desire to open two new Federal Child Nutrition Program sites—one at the Lazy U mobile home park in Medford, a town in southern Minnesota with a population of approximately 1,200, and one at the Vista Villa mobile home park in Waseca, a town in southern Minnesota with a population of approximately 10,000." *Id*. at ¶72. According to the superseding indictment, the same day "Aimee Bock submitted applications to open the Waseca and Medford sites to MDE." *Id*. at ¶73. The superseding indictment further alleges that, "[o]n or about March 4, 2021," Ibrahim "sent Aimee Bock and Hadith Ahmed meal count forms claiming that Mind Foundry served lunch and a snack to 2,000 children a day, seven days a week, at a site in Bloomington, Minnesota, during January 2021," and Ibrahim "further claimed that the Bloomington site served meals to 3,500 children a day, seven days a week, in February 2021." *Id*. at ¶74. According to the superseding indictment, Ibrahim "also included a fake attendance roster purporting to list the names of approximately 3,600 children who received meals at the Bloomington site," in that "[o]nly approximately 103 of the names on the list matched the names of students who attended school in the Bloomington Public School District." *Id*. at ¶75.

The superseding indictment further explains how Ibrahim used his shell company, MIB Holdings LLC, "to receive and launder Federal Child Nutrition

Program funds from Empire Cuisine and Market, Empire Enterprises, and other companies involved in the scheme to defraud." *Id.* at ¶106. The superseding indictment alleges how Ibrahim engaged in hundreds of thousands of dollars in transactions using Federal Child Nutrition Program funds obtained from the scheme to defraud, including transferring $25,000 from MIB Holdings to a Coinbase account and transferring $200,000 from the MIB Holdings account to 3 Pillar Homes, a custom home builder in Columbus, Ohio. *Id.* at ¶¶107-113.

Concerning Shariff's conduct, the superseding indictment alleges how he repeatedly submitted claims for reimbursement, which included fake attendance rosters and fraudulent meal count forms for sites in Bloomington, Waseca, and Medford. *Id.* at ¶¶83-84. The superseding indictment further explains how Shariff received fraudulent meal count forms and a fake attendance roster from at least one other conspirator. *Id.* at ¶85.

The superseding indictment also details at length how certain individuals engaged in a conspiracy to commit federal programs bribery as well as various acts of federal programs bribery. *Id.* at p. 32-36. Specifically, the superseding indictment alleges that "[f]rom at least in or about February 2021 to September 2022," Shariff and others "conspired with Hadith Yusuf Ahmed, Individual I.M., and others known and unknown to the Grand Jury to commit federal programs bribery, that is, to corruptly agree to give anything of value to any person, with intent to influence and reward an agent of an organization, namely, Hadith Yusuf Ahmed and Individual I.M., in connection with any business, transaction and series of transactions with

Feeding Our Future involving anything of value of $5,000 or more, that is, in exchange for sponsoring their fraudulent participation in the Federal Child Nutrition Program, where Feeding Our Future received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period." *Id*. at ¶135.

The bribery conspiracy's purpose, as explained in the superseding indictment, was clear: "to enable individuals and entities participating in the fraudulent scheme to obtain Federal Child Nutrition Program funds to pay bribes and kickbacks to a Feeding Our Future employee, in exchange for Feeding Our Future's sponsorship of their fraudulent participation in the Federal Child Nutrition Program." *Id*. at ¶136. On top of these details, the superseding indictment further explains the manner and means of this particular bribery conspiracy involving Shariff and others. For instance, as alleged in the superseding indictment, "[e]mployees who worked at Feeding Our Future and Sponsor A solicited and accepted bribes and kickbacks from individuals involved in the Federal Child Nutrition Program in exchange for sponsoring their fraudulent participation in the Federal Child Nutrition Program." *Id*. at ¶138. These specific allegations also include information about Shariff, in that he "paid a $250,000 bribe/kickback to a Feeding Our Future employee, Individual I.M., in exchange for her role in sponsoring and facilitating his and his co-conspirators fraudulent participation in the Federal Child Nutrition Program." *Id*. at ¶139. Also, according to the allegations, "[o]n or about June 9, 2021," Shariff "purchased a

$250,000 cashier's check from an Afrique Hospitality Group bank account payable to Individual I.M., an employee of Feeding Our Future." *Id*. at ¶¶144, 151.

It is no secret how the bribes and kickbacks functioned, as the superseding indictment makes clear. Notably, according to the allegations, "[i]n exchange for sponsoring the sites' fraudulent participation in the program, Feeding Our Future received nearly $18 million in Federal Child Nutrition Program funds as administrative fees in 2021." *Id*. at ¶14. As the superseding indictment further alleges, "[b]ecause the amount of administrative fees it received was based on the amount of federal funds received by sites under its sponsorship, Feeding Our Future received tens of millions of dollars in administrative fees to which it was not entitled, due to its sponsorship and facilitation of fraudulent sites participating in the program." *Id*. The superseding indictment explains that, [i]n addition to receiving tens of millions of dollars in administrative fees, Feeding Our Future employees solicited and received bribes and kickbacks from individuals and sites under the sponsorship of Feeding Our Future." *Id*. at ¶15. Thus, the superseding indictment alleges that "[i]n effect, Feeding Our Future operated a 'pay-to-play' scheme in which individuals seeking to operate fraudulent sites under the sponsorship of Feeding Our Future had to kick back a portion of their fraudulent proceeds to Feeding Our Future employees." *Id*. The superseding indictment further explains that "[m]any of these kickbacks were paid in cash or disguised as 'consulting fees' paid to shell companies created by Feeding Our Future employees to conceal the true nature of the payments and to make them appear legitimate." *Id*.

The detailed allegations in the superseding indictment more than satisfy the notice pleading requirements in Fed. R. Crim. P. 7(c)(1) because the superseding indictment contains a "plain, concise, and definite written statement of the essential facts constituting the offense[s] charged." Moreover, both defendants have been provided voluminous discovery, including more than 150 interview reports and dozens of lengthy and detailed search warrant affidavits that lay out the fraud scheme, defendants' roles in it, and probable cause to search the locations and email accounts used in connection with the alleged crimes.

## B.    The Motions Should be Denied Because a Bill of Particulars is Not a Discovery Device

As explained above, the Eighth Circuit has repeatedly held that "[a] bill of particulars is not to be used for discovery purposes." *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1979). Yet discovery is exactly what the defendants seek. Their motions propound interrogatory-style discovery requests under the guise of seeking a bill of particulars.

Both defendants set forth a series of questions that they want the government to answer about its expected evidence and proof at trial. Shariff, for example, asks that the government be ordered to explain the exact nature of I.M.'s employment at Feeding Our Future and other details about the evidence surrounding the $250,000 that Shariff paid to I.M. Dkt. #236 at 1. Similarly, Ibrahim asks for a detailed summary of the evidence and propounds interrogatory-style requests about which portions of funds were fraudulently obtained and which portions of meals were fraudulent. Dkt. #255 at 1-2.

These requests should be denied. A bill of particulars "is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011) (quoting *United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir 2009)); *see also United States v. Thao*, Crim. No. 21-108(2) (PAM/TNL), 2021 WL 5564521, at *7 (D. Minn. Nov. 29, 2021) ("To the extent Defendant seeks evidence the Government intends to introduce at trial, 'a Bill of Particulars is not intended to be a substitute for discovery, nor is it designed to provide information which the Defendant might regard as generally helpful, but which is not essential to his defense.'"); *United States v. Morales*, 19 CR 281, 2020 WL 4043953, at *2 (D. Minn. March 20, 2020) ("The 'whens wheres and with whoms of acts and participation in the charged conspiracy' is not properly the function of a bill of particulars.") (quoting *United States v. Pippenger*, 552 F. Supp. 2d 990, 993 (D.S.D. 2008)); *United States v. Afremov*, Crim. No. 06-196 (JRT/TNL), 2007 WL 2475972, at *2 (D. Minn. Aug. 27, 2007) ("a bill of particulars is not intended to supplement discovery or to provide for the acquisition of evidentiary detail").

Courts in this district have routinely denied these sorts of requests. In *United States v. Belfrey*, for example, the district court affirmed the magistrate judge's denial of the defendants' motions for a bill of particulars in a health care and tax fraud case. 2016 WL 1301085, at *3 (D. Minn. Apr. 1, 2016). The defendants sought answers to a laundry list of questions similar to those defendants have posed in this case:

> (1) the manner and means by which each defendant failed to truthfully account for withheld taxes; (2) the obligation for accounting and paying

26

withheld taxes for entities in which a particular defendant held no interest; (3) the means and manner in which each defendant violated 42 U.S.C. § 1320a-7(i)(3); (4) identification of the law which criminalizes [defendant 1's] concealment of his association with Model Health Care or Integrated; (5) the manner and means of [Defendant's 1's] concealment of his association with Model Health Care or Integrated; (6) the manner and means by which [Defendant 2] cooperated in [Defendant 1's] concealment of his association with Model Health Care or Integrated; (7) the manner and means by which [Defendant 2] participated in naming the owner of Model; and (8) details regarding [Defendant 1] being an alleged manager or owner of Integrated.

*Id.* at *1. The district court denied the defendants' motions, stating, "With respect to the health care fraud allegations, the Indictment identifies by name the businesses through which Defendants allegedly obtained reimbursements from Medicaid in violation of [Defendant 1's] 2004 exclusion order." *Id.* at *3. The district court found that this was "enough information to adequately inform Defendants of the charges against them to enable the preparation of a defense and avoid surprise at trial." *Id.*

Ultimately, the defendants' arguments fail because the purpose of a bill of particulars is to inform the defendants of the nature of the charges against them, not to provide a detailed preview of the government's proof at trial. *See Afremov*, 2007 WL 24759722 at *2 ("In short, the prosecution's production of documents does not require a bill of particulars because the Superseding Indictment adequately informs the defendants of the precise charges against them."). Because the "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir. 1982), these requests should be denied. *See, e.g., United States v. Petters*, Crim. No. 08-364 (RHK/AJB), 2009 WL 1076199, at *4 (D.

Minn. March 26, 2009) (denying motion for bill of particulars seeking, among other things, identification of co-conspirators, victims, and losses).

The superseding indictment in this case is more than sufficiently detailed to allow defendants to prepare their defense, and it has been supplemented by voluminous disclosures that have gone well beyond what the government is legally obligated to provide. The superseding indictment not only contains language that tracks the statutory elements of the offenses charged, but also provides extensive details regarding the criminal conduct alleged to form the basis of those charges, which more than adequately address the questions posed by the defendants' respective motions.

For these reasons, the defendants' motions for a bill of particulars should be denied.

## IV.    DEFENDANTS' MOTIONS TO CHANGE VENUE (DKT. #260)

Defendants Abdiaziz Shafii Farah, Mohamed Jama Ismail, Mahad Ibrahim, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff have moved for a change of venue.[2] Significant cases with equal or far greater publicity have been tried fairly and impartially here in Minnesota, including trials involving

---

[2]    Much of the defendants' argument in support of their change of venue request hinges on a claim that the U.S. Attorney's Office "may have violated" Rule 6(e) of the Federal Rules of Criminal Procedure. *See* Dkt. #261, at 6-11. Specifically, the defendants claim that during a September 20, 2022 press conference announcing charges in this case, the U.S. Attorney's Office used two meal-count forms that, they suggest, appear to be grand jury material protected under Rule 6(e). However, that claim was mistaken, and no 6(e) was used during that event. Since the filing of this motion, the parties have met and conferred. Based on the government's representations that the two images referenced in the defendant's change of venue motion were derived from sources other than the grand jury, defendants do not allege that a 6(e) violation occurred.

the murder of George Floyd and the massive Petters fraud scheme. Nationally, change of venue motions have been rejected in trials involving the Boston marathon bombing, the 1993 World Trade Center bombing, and the Enron fraud scheme. The pretrial publicity in this case—far less by orders of magnitude—has not so displaced the judicial process such that these defendants cannot receive a fair trial. This Court can and should rely on jury selection and instructions to ensure an appropriately impartial jury in the District of Minnesota. The defendants' motion should be denied.

### A. There Is No Presumption of Prejudice Under the Facts of This Case and Transfer Would Be Inappropriate.

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," amend. VI. It also secures to criminal defendants the right to trial by "an impartial jury," *id.*, and to due process of law, amend. V. Taken together, these provisions require a change of venue only if, "extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. 358, 378 (2010).

Federal Rule of Criminal Procedure 21(a) provides for changes in venue under that narrow exception:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

A Rule 21(a) motion "is addressed to the sound discretion of the trial court." *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984). "The defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair

trial.'" *United States v. Sabhnani*, 599 F.3d 215, 232 (2d Cir. 2010) (citations omitted); *see also Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir. 1973); *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994). As the Supreme Court has explained, pretrial publicity "does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling*, 561 U.S. at 381 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.")).

This Court should reject the defendants' contention that pretrial prejudice will prevent them from obtaining a fair trial in the District of Minnesota—a large and diverse area with a population of over five and one-half million people. Their change-of-venue request ignores a court's ability to screen the jury pool to ensure a fair and impartial jury. *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986) ("[I]t was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors . . . ."). Indeed, the Supreme Court has held that it is proper to

presume juror prejudice only where pretrial publicity has effectively displaced the judicial process, which has not happened here. *See Skilling*, 561 U.S. at 381-82.

The proper path forward is for the Court to determine individual juror prejudice during voir dire, and ensure that a fair and impartial jury is selected in this case. *See Peters*, 791 F.3d at 1295. Given the strong public interest in prosecuting crimes in the district where they occur, and the defendants' inability to show that a fair jury cannot be empaneled in a district the size of Minnesota, the defendant's motion for change of venue should be denied.

The Supreme Court has presumed jury prejudice on the basis of pretrial publicity in only three cases, all of which were decided nearly 50 years ago on facts markedly different than those here: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). Wilbert Rideau was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnaping, and murder. *Rideau*, 373 U.S. at 724. Police interrogated him in jail following his arrest and filmed his confession. *Id.* On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. *Id.* In reversing Rideau's conviction, the Supreme Court explained that the televised confession was "in a very real sense . . . Rideau's trial — at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726.

The trial in *Estes* was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). And in *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." 384 U.S. at 355. Each of those cases, the Supreme Court later wrote, involved "a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798.

In contrast, the Supreme Court refused to presume prejudice in *United States v. Skilling*, a prosecution involving the well-known and well-publicized Enron fraud. Instead, the Court made clear that prejudice would be presumed only under the rare circumstances that equal those of *Rideau*, *Estes*, and *Sheppard*, *i.e.,* in cases where "inflammatory pretrial publicity so permeated the community . . . that the publicity in essence displaced the judicial process." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998). The *Skilling* Court explained:

> First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In *Rideau*, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. . . . Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. . . . Third, unlike cases in which trial swiftly followed a widely reported crime, *e.g., Rideau*, 373 U.S., at 724, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered

Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.

*Id.* at 382-83.

The circumstances of this case bear no resemblance to those of *Rideau*, *Estes*, or *Sheppard*. The so-called *Skilling* factors of the (1) size and characteristics of the community, (2) nature of the publicity, (3) time between the media attention and the trial, and (4) whether the jury's decision indicated bias well demonstrate that a change of venue is not warranted here. The District of Minnesota's population is, according to the most recent census, 5.7 million. United States Census Bureau, https://www.census.gov/quickfacts/MN. The jury pool is large, and there is no reason to doubt that twelve impartial jurors can be drawn from over 5.7 million people.

Second, the press conference and articles to which the defendants point are not of the sort that would leave indelible imprints that jurors cannot put to the side, such as a televised confession to kidnapping and murder. *See also United States v. Haldeman*, 559 F.2d 31, 61-62 (D.C. Cir. 1976) (holding that Watergate defendants were not entitled to change of venue because "the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession.").

Third, as in *Skilling*, the "decibel level of media attention" has subsided substantially. There is no reason to assume that past press coverage is indicative of future media attention nor that jurors will not be able to judge the facts based on the evidence at trial. Even significant, continuing, and prejudicial pretrial publicity can dissipate to acceptable levels by the time of the trial. *See, e.g.*, *Skilling*, 561 U.S. at

33

383. Indeed, the defendants' own exhibits demonstrate this fact. The articles they cite in support of their motion were filed at or near the time of the unsealing of the search warrants in March 2022 (Def.'s Exhs. E, F, G) or at the time charges were announced in September 2022 (Def.'s Exhs H, I, J, K).

"Ordinarily, the key to determining the appropriateness of a change of venue is a searching voir dire." *United States v. Jacques*, No. 2:08-cr-117, 2011 WL 1706770, at *4 (D. Vt. May 4, 2011) (internal quotation marks omitted). The defendants urge the Court to ignore that avenue and, instead, to find prejudice and to change venue. However, the presumption of prejudice only rarely applies and "attends only the extreme case." *Skilling*, 561 U.S. at 381. This is not such a case.

The defendants argue that, even if transfer to another venue is not mandatory, this Court should nonetheless exercise its discretion to transfer this case. The Supreme Court has repeatedly held that "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976); *accord Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 404 n.1 (1970) (Rehnquist, J., concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare.") (collecting cases). Even in the notorious *Sheppard* case, where the defendant was subjected to unimaginably prejudicial publicity, *see Sheppard*, 384 U.S. at 335-49, 353-61, the Court held that, absent the "carnival atmosphere" that pervaded the trial, the "months [of] virulent publicity about Sheppard and the murder" would not

have been sufficient to create a presumption of prejudice where the Court identified numerous measures that could have ensured a fair trial. *Id.* at 354-55.

Courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity." *United States v. Bliss*, 735 F.2d 294, 297-98 (8th Cir. 1984). As the Supreme Court explained in *Irvin v. Dowd*, "[i]t is not required . . . . that the jurors be totally ignorant of the facts and issues involved." 366 U.S. 717, 722 (1961). Indeed, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Id.* at 722-23. The Court emphasized that "[t]his is particularly true in criminal cases." *Id.*

As a result, "the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more" is insufficient "to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*; *accord Reynolds v. United States*, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its

merits."); *Drougas*, 748 F.2d at 29 ("[T]his court has previously recognized that the sixth amendment does not require that each juror's conscious mind be tabula rasa, let alone his or her subconsciousness."); *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (finding no manifest error in state court's determination that jury was impartial despite defense argument that 83% of veniremen were excused because they had prejudged the case).

Defendants suggest that a fair and impartial trial is not possible in Minnesota because, in their estimation, anecdotal "public comments on news stories" demonstrate a need to transfer venue. Dkt. #262 at 15. Defendants' argument is entirely without merit. The only purported support for defendants' contention are copies of news articles (almost all of which appear to be authored outside of Minnesota) and that, in any event, are followed by anonymous comments posted by individuals whose state (or country) of residence is unknown. Dkt. #262-1, Exs. E, F, G, I, J, and L; and Dkt. #262-2, Ex. M. Defendants' own professed evidence—select online chatter posted by individuals with no apparent residence in Minnesota—is unavailing and does not demonstrate a need for a change of venue outside of Minnesota.

Measures short of transfer will easily address the defendants' concerns, as they have time and again in cases involving significantly more pretrial publicity than this case where change of venue motions were properly denied, including trials involving:

- **the murder of George Floyd** (*see State v. Chauvin*, 989 N.W.2d 1, 20 (Minn. Ct. App. 2023) ("district court took numerous steps to verify that the

seated jurors would be fair and impartial, thereby mitigating any potential prejudice," and "the district court took numerous steps to prevent the trial from becoming 'utterly corrupted by press coverage…'"); *see also State v. Kueng*, 2021 WL 79794, at *3 (Minn. Ct. App. Jan. 11, 2021) ("we are not persuaded at this point in the proceedings that the district court's order [of denying Keung's motion to change venue] violates Kueng's right to an impartial jury or his rights to due process and fundamental fairness");

- **<u>the Petters fraud scheme</u>** (*see United States v. Petters*, 663 F.3d 375, 385-86 (8th Cir. 2011) ("the size of the jury pool would not favor a presumption of prejudice" and "only a small number of venire members had formed an opinion concerning Petters's guilt, and those individuals were excluded from the jury pool");

- **<u>the Boston Marathon bombing</u>** (see *In re Tsarnaev*, 780 F.3d 14, 16, 21 (1st Cir. 2015) (per curiam) (Boston is a "large, diverse metropolitan area, therefore, "residents obtain their news from a vast array of sources," and "the atmosphere [in Boston] is not to be characterized as disruptive to the ability of the petitioner to be adjudged by a fair and impartial jury," and noting that "Knowledge [of high-profile case from heightened media attention] however, does not equate to disqualifying prejudice");

- **<u>the 1993 World Trade Center bombing</u>** (*see United States v. Yousef,* 327 F.3d 56, 155 (2d Cir. 2003) (citation omitted) (the district court concluded that "a thorough voir dire of potential jurors will be sufficient in detecting

and eliminating any prospective jurors prejudiced by pretrial publicity," and as the Second Circuit observed, "Yousef did not renew the motion for a change of venue after the voir dire—an indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity");

- **January 6th Capitol Insurrection** (*see, e.g., United States v. Ballenger*, ___ F. Supp. 3d ___, 2022 WL16533872, at *3 (D.D.C. Oct. 28, 2022) ("A fair trial is possible even if even if an event had a significant impact on a community" and citing dismissed motions to change venue in other high-profile cases); and

- **Enron accounting fraud** (see *Skilling v. United States*, 561 U.S. 358, 382 (2010) (Larger cities are likely to have a far more diverse pool of jurors, therefore, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain," and there was a "reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals").

With no arguments that satisfy the legal standard, the defendants turn to allegations against the U.S. Attorney, claiming violations of certain rules and policies. Their arguments provide no conceivable basis for changing venue. In fact, the U.S. Attorney's remarks and press release violated no rules, did not unfairly prejudice the defendants, and were entirely consistent with the mission of the Department of Justice.

Courts may consider the extent to which the government is responsible for generating publicity in assessing a Rule 21 change-of-venue motion. *United States v.*

*Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990); *see also* 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, Fed. Rules of Crim. Proc. § 343 (4th ed.). Contrary to the defendants' allegations, the government did not do anything improper.

As the defendants now concede, there was no Rule 6(e) violation. As a result, the defendants' contention that a supposed 6(e) violation counsels in favor of a transfer to another venue is no more.

The defendants' allegation with respect to the U.S. Attorney's Office media release and press conference meets a similar fate. There was nothing inappropriate about the government's statements or press release. The U.S. Attorney's Office did not make any public comments about this case until after the grand jury returned indictments in September 2022, though the press had reported on the investigation long before that time beginning when the search warrants were filed and unsealed months earlier in March 2022. Dkt. #262-1, Exs. E (Mar. 10, 2022), F (Mar. 17, 2022), G (Mar. 9, 2022).

That the government announced charges and used information in the public domain in doing so, including in the indictments themselves, is unsurprising and indeed appropriate in a case as important as this one.

The U.S. Attorney acted appropriately in announcing charges in a case of extraordinary public importance concerning COVID-19 fund fraud. His statements fit squarely within the role and duty of the U.S. Attorney, as the chief federal law

enforcement officer in this District, to speak out and raise awareness of public fraud and the actions law enforcement is taking to combat it.

Nothing in any of the sources cited by the defendants prohibits the government from describing important charges to the public. To the contrary, the law recognizes the appropriateness of transmitting such information. *See* 28 C.F.R. § 50.2(a) ("[T]here are valid reasons for making available to the public information about the administration of the law. The task of striking a fair balance between the protection of individuals accused of crime or involved in civil proceedings with the Government and public understandings of the problems of controlling crime and administering government depends largely on the exercise of sound judgment by those responsible for administering the law and by representatives of the press and other media.").

The defendants suggest that the press conference statements were based on opinions and arguments. Not so. The U.S. Attorney's comments at the September 20, 2022, press conference were tethered throughout to the allegations contained in the indictments. They were appropriately framed as allegations. The U.S. Attorney limited his comments to the allegations in the indictment and explained that his remarks were based upon the indictments' allegations.[3] Thus, at the end of the day,

---

[3]    *See, e.g.,* Office of Public Affairs, U.S. Department of Justice, U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme, YOUTUBE (Sept. 22, 2022), https://www.youtube.com/watch?v=lXBVWVnXJrg at the following: 2:03-06 ("as alleged in these indictments"); 2:19-21 ("as set forth in the indictments…"); 2:37-40 ("As set forth in the six indictments that I will describe"); 3:01-05 ("Each indictment charges a group of defendants..."); 4:31-35 ("and the details, as alleged in these indictments"); 7:09-11 ("as alleged in the indictments"); 7:23-26 ("The allegations make clear that the defendants…"); 8:54-57 ("The indictments detail a number of

the defendants complain not about the U.S. Attorney's remarks, but about the allegations contained in the indictments—their own alleged criminal conduct.

As to the press releases themselves, in keeping with its standard practice, the U.S. Attorney's Office stressed that the defendants are presumed innocent unless and until proven guilty beyond a reasonable doubt in a court of law. *See, e.g.,* Press Release, Office of Public Affairs, U.S. Department of Justice, U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme (Sept. 22, 2022), https://www.justice.gov/opa/pr/us-attorney-announces-federal-charges-against-47-defendants-250-million-feeding-our-future.

---

these sites"); 9:48-50 ("As the indictments describe"); 10:23-25 ("some of which are set forth in the indictments"); 11:27-30 ("As charged in the indictments"); 11:51-55 ("The indictments explain how the defendants"); 14:56-15:01 ("now, not only were the reimbursement forms, as alleged in the indictment, false…"); 17:13-16 ("Another example, as alleged in these indictments"); 17:46-49 ("The indictments also explain that the defendants regularly provided …"); 18:00-03 ("later in the scheme, as alleged in the indictments"); 18:09-11 ("The indictments also detail …"); 18:50-53 ("and, as the indictment alleges, this was false …"); 19:08-10 ("As set forth in the indictments"); 19:25-28 ("At times, at set forth in the indictments …"); 20:07-12 ("All of this, the indictment alleges, was simply part of the scheme …"); 20:50-52 ("But, as the indictments allege…"); 21:10-15 ("In the Safari indictment, the charges explain how the defendants"); 21:44-46 ("The indictment alleges that a defendant…"); 22:02-04 ("According to the indictment"); 22:28-30 ("So, according to the indictment"); 23:04-06 ("But the indictment charges that …"); 24:50-55 ("This is just one example of the many in the indictment …"); 40:40-44 ("Well, I am going to stick with what's in the indictments for all of your questions"); 40:46-48 ("The indictment alleges that there were concerns…"); 40:57-41:00 ("That, that's what the indictment says when…"); 41:14-17 ("But everything about that is in the indictments"); 42:55-58 ("But, that's what I'm going to limit my answer to because the indictments don't go further into that"); 44:07-09 ("The indictments don't list …"); 48:20-24 ("The indictments allege that in some of the sites food was purchased …"); 48:39-40 ("The indictments allege"); 48:44-46 ("But, the indictments also make it clear…"); and 49:04-08 ("It's in the indictments. I'm going to refer to the indictments to answer that question").

In short, the challenged statements made by the U.S. Attorney and the U.S. Attorney's Office were fully compatible with the proper and fair administration of justice.

The defendants have failed to demonstrate that pretrial publicity has displaced the judicial process. This Court can and should rely on jury selection and instructions to ensure an appropriately impartial jury. *See Yousef*, 327 F.3d at 155 ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."). The announcements by the U.S. Attorney's Office were appropriate and important given the scope and nature of the criminal conduct. And the publicity in this case comes nowhere close to that in high-profile cases that have been correctly and presumptively tried in the district where the criminal conduct occurred. This Court should deny the defendants' motion for change of venue.

## V.    DEFENDANTS' MOTIONS TO SEVER (DKT. ##242, 243, 245, 248, 252, 253, 257, 259, 263)

Defendants Abdiaziz Farah, Mohamed Ismail, Mahad Ibrahim, Said Farah, Abdiwahab Aftin, and Mukhtar Shariff have filed motions to sever their trials from those of some or all of their co-defendants and sever certain counts of the superseding indictment. The defendants' arguments can be broadly broken down into three categories. First, defendants argue that severance is required as a legal matter, due to dangers of spillover evidence and unfair prejudice. Because defendants were all charged with participating in the same fraudulent scheme, and because the defendants have not met the high burden required to demonstrate that severance is appropriate, their motion should be denied.

42

Second, defendants argue that severance of the counts charging Federal Programs Bribery is necessary to prevent the jury from using evidence presented on the fraud and money laundering counts to "infer guilt" on the bribery counts.

Third, defendants argue that severance is required because a joint trial may violate the defendants' Sixth Amendment Right to confrontation. However, the defendants have not pointed to any statements that they believe would create confrontation issues pursuant to *Bruton v. United States*, nor is the government aware of any, and for that reason, their motion should be denied.

For the reasons set forth below, the defendants should be tried jointly with all co-defendants charged in the same indictment and conspiracy, and the single trial should include all the counts in the superseding indictment.

## A.    The Defendants Should Be Tried Jointly with all Co-Defendants

Rule 8(b) of the Federal Rules of Criminal Procedure provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 8(b) is "construed liberally in favor of joinder." *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995). The Supreme Court has repeatedly reminded federal courts that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 536 (1993); *United States v. Bordeaux*, 84 F.3d 1544, 1547 (8th Cir. 1996). As the Court has explained: "Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537.

43

Indeed, not every defendant joined must have participated in every offense charged for joinder to be appropriate. *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) (citing *United States v. Jones*, 880 F.2d 55, 62-63 (8th Cir. 1989)).

Here, all the co-defendants are charged with participating in the same fraudulent conspiracy. As described above, the superseding indictment alleges that they worked together to carry out the scheme and participated in the same conspiracy.

Notwithstanding the propriety of joinder under Rule 8(b), defendants also ask the Court to sever their trials from those of their co-defendants pursuant to Rule 14 of the Federal Rules of Criminal Procedure. They argue that severance is appropriate because they would be prejudiced by "spillover" evidence relating to other co-defendants. This is not proper grounds for a severance.

The Eighth Circuit has repeatedly held that "[w]hen defendants are properly joined, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009). To overcome this presumption a defendant must show prejudice that is "severe or compelling." *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008). "It is not enough that a defendant thinks his chances for acquittal would be better in a separate trial." *Delpit*, 94 F.3d at 1143 (citing *Zafiro*, 506 U.S. at 540). To demonstrate the type of severe or compelling prejudice necessary to overcome the presumption in favor of joint trials, a defendant must show that "(a) his defense is irreconcilable with that of a co-defendant

44

or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004); *see also Lewis*, 557 F.3d at 609. Such prejudice rarely rises to a level requiring severance. *United States v. Kirk*, 528 F.3d 1102, 1107 (8th Cir. 2008). Instead, "[t]he Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41).

The possibility that one defendant may attempt to point the finger at another defendant at trial is not grounds for a severance. It is not uncommon for co-defendants to blame each other at trial. The Supreme Court has held that "[m]utually antagonistic defenses are not prejudicial *per se*." *United States v. Nichols*, 416 F.3d 811, 816 (8th Cir. 2005) (quoting *Zafiro*, 506 U.S. at 538). The Eighth Circuit has repeatedly held that such blame shifting and finger pointing is not grounds for a severance. *See, e.g.*, *Zafiro*, 506 U.S. at 540-41 (holding that co-defendants who were accusing each other of the crime were not entitled to a severance); *Nichols*, 416 F.3d at 817 ("Blame-shifting on the part of the defendants 'is not a sufficient reason for a severance.'") (quoting *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir. 1997)); *Lewis*, 557 F.3d at 609 ("The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to 'point the finger,' to shift the blame, or to save himself at the expense of the other.").

Defendants claim a severance is necessary because they will be prejudiced by "spillover" evidence. This argument fails for two reasons. First, the defendants are charged with conspiracy to commit wire fraud and are therefore responsible for the actions their co-defendants took in furtherance of the scheme. The Eighth Circuit has "said many times that it will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators." *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002). Second, the fact that the evidence may be stronger against some defendants than others is not grounds for a severance. *See, e.g.*, *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased."); *Bordeaux*, 84 F.3d at 1547 ("Disparity in the weight of the evidence between the codefendants is not a sufficient reason for severance."); *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995) ("A severance, however, is not required merely because the evidence against one defendant is more damaging than the evidence against another."). This is so even where "evidence that is admissible only against some defendants may be damaging to others." *Mickelson*, 378 F.3d at 818 (citing *Blum*, 65 F.3d at 1444).

The concerns defendants raise about a joint trial are best dealt with through "careful and thorough jury instructions." *Delpit*, 94 F.3d at 1144 (citing *Zafiro*, 506 U.S. at 540-41). The Eighth Circuit pattern instructions cover many of the issues raised in defendants' various motion. *See, e.g.*, 8th Circuit Model Instruction 3.08

("Keep in mind that you must give separate consideration to the evidence about each individual defendant. Each defendant is to be treated separately . . ."); 2.14 ("You may consider some of the evidence in this case only against defendant (name); you may not consider that evidence against the other defendant[s]."). There is no reason to believe a properly instructed jury will not be able to fairly consider the evidence against each defendant, as well as each defendant's proffered defenses.

### B.    All Counts in the Superseding Indictment Should Properly Be Heard in the Same Trial.

The defendants argue that if the counts in the superseding indictment related to Federal Programs Bribery are tried at the same time as the other counts alleging conspiracy to commit fraud and money laundering, the defendants will suffer prejudice. For the same reasons discussed above, all counts charged in the superseding indictment should properly be heard in the same trial.

According to Federal Rule of Criminal Procedure 8, an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged— whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Here, the Federal Programs Bribery counts are properly joined under Rule 8(a). They concern conduct that is of the same or similar character because they refer to the same fraud scheme and conduct that was used to perpetuate the same fraud scheme.

Nevertheless, defendants argue that the Court should sever certain counts pursuant to Federal Rule of Criminal Procedure 14(a) because there is "a real

possibility that jurors will use evidence presented on the wire fraud and money laundering counts to infer guilt" on the bribery counts.

A defendant seeking severance bears the burden of establishing that joining counts in a single trial would be prejudicial. *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992). Prejudice exists where a "jury might use evidence of one crime to infer guilt on the other or . . . the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately." *United States v. Davis*, 103 F.3d 660, 676 (8th Cir. 1996). "On the other hand, a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime." *Id.* However, the mere possibility that a defendant could have a "better chance of acquittal in separate trials" does not mean that joinder is unfairly prejudicial. *Zafiro*, 506 U.S. at 539.

Here, evidence of the alleged fraud conspiracy is probative of the charged bribery counts, and evidence of the alleged bribes is probative of the charged fraud conspiracy. For the same reason that the defendants' "spillover" arguments fail with respect to their motion to sever defendants, that same argument fails as to their request to sever the bribery counts.

Defendant Abdiaziz Farah separately moves that Count 43 of the Superseding Indictment, charging Farah with making a false statement in an application for a passport, should be severed for a separate trial from the remaining counts. The passport fraud count is properly joined into a single indictment because the multiple

offenses are connected with or constitute parts of a common scheme or plan. At trial on the passport fraud count, the government will introduce evidence of the underlying fraud scheme because it is relevant to Farah's motive and intent to obtain a new passport. There is overlapping witnesses and testimony pertaining to both the passport fraud count and the remaining counts. The joinder rule permits very broad joinder because of the efficiency in trying the defendant on related counts in the same trial. *See United States v. Midkiff*, 614 F.3d 431, 439 (8th Cir. 2010) ("The rule is broadly construed in favor of joinder to promote judicial efficiency.").

Farah also contends that severance is required under Federal Rule of Criminal Procedure 14(a) to prevent prejudice. But again, evidence of the fraud scheme is relevant to the charged passport fraud count because it is evidence of Farah's intent to fraudulently obtain a passport after his original passport was seized during a search of his residence and vehicles.

### C.    A Joint Trial Will Not Violate the Defendants' Right to Confrontation.

The defendants argue that a joint trial would violate the defendants' Sixth Amendment rights to confrontation if the government offered extrajudicial statements of one defendant that implicate another defendant. The government is not aware of any such statement and the defendants collectively do not point to any particular statement that any defendant believes would implicate his rights under *Bruton v. United States*. For this reason, the Court should deny the defendants' motion as moot, with leave to refile should any defendant raise an issue implicating any defendant's rights pursuant to *Bruton*.

## VI.   MOTION TO SUPPRESS DEFENDANT'S STATEMENT (DKT. #250)

Defendant Mohamed Ismail moves to suppress a non-custodial interview he gave to law enforcement outside his home on January 20, 2022. Dkt. #250. Because Ismail's statement was non-custodial and voluntarily, his motion should be denied.

In January 2022, the government obtained a federal search warrant for Ismail's home in Minnesota, where he, in part, participated in the alleged fraudulent scheme to misappropriate federal funds. Agents executed the search warrant on January 20, 2022 at approximately 7:00 a.m., in a coordinated search of numerous business, houses, and other locations throughout Minnesota.

Ismail was home when agents arrived to conduct the search. Upon arrival, agents told Ismail that he was free to go and that he was not under arrest. Agents further advised that the decision to speak with them was voluntary and completely up to him, and that he could stop the interview or leave at any time.

Ismail agreed to speak with agents. Because agents were searching Ismail's house, and because the temperature was well below zero degrees, agents spoke with Ismail in an unmarked law enforcement vehicle parked outside his house. Agents spoke with Ismail for approximately two hours and recorded the interview. The agents were dressed in casual street clothing and Ismail was calm and composed throughout the interview. Agents left Ismail's house several hours after beginning the search. Ismail was not arrested that day.

### A.   Ismail's Statement Was Non-Custodial and Voluntary.

Ismail's motion should be denied because his statement was non-custodial and voluntary. A statement that is the product of a non-custodial interrogation should be

suppressed only if the statement was not made voluntarily. *See United States v. Clark*, No. 15-cr-154 DWF/LIB, 2015 WL 4964665, at *3 (D. Minn. Aug. 19, 2015). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001). In making this determination, courts will inquire into the totality of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist any pressure. *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990).

Ismail's statement was entirely voluntary. No coercive tactics were used. No threats were made. He was not shouted at or physically threatened. He was told he could end the interview (which took place in a vehicle outside his house due to the extreme cold) and leave at any time. The tone of the interview was cordial throughout.

Ismail argues that the interview that took place outside his house in a law enforcement vehicle during the search of his house was a non-Mirandized custodial interrogation. It was not.

When a suspect is interrogated in a custodial setting, the police must advise her of her right not to answer questions and to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief. *Id.*

The clearest example of custody is when a suspect is placed under formal arrest. *United States v. Ollie*, 442 F.3d 1135, 1136 (8th Cir. 2006). Absent a formal arrest, the Eighth Circuit employs a non-exclusive six-factor test in determining whether a suspect was in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The analysis depends upon a review of the totality of the circumstances, and the ultimate test is whether a reasonable person in the suspect's position would have felt free to end the interview. *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

"The most obvious and effective means of demonstrating that a suspect has not been taken into custody is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Griffin*, 922 F.2d at 1349. When a person is questioned at their home—on their "own turf"—the Eighth Circuit has observed repeatedly that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984); *see United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004).

Here, Ismail's January 20, 2022 interview was non-custodial. The agents repeatedly told Ismail that he was not under arrest and that he was free to leave or terminate the interview at any point. Ismail voluntarily agreed to respond to the agents' questions. The agents did not use any strong-arm tactics or deceptive strategies. The agents were wearing street clothing when they spoke with Ismail and did not yell or use aggressive language. The atmosphere of the questioning was not police dominated, but rather was friendly and professional. And Ismail was not placed under arrest at the termination of the questioning. For these reasons, the interview with Ismail was non-custodial.

Accordingly, no basis exists to suppress Ismail's statement. The defendant's motion should be denied.

**VII.   CONCLUSION**

The government respectfully requests that the Court dispose of defendants' pretrial motions as suggested above.

Date: July 10, 2023                          Respectfully submitted,

                                             ANDREW M. LUGER
                                             United States Attorney


                                      BY:    _/s/ Harry M. Jacobs_
                                             JOSEPH H. THOMPSON
                                             HARRY M. JACOBS
                                             MATTHEW S. EBERT
                                             CHELSEA A. WALCKER
                                             Assistant U.S. Attorneys