1
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2

3      ------------------------------------------------------------
                                    )
       United States of America,    ) File No. 22-cr-124
4                                   )            (NEB/TNL)
                 Plaintiff,         )
5                                   )
       v.                           )
6                                   )
       Abdiaziz Shafii Farah(1),    ) Courtroom 13W
7      Mohamed Jama Ismail(2),      ) Minneapolis, Minnesota
       Abdimajid Mohamed Nur(4),    ) Friday, May 17, 2024
8      Said Shafii Farah(5),        ) 9:06 a.m.
       Abdiwahab Maalim Aftin(6),   )
9      Mukhtar Mohamed Shariff(7),  )
       Hayat Mohamed Nur(8),        )
10                                  )
                 Defendants.        )
11     ------------------------------------------------------------
12
                    BEFORE THE HONORABLE NANCY E. BRASEL
13            UNITED STATES DISTRICT COURT DISTRICT JUDGE

14            **JURY TRIAL PROCEEDINGS - VOLUME XVIII OF XXX**

15

16

17

18

19

20     Court Reporter:          LYNNE M. KRENZ, RMR, CRR, CRC
                                United States Courthouse, Suite 146
21                              316 North Robert Street
                                St. Paul, Minnesota 55101
22
                                     *   *   *
23

24          Proceedings recorded by mechanical stenography;
       Transcript produced by computer.

25                                   *   *   *

```
 1      APPEARANCES:

 2      For Plaintiff:            UNITED STATES ATTORNEY'S OFFICE
                                  BY:   JOSEPH H. THOMPSON
 3                                      HARRY JACOBS
                                        MATTHEW S. EBERT
 4                                      CHELSEA A. WALCKER
                                        DANIEL W. BOBIER
 5                                600 United States Courthouse
                                  300 South Fourth Street
 6                                Minneapolis, Minnesota 55415

 7      For Defendant             BIRRELL LAW FIRM PLLC
        Abdiaziz Shafii           BY:   ANDREW S. BIRRELL
 8      Farah(1):                       IAN S. BIRRELL
                                  333 South Seventh Street, #3020
 9                                Minneapolis, Minnesota 55402

10      For Defendant             SIEBEN & COTTER PLLC
        Mohamed Jama              BY:   PATRICK L. COTTER
11      Ismail(2):                105 Hardman Court, #110
                                  South St. Paul, Minnesota 55075
12
        For Defendant             SAPONE & PETRILLO LLP
13      Abdimajid Mohamed         BY:   EDWARD V. SAPONE
        Nur(4):                   40 Fulton Street, 17th Floor
14                                New York, New York 10038

15      For Defendant Said        MASLON LLP
        Shafii Farah(5):          BY:   STEVEN L. SCHLEICHER
16                                      CLAYTON CARLSON
                                  225 South Sixth Street, #2900
17                                Minneapolis, Minnesota 55402

18      For Defendant             KOCH & GARVIS
        Abdiwahab Maalim          BY:   ANDREW S. GARVIS
19      Aftin(6):                 3109 Hennepin Avenue South
                                  Minneapolis, Minnesota 55408
20
        For Defendant Mukhtar     GOETZ AND ECKLAND P.A.
21      Mohamed Shariff (7):      BY:   FREDERICK J. GOETZ
                                        ANDREW H. MOHRING
22                                      KAITLYN C. FALK
                                  615 First Avenue NE, #425
23                                Minneapolis, Minnesota 55413

24

25
```

4210

1    APPEARANCES (Continued):

2    For Defendant Hayat        BRANDT KETTWICK DEFENSE PLLC
     Mohamed Nur(8):           BY:  MICHAEL J. BRANDT
3                                   NICOLE A. KETTWICK
                               2150 Third Avenue, #210
4                              Anoka, Minnesota 55303

5
     Court Reporter:           LYNNE M. KRENZ, RMR, CRR, CRC
6                              Suite 146 US COURTHOUSE
                               316 North Robert Street
7                              St. Paul, Minnesota 55101

8

9                                   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **I N D E X**

                                                        PAGE
2

3     **LUCY VONGDEUAN**
         Direct Examination By Mr. Bobier               4213
         Cross-Examination By Mr. Cotter                4225
4        Cross-Examination By Mr. Ian Birrell           4226

5     **REBECCA SCATENA**
         Direct Examination By Mr. Bobier               4228
6        Cross-Examination By Mr. Brandt                4242

7     **AGENT BRIAN PITZEN**
         Direct Examination (Continued) By Mr. Thompson:  4246
8        Cross-Examination By Mr. Ian Birrell           4319
         Cross-Examination By Mr. Mohring               4405
9        Cross-Examination By Mr. Cotter                4457
         Cross-Examination By Mr. Garvis                4476
10       Cross-Examination By Mr. Sapone                4490

11

12

     GOVERNMENT EXHIBITS                                 REC'D
13       H-50a                                          4287
         H-50b                                          4287
14       H-53t                                          4308
         H-55a                                          4304
15       H-85                                           4448
         L-33                                           4221
16       L-34                                           4232
         L-35                                           4234
17       L-37                                           4223
         L-39                                           4236
18       L-40                                           4238
         L-41                                           4239

19

20

21

22

23

24

25

1          **IN OPEN COURT**

2          **(JURY PRESENT)**

3                (Defendants present)

4                THE COURT:  Members of the Jury, as we have done

5     before, we are interrupting Agent Pitzen's testimony to

6     accommodate the schedule of a couple of witnesses this

7     morning, so we'll have a couple of witnesses out of order.

8                The government may call its next witness.

9                MR. BOBIER:  Your Honor, the government calls Lucy

10    Vongdeuan.

11               THE COURT:  Good morning.  You're going to stand

12    before me to take the oath and then you'll take the witness

13    chair.  Raise your right hand.

14               Do you affirm under penalty of perjury that the

15    testimony you're about to give is the truth, the whole truth

16    and nothing but the truth?

17               THE WITNESS:  Yes.

18               THE COURT:  Thank you.  You may be seated.

19               When you're seated, please state and spell both

20    your first and last name for the record.

21               THE WITNESS:  My name is Lucy Vongdeuan, Lucy,

22    L-U-C-Y.  Vongdeuan, V-O-N-G-D-E-U-A-N.

23               THE COURT:  You may inquire, Mr. Bobier.

24               MR. BOBIER:  Thank you, Your Honor.

25

**(Lucy Vongdeuan)**

**DIRECT EXAMINATION**

BY MR. BOBIER:

Q.  Ms. Vongdeuan, good morning.

A.  Good morning.

Q.  Could you introduce yourself to the jury, please, by telling them where you work.

A.  Sure, I work at U.S. Bank.  I have been there for 18 years under check processing.

Q.  And what do you do under check processing at U.S. Bank?

A.  I see all of the back office operations, so ingestion to clearing.

Q.  Can you describe what those mean to folks maybe not familiar with the system's process of how checks are cleared?

A.  Sure.  So think of writing a check.  If you deposit it into your account, whether it's via a branch, sent in, ATM, mobile, it goes through various steps of perfection prior to it posting to an account.

Q.  And when you say "various steps of perfection," can you tell us a little bit more about what that means.

A.  Sure.  So it ingests electronically into our settlement system.  Every detail of a check is verified and then sent for payment.

Q.  Okay.  I want to talk to you a little bit today about

1       the step-by-step process --

2       A.  Mm-hmm.

3       Q.  -- of how an accountholder at U.S. Bank might write a

4       check and have that check deposited by a recipient?

5       A.  Okay.

6       Q.  At a high level, could you just tell us kind of in plain

7       English what that process looks like.

8       A.  Sure.  So you're saying a U.S. Bank customer writing a

9       check?

10      Q.  That's right.

11      A.  Sure.  So a U.S. Bank check, let's say a customer is

12      writing it out to a payee, so whether that's a store or

13      another customer or a noncustomer, they would then hand that

14      check over.  They would deposit it into their account and

15      whether it's with U.S. Bank or another bank, it would then

16      flow electronically down into our system.  And the data and

17      the images themselves then flow through our settlement

18      system, which is housed in Olathe, Kansas.

19      Q.  When you say "the data and images" would flow from the

20      recipient bank --

21      A.  Mm-hmm.

22      Q.  -- into the U.S. Bank settlement system --

23      A.  Correct.

24      Q.  -- are you talking about data and images related to that

25      check?

1    A.  Correct.

2    Q.  Could you explain that a little more.

3    A.  Sure.  So any time a check is presented, obviously

4    because it's paper, it has to be converted into an

5    electronic image for payment, you know, and that's where we

6    moved in the 21st Century where we're not wanting to send

7    physical paper through for settlement.

8             So electronically we capture the account and

9    routing information, along with the image, and then sent

10   electronically downstream.

11   Q.  At one point in your description of U.S. Bank's systems

12   you mentioned a system in Kansas; is that right?

13   A.  That is where our data center is.

14   Q.  And what does the data center do in this process?

15   A.  It really just allows the electronic information to flow

16   and process through.

17   Q.  So if I'm a U.S. Bank customer and I write a check from

18   my account, give it to someone as payment and they deposit

19   it, does that transaction require use of the U.S. Bank

20   server in Kansas?

21   A.  Correct.

22   Q.  Even if I'm not in Kansas when I write the check?

23   A.  That's correct.

24   Q.  And even if the recipient of the check isn't in Kansas?

25   A.  That's correct.

1    Q.  All right.  I want to ask you about three checks at

2    issue in this case, okay?

3    A.  Okay.

4    Q.  The first one concerns Count 28 in the indictment in

5    this case.

6         Let me show you what is already in evidence on

7    that screen in front of you as Government's O-66.  And this

8    is at page 424.

9         All right.  Ms. Vongdeuan, can you see that?  I'll

10   zoom in a bit to make it a little more legible.  There.  Can

11   you see that in front of you?

12   A.  I can.

13   Q.  Can you describe what we're looking at here?

14   A.  Sure.  So this is an internal copy at Wells Fargo of a

15   purchase of a cashier's check for $137,270.41.

16   Q.  Okay.  Now, just to be clear, you are not a Wells Fargo

17   employee, right?

18   A.  Correct, I am not.

19   Q.  You work at U.S. Bank?

20   A.  Mm-hmm.

21   Q.  Okay.  Let me ask you a few details about this document

22   that's already in evidence.

23         Now, you mentioned that this is a document

24   reflecting purchase of a cashier's check; is that right?

25   A.  That's correct.

1    Q.  And before we go a few -- through a few of the details

2    here, can you just tell us at a high level what a cashier's

3    check is?

4    A.  Sure.  A cashier's check is different than a normal

5    check because it has to be paid for at the time of purchase.

6    Meaning if I go into a branch and -- it's specifically used

7    for large dollar amounts, you would have to pay with either

8    cash or withdrawal from your account and it's immediately

9    withdrawn and then this cashier's check is then created for

10   that large dollar amount.

11   Q.  So a cashier's check is sort of like a money order; is

12   that fair?

13   A.  Correct.

14   Q.  Okay.  So for this cashier's check, as shown on

15   Government's O-66, who is the purchaser?

16   A.  Mohamed Ismail.

17   Q.  And can you tell us the amount that Mohamed Ismail

18   purchased a cashier's check for at Wells Fargo?

19   A.  Correct.  It's $137,270.41.

20   Q.  Now, I noticed that U.S. Bank is mentioned here in the

21   "Pay to the Order of" row; is that right?

22   A.  Correct.

23   Q.  And right above that, can you tell us the date that this

24   check was purchased?

25   A.  It looks like May 27, 2021.

1    Q.  What does it indicate to you that U.S. Bank is written

2    here under "Pay to the Order of"?

3    A.  So this cashier's check was specifically made to pay

4    this dollar amount to U.S. Bank.

5    Q.  Did you have occasion to look into U.S. Bank records

6    concerning this transaction?

7    A.  I did.

8    Q.  And what did the U.S. Bank records indicate concerning

9    this cashier's check?

10   A.  This cashier's check was a payoff for a mortgage owned

11   by U.S. Bank.

12   Q.  Do you know if this cashier's check actually made its

13   way to U.S. Bank?

14   A.  It did.  This cashier's check was sent in with a payoff

15   quote, which is a physical letter sent by U.S. Bank, into

16   our Owensboro, Kentucky payment center and was processed via

17   remote deposit capture.

18   Q.  Okay.  You said the cashier's check was "sent in" to a

19   U.S. Bank center in Kentucky?

20   A.  Yep.

21   Q.  Do you know how it was sent in?  Was it scanned?  Was it

22   physically mailed?

23   A.  That I would not know.

24   Q.  But you know that the U.S. Bank system in Kentucky

25   received it, correct?

1    A.  Correct.  And they, of course, would have had to receive

2    the paper cashier's check with the letter.

3    Q.  Now, after the U.S. Bank processing group in Owensboro,

4    Kentucky received this cashier's check for $137,000 and

5    change, what happened with the funds next?

6    A.  So once it was captured or imaged, as I stated earlier,

7    electronically through remote deposit capture, it flowed

8    through our system, our settlement system, in Olathe,

9    Kansas.

10    Q.  From Kentucky to Kansas; is that right?

11    A.  Correct.

12    Q.  Do you know whether the -- well, you mentioned this was

13    a payoff against a mortgage; is that right?

14    A.  Mm-hmm.

15    Q.  Do you know whether the payoff against that mortgage as

16    represented by this 137,000 and change was in full

17    satisfaction of that mortgage?

18    A.  To my knowledge, yes.

19    Q.  That it was in full satisfaction?

20    A.  That it was.

21    Q.  Do you know the address of the property that Mohamed

22    Ismail paid off the mortgage on using this cashier's check?

23    A.  I don't recall the full address.  I know it is in

24    Savage, Minnesota.

25    Q.  Would it refresh your recollection to look at the U.S.

1    Bank payoff letter?

2    A.  Yes.

3             MR. BOBIER:  Your Honor, may I approach with the

4    payoff letter?

5             THE COURT:  You may.

6             (Witness reviews document)

7             THE WITNESS:  So the payoff property address is

8    13825 Edgewood Avenue, Savage, Minnesota 55378.

9    BY MR. BOBIER:

10   Q.  Okay.  Ms. Vongdeuan, let me ask you about a second

11   check, if I could.  This concerns Count 33 in the indictment

12   in this case.

13            Let me show you what's been marked for

14   identification as Government's L-33.

15            Do you recognize that document in front of you?

16   A.  Yes.  This is a check drawn off a U.S. Bank account.

17   Q.  Do you recognize that as a true and accurate copy of a

18   U.S. Bank check?

19   A.  I do.

20   Q.  Have you had occasion to review this particular record

21   before?

22   A.  I have.

23   Q.  And is this a record kept in the ordinary course of U.S.

24   Bank's business activities?

25   A.  Yes.

1          MR. BOBIER:  Your Honor, the government offers

2     L-33.

3          THE COURT:  Any objection?

4          MR. IAN BIRRELL:  No objection.

5          THE COURT:  L-33 is admitted and may be published.

6          MR. BOBIER:  Thank you, Your Honor.

7     BY MR. BOBIER:

8     Q.  Okay.  So now that the jury can see this check, can you

9     tell us again what bank this check is from?

10    A.  Yes.  This is drawn off a U.S. Bank account.

11    Q.  And up here in the top left, does this indicate the

12    account title on the account?

13    A.  Yep, that would be the payor.

14    Q.  And who is the payor here?

15    A.  Empire Cuisine & Market.

16    Q.  Can you tell us to whom this check is made out?

17    A.  Porsche Minneapolis.

18    Q.  And to the extent you're able to make out the memo line,

19    can you read any portion of this?

20    A.  "Car" -- I can't read that word, but "company."

21    Q.  Okay.

22    A.  "Purchase company."  I'm not sure.

23    Q.  The date is July 31, 2021; is that right?

24    A.  Correct.

25    Q.  And it's signed?

1    A.   Mm-hmm.

2    Q.   And what's the total amount on this check going from

3    Empire Cuisine & Market in July of 2021 to Porsche

4    Minneapolis?

5    A.   $29,083.87.

6    Q.   From your review of U.S. Bank's records, do you know

7    whether this check was paid?

8    A.   It was.

9    Q.   Do you know whether it was paid to Porsche Minneapolis,

10   the "Pay to the Order of" on the check there?

11   A.   Yeah.  So we can't see the exact account.  It was sent

12   in from -- through our partner, our share partner, through

13   Wells Fargo.  So we sent these funds through Wells Fargo and

14   it would just depend on, you know, where the account is

15   housed there.

16   Q.   Okay.  But your records confirm this check was paid out,

17   correct?

18   A.   Correct.

19   Q.   Was this -- in order for this check to be paid out,

20   would its information have to have moved through the Kansas

21   server that U.S. Bank uses to process checks?

22   A.   Yes, that's correct.

23   Q.   Let me show you one more.

24            This is marked for identification as Government's

25   L-37.

```
 1                    Do you recognize this document?
 2    A.  Yes.  It's also a check drawn off of a U.S. Bank
 3    account.
 4    Q.  Is it also a true and accurate copy of a U.S. Bank
 5    business record?
 6    A.  Yes.
 7              MR. BOBIER:  Your Honor, the government offers
 8    L-37.
 9              MR. IAN BIRRELL:  No objection.
10              THE COURT:  L-37 is admitted.  It may be
11    published.
12    BY MR. BOBIER:
13    Q.  All right.  Now, this check concerns Count 37 in the
14    indictment in this case.  I just want to ask you a few
15    questions about it, okay?
16    A.  Sure.
17    Q.  All right.  Can you tell us who the payor is?
18    A.  Empire Cuisine & Market, LLC.
19    Q.  And who is this one made out to?
20    A.  Lupient.
21    Q.  Can you tell us what the memo line says to the extent
22    you can make it out?
23    A.  Car-fleet-services.
24    Q.  This one is signed; is that right?
25    A.  Correct.
```

1    Q.  And dated August 21 of 2021; is that right?

2    A.  Correct.

3    Q.  What's the amount on this check going from the U.S. Bank

4    account to Lupient?

5    A.  $65,005.72.

6    Q.  And if I rotate this, we zoom in on what I believe is

7    the back of the check, is that what this sort of second

8    image is here on the screen?

9    A.  Correct.

10   Q.  Can you read to us what's written below for deposit

11   only?

12   A.  Yes, "For deposit only, Jim Lupient Infiniti."

13   Q.  Okay.  So this check went to Jim Lupient Infiniti; is

14   that right?

15   A.  Correct.  And the account number listed below.

16   Q.  Now, again, were you able to determine from your review

17   of your bank's records whether this check was paid?

18   A.  Yes.

19   Q.  And was it paid?

20   A.  Yes.

21   Q.  And in order for this check to be paid, would its

22   information have to have moved through the U.S. Bank server

23   in Kansas?

24   A.  Yes.

25             MR. BOBIER:  Thank you.  Nothing further, Your

1    Honor.

2              THE COURT:  Cross-examination?  Mr. Cotter.

3

4                        **CROSS-EXAMINATION**

5    BY MR. COTTER:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  My name is Patrick Cotter, I represent Mohammed Ismail.

9    I just have a few questions.

10             Real basic.  The Exhibit 66, where you were

11   advised of the purchaser of that cashier's check, is it your

12   understanding that Mr. Ismail would have had to physically

13   go to a branch store and purchase the cashier's check, is

14   that how that works?

15   A.  Yes.

16   Q.  All right.  So he'd have to go in person, have

17   identification, and he used his own name; is that true?

18   A.  Yes.

19   Q.  And then you don't have information about what account

20   he drew those funds from?

21   A.  No.

22   Q.  But you know that he used his own name in order to

23   purchase the cashier's check; is that correct?

24   A.  Per the evidence, yes.

25   Q.  Yeah.  And then that cashier's check was used in his

```
 1    name to pay off a mortgage that was in his own name; is that
 2    correct?
 3    A.  The cashier's check was used to pay off the mortgage,
 4    yes.
 5    Q.  And to your knowledge, that mortgage was in his same
 6    name, Mohamed Ismail, right?
 7    A.  Correct.
 8    Q.  Right.  And do you know how long that that mortgage had
 9    been -- how long U.S. Bank had owned that mortgage?
10    A.  I don't have that information, no.
11    Q.  All right.  But in any event, it was -- the check was
12    used to pay off his mortgage in his own name, correct?
13    A.  Correct.
14            MR. COTTER:  All right.  I don't have anything
15    further.  Thank you.
16            THE WITNESS:  Thank you.
17            THE COURT:  Mr. Birrell.
18            MR. IAN BIRRELL:  Just briefly.
19
20                     CROSS-EXAMINATION
21    BY MR. IAN BIRRELL:
22    Q.  Good morning, Ms. Vongdeuan.
23    A.  Good morning.
24    Q.  You are here to talk about how the information that gets
25    processed through the U.S. Bank system, right?
```

```
1    A.  Correct.

2    Q.  The way the information when you're paying checks,

3    receiving checks, goes electronically, right?

4    A.  Mm-hmm.

5    Q.  And you're not here to give any opinion on whether these

6    checks that you were shown, whether they're proper or

7    improper, right?

8    A.  Correct.

9              MR. IAN BIRRELL:  Nothing further.  Thank you.

10             THE COURT:  Any other defense counsel wish to

11   cross-examine?

12             Any redirect, Mr. Bobier?

13             MR. BOBIER:  No redirect, Your Honor.  Thank you.

14             THE COURT:  You may step down.  Thank you for

15   being here.

16             And the government may call its next witness, Mr.

17   Bobier.

18             MR. BOBIER:  Thank you, Your Honor.  The

19   government calls Rebecca Scatena.

20             THE COURT:  Good morning.  I'll have you come up

21   here and stand to take the oath.

22             Do you affirm under penalty of perjury that the

23   testimony you're about to give is the truth, the whole truth

24   and nothing but the truth?

25             THE WITNESS:  Yes.
```

```
 1                THE COURT:  Thank you.

 2                You may be seated, please.

 3                And when you are, I'll have you state and spell

 4    both your first and last name for the record.

 5                THE WITNESS:  Okay.  It's Rebecca Scatena.  And

 6    it's spelled R-E-B-E-C-C-A, S-C-A-T-E-N-A.

 7                THE COURT:  Mr. Bobier.

 8                MR. BOBIER:  Thank you, Your Honor.

 9                       (Rebecca Scatena)

10                       DIRECT EXAMINATION

11    BY MR. BOBIER:

12    Q.  Ms. Scatena, good morning.

13    A.  Good morning.

14    Q.  Could you introduce yourself to the jury by letting them

15    know where you work.

16    A.  Sure.  I work for Chase Bank in operations.

17    Q.  How long have you worked at Chase Bank?

18    A.  For 17 years.

19    Q.  Has that whole 17 years been in operations?

20    A.  It has not.  I've held a couple of different roles at

21    Chase.

22    Q.  What were those other roles?

23    A.  So I've worked in a control program bringing new

24    initiatives to market and I also worked in student loans for

25    a period of time.
```

1   Q.  Now that you're in operations at Chase Bank, can you

2   give us a sense of what your responsibilities are?

3   A.  Sure.  I manage a team of about 80 people and we handle

4   deposit review as well as a group called "Exceptions and

5   Returns."  So when items are presented to the bank and they

6   don't post directly, then my team would work those items to

7   then make sure that then they flow through the system

8   properly.

9   Q.  And given your 17 years of experience at Chase and your

10  role in operations, are you familiar with how Chase Bank

11  handles checks that are processed at the bank?

12  A.  Yes.

13  Q.  And checks that are written from Chase Bank

14  accountholders as well?

15  A.  Yes.

16  Q.  I want to talk to you a little bit about that process

17  this morning, okay?

18  A.  Okay.

19  Q.  Could you tell the jury just step-by-step what the

20  process looks like when a Chase Bank accountholder writes a

21  check and seeks to have it deposited in a recipient's

22  account.

23  A.  Sure.  So the account owner would write the check, give

24  it to the payee.  That person would then deposit the check

25  and then it would then be presented back to Chase, typically

1    through the bank of first deposit if it's not Chase and then

2    it goes through a clearinghouse for presentment.  It would

3    then bump against the account to make sure the funds are

4    there.  And then the same process kind of follows through

5    where it would go back through a clearinghouse and then pay

6    to the bank of first deposit.

7    Q.  So to be clear, when a Chase bank accountholder writes a

8    check and it is deposited in a recipient's account at a bank

9    other than Chase, the two banks don't communicate about the

10   check directly; is that right?

11   A.  That's correct.

12   Q.  In between those two banks, there's at least a

13   clearinghouse; is that right?

14   A.  That's right.

15   Q.  Can you tell us what that is?

16   A.  So it's a business that handles the image cash letters.

17   So it's basically a bundled electronic document that

18   includes the data about the check and typically the images

19   of the check.  And then it goes from one to the other,

20   handling not only the transaction but then also the monetary

21   bank-to-bank transfer of funds.

22   Q.  And you also mentioned in that process there's a bank of

23   first deposit?

24   A.  Correct.

25   Q.  Can you tell us what that term means?

1    A.  Ah, sure.  So the best example would be if I have a

2    Chase account and I write you a check and your bank is Wells

3    Fargo and you deposit it at Wells Fargo and then it comes

4    back, Wells Fargo is the bank of first deposit.  So it's

5    where the item was first deposited.

6    Q.  Ms. Scatena, does Chase Bank have servers that process

7    checking transactions like we've been discussing?

8    A.  Yes.

9    Q.  Are any of those servers in the State of Minnesota?

10   A.  No, they're not.

11   Q.  And in 2021 were any of those servers in the State of

12   Minnesota?

13   A.  They were not.

14   Q.  So even if a Chase check is written in Minnesota and

15   deposited by a recipient in Minnesota, still, that

16   transaction requires use of the out-of-Minnesota Chase

17   servers; is that right?

18   A.  That's correct.

19   Q.  All right.  I want to talk to you just briefly this

20   morning about five checks at issue in this case, okay?

21   A.  All right.

22   Q.  The first concerns Count 34 in the indictment in this

23   case.

24         Let me pull up for you on your screen there what's

25   been marked for identification as L-34.  And I'll zoom in to

1    make it a little more legible.

2    A.  Thank you.

3    Q.  Can you make that out right now?

4    A.  I can.

5    Q.  Do you recognize what I've put on the screen in front of

6    you?

7    A.  I do.

8    Q.  And what is it?

9    A.  It is check 1051, written off of the account of Nur

10   Consulting, LLC.

11   Q.  Do you recognize this as a Chase business record?

12   A.  Yes.

13   Q.  Is it a true and accurate copy of a Chase business

14   record?

15   A.  It is.

16           MR. BOBIER:  Your Honor, the government offers

17   L-34.

18           THE COURT:  Any objection?

19           MR. SAPONE:  No objection.

20           THE COURT:  L-34 is admitted and may be published.

21           THE COURT REPORTER:  I'm sorry.  Who said that?

22           THE COURT:  That was Mr. Sapone.

23           THE COURT REPORTER:  Okay.  Thank you.

24   BY MR. JACOBS:

25   Q.  Okay.  So now that the jury can see the check with us,

1    can you tell us, again, who the payor on this check is?

2    A.  Yes, it is Nur Consulting, LLC.

3    Q.  And above that there's some handwritten text.  Do you

4    see that?

5    A.  I do.

6    Q.  Are you able to make out what this name says about Nur

7    Consulting, LLC?

8    A.  I won't pronounce it right, but I don't know if I should

9    even give it a try, yeah.

10    Q.  Maybe Abdimajid Nur?

11    A.  Thank you.  Abdimajid Nur and then it has the

12    information "Wings" and what appears to be a number and a

13    loan account.

14    Q.  "Pay to the Order of."  Who's receiving this check?

15    A.  Wing's Financial.

16    Q.  And what does the memo describe?

17    A.  "Car payoff."

18    Q.  This check is signed, right?

19    A.  It is signed.

20    Q.  Dated August 9, 2021?

21    A.  Correct.

22    Q.  And what is the total amount going from Nur Consulting,

23    LLC, in August of 2021 to Wings Financial for car payoff?

24    A.  Sure.  $11,504.

25    Q.  Do you know if this check was, in fact, paid?

1    A.  It was paid.

2    Q.  Do you know where Wings, the recipient of this check,

3    where their bank of first deposit was located?

4    A.  Yes.  In Minnesota.

5    Q.  And to complete Wings's deposit, upon their receipt of

6    this check from Nur Consulting, LLC, would a Chase server

7    outside the State of Minnesota have had to have been used?

8    A.  Yes.

9    Q.  Let me show you a second check.  This has been marked

10   for identification as Government's L-35.  This concerns

11   Count 35 in the indictment.  And let me zoom in on this one

12   so you can make it out.

13            Are you able to see that?

14   A.  I can see it.

15   Q.  Is this also a true and accurate Chase Bank business

16   record?

17   A.  It is.

18            MR. BOBIER:  Your Honor, the government offers

19   L-35.

20            MR. SAPONE:  No objection.

21            THE COURT:  Mr. Sapone, thank you.  No objection.

22   So L-35 is admitted and may be published.

23            MR. BOBIER:  Thank you, Your Honor.

24   BY MR. BOBIER:

25   Q.  All right.  The jury can see the check with us now.

1   This is also from Nur Consulting, LLC, correct?

2   A.  Correct.

3   Q.  What's the date on this one?

4   A.  August 17th, 19 -- or sorry, 2021.

5   Q.  August 17th, 2021, correct?

6   A.  Yes.

7   Q.  The memo line similar to the last one, what does this

8   say?

9   A.  "Car payment."

10  Q.  Pay to the order of?

11  A.  "Dodge of Burnsville."

12  Q.  This one is also signed, correct?

13  A.  Correct.

14  Q.  All right.  In August of 2021, from Nur Consulting, LLC,

15  to Dodge of Burnsville, how much is this check for?

16  A.  $64,406.65.

17  Q.  Do you know that this check was actually paid?

18  A.  It was paid.

19  Q.  Do you know where the bank of first deposit is for this

20  transaction for Dodge of Burnsville?

21  A.  The bank of first deposit was Old National Bank and it

22  -- yeah, for a Minnesota account.

23  Q.  And do you know whether in order for Dodge of Burnsville

24  to deposit this check from Nur Consulting, LLC, Chase

25  servers outside the State of Minnesota would have had to

```
 1    have been accessed?

 2    A.  Yes.

 3    Q.  And were they accessed?

 4    A.  They were.

 5    Q.  All right.  Let me show you a third check.

 6             This has been marked for identification as

 7    Government's L-39.  Is this another true and accurate Chase

 8    business record?

 9    A.  It is.

10             MR. BOBIER:  Your Honor, the government offers

11    L-39.

12             MR. IAN BIRRELL:  This is Ian Birrell.  No

13    objection.

14             THE COURT:  Okay.  L-39 is admitted and may be

15    published.

16    BY MR. BOBIER:

17    Q.  Okay.  Who is the payor on this one, Ms. Scatena?

18    A.  Empire Cuisine & Market, LLC.

19    Q.  And what is this for, according to the memo line?

20    A.  "Construction payment" -- or maybe "project."

21    Q.  Okay.  Can you tell us where this is going or who the

22    payee is --

23    A.  Yeah.

24    Q.  -- on the check?

25    A.  Johnson-Reiland.
```

```
 1   Q.  And the date is September of 2021, correct?

 2   A.  Correct.

 3   Q.  And what is the amount in September 2021 represented on

 4   this check from Empire Cuisine & Market to Johnson-Reiland

 5   for construction project?

 6   A.  150,000.

 7   Q.  We're able to see on the back of this check, I think it

 8   says "Johnson-Reiland Builders;" is that right?

 9   A.  Correct.

10   Q.  Do you know whether this check was paid?

11   A.  It was paid.

12   Q.  Do you know where the bank of first deposit was on this

13   transaction for Johnson-Reiland?

14   A.  It was paid through Minnesota.

15   Q.  And in order to be paid through Minnesota to

16   Johnson-Reiland, would this check or its information have

17   had to have accessed Chase servers outside the State of

18   Minnesota?

19   A.  Yes.

20   Q.  And did they?

21   A.  They did.

22   Q.  Just two more.

23   A.  Okay.

24   Q.  Let me show you what's been marked as Government 40,

25   L-40, excuse me.
```

```
1            Is this another true and accurate Chase business
2     record?
3     A.  It is.
4            MR. BOBIER:  Your Honor, the government offers
5     L-40.
6            THE COURT:  Any objection?
7            MR. IAN BIRRELL:  No objection.
8            THE COURT:  Mr. Birrell, no objection.
9            L-40 is admitted and may be published.
10           MR. BOBIER:  Thank you, Your Honor.
11    BY MR. BOBIER:
12    Q.  This check is also from Empire Cuisine & Market, LLC; is
13    that right?
14    A.  Yes.
15    Q.  Dated September of 2021; is that right?
16    A.  Yes.
17    Q.  What's the memo line state?
18    A.  It looks like "groceries."
19    Q.  And to whom is this check going?
20    A.  Bushra Wholesaler, LLC.  Wholesalers, LLC.
21    Q.  And what is the amount going from Empire Cuisine &
22    Market to Bushra Wholesalers in September of 2021,
23    purportedly for groceries?
24    A.  $66,506.72.
25    Q.  Do you know whether this check was paid?
```

1    A.  It was paid.

2    Q.  Do you know where the bank of first deposit was for

3    Bushra Wholesalers for this check?

4    A.  Yes, it was a TCF bank.  So Twin City -- well, I think

5    it's Federal, the "F."

6    Q.  Do you know whether in order for Bushra to deposit this

7    check Chase servers outside the State of Minnesota would

8    have had to have been accessed?

9    A.  Yes.

10   Q.  And were they?

11   A.  They were.

12   Q.  Last check, Ms. Scatena.

13   A.  Okay.

14   Q.  Okay.  Let me show you what's been marked for

15   identification as Government's L-41.

16           All right.  Is this also a true and accurate Chase

17   business record?

18   A.  It is.

19           MR. BOBIER:  Your Honor, the government offers

20   L-41.

21           THE COURT:  Any objection?

22           MR. SAPONE:  No objection.

23           THE COURT:  L-41 is admitted and may be published.

24           MR. BOBIER:  Thank you, Your Honor.

25   BY MR. BOBIER:

1    Q.  All right.  Ms. Scatena, the checks we've looked at so

2    far have just been standard checks written from a Chase

3    account, correct?

4    A.  That's right.

5    Q.  This one at the top says, "Cashier's check."  Is that

6    right?

7    A.  That's correct.

8    Q.  Now, the jury heard earlier what a cashier's check is,

9    but can you tell us, in order to purchase a cashier's check

10    at Chase, does a Chase customer have to show identification?

11    A.  They do.  Yes.  They have to have an account with Chase

12    and they have to show identification.

13    Q.  When a cashier's check is purchased by someone at a

14    Chase location or someone with a Chase account, can you tell

15    us what happens on a system's level?

16    A.  Yes.  So there has to be money to pay for the check

17    that's going to be issued.  So withdrawal would be made from

18    the remitter and then the funds would be deposited into a

19    Chase-owned account and the cashier's check is written from

20    that account.

21    Q.  Now, we've been talking a lot about the Chase servers

22    outside of Minnesota; is that right?

23    A.  Yes.

24    Q.  In order to purchase a cashier's check from Chase, are

25    those same outside-of-Minnesota servers implicated?

4241

```
 1   A.  Yes.

 2   Q.  How so?

 3   A.  In order to query the funds and then withdraw the funds

 4   from one account depositing them into the Chase account, the

 5   same servers are used.

 6   Q.  So simply put, if I walk into a Chase and buy a

 7   cashier's check from my Chase account, those servers outside

 8   of Minnesota are accessed right away?

 9   A.  That's correct, yes.

10   Q.  Let me ask you a bit about this particular check.

11           Can you tell  us who the purchaser of the check is

12   or who the remitter is?

13   A.  Yeah.

14   Q.  Is it that name we saw earlier?

15   A.  It is.

16   Q.  Abdimajid Nur?

17   A.  Abdimajid Nur.

18   Q.  Where is this check going?

19   A.  Morrie's 394 Hyundai.

20   Q.  And this is dated September of 2021; is that right?

21   A.  That's right.

22   Q.  What's the amount going from Abdimajid Nur in the form

23   of this cashier's check to Morrie's Hyundai in September of

24   2021?

25   A.  $34,777.52.
```

1    Q.  From your review of Chase's records, were you able to

2    determine where this cashier's check was purchased?

3    A.  Yes.  It was purchased from the St. Louis Park branch in

4    Minnesota.

5    Q.  At the brick-and-mortar Chase location?

6    A.  It is.

7    Q.  So it would have been purchased in person according to

8    your records?

9    A.  Yes.

10   Q.  And at the time this check was purchased, were those

11   servers outside of Minnesota immediately accessed?

12   A.  Yes.

13   Q.  Do you know if Morrie's Hyundai deposited this check?

14   A.  They did.  It cleared.

15   Q.  It cleared?

16   A.  It did.

17          MR. BOBIER:  Thank you.

18          THE WITNESS:  You're welcome.

19          MR. BOBIER:  Nothing further, Your Honor.  Thank

20   you.

21          THE COURT:  Any cross-examination?  Mr. Brandt.

22                    **CROSS-EXAMINATION**

23   BY MR. BRANDT:

24   Q.  Good morning, Ms. Scatena.

25   A.  Yes.

 1    Q.  My name is Michael Brandt.  I've got a couple of

 2    questions for you here.

 3    A.  Sure.

 4    Q.  And I'm showing you Exhibit L-34.  You talked earlier

 5    this morning about that exhibit?

 6    A.  Yes.

 7    Q.  And I'm going to ask some questions, and it may be

 8    patently obvious, but bear with me here.

 9    A.  Okay.  Sure.

10    Q.  So first off, on this check it indicates that it was

11    drawn on an account, the name up in the upper left corner,

12    correct?

13    A.  Correct.

14    Q.  "Pay to Wings Financial," correct?

15    A.  That's right.

16    Q.  Doesn't indicate any other person was involved in this

17    transaction, correct?

18    A.  That's correct.

19    Q.  Okay.  And like I said, stating the obvious.  Just

20    wanted to make sure.

21            And the -- up on the top there you had read

22    earlier, there was some handwritten notes that would suggest

23    it was associated with number one, an account at Wings

24    Financial and a loan account, true?

25    A.  It does appear that way.

4244

1    Q.  Okay.  And then in the bottom left corner in the memo

2    field, it shows that this was for a car payoff, right?

3    A.  Correct.

4    Q.  Doesn't say "car purchase," does it, obviously?

5    A.  It doesn't.

6    Q.  Again, obvious.

7           And so based on your training and experience, it

8    would suggest at least by that memo field that this was to

9    pay off an existing loan with Wings Financial Credit Union,

10   correct?

11   A.  Seems that way.

12   Q.  Yep.  And so, you were asked earlier about some of the

13   practices dealing with, you know, dealing with the bank, how

14   things were processed, and so if there are records that --

15   well, strike that.

16          Let's back up to the loan.  It doesn't indicate in

17   terms of on that check, right, the -- who was on the loan

18   document; does it?

19   A.  It does not.

20   Q.  Doesn't indicate if there was a cosigner on the loan;

21   does it?

22   A.  It does not.

23   Q.  Could be, right?

24   A.  We don't know.

25   Q.  We don't know.  Exactly.

```
 1              And so based on your experience, I want to ask
 2      about some of the practices that we've touched on.
 3              So if there are bank records with Wings Financial
 4      that show that loan was paid by an individual, that loan
 5      number, and it matches this payoff with this check, would
 6      that suggest to you that the loan was being processed or
 7      paid by that individual?
 8      A.  It would.
 9      Q.  Okay.  Thank you.
10              MR. BRANDT:  Nothing further.  Thank you.
11              THE WITNESS:  You're welcome.
12              THE COURT:  Any other defense counsel?
13              Mr. Bobier any redirect?
14              MR. BOBIER:  No redirect, Your Honor.
15              THE COURT:  You may step down.  Thank you for
16      being here.
17              THE WITNESS:  Thank you.
18              THE COURT:  And the government may call its next
19      witness.  Are we back to Agent Pitzen?
20              MR. THOMPSON:  Yeah, Your Honor.  We would recall
21      Special Agent Brian Pitzen.
22              THE COURT:  Thank you.  Just one moment.
23              (Off-the-record discussion.)
24              THE COURT:  Good morning.
25              THE WITNESS:  Good morning, Your Honor.
```

1          Agent Pitzen is on the stand.  He remains under

2      oath.

3              Mr. Thompson, you may inquire.

4              MR. THOMPSON:  Thank you, Your Honor.

5                    **(Agent Brian Pitzen)**

6                 **DIRECT EXAMINATION (CONTINUED)**

7      BY MR. THOMPSON:

8      Q.  Welcome back, Agent Pitzen.

9      A.  Once again, thank you.

10     Q.  As the Judge just said, we have a substitute court

11     reporter today, so let's -- we'll try to keep it slow for

12     her sake, okay?

13     A.  Okay.  I'll try not to trip over you.

14     Q.  Okay.  Agent Pitzen, when we left off on Wednesday we

15     were talking about a series of text messages between

16     Abdiaziz Farah and Ahmednaji Maalim Aftin, correct?

17     A.  Correct.

18     Q.  And Mr. Aftin, where was he located according to these

19     text messages?

20     A.  Kenya.

21     Q.  And generally, what was the nature of the conversation

22     of the text messages that we went through on Wednesday?

23     A.  The ones we were going through were related to property

24     transactions in Kenya and flow of money from here to Kenya.

25     Q.  Okay.  And the flow of money from who to who?

```
 1    A.  From Abdiaziz Farah over to Kenya and others in the

 2    investigation.

 3    Q.  Thank you, Agent.

 4         I want -- you have -- you found when you reviewed

 5    Abdiaziz Farah's phone additional text message exchanges

 6    between Abdiaziz Farah and Ahmednaji Maalim Aftin related to

 7    the transfer of money to Kenya and the purchase of real

 8    estate in Kenya; is that right?

 9    A.  Correct.

10    Q.  I want to direct your attention to what's been admitted

11    as Government Exhibit H-52m.  And is this one of those text

12    message exchanges?

13    A.  It is, yes.

14    Q.  And again, Ahmednaji Maalim Aftin in blue.  Abdiaziz

15    Farah in green?

16    A.  Correct.

17    Q.  What's the date on this exchange?

18    A.  September 14th, 2021.

19    Q.  And it begins with a message from Ahmednaji Maalim

20    Aftin; is that right?

21    A.  Correct.

22    Q.  And it looks like he sends a document.  Could you

23    describe it?

24    A.  Yes.  This appears to be an agreement for sale that was

25    dated September 13th of that year, 2021.
```

1    Q.  So the day before the text message here?

2    A.  Correct.

3    Q.  I don't think we need to go through the whole document,

4    but could you describe the nature of the purchase?

5    A.  Sure.  It appears to be a property sold at Plot Number

6    7, 27 Milk Market between Mohamed Adan Omar and Ahmednaji

7    Maalim Aftin Sheikh.

8    Q.  And who was the purchaser according to this agreement?

9    A.  Ahmednaji Maalim Aftin Sheikh.

10   Q.  What was the purchase price?

11   A.  Seven million Schillings.

12   Q.  And I think we said the exchange rate was about a

13   hundred-to-one; is that right?

14   A.  Correct.

15   Q.  So that means seven million Kenyan Schillings would be

16   $70,000; is that right?

17   A.  That's correct, yes.

18   Q.  Okay.  I'm going to direct your attention to page 2 of

19   this exhibit.

20          It looks like there's another image that's sent by

21   Ahmednaji Maalim Aftin to Abdiaziz Farah; is that right?

22   A.  Correct.

23   Q.  And generally what's depicted on that?

24   A.  This is an application for funds transfer.

25   Q.  And on page 3, Ahmednaji sends a series of messages to

1   Abdiaziz Farah; is that correct?

2   A.   Correct.

3   Q.   What does he say?

4   A.   He says, "$100,000 from Amana, $100,000."

5   Q.   And again, what's Amana?

6   A.   That's the international money transfer service.

7   Q.   I'm going to show you now Government Exhibit H-52n.

8            Is this another text exchange between these two

9   the following day, September 15th, of 2021?

10  A.   It is, yes.

11  Q.   Again, about the transfer of funds from Abdiaziz Farah

12  in the United States to Ahmednaji and others in Kenya?

13  A.   Correct.

14  Q.   I'll start by reading Abdiaziz Farah in green, okay?

15  A.   Okay.

16  Q.   "Did you call the guy for the three million?"  Question

17  mark.  "And also, any update on the title?"

18  A.   "Yes, bro.  He refused the 3M and he needs dollars."

19  Q.   "Give him the rate, bro.  Is he okay with that?  $30,000

20  rate to Kenya."

21  A.   "Okay, bro.  Inshallah.  I love you so much."

22  Q.   "Love you too, bro."

23           And this continues on page 2 and 3 with Abdiaziz

24  Farah sending some images to Ahmednaji Maalim Aftin; is that

25  correct?

```
 1    A.  Correct.

 2    Q.  Could you describe them generally.

 3    A.  Sure.  This is a -- appears to be a rendering of what

 4    appears to be a residence.

 5    Q.  And on page 4?

 6    A.  Similar.  It appears to be a different landscape

 7    rendering kind of the front of the residence.

 8    Q.  To be clear, that's page 3 actually; is that right?

 9    A.  Correct.

10    Q.  I'm going to skip ahead to page 5.

11            And Abdiaziz Farah -- oh, on page 4, Ahmednaji

12    Maalim Aftin sends a photo; is that right?

13    A.  Correct.

14    Q.  What's in the photo?

15    A.  This is a photo of what appears to be a notebook with

16    handwriting inside of it.

17    Q.  Can you generally describe the handwriting.

18    A.  Sure.  It appears to be numbers written on their

19    calculations and then it appears to say at the bottom,

20    "Amana, 100,000."

21    Q.  So these are lists of dollar figures; is that right?

22    A.  Correct.

23    Q.  You see $90,000, $40,000, $100,000, figures like that?

24    A.  Correct.

25    Q.  And then on page 5, Abdiaziz Farah responds, "Thanks,
```

1    bro.  I need to get to 200 million by December.  Inshallah,

2    bro.  So 75 million to go, inshallah."

3    A.  "Inshallah bro, mcn."

4    Q.  And inshallah means God willing?

5    A.  Yes.  That's my understanding.

6    Q.  I'm going to skip ahead to some other messages about

7    money transfers.

8              Showing you now Government Exhibit H-52o.  This is

9    a text exchange on September 21st of 2021; is that right?

10   A.  Correct.

11   Q.  It begins with Abdiaziz Farah in green sending a image;

12   is that right?

13   A.  Correct.

14   Q.  What's this image?

15   A.  This is a -- it looks like a receipt from Taaj Services

16   in the United States.  It lists the sender as Abdiaziz Farah

17   and the receiver is Ahmednaji Maalim Aftin Sheikh.

18   Q.  What's the amount of money that Abdiaziz Farah sends to

19   him in this receipt, according to this receipt?

20   A.  6,000 U.S. Dollars.

21   Q.  And where is Ahmednaji Maalim Aftin Sheikh located

22   according to this?

23   A.  This is Mandera, Kenya.

24   Q.  Ahmednaji responds later that day with an image; is that

25   right?

```
 1    A.  Correct.

 2    Q.  What's the image?

 3    A.  This appears to be, again, an image of a rendering,

 4    potentially of a residence.

 5    Q.  And then on page 2 he sends another -- another

 6    screenshot it looks like; is that right?

 7    A.  Correct.

 8    Q.  What's the screenshot?

 9    A.  It's the same rendering from before and it has -- it

10    appears to be, like, a real estate listing potentially.  It

11    indicates, "For sale:  Estate South C.  Four bedroom with a

12    master en suite, study room, living and dining room."

13    Q.  Thank you.

14              Now, first, I want to direct your attention back

15    to H-52f, which is a text message that we looked at on

16    Wednesday from August 13th of 2021.  Do you see that?

17    A.  I do.

18    Q.  And it looks like Abdiaziz Farah sends a screenshot of a

19    text message conversation to Ahmednaji Maalim Aftin; is that

20    right?

21    A.  Correct.

22    Q.  And who is that text message exchange with?

23    A.  Uthman H.

24    Q.  And generally, what do they appear to be talking about?

25    A.  It appears to be talking about a property, the 12th
```

4253

1   floor, in the South C neighborhood.

2   Q.  And during the conversation someone says, "I have just

3   talked to the guy.  He says we can submit ground, plus 8 for

4   Donholm, but he needs 750,000 for facilitation."  Is that

5   right?

6   A.  Correct.

7   Q.  Now, I want to direct your attention to what's been

8   admitted as Government Exhibit H-52p, which is another text

9   message thread between Abdiaziz Farah and Ahmednaji Maalim

10  Aftin; is that right?

11  A.  Correct.

12  Q.  On September 28th of 2021?

13  A.  Correct.

14  Q.  And how does Abdiaziz Farah in green begin?

15  A.  "Asc, bro.  Talked to Uthman.  Please give him 1m.  I am

16  talking to Uthman."  And then he sends a TikTok video.

17  Q.  And then Ahmednaji Maalim Aftin responds with an image;

18  is that right?

19  A.  Correct.

20  Q.  Could you describe that image?

21  A.  It appears to be a rendering of an apartment building of

22  some sort.

23  Q.  Now I'm showing you what's been marked as H-52q, which

24  is a continued text message conversation between Abdiaziz

25  Farah and Ahmednaji Maalim Aftin on September 30th, 2021; is

1    that right?

2    A.  Correct.

3    Q.  And it begins with Abdiaziz Farah sending a text and an

4    image; is that right?

5    A.  Correct.

6    Q.  Could you describe what the title of this text is and

7    the image.

8    A.  Sure.  The title indicates this is a typical floor plan

9    for Capital View.  Capital View Properties, South C, in

10   Nairobi.  And it appears to be like a layout.  I think if

11   you scroll down, it's the main floor -- it doesn't say what

12   floor it's for, but typical floor plan, I guess, for one of

13   the floors within that proposed building.

14   Q.  And Capital View Properties, we looked at that on

15   Wednesday; is that right?

16   A.  We did.

17   Q.  What was that entity?

18   A.  That was the entity that was proposing to be building or

19   involved with the building of this project, the apartment

20   project.

21   Q.  Owned by Abdiaziz Farah and Abdiwahab Aftin and others;

22   is that correct?

23   A.  Correct.

24   Q.  All right.  Now I'm showing you the second page of this

25   exhibit.  Abdiaziz Farah begins, "We agreed with me, Said,

1    and Abdiwahab will top up your $2,000 Abdisitar with another

2    $3,000, and give Mohamed Ali a total of $5,000.  Can you

3    tell Naji that we took care of it and will send to Abdulahai

4    directly from here?"  Is that right?

5    A.  That's what it says, yes.

6    Q.  And here it goes on.  "Don't give Mohamed Ali anything,

7    bro.  We will take care of it from here."

8    A.  "Swa, bro."

9    Q.  "Asc, bro, Naji.  Please make sure to give Uthman, the

10   engineer, the 1 million.  He really needs it."

11           Now I'm showing you what's been admitted as

12   Government Exhibit H-52t.  Could you describe what we're

13   looking at here.

14   A.  This appears to be a rendering, again, images rendering

15   and it says "Afrigue" on it.

16   Q.  And who is -- and this is a text exchange; is that

17   right?

18   A.  Yes, it appears so.

19   Q.  Who's texting these images?

20   A.  Abdiaziz Farah.

21   Q.  Who is he texting them to?

22   A.  Ahmednaji Maalim Aftin.

23   Q.  Continued on page 2.  There's more renderings of this

24   Afrique?

25   A.  Correct.

1    Q.  And what does it say under -- or the picture on the sign

2    on this rendering, what does it say?

3    A.  It says, "Afrigue Food Event and Community Business

4    Center."

5    Q.  And then there's a missed call in response to those

6    texts; is that correct?

7    A.  Correct.

8    Q.  Or after them, anyway.

9         All right.  Agent Pitzen, moving on to H-52u,

10   another text exchange between Abdiaziz Farah and Ahmednaji

11   Maalim Aftin; is that right?

12   A.  Correct.

13   Q.  This time on October 19th of 2021?

14   A.  Correct.

15   Q.  And it looks like it begins with a screenshot sent to --

16   from Abdiaziz Farah to Ahmednaji Maalim Aftin; is that

17   right?

18   A.  Correct.

19   Q.  Could you describe the screenshot.

20   A.  Sure.  It's a screenshot.  It appears to be off of a --

21   potentially taking it off of a computer with a receipt for

22   Amana Money Transfer Company.

23   Q.  And can you tell who's sending the money to who per this

24   receipt?

25   A.  Sure.  It lists Abdiaziz Farah sending money to

1    Ahmednaji Maalim Aftin.

2    Q.  And what's the amount listed?

3    A.  I believe it says $9,000.

4    Q.  I'm going to skip ahead to page 4 of this exhibit.

5         And on October 21st, Ahmednaji Maalim Aftin sends

6    an image to Abdiaziz Farah; is that right?

7    A.  Correct.

8    Q.  What is this image?

9    A.  This image appears to be of a piece of paper listing

10   Amana Money Transfer and it lists the beneficiary as

11   Ahmednaji Maalim.

12   Q.  And who is the sender?

13   A.  Abdiaziz Farah.

14   Q.  What's the amount that he sent according to this

15   receipt?

16   A.  $60,000.

17   Q.  And after sending that image, what does Ahmednaji Maalim

18   Aftin text to Abdiaziz Farah?

19   A.  "I've got 60,000 from Amana today."  He sends an

20   attachment of a video file and then $60,000 from Amana.

21   Q.  And then moving to page 5, Abdiaziz Farah asks, "Did you

22   get the 1,000 from magala joga?  They will give you another

23   20,000 by Saturday."

24   A.  "Yeah, bro, m'pesa.  May Allah bless you."

25   Q.  "Mashallah.  That's awesome, bro.  You should get

1    $800,000 before the end of November from various people."

2    A.  "Okay, bro.  Inshallah.  Should I add the $80,000 to the

3    other money from ama?  That's 60,000 received, plus $20,000

4    on Saturday."

5    Q.  "Yes, bro.  Construction money.  Inshallah."

6    A.  "Where's the $30,000, bro?  Should I deduct from this

7    money or are you gonna send separately?  Because I paid it

8    from the construction money."

9    Q.  "I will send it.  Wait.  Also, you can check for me

10   Capital View Property for South Africa -- also, can you

11   check for me Capital View Property for South Africa?"

12          And this conversation continues on page 6; is that

13   right?

14   A.  It does.  He -- Ahmednaji Maalim Aftin responds, "Cool,

15   bro.  You need to balance at Capital View, ama?"  Question

16   mark.

17   Q.  "Yes, bro."

18   A.  And then Ahmednaji Maalim Aftin responds by sending what

19   appears to be an ABSA Bank statement in the name of Capital

20   View Properties Limited.

21   Q.  And have you -- have we gone through statements like

22   this in prior text messages --

23   A.  We have, yes.

24   Q.  -- with other people?

25   A.  Correct.

1    Q.  Directing your attention then to page 7 of this exhibit.

2              It looks like Ahmednaji Maalim Aftin sends another

3    version of the bank statement from Capital View Properties?

4    A.  It does.

5    Q.  At the Kenyan bank ABSA?

6    A.  Correct.

7    Q.  Abdiaziz Farah says, "Thank you, bro, so much."

8    A.  "Welcome bro, mcn."

9    Q.  On page 9 of Government Exhibit H-52u, does Ahmednaji

10   send another Amana Money Transfer receipt to Abdiaziz Farah

11   on October 23rd of 2021?

12   A.  He does, yes.

13   Q.  Could you describe the receipt.

14   A.  Sure.  Again, this is a paper receipt listing the

15   beneficiary as Ahmednaji Maalim and the sender is Abdiaziz

16   Farah, what's $20,000.

17   Q.  And then Ahmednaji, after sending that image, what does

18   he text Abdiaziz Farah?

19   A.  "Asc, bro.  I've received $20,000 from Amana today and I

20   have given $5,000 to Abdulahi Sadam."

21   Q.  "Asc, bro.  Thank you.  I will call you back in a little

22   bit."

23   A.  "Wcs, bro.  Okay, bro."

24   Q.  And then the final page, it looks Ahmednaji Maalim Aftin

25   sends a sheet of paper with a list of funds; is that right?

1    A.  Correct.  It appears to be the same notebook that was

2    sent earlier and then it appears like there's another line

3    item in there at the bottom in blue pen listing "Amana

4    $20,000."

5    Q.  Is that that money transfer we just looked at a page

6    ago?

7    A.  The numbers match.  It appears to be that, yes.

8    Q.  Added to the list.

9         And that's October 23rd, 2021; is that right?

10   A.  Correct.

11   Q.  Government Exhibit H-52v is additional text messages

12   between Abdiaziz Farah and Ahmednaji Maalim Aftin in Kenya;

13   is that correct?

14   A.  Correct.

15   Q.  That same day, October 23rd?

16   A.  Correct.

17   Q.  It begins with a text -- a title "Abdifatah, M. Aftin

18   cash received as of October 28th, 2021."  Is that right?

19   A.  Correct.

20   Q.  And what's listed on there?

21   A.  So this appears to list the Donholm project amounts,

22   payment details.

23   Q.  Mm-hmm.

24   A.  And it lists kind of fees and rates and then tolls it up

25   at the bottom.

1    Q.  Okay.  And then there's a series of images sent, as we

2    go through the pages here, Pages 2 and 3; is that right?

3    A.  Correct.

4    Q.  What do we see?

5    A.  So this appears to be similar floor plans that were

6    texted before of the apartment building for Capital View

7    Properties.

8    Q.  And then on page 4, it looks like there's another image

9    of a money transfer receipt; is that right?

10   A.  It appears to be, yes.

11   Q.  From Abdiaziz Farah to Ahmednaji Maalim Aftin?

12   A.  Correct.

13   Q.  And they continue it on page 6 and 7.  It looks like

14   there's additional documents related to this construction

15   project?

16   A.  It appears so, yes.

17   Q.  I'm going to show you now Government Exhibit H-52w.

18           This is an additional text message exchange in

19   November of 2021?

20   A.  It is.

21   Q.  It begins with Ahmednaji Maalim Aftin sending a

22   document; is that right?

23   A.  Correct.

24   Q.  Can you describe the document.

25   A.  Sure.  This appears to be an invoice related to Road

1    Trank for MaalAftin Company Limited and it indicates a

2    description.  "Deposit of one unit of four-bedroom apartment

3    at South C at Capital View Apartments."  Lists a unit and

4    total price of $18 million.

5    Q.  Okay.  And is that $18 million or 18 million Kenyan

6    Schillings?

7    A.  Oh, it doesn't, I guess, indicate that that I can see on

8    there, but it -- yeah, it most likely is Kenyan Schillings.

9    Q.  And what, according to the invoice, where are payments

10   to be made?

11   A.  At ABSA Bank Kenya.

12   Q.  Which account?

13   A.  Capital View Properties Limited.

14   Q.  And then on page 2 of Government Exhibit H-52w, Abdiaziz

15   Farah responds to that -- that invoice; is that right?

16   A.  He does.

17   Q.  And he states, "I need one for Empire Enterprises, LLC,

18   15418 Hampshire Lane, Savage, Minnesota 55378.  It has to be

19   related to property, bro., and it should say U.S. Dollars

20   and Kenyan Schillings."  Is that correct?

21   A.  Correct.

22   Q.  How does Ahmednaji Maalim Aftin respond?

23   A.  "We do both in kes and in dollars, bro.  We supposed to

24   write money on it.  Do we?"

25   Q.  "Yes, bro.  I need swift."

1           And then on page 3, it looks like Abdiaziz Farah

2     sends a document, a text, with the title, "Off Ole Shaparo

3     Road, South C."  Is that right?

4     A.  Correct.

5     Q.  And then there's a document attached, a PDF attached?

6     A.  Correct.

7     Q.  What's the -- can you describe the PDF.

8     A.  It appears to be an invoice related to Capital View

9     Properties Limited to Empire Enterprises, LLC.

10    Q.  What's the address listed for Empire Enterprises, LLC?

11    A.  2713 Fifth Avenue South in Minneapolis.

12    Q.  And it says --

13    A.  I believe it's Said Farah's residence.

14    Q.  Okay.  And what's it say attention -- the attention

15    line?

16    A.  Abdiaziz Farah.

17    Q.  Can you describe the description of the purchase,

18    according to the invoice.

19    A.  The description says, "Purchase of 20 percent

20    shareholding of Capital View Properties Limited.  Unit price

21    1 million."

22    Q.  And, again, that's pay to the order of Capital View

23    Properties Limited account at ABSA Bank in Kenya?

24    A.  That's the account listed here, yes.

25    Q.  And then Abdiaziz Farah then writes, after sending that

1    invoice, "Something like that."  And continued on page 4,

2    how does Ahmednaji Maalim Aftin respond?

3    A.  "What do we write in the description?  And share your

4    logo in photo."

5    Q.  "No logo, bro."

6    A.  "And what do I write in the description, bro?"

7    Q.  "Purchase of apartments."

8           On page 5, does Ahmednaji Maalim Aftin then send

9    another invoice to Abdiaziz Farah?

10    A.  He does, yes.

11    Q.  Could you describe it.

12    A.  It lists at the top, "Empire Enterprises, LLC," and it

13    appears to be, again, an invoice from MaalAftin Company

14    Limited.  "Description:  Purchase of two acres of land in

15    Mandera from MaalAftin Company Limited."  With a unit price

16    of 50 million.

17    Q.  And again, what does the invoice direct in terms of how

18    to pay this invoice?

19    A.  Here it says to make the payments to Equity Bank of

20    Kenya in the account name of MaalAftin Company Limited.

21    Q.  On page 6, Ahmednaji then sends another photograph of an

22    application for funds transfer; is that right?

23    A.  Correct.

24    Q.  And then on page 7, Abdiaziz Farah responds, correct?

25    A.  He does.

1    Q.  What does he say?

2    A.  "Bro, you forgot that the amount needs to be U.S.

3    Dollars.  If you have a U.S. Dollar account, make sure it's

4    listed on the invoice.  Also it doesn't have an invoice

5    number, bro."

6    Q.  Agent Pitzen, now I'm going to direct your attention to

7    Government Exhibit H-52x, which is another text message

8    exchange in November of 2021; is that right?

9    A.  Correct.

10   Q.  Again, between Abdiaziz Farah and Ahmednaji Maalim

11   Aftin?

12   A.  Correct.

13   Q.  And again, regarding this purchase of apartments and

14   real estates in Kenya by Empire Enterprises?

15   A.  That's what it states, yes.

16   Q.  Okay.  Can you -- this begins with another invoice from

17   Ahmednaji Maalim Aftin to Abdiaziz Farah, correct?

18   A.  From MaalAftin Company Limited, yes.

19   Q.  Could you describe the invoice.

20   A.  Sure.  This says it's an invoice to "Empire Enterprises,

21   LLC, 15418 Hampshire Lane, Savage, Minnesota.  Attention,

22   Abdiaziz Farah.  Description:  Purchase of 40 acres of land

23   in Mandera from MaalAftin Company Limited.  Unit price 1

24   million Kenyan Schillings."

25   Q.  And the date is November 22nd of 2021?

1    A.  Correct.

2    Q.  And who are the payments to be made to?

3    A.  They're to be made to an account -- account name

4    MaalAftin Company Limited at Equity Bank.

5    Q.  And who's listed as the director of the MaalAftin

6    Company?

7    A.  Ahmednaji Maalim Aftin.

8    Q.  Moving on to page 2 of Government Exhibit H-52x.  The

9    conversation continues after Ahmednaji Maalim Aftin sends

10   that invoice; is that right?

11   A.  Correct.

12   Q.  And specifically Abdiaziz Farah says, "Bro, give that

13   guy 20,000 ASAP."  And there's a phone number and a name,

14   Khalid Mohamed Haji, is that right?

15   A.  Correct.

16   Q.  How does Ahmednaji Maalim Aftin respond?

17   A.  "Okay, bro."

18   Q.  "Thanks, bro."

19        And then Ahmednaji Maalim Aftin sends an image.

20   Can you describe the image.

21   A.  Sure.  The image that he sends appears to be some sort

22   of travel document, a passport, it says -- and the name on

23   there is Abdigani Maalim Aftin.

24   Q.  And which country is listed -- which country issued this

25   passport?

1   A.  The Republic of Kenya.

2   Q.  And what nationality is listed for Abdigani Maalim

3   Aftin?

4   A.  Kenyan.

5   Q.  And what's his place of birth?

6   A.  Mandera, Kenya.

7   Q.  Now, I'm turning to page 3, Ahmednaji Maalim Aftin then

8   sends another image of a passport; is that right?

9   A.  Yes, he does.

10  Q.  Whose passport is that?

11  A.  This is Ahmednaji Maalim Aftin, his passport.

12  Q.  And which country issued this passport?

13  A.  Republic of Kenya.

14  Q.  What nationality is listed for Ahmednaji Maalim Aftin?

15  A.  Kenyan.

16  Q.  And where is his place of birth?  What is listed as his

17  place of birth?

18  A.  Mandera, Central Kenya.

19  Q.  Then at the bottom of page 3 there's another -- it looks

20  like a travel document; is that right?

21  A.  Yeah, it appears to be something issued by the Republic

22  of Turkey, like a Vize maybe.

23  Q.  Okay.

24  A.  V-I-Z-E.

25  Q.  And who is this -- who is did the Republic of Turkey

 1    issue this Vize to?

 2    A.  Ahmednaji Maalim Aftin Sheikh.

 3    Q.  And what kind of a Vize is it?

 4    A.  It says, "Tourism."

 5    Q.  And then on page 4 of Government Exhibit H-52x, there's

 6    another image that Ahmednaji Maalim Aftin sent to Abdiaziz

 7    Farah; is that right?

 8    A.  Correct.

 9    Q.  Could you describe --

10            MR. SAPONE:  Objection.  Could we have a sidebar?

11            THE COURT:  You may.

12            **(At sidebar)**

13            MR. SAPONE:  Can you hear me?  Can the Court hear

14    me?

15            THE COURT:  Yes.

16            MR. SAPONE:  Thank you, Your Honor.

17            So, Your Honor, the objection here is to leading.

18    I let it go on for a long time, but I want to just give the

19    Court a little insight into the basis for my objection.

20            The questions are consistently as follows -- or

21    here's an example:

22            Government:  "On page 6, Aftin sends another

23    invoice to Farah; is that right?"  Versus asking the

24    witness, "What does it show?"

25            Another example.  Government question:  "And again

1    it begins with another invoice, right?"  Versus, "What does

2    it begin with?"

3            Here's another example.  Government question:

4    "Then Aftin sends an image.  Can you describe the image?"

5    Versus asking, "What does it show?"

6            And then lastly, government question:  "Aftin then

7    sends another passport; is that right?"  Versus, "What does

8    Aftin appear to send?"

9            So I understand that a little bit of leading is

10   good because it speeds the process up and maybe there's no

11   prejudice but it seems that, you know, this is happening too

12   much and I object.

13           THE COURT:  Okay.  The objection to that last

14   question is sustained.

15           I need you to object every time to leading.  I

16   can't -- I can't have a standing objection, as I said

17   before, on that ground.  Sometimes it's helpful, as you say,

18   sometimes it is not.  And so when defense counsel believes

19   that it is objectionable, you need to object and I will

20   rule.  It's the only way that I can manage the courtroom and

21   that's what the Federal Rules of Evidence require.

22           So I will sustain that objection to the last

23   question.

24           MR. SAPONE:  Yes.

25           THE COURT:  Okay.

1          **(In open court)**

2              THE COURT:  Objection was leading.  It is

3      sustained.

4      BY MR. THOMPSON:

5      Q.  Agent Pitzen, I'm directing your attention back to

6      Government Exhibit H-52x at page 4.

7              What does Ahmednaji Maalim Aftin send to Abdiaziz

8      Farah at 7:16 a.m. on November 23rd of 2021?

9      A.  It's a tourism Vize issued from the Republic of Turkey

10     to Abdigani -- in the same of Abdigani Maalim Aftin.

11     Q.  It appears that Ahmednaji Maalim Aftin sends a series of

12     texts after that?

13     A.  Yeah, there was a couple, yeah, missed calls and then a

14     message after that, yes.

15     Q.  Could you describe the text.

16     A.  Sure.  It says, "Confirmed, ksh, 20,000 sent to Khalid

17     Haji on November 23rd, 2021."

18     Q.  And then on page 5, what does Ahmednaji Maalim Aftin

19     send to Abdiaziz Farah?

20     A.  It appears to be a travel itinerary of Qatar Airways.

21     Q.  Can you describe the -- what's listed as the travel.

22     A.  Sure.  It says the passengers are Abdigani Maalim Aftin

23     and Ahmednaji Maalim Aftin.  And it lists departing

24     Istanbul, Turkey and it appears to be going to Doha, Qatar.

25     Q.  Is there a second flight listed below from Doha, Qatar?

4271

1    A.  There is, yes.

2    Q.  Where is that flight to?

3    A.  Nairobi, Kenya.

4    Q.  And we go to the next page.  There's another picture

5    sent from Ahmednaji Maalim Aftin to Abdiaziz Farah; is that

6    correct?

7    A.  That is correct.

8    Q.  Can you describe that picture.

9    A.  Sure.  This is a -- it looks like a document issued by a

10   travel agency, again, listing flights departing Friday,

11   November 26th from Nairobi, Kenya going to Doha, Qatar.  And

12   it looks like it's the same two individuals that are on that

13   flight.

14          And then below there's a -- it looks like what

15   appears to be a return flight, Friday, November 26th, from

16   Doha, Qatar -- it's not a return flight, I apologize.  Going

17   from Doha, Qatar to Istanbul, Turkey.

18   Q.  And, again, the dates on that travel, do you --

19   A.  Sure.  On here it lists -- it was issued on November

20   24th and the flight dates are listed as November 26th,

21   2021.

22   Q.  And on page 5, does that list a return flight from

23   Istanbul?

24   A.  It appears to be, yes.  Again, through Doha, Qatar back

25   to Nairobi, Kenya.

1    Q.  I'm going to direct your attention back to Government

2    Exhibit H-51q -- that was weird.  The computer says no.  I'm

3    moving on.

4              I'm showing you now what's been admitted as

5    H-52aa; is that right?

6    A.  Correct.

7    Q.  What is depicted here?

8    A.  Again, there's a series of messages with Ahmednaji

9    Maalim Aftin sending two Amana Money Transfer receipts.

10   Q.  Okay.  And can you describe how does he begin the

11   conversation?

12   A.  "Asc, bro.  I have received today 90,000 -- 90,000 from

13   Amana from the first batch of $300,000 -- or 300,000K."

14   Q.  What does he then send to Abdiaziz Farah?

15   A.  He sends an Amana Money Transfer receipt with the

16   beneficiary listed as Ahmednaji Maalim and the sender is

17   Abdiaziz Farah and the amount listed is 300,000.

18   Q.  Does he send a second text after that?

19   A.  He does, yes.

20   Q.  Can you describe that.

21   A.  This here indicates Amana Money Transfer cash deposit in

22   the amount of 210,000 U.S. Dollars.

23   Q.  And what's listed as the description?

24   A.  It says "Amednaji Hafi Aftin.

25              And then he responds by saying, "Picked up another

1    60,000 from Amana.  That's a total of 150,000 today.  90,000

2    plus 60,000K equals 150,000 -- 150K."

3    Q.  $150,000?

4    A.  Correct.

5    Q.  How does Abdiaziz Farah respond?

6    A.  "Thank you, bro, so much."

7    Q.  You found other texts related to the transfer of money

8    to Kenya?

9    A.  I did.

10   Q.  Showing you now Government Exhibit H-52z, what's the --

11   who's the party to these text messages?

12   A.  Sure.  Ahmednaji Maalim Aftin sending a picture -- what

13   appears to be a picture to Abdiaziz Farah of a box with what

14   appears to be money in it banded in rubber bands.

15   Q.  How would you describe the box?

16   A.  It appears like it's a shoebox-style type of a box.

17   Q.  Okay.  What does -- after sending that picture of that

18   box, does Ahmednaji send some additional text to Abdiaziz

19   Farah?

20   A.  He does.  There's a handwritten piece of paper that

21   says, "Total dollars at Farah."  And it says, "300,000 minus

22   30,000."  And then it leaves a balance of $270,000.

23           He then sends a text.  Ahmednaji Maalim Aftin

24   sends a message to Abdiaziz Farah saying, "$270,000 cash."

25   Q.  Abdiaziz Farah then asks, "Is this from Amana, bro?"

```
 1              Abdiaziz Farah sends some additional text messages
 2     on page 2 of Government Exhibit H-52z; is that right?
 3     A.  He does.
 4     Q.  What does he say?
 5     A.  "Okay, bro.  Can you call Amana and see if they have
 6     money for us?"
 7     Q.  And then what does he send?
 8     A.  He then sends two picturings -- two pictures, it looks
 9     like it appears to be renderings of some sort of
10     restaurant-style place.  I believe, it says "Afrigue" up in
11     the -- kind of the menu board up there.
12     Q.  And on page 3, there's some additional texts from
13     Abdiaziz Farah; is that right?
14     A.  Correct.  Additional messages, yep.
15     Q.  And could you describe them for the record.
16     A.  Sure.  They're additional renderings.  Appear to be the
17     same Afrigue-type restaurant.
18     Q.  Okay.  Showing you another text message, H-52bb, could
19     you describe what Government Exhibit H-52bb depicts?
20     A.  Sure.  This is a series of messages, again, between
21     Ahmednaji Maalim Aftin and Abdiaziz Farah.
22     Q.  Ahmednaji Maalim Aftin in blue?
23     A.  Correct.
24     Q.  Do you want to read his portion and I'll real Abdiaziz
25     Farah in green?
```

1    A.  "Bro, I have received another 50K from Amana today.  So

2    I have a total of 200K from the 700K."

3    Q.  "Okay, bro.  Thank you."

4    A.  "Welcome bro, mcn."

5    Q.  And Abdiaziz Farah writes, "iPhone 13 Pro, 256

6    gigabytes, sierra blue, AirPods.  Mega safe duo charger.  I

7    got you everything, bro, and I got an iPhone 13 for

8    Abdigani."

9    A.  "Mashallah, bro.  Thanks, bro, mcn."

10    Q.  Abdiaziz Farah continues.  "I'm only staying for five

11    days and not trying to spend any money, agahaha.

12    Hassan-style."

13    A.  "It's perfect."

14    Q.  "I would have stayed longer to work on South C project

15    but not title.  Inshallah, khayr.  Love you, bro, and sleep

16    well."

17         Does this conversation continue on page 2 of

18    Government Exhibit H-52b?

19    A.  It does, yes.

20    Q.  And it begins with a text from Abdiaziz Farah or

21    continues with a text from Abdiaziz Farah; is that right?

22    A.  It does.

23    Q.  Could you describe it.

24    A.  Sure.  There's what appears to be like a screenshot,

25    phone screenshot, that lists Model Y.  It appears to be a

1    vehicle, a Tesla Model Y vehicle with the VIN number and

2    it shows a delivery date of Friday, December 24th, 2 to

3    4 p.m.

4    Q.  How does Ahmednaji Maalim Aftin respond to that message

5    about the delivery of a Tesla Model Y?

6    A.  He says, "Thanks a lot, bro.  Time will come and all

7    will be well.  Hehe.  That's beautiful, bro.  Could you also

8    help us have Toyota Prada TX in Kenya?  We can use it to

9    make other comfortable at least that we have a car."

10            He then sends a -- Ahmednaji Maalim Aftin sends a

11   picture of a vehicle in the message.

12   Q.  A Toyota?

13   A.  It appears to be that way, looking at the front grille,

14   yes.

15   Q.  Turning your attention to page 3 of Government Exhibit

16   H-52b, Abdiaziz Farah continues?

17   A.  Correct.

18   Q.  How does he respond to that request?

19   A.  He says, "How much is it?"

20   Q.  And Ahmednaji Maalim Aftin says, "Best quality after

21   duty, $60,000, bro."  Is that right?

22   A.  Correct.

23   Q.  That is -- how does the conversation continue?

24   A.  "Let's meet and we can talk about it, inshallah."

25   Q.  And then Ahmednaji Maalim Aftin responds to that?

1    A.  Correct.

2    Q.  What does he say?

3    A.  "I guess this time you are coming with money to spend

4    for the seven days.  How much are you carrying in the

5    pocket?  Hehe.  Thanks, bro.  Cool.  Inshallah."

6    Q.  Showing you now Government Exhibit H-52cc.  Is this an

7    additional text message exchange between Abdiaziz Farah and

8    Ahmednaji Maalim Aftin?

9    A.  It is.

10   Q.  What's the date on these?

11   A.  December 26th, 2021.

12   Q.  And what's the first text message?

13   A.  It's a -- it appears to be a receipt listing the sender

14   as Ahmednaji -- Abdimajid Mohammed Nur and then it lists the

15   receiver name as Ahmednaji Maalim Aftin.

16   Q.  And according to this receipt, how much money does

17   Abdimajid Nur send to Ahmednaji Maalim Aftin?

18   A.  2,500 U.S. Dollars.

19   Q.  And where does that transfer go to?

20   A.  Nairobi.  Nairobi, Kenya.

21   Q.  Then there's another text from Abdiaziz Farah to

22   Ahmednaji Maalim Aftin; is that right?

23   A.  Correct.

24   Q.  Would you describe the image just generally.

25   A.  Sure.  This is another receipt of money sent from

1    Farhiyo Hirsi to Ahmednaji Maalim Aftin for $500.

2    Q.  And then directing your attention to the second page of

3    Government Exhibit H-52cc, Abdiaziz Farah then sends an

4    image; is that right?

5    A.  Correct.

6    Q.  Could you describe it.

7    A.  It appears to be a picture of a passport in the name of

8    Abdimajid Mohamed Nur.

9    Q.  And then what does Abdiaziz Farah text to Ahmednaji

10   Maalim Aftin after sending that image?

11   A.  He says, "I need COVID tests for me and Abdimajid

12   tomorrow.  Inshallah."

13   Q.  He says, "Don't forget about my COVID-19 certificate."

14   A.  Correct.

15   Q.  On the next page, there's another text from Abdiaziz

16   Farah to Abdimajid Maalim Aftin on that same day?

17   A.  There is, yes.

18   Q.  Could you describe the text.

19   A.  This is a picture of a U.S. passport in the name of

20   Abdiaziz Farah.

21   Q.  And then on page 4 and 5 there's some additional travel

22   documents; is that right?

23   A.  Correct.

24   Q.  And 6, as well?

25   A.  Correct.

1    Q.  I'm going to direct your attention to page 7 of

2    Government Exhibit H-52cc, okay?

3    A.  Okay.

4    Q.  And could you describe or read through this exchange on

5    December 26th of 2021?

6    A.  Sure.  Abdiaziz Farah says, "Everything is on the

7    passports, bro."  Ahmednaji Maalim Aftin responds, "Full

8    name, Abdiaziz S. Farah," with an e-mail address, addresses,

9    contact names.

10   Q.  Who's listed as the next-of-kin?

11   A.  Ahmednaji Maalim Aftin Maalim.

12   Q.  What does Abdiaziz Farah respond to that?

13   A.  "Thanks, bro."

14   Q.  What does -- how does that conversation continue then?

15   A.  Ahmednaji Maalim Aftin responds, "Welcome, bro, mcn."

16   Abdiaziz Farah responds, "Have a great night.  Bro, please

17   grab the documents from Abdiwahab wife."

18   Q.  And then on page 8, there's a COVID certificate; is that

19   right?

20   A.  Yes, it's listed as a COVID-19 vaccination certificate.

21   Q.  Issued by the Republic of Kenya?

22   A.  Correct.

23   Q.  And then another one on page 8 -- or 9 and 10?

24   A.  Correct.

25   Q.  And then directing your attention to page 11, there's an

1    exchange -- or the exchange continues on December 27th; is

2    that right?

3    A.  It does.

4    Q.  Could you describe it.

5    A.  Sure.  Abdiaziz Farah says, "I know my Nairobi very

6    well.  And also my Kiswahili.  Ha, ha, ha.  Let's meet at

7    11:30.  Pick up Abdimajid kondoo and meet me at mama

8    Sahara."

9    Q.  And at the bottom of the page Ahmednaji Maalim Aftin

10   says, "Give me ten minutes."

11   A.  Correct.

12   Q.  And then at the bottom of page 12 of Government Exhibit

13   H52-cc, Ahmednaji Maalim Aftin sends a series of text

14   messages to Abdiaziz Farah; is that right?

15   A.  Correct.

16   Q.  What does he text him about?

17   A.  He texts him some sort of an account number and then

18   says, "Amana, 270,000, Tawakal 717,000, and $300,000

19   yesterday.  Total $1,287,000.  Mahat Bashir."

20   Q.  And then Abdiaziz Farah responds, "Yes, bro."

21   A.  Correct.

22   Q.  Directing your attention to Government Exhibit H-52dd,

23   is this another text message exchange between Abdiaziz Farah

24   in green and Ahmednaji Maalim Aftin in blue?

25   A.  It is, yes.

```
 1    Q.  What's the date on which this exchange begins?

 2    A.  January 9th, 2022.

 3    Q.  Can you -- I'll read the Abdiaziz Farah in green, okay?

 4    A.  Sure.

 5    Q.  "Any update from Amana, bro?"

 6    A.  "Bro, I received Abdigani $10,000."

 7    Q.  "Asc, bro.  Add to the math, inshallah."  And then,

 8    "Thanks, bro."

 9    A.  "Welcome bro, mcn.  I wanted $3,000 from Mohamed Ismail,

10    bro, and he failed to pick my calls."

11    Q.  "Ha, ha, ha.  He will send, bro.  Don't worry."

12    A.  "Inshallah, bro.  Next year."

13    Q.  Directing your attention now to H-52ee.  Additional text

14    exchange on January 15th of 2021?

15    A.  Correct.

16    Q.  How does Abdiaziz Farah begin the conversation?

17    A.  He says -- sends a message saying, "Copy of petitioner

18    certificate of naturalization.  Information on the

19    certificate is needed on the form.  Petitioner height,

20    weight, eye and hair color."  With a series of questions

21    below that.

22    Q.  Okay.  And can you generally describe the types of

23    questions that are -- that Abdiaziz Farah includes in this

24    message?

25    A.  Sure.  It asks questions about if there's -- his
```

1    children, country of birth, and relationship.

2         Has Naji ever been in the U.S.?  Has Naji ever

3    been in immigration proceedings or judicial proceedings?

4    The last address and beneficiary.  Physical address.  Live

5    together?  "Have you previously filed for Naji or another

6    person, if so, provide their full name, date of filing,

7    place of filing, and result."

8    Q.  After sending that message, Abdiaziz Farah sends another

9    one, is that correct?

10   A.  He does.

11   Q.  And what does he explain in the second message?

12   A.  "Tell Abdigani to help you with everything."

13   Q.  And then Ahmednaji Maalim Aftin responds, "Swa, bro,

14   inshallah."

15   A.  "Please send all the paperwork to my e-mail.

16   Inshallah."

17   Q.  How does Ahmednaji Maalim Aftin respond?

18   A.  "Okay, bro.  Mcn.  I love you so much."

19   Q.  Abdiaziz Farah states, "Love you, bro.  Stay blessed and

20   I will call you when I wake up, inshallah."

21   A.  Abdimajid responds, "Brother love.  Stay blessed always.

22   Inshallah.  May Allah continue to always --

23        COURT REPORTER:  I'm sorry.  Can you slow down,

24   please.

25        THE WITNESS:  Oh, I'm sorry.  "Brother love.  Stay

1    blessed always.  Inshallah.  May Allah continue to always

2    elevate you, bro."

3    BY MR. THOMPSON:

4    Q.  Abdiaziz Farah replies, "Amen, bro."

5            It looks like there's a missed voice call?

6    A.  Correct.

7    Q.  And Abdiaziz Farah states -- or asks, "Did Abdiwahab

8    give you $5,000, bro?"

9    A.  Ahmednaji Maalim Aftin responds, "Yeah, bro."

10   Q.  And then Abdiaziz Farah says, "Okay, bro.  Keep it.  Add

11   to the math, bro.  Inshallah."

12           It looks like Ahmednaji Maalim Aftin sends an

13   audio file, correct?

14   A.  Correct.

15   Q.  And then Abdiaziz Farah says, "Just keep it, bro.,

16   Adiga.  Inshallah."

17           And then Ahmednaji Maalim Aftin sends an image to

18   Abdiaziz Farah; is that right?

19   A.  Correct.

20   Q.  Could you describe the image.

21   A.  Sure.  It's a -- looks like a piece of notebook paper

22   with handwriting on it with sums of money.  And then I see

23   it says, "Amana" on there, on a couple of them.  So it

24   appears to be kind of an accounting of money received.

25   Q.  And then finally on page 4 of this exhibit, Government

4284

 1    Exhibit H-52ee, Ahmednaji Maalim Aftin sends another image

 2    to Abdiaziz Farah; is that right?

 3    A.  Correct.

 4    Q.  Could you describe it.

 5    A.  Sure.  It's, again, handwritten piece of paper.  It

 6    lists 130,000 tickets to Istanbul.  $7,200 for something.

 7    Abdimajid, 11,500.  And then it lists, I guess, a sum of

 8    some other numbers, 51,000, 10,200, and 20,000.

 9    Q.  Directing your attention to Government Exhibit H-52ff,

10    an additional text message exchange between these two; is

11    that correct?

12    A.  Correct.

13    Q.  And what's the date?

14    A.  January 19th, 2022.

15    Q.  Begins with a series of text messages or WhatsApp

16    messages from Ahmednaji Maalim Aftin to Abdiaziz Farah; is

17    that correct?

18    A.  Correct.

19    Q.  Could you describe the images on page 1 of this exhibit.

20    A.  Sure.  This appears to be pictures of a vehicle.  And

21    then the exterior of the vehicle is in the first image and

22    then the second is a picture -- it appears to be on the

23    inside of it.

24    Q.  And then on page 2?

25    A.  Page 2 is a -- the top picture is a picture of the rear

1    of the vehicle, which appears to have the Toyota emblem and

2    then the picture below that is kind of from the front

3    corner.

4    Q.  And then on page 3?

5    A.  He sends another picture of the front of the vehicle.

6    Q.  And then Abdiaziz Farah texts, "Abdiwahab will send you

7    $5,000 tomorrow.  Buy him a Lexus, bro, for 3.7 million.

8    That should be enough for him."

9    A.  Ahmednaji Maalim Aftin responds, "Lexus is 4.5M, bro.

10   Will just buy him Harrier hybrid, bro.  Thanks a lot.  And

11   be blessed bro.  Praying for you that Kowthar will deliver

12   twins, bro."

13   Q.  Abdiaziz Farah says, "Inshallah, bro.  Amen."

14            And then on page 4 of this exhibit, there's some

15   text messages on January 19th; is that right?

16   A.  Correct.

17   Q.  Abdiaziz Farah says, "Thank you, bro.  And safe journey,

18   bro.  Much love.  And I will call you in the morning.

19   Please send the documents, ASAP."

20   A.  And on January 20th, 2022, Ahmednaji Maalim Aftin

21   responds, "Bro?  I have received another $60,000 from Amana

22   today."

23   Q.  Agent Pitzen, in January 20th, 2022, the date of that

24   last text, was that a significant day in this investigation?

25   A.  It was, yes.

```
 1    Q.  How so?
 2    A.  That was the date that numerous search warrants were
 3    executed.
 4    Q.  Including search warrants related to these defendants?
 5    A.  Yes.  Correct.
 6    Q.  Thank you.
 7           Agent Pitzen, when you reviewed -- we've been
 8    talking about a lot of real estate and other investments in
 9    Kenya; is that right?
10    A.  Correct.
11    Q.  When you looked at Abdiaziz Farah's phone, did you find
12    messages between him and individuals in this other -- other
13    individuals in this case about investments in Kenya?
14    A.  Yes.
15    Q.  Does that include text messages with Mukhtar Shariff?
16    A.  Yes.
17    Q.  I'd like to show you what's been marked but not yet
18    admitted as Government Exhibit H-50a and H-50b.  Do you see
19    those?
20    A.  I do, yes.
21    Q.  Could you describe what these are.
22    A.  These are WhatsApp messages that were found in a similar
23    fashion to the other ones on Abdiaziz Farah's phone.
24    Q.  And these are excerpts related to that topic we were
25    just talking about?
```

```
 1    A.  Correct.
 2              MR. THOMPSON:  Your Honor, I would move to admit
 3    Government's Exhibit H-50a and H-50b.
 4              THE COURT:  Any objection?
 5              MR. GARVIS:  No objection, Your Honor.
 6              MR. IAN BIRRELL:  No objection, other than
 7    conditionally admitted.
 8              THE COURT:  H-50a and b are conditionally
 9    admitted.
10              MR. THOMPSON:  Thank you, Your Honor.
11    BY MR. THOMPSON:
12    Q.  Agent Pitzen, I'm starting with Government Exhibit
13    H-50a, okay?
14    A.  Okay.
15    Q.  And I want to direct your attention to page 4.
16              Could you describe what we're looking at here in
17    this exhibit and orient the jury.
18    A.  Sure.  This is a message -- I guess a string of
19    messages between Mukhtar Shariff and Abdiaziz Farah in July
20    of 2021.
21    Q.  And Mukhtar Shariff is listed in blue; is that right?
22    A.  That is correct.
23    Q.  How is he listed in Abdiaziz Farah's phone?
24    A.  Mukhtar DAR.
25    Q.  Okay.  Do you want to read Mukhtar Shariff's part in
```

1    blue and I'll read Abdiaziz Farah's in green?

2    A.  Sure.  "Okay.  Once we know the food situation with

3    Sysco, I'll put together a logistics plan and delivery

4    schedule."

5    Q.  "Inshallah.  Let's get that money so that we can get

6    apartments in hometown, bro."

7    A.  "Say less, akhi.  May Allah swt put baraka in it."

8    Q.  "Amen, bro, and always, bro.  You know we are hard

9    workers, bro.  We don't want anything free, just want to

10   earn it."

11   A.  "Absolutely, bro."

12   Q.  Abdiaziz Farah then sends an image?

13   A.  He does.

14   Q.  Could you describe it.

15   A.  It appears to be a rendering of an apartment building.

16   Q.  Is that similar to some of the renderings that we talked

17   about the other day?

18   A.  It is, yes.

19   Q.  How does Mukhtar Shariff respond to that rendering?

20   A.  He responds.  "You think we can build one of these after

21   summer, lol?"

22   Q.  "It depends on us, bro.  That's the third one for now,

23   alx.  Patience, bro."

24   A.  "Inshallah, bro.  You right.  Hard work pays off."

25   Q.  And that's on page 5 of Government Exhibit H-50a; is

1    that right?

2    A.  Correct.

3    Q.  Directing your attention now to page 13 of the

4    Government Exhibit H-50a, okay?

5    A.  Okay.

6    Q.  Can you describe -- well, when does this text message

7    exchange begin?

8    A.  December 21st, 2021.

9    Q.  And how does Mukhtar Shariff begin?

10   A.  "When are you free to meet?"

11   Q.  "I'm in Kenya now.  Inshallah.  Coming back the 27th."

12   A.  "Okay.  Let's meet soon as you come back.  We got a lot

13   to discuss."

14   Q.  "You let me know.  You are the mastermind.  I am just an

15   investor, bro."

16   A.  "You are mastermind as well, lol.  Need your business

17   mind."

18   Q.  Abdiaziz Farah writes, "You know one thing I forgot to

19   add to the contract when I purchased Afrique shares.

20   Afrique, Nairobi.  Afrique, Shakopee.  I should be the

21   majority shareholder and exclusive use of branding."

22   A.  "Add Afrique Garissa too."  And then he loved his prayer

23   message.

24   Q.  "That's all you, bro."

25   A.  "Lol."

1    Q.  "Check WhatsApp."

2    A.  "Asc, bro.  You back yet?"

3    Q.  And directing your attention back to the middle of

4    page 13 there, Abdiaziz Farah talks about purchasing Afrigue

5    shares; is that right?

6    A.  Correct.

7    Q.  I'm going to direct your attention back to page 2 of

8    this exhibit.  Government Exhibit H-52.  And there's a text

9    message on June 1st, 2021?

10   A.  Correct.

11   Q.  To -- from Abdiaziz Farah to Mukhtar Shariff; is that

12   right?

13   A.  Correct.

14   Q.  Can you describe what Abdiaziz Farah sends to Mukhtar

15   Shariff that day?

16   A.  There's a picture that's sent.  It's an image of a check

17   from Empire Cuisine & Market, LLC, pay to the order of

18   Afrigue Hospitality, $200,000.  And it says in the memo

19   line, "Shares Purchase."

20   Q.  And then Abdiaziz Farah sends a followup message right

21   after that; is that correct?

22   A.  Correct.

23   Q.  What does he say?

24   A.  "It's ready, bro."

25   Q.  Mukhtar Shariff responds, "Thanks, bro."

1    A.  Correct.  Abdiaziz Farah responds, "No tip for you and

2    Mohamed, though.  Mahad too."

3    Q.  "Lol, next time, lol."

4              THE COURT:  Mr. Thompson.

5              MR. THOMPSON:  Yes.

6              THE COURT:  Are you ready for a morning break?

7              MR. THOMPSON:  Absolutely.

8              THE COURT:  Thank you.

9              We are going to take a break until 11:05 and then

10    we'll be back here.  All rise.

11        (Recess taken at 10:48)

12                        *    *    *    *    *

13        (11:09 a.m.)

14                        **IN OPEN COURT**

15              THE COURT:  Counsel, you may continue.

16              MR. THOMPSON:  Thank you, Your Honor.

17    BY MR. THOMPSON:

18    Q.  Agent Pitzen, before the break we were looking at some

19    text messages between Abdiaziz Farah and Mukhtar Shariff; is

20    that right?

21    A.  Correct.

22    Q.  And they were about Kenyan real estate?

23    A.  Correct.

24    Q.  I'd like to show you now Government Exhibit H-50b.  What

25    do we have here?

 1    A.  So, again, this is another portion of a text message --

 2    or WhatsApp messaging string between Mukhtar Shariff and

 3    Abdiaziz Farah.

 4    Q.  And it looks like it starts with a text message from

 5    Abdiaziz Farah in green; is that right?

 6    A.  Correct.

 7    Q.  What's the date on this text?

 8    A.  May 25th, 2021.

 9    Q.  And could you describe the image that Abdiaziz Farah

10    sends to Mukhtar Shariff on May 25th, 2021?

11    A.  It appears to be a picture of a Mercedes, kind of

12    commercial grade truck vehicle.  On the top of the vehicle

13    above the windshield it says "www.africatrucksales.co.ke."

14    Q.  And I'll read Mukhtar Shariff's part in blue.  "Wow,

15    bro.  Mashallah."

16    A.  "We are going with five and see what's up."

17    Q.  "May Allah swt bless it.  Imported from Europe?"

18    A.  "Yes, bro.  Alx."

19    Q.  "They look very nice, though.  Mashallah.  Is it

20    logistics or what?"

21    A.  "Yes.  We got seven working for Mandera County and

22    trying to make it fifteen."

23    Q.  "Man, I love the hustle, sxb.  You got to coach me to

24    hustle like that.  Lol.  Mashallah."

25    A.  "Bro, we can do so much together.  Keys is focus.  This

 1    country is crazy, so always need a better plan."

 2    Q.  "Yeah, bro.  100 percent.  May Allah swt grant us

 3    Baraka."

 4    A.  "Yes, bro."

 5    Q.  And you continue on page 3.

 6    A.  "Amen, bro.  Don't hesitate to ask, bro, if you need

 7    anything."

 8    Q.  Mukhtar Shariff says, "Appreciate it, bro.  Likewise.

 9    Inshallah."

10    A.  And then Abdiaziz Farah responds with a message.  An

11    image of a rendering of what appears to be an apartment

12    complex.

13    Q.  Continuing on page 4 of Government Exhibit H-50b.

14    A.  "That's the floor plans I was telling you about."

15    Q.  Mukhtar Shariff says, "No way."

16            And then what does Abdiaziz Farah text?

17    A.  He texts a screenshot image.  It says, "A shares

18    purchase agreement."

19    Q.  And what company is listed on this share purchase

20    agreement?

21    A.  Capital View Properties Limited.

22    Q.  Does Abdiaziz Farah continue the conversation on page 5

23    of Government Exhibit 50b?

24    A.  He does.  He responds, "I will get you and Mahad on the

25    next one."

1    Q.  Mukhtar Shariff responds, "You have to, bro.  Lol.  When

2    we come for your nickaax, show us some opportunities, akhi."

3    A.  "Ready, bro.  I got two lands we can develop, Afrique

4    apartments, Empire apartments.  Sky is the limit."

5    Q.  Mukhtar Shariff responds, "Mashallah.  Where are the

6    plots?"

7    A.  "South C, prime area.  Just the land, 1.1M, so I can

8    give up to you and the team.  One plot to you guys.

9    Probably need 1.5 to make 30 to 50 a month."

10   Q.  Mukhtar Shariff continues on page 6.  "Say less, bro.

11   That would be a great opportunity.  Inshallah."

12   A.  "Inshallah, bro.  I am ready.  We will go see it.

13   Inshallah."

14   Q.  And, Agent Pitzan, go back to page 5.  There's a

15   reference to "South C" in a prime area.

16   A.  Correct.

17   Q.  What's South C?

18   A.  That's a neighborhood in Kenya.

19   Q.  Nairobi?

20   A.  Correct.

21   Q.  Now I'm going to skip ahead to page 8 of Government

22   Exhibit H-50b.  Do you see that?

23   A.  I do.

24   Q.  And this is another text exchange between Mukhtar

25   Shariff in blue and Abdiaziz Farah in green?

1    A.  Correct.

2    Q.  And it begins with Mukhtar Shariff.  Should I read his

3    part?

4    A.  Sure.

5    Q.  "How's things on your end?"

6    A.  "Alx, bro.  I am glad dad is doing well.  Let's connect

7    when you get back, please.  Safe travels."

8    Q.  "Inshallah, bro.  I want to see those apartments your

9    bros were building.  Also meet them."

10    A.  "Okay, bro.  I will connect ASAP."

11    Q.  "Wcs, bro.  We lost our sister today and everyone is at

12    Mandera for the burial."

13            Sorry.  Am I reading the wrong part?  Where did I

14    leave off.  Sorry.

15            Can you continue in green there?

16    A.  Sure.  "Wcs, bro.  We just lost our sister today and

17    everyone is at Mandera for burial.  I will get back to you

18    ASAP."

19    Q.  "Subhanallah, bro.  So sorry to hear that.  May Allah

20    swt grant her jannah and the family sabr and imaan."

21    A.  "Amen, bro.  Inshallah.  I will reach out to you, bro."

22    Q.  "Inshallah.  Take your time."

23    A.  "Asc, bro.  Are you still in Nairobi?"

24    Q.  "I'm back now, alx.  Last night."

25    A.  "Dang, that fast?  Everyone is back now."

1    Q.  Now directing your attention to page 11 of Government

2    Exhibit H-50b.  This is an additional WhatsApp message

3    exchange between Abdiaziz Farah in green and Mukhtar Shariff

4    in blue?

5    A.  It is, yes.

6    Q.  And this is on December 21st of 2021?

7    A.  Correct.

8    Q.  How does Abdiaziz Farah begin?

9    A.  He sends two images of renderings of what appear to be

10   an apartment building, similar to ones we've seen in other

11   strings.

12   Q.  And on page 12?

13   A.  Again, additional renderings of what appear to be an

14   apartment building.

15   Q.  Page 13?

16   A.  Similar renderings.

17   Q.  Page 14?

18   A.  Same thing.  Similar renderings of an apartment

19   building.

20   Q.  And again on page 15?

21   A.  Correct.  Same thing.

22   Q.  16?

23   A.  Same thing.

24   Q.  Mukhtar Shariff responds on page 17 of Government

25   Exhibit H-50b; is that right?

1   A.  Correct.

2   Q.  It begins, "Wow.  Amazing building.  Mashallah, bro."

3   A.  Abdiaziz Farah responds, "South C, next to Al Jazeera.

4   78 three-bedroom units."

5   Q.  Reply, "Lol.  We have to wait until our first concept is

6   perfected.  Mashallah.  When will it open?"

7   A.  "Restaurant spot on the first floor with conference

8   rooms."

9   Q.  "I was staying right next to that area last time.  South

10  C is going crazy now."

11  A.  "We own the property across the street.  South C is nice

12  area now."

13  Q.  "Yeah.  Mashallah.  Is it land?"

14  A.  "Yes."

15  Q.  Mukhtar Shariff says, "It's hard to find land there

16  now."

17  A.  "Need to build two apartments ASAP."

18  Q.  Mukhtar Shariff says, "When are you going to bring me

19  and Mahad into the apartment deal?  Lol."

20          And then what does Abdiaziz Farah text back?

21  A.  He texts back a screenshot of a photo rendering of an

22  apartment building with something circled next to it.

23  Q.  Continuing on page 19.  Mukhtar Shariff replies, "How

24  much?"

25  A.  "Crazy money.  1M.  I offered 750 but refused.  We paid

1   1.9M for our land."

2   Q.  "Wow, 1 million is insane.  No way."

3   A.  "It's prime."

4   Q.  Mukhtar Shariff asks, "What's the size?"

5   A.  "78 units, plus restaurant and conference.  Will

6   typically generate 105 to 120K a month.  150x200.  Our land

7   is huge.  Bigger than Al Jazeera."

8   Q.  Mukhtar Shariff says, "Okay.  It's pretty big.  Most are

9   100x50."

10  A.  "We could build two apartments but need parking.  We

11  have 68 parking spots.  Unheard of.  Basement and ground

12  floor is all parking.  First floor restaurant, twelve floors

13  of apartments."

14  Q.  Mukhtar Shariff says, "This is going to be massive."

15  A.  And then Abdiaziz Farah responds by sending a image

16  photo rendering of what appears to be like a balcony outdoor

17  area with seating.

18  Q.  Mukhtar Shariff responds, "Haven't seen anything like

19  that in the area."  And he replies, "No way.  Beautifully

20  done."

21          On page 21, Mukhtar Shariff continues, "When will

22  it finish?"

23  A.  "January to March of 2022.  It's a big undertaking.  We

24  need -- or revamp that area, bro."

25  Q.  Mukhtar Shariff says, "It's not easy.  It's booming

1     right now."

2     A.  "Residents in South C don't have much going on.

3     Inshallah.  Let's connect when I am back.  Inshallah.  How's

4     Afrigue coming?  I don't think it's going to be ready by

5     March."

6     Q.  Mukhtar Shariff responds, "Coming along well.  Should be

7     painting and flooring next week.  Equipment in January.

8     Inshallah.  March is feasible."

9     A.  "You nailed it, bro.  The designs are top-notch."

10    Q.  "Yeah, bro.  We are trying to do top-notch work."

11            Agent Pitzen, we talked yesterday or on Wednesday,

12    we went through some text messages between Abdiaziz Farah

13    and another defendant in this case, Abdimajid Nur; is that

14    right?

15    A.  We did, yes.

16    Q.  In their WhatsApp message exchange did you find some

17    messages about investments in Kenya?

18    A.  I did, yes.

19    Q.  And I want to show you what's been admitted as

20    Government Exhibit H-51n.  Can you describe what's on the

21    screen here.

22    A.  Yes.  So this is a portion of a Cellebrite text message

23    report between Abdimajid Nur and Abdiaziz Farah.  Abdimajid

24    Nur is in blue, Abdiaziz Farah is in green.

25    Q.  What's the date of this exchange?

4300

1    A.   November 11th, 2021.

2    Q.   Abdiaziz Farah begins in green by sending a document; is

3    that correct?

4    A.   Correct.

5    Q.   Could you describe the image in the text.

6    A.   Sure.  This is a purchase agreement type of document,

7    from Mohamud Farah, as the seller, and Nur Consulting, as

8    the purchaser, related to the Matuu Hospital Limited.

9    Q.   And what's Nur Consulting?

10   A.   It's Abdimajid Nur's entity he controls.

11   Q.   After sending the document, Abdimajid Farah then sends a

12   second message to Abdimajid Nur; is that right?

13   A.   He does, yes.

14   Q.   What does he say?

15   A.   "Read it, bro."

16   Q.   And Abdimajid Nur responds, "Okay, bro."

17   A.   Correct.

18   Q.   Now, Agent Pitzan, H-51p is the document that Abdiaziz

19   Farah sent to Abdimajid Nur on November 11th of 2021; is

20   that right?

21   A.   Correct.

22   Q.   Can you describe the document here on the first page.

23   A.   This is a share purchase agreement.  Same -- I guess

24   similar picture to the text message relating to the sale of

25   20 ordinary shares in the company.

1   Q.  And what's the --

2   A.  -- the hospital.  The Matuu Hospital Limited.

3   Q.  And there's a -- it looks like there's a law firm

4   listed.  What's the address of the law firm listed on the

5   share purchase agreement?

6   A.  Nairobi, Kenya.

7   Q.  I'm going to direct your attention to page 3 of

8   Government Exhibit H-51p, which has some details about the

9   parties to this proposed agreement; is that right?

10  A.  Correct.

11  Q.  Who are the -- what's the first party listed as the

12  purchaser of these shares in the hospital?

13  A.  Nur Consulting.

14  Q.  What's the address listed?

15  A.  15418 Hampshire Lane, Savage, Minnesota.  The residence

16  of Abdiaziz Farah.

17  Q.  And the -- again, the company, what's listed as the

18  company under this agreement?

19  A.  The Matuu Hospital Limited.

20  Q.  And how is it described?

21  A.  It says it's a private company incorporated with limited

22  liability in the Republic of Kenya.

23  Q.  Directing your attention to page 5.  The purchase

24  agreement is for shares in the Matuu Hospital; is that

25  correct?

1    A.  That's what it indicated on the front page, yes, 20

2    ordinary shares.

3    Q.  I believe on -- the purchase price is listed on page 4

4    of Government Exhibit H51-p; is that right?

5    A.  Correct.

6    Q.  What's the purchase price for these 20 shares in the

7    Matuu Hospital in Kenya?

8    A.  This lists 20 million Kenyan Schillings.

9    Q.  And again, at a hundred-to-one, how many U.S. Dollars is

10   that roughly?

11   A.  200,000, approximately.

12   Q.  I'm going to direct your attention to the 17th page of

13   this share purchase agreement, Government Exhibit H-51p.

14           It's signed by the -- Mohamud Farah on behalf of

15   the company; is that right?

16   A.  That's what it indicates, yes.

17   Q.  And it looks like it's notarized.  Where was it

18   notarized?

19   A.  It says -- the stamp indicates Nairobi.

20   Q.  And who is listed as the purchasers of this -- the

21   shares in this hospital.

22   A.  It says, Abdimajid Nur and Abdiaziz Farah.

23   Q.  Thank you, Agent Pitzen.

24           Agent Pitzen, when you testified the other day you

25   mentioned someone named Hadith Ahmed; is that correct?

1    A.  Correct.

2    Q.  I think you looked at -- you saw some reference to him

3    in text messages or WhatsApp messages?

4    A.  That's correct.

5    Q.  Could you remind us who Hadith Ahmed is?

6    A.  He was a site supervisor employee at Feeding Our Future.

7    Q.  When you looked at Abdiaziz Farah's phone, did you see

8    any WhatsApp messages between Abdiaziz Farah and Hadith

9    Ahmed?

10   A.  There was, yes.

11   Q.  I'm going to show you what's been marked but not

12   admitted as Government Exhibit H-55 -- H-55a.  I'm sorry.

13   A.  Okay.

14   Q.  One second.

15         H-55a.  Do you see that on the screen?

16   A.  I do, yes.

17   Q.  And is that an excerpt of the WhatsApp conversation

18   between Abdiaziz Farah and Hadith Ahmed?

19   A.  It is, yes.

20   Q.  Was it, this document, this exhibit, created in a

21   similar way to the other ones?

22   A.  It was, yes.

23         MR. THOMPSON:  Your Honor, I move to admit

24   Government Exhibit H-55a, sorry.

25         MR. IAN BIRRELL:  Your Honor, a little bit more

1   foundation about "created in a similar way to the other

2   ones," perhaps.

3           THE COURT:  More foundation, Mr. Thompson.

4   BY MR. THOMPSON:

5   Q.  Agent Pitzen, could you describe how this exhibit was

6   created from the Cellebrite extraction?

7   A.  Sure.  So there was a Cellebrite extraction, portions of

8   that were pulled out to create this exhibit.  Essentially

9   taking portions of it and making it easier to read and more

10  legible.

11  Q.  The information -- where does the information in this

12  exhibit come from?

13  A.  The information is taken, copied, out of the Cellebrite

14  report and put into this format.

15  Q.  To make it more readable and user-friendly?

16  A.  Correct.  But the dates and, I guess, content that's in

17  here is copied directly over.

18  Q.  Thank you.

19          Your Honor, I'd move to admissible Government

20  Exhibit H-55a.

21          MR. IAN BIRRELL:  No objection to their

22  conditional admittance.

23          THE COURT:  They're conditionally admitted, H-55a.

24          MR. THOMPSON:  Thank you, Your Honor.

25  BY MR. THOMPSON:

1    Q.  Now, Agent Pitzen, could you just orient us in terms of

2    the color scheme and the participants to this WhatsApp

3    message conversation.

4    A.  Sure.  So on this particular one in blue, you will see

5    that's messages from Hadith Ahmed.  And then on the right

6    side in green are messages from Abdiaziz Farah.

7    Q.  Do you want to read Hadith Ahmed in blue and I'll read

8    Abdiaziz Farah in green?

9    A.  Sure.

10   Q.  And first off let me ask you, what's the date on this --

11   of this exchange?

12   A.  October 16th, 2021.

13   Q.  Why don't you go ahead with Hadith Ahmed.

14   A.  "I heard something from inside MDE.  Call me tomorrow

15   when you get time."

16   Q.  "No more dry food?  Lol."

17   A.  "No.  Sometimes serious."

18   Q.  "MDE is always serious but they never do shit."

19   A.  "Bro, feds are in."

20   Q.  "It's crazy.  I know, bro."

21   A.  "It's inside, bro.  I will call you tomorrow on WhatsApp

22   to fill you in.  Inshallah."

23   Q.  "Inshallah, bro.  We have tried to clean up but it's

24   always hard.  Do you think it's a good idea to get out?"

25            Now, Agent Pitzen, yesterday -- or on Wednesday,

```
 1    earlier this week, you talked about some of the images of

 2    food that you talked -- that you saw, correct?

 3    A.  Correct.

 4    Q.  And first off, I want to be clear, these text message

 5    exchanges that we looked at, they're not all the text

 6    messages on Abdiaziz Farah's phone; is that right?

 7    A.  They are not, no.  These are portions that were selected

 8    and pulled out of the WhatsApp -- larger WhatsApp message

 9    files.

10    Q.  And we -- I think we went through first text messages

11    between Abdiaziz Farah and Mahad Ibrahim, is that right?

12    A.  Correct.

13    Q.  And we went through text messages between Abdiaziz Farah

14    and Abdimajid Nur, right?

15    A.  We did.

16    Q.  And then some others as well, Mr. Aftin in Nairobi?

17    A.  Correct.

18    Q.  A few with Mukhtar Shariff?

19    A.  Correct.

20    Q.  And we talked about we saw pictures of food; is that

21    right?

22    A.  We did, yes.

23    Q.  And you said you did find some pictures of food on the

24    phone; is that right?

25    A.  There were pictures of food.  Yeah, we went through some
```

1    of those earlier this week, yes.

2    Q.  And there was text messages -- was there text messages

3    about food as well?

4    A.  There was, yes.

5    Q.  Can you give us a general sense.

6    A.  There were some text messages on the phone also about

7    kind of logistics-type stuff, food delivery, and then I

8    guess distribution as well.

9    Q.  Okay.

10   A.  Similar like in context with the pictures that we saw

11   earlier this week.

12   Q.  Okay.  The messages between Abdiaziz Farah and Mahad

13   Ibrahim generally, what were they discussing most of the

14   time?  Those were long messages, right?

15   A.  They were, yeah.  There was -- I mean, as I guess we

16   saw, there was lots of conversation about kind of up

17   splitting up the money take.  Who gets what cut.

18   Q.  Agent Pitzen, were there on Abdiaziz Farah's phone text

19   messages between him and Kara Lomen?

20   A.  There was, yes.

21   Q.  And, again, who's Kara Lomen?

22   A.  She's the Executive Director at Partners in Quality

23   Care.

24   Q.  I want to go through a couple of them, including one

25   that's not yet admitted, which is H-53t.  Do you see that?

```
 1    A.  I do, yes.

 2    Q.  And is that another text exchange between Kara Lomen and

 3    Abdiaziz Farah?

 4    A.  It is, yes.

 5    Q.  On -- what's the date on it?

 6    A.  This is July 20th of 2021.

 7            MR. THOMPSON:  Your Honor, I'd move to admit

 8    Government Exhibit H-53t.

 9            MR. IAN BIRRELL:  No objection, Your Honor.

10            THE COURT:  H-53t is admitted.

11            MR. THOMPSON:  Thank you.

12    BY MR. THOMPSON:

13    Q.  Now, Agent Pitzen, on the other day when we went through

14    those pictures of food, can you just kind of summarize the

15    types of food that you saw pictures of.

16    A.  Yeah.  I mean, generally, I guess we showed you the

17    pictures, but there was lots of pictures of fruit -- fruits,

18    vegetables, onions, potatoes, tomatoes, peppers, kind of

19    groceries, I would say, in bags.  Occasionally there was a

20    picture of some eggs and then bread.

21    Q.  Okay.  String cheese and some cereal at times?

22    A.  There was, correct, yes.

23    Q.  Okay.  Now, directing your attention to H-53t.  This is

24    a text exchange on July 20th; is that right?

25    A.  That's correct.
```

```
 1    Q.  Abdiaziz Farah in green and Kara Lomen in blue.

 2    A.  Correct.

 3    Q.  How does Abdiaziz Farah begin this conversation on

 4    July 20th of 2021?

 5    A.  Abdiaziz Farah sends a picture image to Kara Lomen and

 6    says, "They gave out what you see here, plus sugar.  Meat,

 7    one pound per child.  Plus one gallon of milk, one percent

 8    per child for the seven days."

 9              And then there's a picture up above which shows

10    some bananas, potatoes, onions, peppers.  It looks like a

11    thing of pasta, a box of Cheerios, some oranges.

12    Q.  How many bananas would you say?

13    A.  It looks like two.

14    Q.  How many oranges?

15    A.  It looks like three.

16    Q.  Two potatoes?

17    A.  That's what it appears, yes.

18    Q.  It looks like how many peppers?

19    A.  It looks like three peppers.

20    Q.  Two onions?

21    A.  Correct.

22    Q.  Two tomatoes?

23    A.  Correct.

24    Q.  And then Abdiaziz Farah asks a question of Kara Lomen;

25    is that right?
```

1    A.  He does.

2    Q.  What does he say?

3    A.  "What's PIN opposition to such menu?"

4    Q.  And then continuing on page 2.  Kara Lomen responds.

5         "It isn't us.  It is MDE.  Green peppers, onions,

6    potatoes, and uncooked meat don't count.  It has to be easy

7    prepped food.  No cooking or chopping.  If MDE sees it, they

8    will disallow the meals."

9    A.  "We are not doing that at all."

10   Q.  Kara Lomen says, "No pasta, rice -- no pasta, rice or

11   dry beans either."

12   A.  Abdiaziz Farah responds, "We are not doing pasta unless

13   it's in addition to the actual meal pattern."

14   Q.  Kara Lomen says in response, "Yes.  We can do as many

15   extras as we want as long as we fully meet the meal pattern

16   with everything else.  It sucks, I know."

17   A.  "We are following your menu.  Just annoying that we have

18   to deal with families asking for uncooked food."

19   Q.  Kara Lomen says, "Right.  It is on my agenda again for

20   MDE Friday."

21        And then on page 3 Abdiaziz Farah continues; is

22   that correct?

23   A.  He does.

24   Q.  What does he say?

25   A.  "No Somali person is going to eat Uncrustable, ha ha,

1    sandwich."

2    Q.  Kara Lomen says, "I know, it is an issue."

3    A.  "If MDE actually WANTS food to go into bodies of kids,

4    they need to stop smoking the wrong stuff."

5    Q.  Now I'm going to show you another -- let me go back up

6    here.

7         At 11:18 a.m. on page 2 here of Government Exhibit

8    H-52t, Abdiaziz Farah says, "We are not doing pasta unless

9    it's in addition to the actual meal pattern."  Is that

10   right?

11   A.  Correct.

12   Q.  Did you find other texts where he describes that?

13   A.  I did, yes.

14   Q.  Showing you Government Exhibit H-53q, which has been

15   admitted.  What is H-53q?

16   A.  This is, again, a portion of a WhatsApp message that was

17   pulled out for purposes of creation of this document.

18   Q.  And what's the date on this text exchange?

19   A.  November 11, 2021.

20   Q.  What does Abdiaziz -- how does Abdiaziz Farah in green

21   start this conversation with Kara Lomen?

22   A.  "The bone of contention is always the supplemental

23   items.  All the brown bags we give out have complete meal

24   patterns and the rest is extra for retention and

25   recruitment.  Our profit margins are less than 11 cents per

1    meals because every other organization other than PIN is

2    giving out whatever they want.  Anyways, we should talk.  I

3    just want to know what I am doing wrong.  Like I told you,

4    I'm not immune to scrutiny."

5    Q.  "Our profit margins are less than 11 cents per meal?"

6    A.  That's what he says.

7    Q.  Now, Agent Pitzen, I want to finish up here with a

8    series of text messages between Abdiaziz Farah and Mohamed

9    Abrahim, okay?

10    A.  Okay.

11    Q.  Beginning with Government Exhibit H-54c, which I believe

12    is a text exchange between Abdiaziz Farah in green and Mahad

13    Ibrahim in blue.

14    A.  That is correct.

15    Q.  How about I read Abdiaziz Farah in green and you can

16    read Mahad Ibrahim in blue.

17         Abdiaziz Farah begins, "Cash in lieu would be a

18    lot this time around."

19    A.  "Yes.  Now let's hope she pays."

20    Q.  "Lol.  I think she will this time around, bro."

21    A.  "These people are hungry.  The beast must be fed."

22    Q.  Abdiaziz Farah states, "We survived last time but I also

23    have other beasts to feed on my end.  It's crazy, bro, but

24    we'll figure it out."

25    A.  "You feed a lot of people.  That's why everyone is

1    scared of you."

2    Q.  Abdiaziz Farah responds, "Ha, ha.  Lol.  Seriously.  I

3    am super nice to everyone, bro."

4    A.  "It doesn't mean people aren't intimidated by you --

5    aren't intimidated."

6    Q.  "True.  But I put in the hours and time and your boys

7    are just late.  Like really late."

8    A.  "You do.  I didn't say it's logical, but haters going to

9    hate."

10   Q.  "That's the least of our worries now, bro.  Plus, race

11   to the money is where the game is headed, bro.  By the way,

12   thanks for taking care of the Plymouth deal for us."

13        Abdiaziz Farah continues on page 3.  "We had a

14   good system going, bro.  I need to pay my business partner."

15   A.  "You don't deposit daily?"

16   Q.  "Never, bro.  That's how we hold cash.  Bank doesn't

17   need cash.  Plus it's hard to take cash out."

18   A.  "Got it.  I'm always scared of cash."

19   Q.  "Bring me all your cash and I will write you a check."

20   A.  "I have no cash.  I don't own a restaurant anymore."

21   Q.  "You are about to with me."

22        And now another -- Government Exhibit H-54b is an

23   additional text message exchange between Mahad Ibrahim in

24   blue and Abdiaziz Farah, correct?

25   A.  Correct.

4314

1    Q.  This is -- the date on this?

2    A.  February 28th, 2021.

3    Q.  Do you want to read Mahad Ibrahim in blue and I'll read

4    Abdiaziz Farah in green?

5    A.  "Btw, I need you to tell me what to do with this Aimee,

6    Hadith, Mahad thing."

7    Q.  Abdiaziz Farah responds, "Make sure your uncle remembers

8    to give it, the money, to people if you want it to lay -- to

9    last.  Ha ha.  So how much was the offer, bro?"

10   A.  "Two things:  Education thing, plus consulting."

11   Q.  "What's the contract for education and what terms or

12   relationship?  Also, the consulting money is $13,000 or 15,

13   I remember."

14   A.  "MF gets 20 per kid, per month, plus 20 percent of

15   profit and all teacher costs paid.  Consulting was 15K.  My

16   preference is to just work with you and do Afrique.  And you

17   negotiate with these people."

18   Q.  Abdiaziz Farah states, "Bro, here is what you need to

19   do, my business idea.  $35 per charge [sic] for a minimum of

20   1,000 kids at all childcare centers Aimee has.  Online

21   digital content and save money.  $22 consulting for you to

22   do defined scope of work, teacher budget of $10,000

23   minimum."

24          "My stuff is guaranteed, so don't even worry about

25   it.  Plus we got Hooyo and Bianca.  We should also dedicate

```
1    our time to our sites and assure Aimee we won't touch her

2    sites."

3              "So what's the 20 percent profit?  Can you explain

4    to me?  20 percent profit of what Aimee makes at the child

5    care centers or what is it or overall Feeding Our Future

6    operations?  Lowest I would go for MF kids is $30."

7    A.  "Let's discuss more."

8    Q.  Abdiaziz Farah continues on page 3.

9              "I think it's a terrible deal for you to take that

10   now.  You opening your sponsor and you got Afrique and you

11   got us.  Everything comes down to terms, bro.  And time,

12   bro."

13   A.  "I'm not planning to make any moves."

14   Q.  "Bro, you can just make sure it's worth your time."

15   A.  "They need me a lot more than I need them."

16   Q.  "In seven months" -- Abdiaziz Farah says, "In seven

17   months if things stay the same you are multi-millionaire

18   with zero debt.  Now it's time to enjoy and sustain that

19   all.  Aimee wants to keep her business going and I

20   understand why she needs you."

21   A.  "What did Hadith say?"

22   Q.  "Just between me and you, he thinks you entertained a

23   terrible deal."

24   A.  "What does he think it should be?"

25   Q.  "He is not a numbers guy and he is confused.  He was
```

1    shocked you took 10 or 20 percent."

2    A.  "My thing was to get the guaranteed money per child."

3    Q.  Abdiaziz Farah responds, "Profit."

4    A.  "Because that's guaranteed."

5    Q.  "I know, bro, but..."

6    A.  "And then take less on top.  Anyways, we didn't agree,

7    so I'll counter based on what you said."

8    Q.  "Bro, the point is you can negotiate."

9            I want to go back to page 3 in Abdiaziz Farah text

10   to Mahad Ibrahim.  "In seven months if things stay the same

11   you are multi-millionaire with zero debt."

12           When did Abdiaziz Farah text that to Mahad

13   Ibrahim?

14   A.  That was February 28th, 2021.

15   Q.  I only want to show you Government Exhibit H-54a, which

16   is more conversation that day on February 2021 between Mahad

17   Ibrahim and Abdiaziz Farah; is that right?

18   A.  It is, yes.

19   Q.  Mahad Ibrahim begins talking about a house.  Is that

20   right?

21   A.  Correct.

22   Q.  Could you read his portion.

23   A.  "Btw, the builder sent us the revised plan, plus price."

24   Q.  Abdiaziz Farah responds, "Over 1 million."

25   A.  "These people done lower their mind -- lost, 896.  For

1     what, I don't know."

2     Q.  "Let me see your plan, bro."

3     A.  "I'll forward now."

4     Q.  "You will hit 1 million.  Send it here."

5          And what does Mahad Ibrahim then send?

6     A.  He then sends them an image.  It's titled, "Ibrahim-Aser

7     Design, February 26, 2021."  And it's a -- it appears to be

8     plans for a house and it lists 3 Pillar Homes, "Building

9     Dreams."  It says, "First Floor Plan."

10    Q.  On page 2 of Government Exhibit 54a, Mahad Ibrahim sends

11    a followup to that; is that right?

12    A.  He does, yes.

13    Q.  What does he send in the followup message?

14    A.  This is a -- I guess, a breakdown of the building

15    expenses for the house.

16    Q.  And the builder is?

17    A.  3 Pillar Homes.

18    Q.  What's the cost of the Ibrahim-Aser residence?

19    A.  It lists final price of home $896,823.

20    Q.  And Mahad Ibrahim continues?

21    A.  He does.  He says, "I'm going to tell them to not finish

22    the apartment too.  Remove some of the BS."

23    Q.  Abdiaziz Farah writes, "Bro, don't do it.  Let's see how

24    the cash flow takes us.  Finance guy for you."

25    A.  "Okay."

1    Q.  "Don't make decisions when stuff looks disappointing.

2    Always find solutions, unless it's an absolute no.  In this

3    case you got a window of opportunity."

4    A.  Mahad Ibrahim responds, "Some of the stuff is ba -- bs.

5    Fluff."

6    Q.  "Piece of advice, bro, that you don't need."

7    A.  "Sahur is fine getting rid of.  Core stuff I agree.

8    Some stuff my cousin can do for a third of the price, but

9    I'm not going to make any rash decisions."

10   Q.  "I will check it out."

11   A.  Mahad Ibrahim continues, "It's insanely large house.

12   Just two floors are same size as my current -- my whole

13   current house.  I like the design, though.  We both do.

14   Just more comfortable at 850K because then we can take care

15   of all expenses with proceeds from home sales."

16   Q.  Abdiaziz Farah responds, "850 is good, but not that much

17   difference."

18   A.  "For you.  In my mind, huge difference."

19   Q.  "Soon you won't.  Inshallah.  Don't worry.  Seven years

20   ago I was working at our Minneapolis halal for $200 every

21   weekend in cash, Alx."

22   A.  "True.  A lot can change."

23   Q.  "Huge money I could get for the latest Air Force shoes."

24   A.  "This food stuff is kind of a golden ticket."

25   Q.  Abdiaziz Farah responds, "Yes, but we also worked hard,

1    bro.  With or without food, we would have been fine.  Food

2    just for us the disposable income."

3                MR. THOMPSON:  No further questions, Your Honor.

4                THE COURT:  Cross-examination?  Mr. Birrell.

5                MR. IAN BIRRELL:  Thank you, Your Honor.

6                          **CROSS-EXAMINATION**

7    BY MR. IAN BIRRELL:

8    Q.  Good morning, Agent Pitzen.

9    A.  Good morning.

10   Q.  I want to start by talking about your role in this

11   investigation, okay?

12   A.  Sure.

13   Q.  You mentioned that you weren't involved in the execution

14   of the January 20th, 2022, search warrants, right?

15   A.  That is correct.  I assisted on a search warrant, kind

16   of a followup search warrant the following day, but I had

17   prior commitments on the day of the original search

18   warrants.

19   Q.  And then on direct examination did you testify that you

20   were brought into the current role shortly before trial?

21   A.  So I replaced -- there was an original IRS agent who was

22   working on this investigation.  She took a promotion within

23   the agency and so I was assigned to the -- I guess the

24   larger Feeding Our Future investigation in January --

25   January or so of 2023.  And that investigation involved, you

1    know, multiple different entities in addition to this group.

2    Q.  Right.  So the reality is you've been involved in this

3    case -- in this investigation for quite some time, right?

4    A.  Since January 2023 or so I've been part of this

5    investigation -- you know, part of the overarching

6    investigation.

7        And then as far as focusing on this group or the

8    trial that's here today, kind of my focus, I guess, shifted

9    towards that leading up to trial.

10       So not so much, I guess, between January and say

11   earlier this year but...

12   Q.  Well, we talked about -- you talked about Hadith Ahmed

13   on direct examination, right?

14   A.  I did, yes.

15   Q.  Do you recall interviewing Hadith Ahmed in

16   February 2023?

17   A.  I believe I met with Mr. Ahmed one time.  I don't

18   remember the exact date that that was, but that very well

19   could be.

20       MR. BIRRELL:  Well, Mr. Carlson, could you show

21   just for the witness what's marked as report 8979.  And see

22   if this refreshes your recollection.

23       Could you zoom in on the top paragraph with the

24   members of the investigation.

25       THE WITNESS:  Yeah, I see -- I see that.

 1    BY MR. IAN BIRRELL:

 2    Q.  And then the date of the interview near the bottom?

 3    A.  Yep, I see that.

 4              MR. IAN BIRRELL:  And then you can blank that out.

 5    BY MR. IAN BIRRELL:

 6    Q.  So you recall interviewing him in February of 2023,

 7    right?

 8    A.  I do, yes.

 9    Q.  So you've been involved with the prosecution team deeply

10    since at least 15 months ago; is that right?

11    A.  I don't think that's a fair assessment, no.

12    Q.  Well, Hadith Ahmed told you about all kinds of things

13    with this Feeding Our Future investigation, right?

14    A.  When I was interviewing Mr. Hadith Ahmed, I was actually

15    interviewing him in regard to a different group of people.

16    We had no relation to, I guess, the reason we're here today.

17    Q.  Well, he talked with you about Aimee Bock, right?

18    A.  I don't remember the exact -- I remember the purpose of

19    the interview.  The reason I was there was multifold.

20              There were several of us agents there.  Some

21    agents were asking about kind of one group of people and my

22    particular role in that interview was asking about a

23    completely different separate group of people not related to

24    this group.

25    Q.  So you don't recall whether or not he talked about Aimee

```
 1    Bock?
 2    A.  As I sit here right now, if you say he did I guess, but
 3    I don't -- I don't specifically remember if he did, but I
 4    have no reason to believe he didn't.
 5    Q.  Okay.
 6              MR. BIRRELL:  Well, let's show page 2 of that
 7    report just to refresh your memory.
 8              Can you zoom in on the top paragraph.
 9              THE WITNESS:  I see conversation.  I see her name
10    listed there, yeah.
11              MR. IAN BIRRELL:  Okay.  If you could blank that
12    out.
13    BY MR. IAN BIRRELL:
14    Q.  So she -- do you recall now that she -- if he talked
15    about his conversations with Aimee Bock related to the
16    Federal Food Program?
17    A.  It appears so, yeah.
18    Q.  But you don't remember one way or the other from your
19    memory?
20    A.  I don't specifically remember.  That wasn't the reason,
21    I guess.  I was there.  I very specifically remember the
22    reason why I was there and the questions I was asking him
23    about.
24    Q.  Okay.  Well, your role here today is not to be a neutral
25    witness, right?
```

1    A.  My -- my role here today is to testify about what I know

2    as part of this investigation.

3    Q.  And your role is to assist the prosecution team in

4    presenting its version of events to the jury; fair?

5    A.  I would say my role in this investigation related to

6    these people, kind of two roles I played.

7           One was I conducted some site visits.  You guys

8    saw, like, the food distribution sites.  I did those.  Took

9    photographs.  Interviewed people that were at those site

10   locations.

11          And then I also spent some time leading up to

12   trial going through some of the electronic devices and

13   WhatsApp messages.

14          Those were kind of the -- my two primary focuses.

15   Q.  Well, and these are the site visits you conducted in the

16   last couple months of this year?

17   A.  I would say that earlier this year.  So, I mean, I don't

18   know what you mean by last couple months, but I would say

19   maybe starting in February or so, leading up until maybe

20   March or April, yeah.

21   Q.  How many weeks before trial did you conduct the last

22   site visit?  Best guess.

23   A.  I would have to guess maybe three weeks or so.

24   Q.  Okay.  And we'll get back to that.

25          But one of your roles you talked about became to

1    look at the evidence on Abdiaziz Farah's phone and talk

2    about that here in court, right?

3    A.  That was one of my roles.

4    Q.  And to be clear, the government sought for and obtained

5    a warrant for that phone, right?

6    A.  We did.

7    Q.  And that's a search warrant signed by a magistrate

8    judge, right?

9    A.  Correct.

10   Q.  And the government seized the phone in January of 2022,

11   right?

12   A.  Correct.

13   Q.  And the reason the phone was seized was to collect

14   evidence, right?

15   A.  It was seized because it was listed as one of the items

16   to be seized in the search warrant documents.

17   Q.  And it was listed as what was to be seized because a

18   phone can show an unbiased snapshot of what was going on at

19   the time, right?

20   A.  Okay.

21   Q.  Do you agree or do you disagree?

22   A.  I mean, I think it was seized to see what was on the

23   phone.

24   Q.  Yeah.  And because that can be evidence, right?

25   A.  It could be evidence, yes.

1    Q.  That's why people do search warrants, right?

2    A.  Correct.

3    Q.  And the phone was seized in January 2022, right?

4    A.  Yes, it was seized, I believe, during the -- when they

5    did the search warrants, January 20, 2022.

6    Q.  At Mr. Farah's home, right?

7    A.  Correct.

8    Q.  And then the phone then would show what was going on in

9    relation to the Federal Food Program in 2020 and 2021,

10   right?

11   A.  Not -- not necessarily.  I mean, it would show

12   whatever's on the phone I guess, I don't -- you know.

13   Q.  As of 2020 to 2021, right?

14   A.  Correct.  Yes, sorry.

15   Q.  Information from 2023 wouldn't be on the phone that was

16   seized in 2022, right?

17   A.  Correct.

18   Q.  Okay.  Let's talk about some of the photos and videos

19   that were on the phone.

20          And on this phone there was a huge amount of

21   information, right?

22   A.  There was quite a bit on there, yes.

23   Q.  Which is pretty typical when we seize phones these days,

24   right?

25   A.  I guess we see varying degrees but it's not atypical.

1    Q.  It's not unusual, right?

2         And you said one of your roles was to look at the

3    evidence on the phone, analyze it and present it to the

4    jury, right?

5    A.  I would say my main focus looking through the phone was

6    looking at -- was looking through various Cellebrite reports

7    with chat messages.  WhatsApp messages was kind of my

8    primary focus.

9    Q.  Well, there were 134,032 photos on the phone as well,

10   right?

11   A.  I believe that's correct, yes.

12   Q.  Okay.  And --

13   A.  I don't know if I would say they were photos.  I think

14   there was 134,000 images, like we talked about the other

15   day.  Like a lot of these are, you know, gifts or various --

16   various things.  So I wouldn't say they were all photos.

17   Q.  Right.  So to be fair, there were 134,000 images on the

18   phone, right?

19   A.  I think it bases it based off file extensions.  So if

20   it's -- it could be a JPEG.  It could be like a PNG.  I

21   think that's how it determines if it's considered an image

22   or not, yeah.

23   Q.  So 134,000 images on the phone that someone could open

24   up and look at, right?

25   A.  Correct.

```
 1    Q.  And to be fair, many of those images had nothing to do
 2    with the food program, right?
 3    A.  Correct.
 4    Q.  Things like family pictures would be on there, right?
 5    A.  Correct.
 6    Q.  Or an e-mail with a company logo.  That might get saved
 7    as an image in the phone, right?
 8    A.  It could, yes.
 9    Q.  But of the 134,000 images on the phone it's fair to say
10    that thousands of them dealt with the Federal Food Program;
11    is that true?
12    A.  I don't -- I don't know if that would be an accurate
13    assessment.  I'd have to go back and look to see but I don't
14    think that's -- I don't think that's fair.
15            I think from what I recall when I sorted the
16    phone, you can sort by kind of file type and then also image
17    type, so when I sorted that down to -- a lot of the other
18    kind of gifts and stuff are smaller files.  So when I set up
19    a size limit and I searched it by JPEGs, I think there was a
20    few thousand of those.
21    Q.  So thousands or at least hundreds and hundreds of the
22    pictures were relevant to the food program then, right?
23    A.  There was thousands of pictures, not all of which
24    were -- I mean, there was thousands of JPEGs between --
25    there was approximately -- I don't know the exact number but
```

1    around 3,000 pictures, JPEG pictures, between 1 megabyte and

2    I believe 5 megabytes was kind of the search.

3            These days with cell phones, it seems like a lot

4    of the pictures tend to be around that 3 megabyte level and

5    that's what I was trying to hone in on, kind of like actual

6    pictures that were taken.

7    Q.  And hundreds or thousands -- at least hundreds of these

8    pictures were relevant to the Federal Food Program or

9    potentially relevant?

10   A.  I never did count up how many were pictures of food or

11   how many were pictures of other things.  So I just -- I

12   don't know.

13   Q.  You don't know?  Well, you looked at them, right?

14   A.  I did look at them but I didn't, like -- as I was

15   looking at them, I didn't specifically count, like --

16   Q.  You didn't --

17   A.  -- here this is a picture of food.  This is a picture of

18   something else but...

19   Q.  You didn't specifically --

20   A.  There was substantial numbers of food pictures similar

21   to the ones that we showed the other day.  We didn't show,

22   like, obviously every food picture.  There were addition --

23   ones in addition to those pictures, yes.

24   Q.  There were hundreds and hundreds of pictures that you

25   saw that were similar to that in character, right?

```
1    A.  I'm not going to quantify, like, exactly how many

2    because I don't -- I didn't count them.

3    Q.  You didn't count them.  Did you look at them all?

4    A.  I did go through them.  In kind of the preview pane, you

5    can have a whole thing of them, so I would scroll through

6    and you could see kind of thumbnail pictures of them all,

7    yeah.

8    Q.  You looked at all of the pictures that came out of your

9    search criteria; is that right?

10   A.  Correct.

11   Q.  So you didn't look at all the pictures on the phone?

12   A.  Well, I looked -- I scrolled through the images of that

13   search criteria.

14   Q.  And the images that did not fall into that search

15   criteria, you did not look at?

16   A.  I -- I looked at some of them.  I don't remember -- I

17   know when I first started I started going through all

18   134,000 and I was coming across many that were clearly

19   irrelevant.  So that's when I set up kind of a more refined

20   search criteria that got me to where I was getting what I

21   thought would be, you know, pictures that were relevant to

22   what I was looking for.

23   Q.  So how many of the 134,000 images do you think you

24   looked at?

25   A.  Several thousand.
```

1    Q.  Can you give a ballpark estimate?

2    A.  Oh, in some -- I mean I would say probably -- like I

3    say, when I started I was going through page after page

4    after page, you know, so how many was, I don't -- over

5    10,000 I'm sure.

6    Q.  Over ten thousand?

7           So you might have looked at ten percent of the

8    images on the phone?

9    A.  Well, like I say, most of the ones that were super

10   small, you know, the images that were less than that 1

11   megabyte were clearly irrelevant.  It was little, you know,

12   e-mail-type pictures, stuff like that.

13   Q.  So the answer to my question is, you looked at less than

14   10 percent or about 10 percent of the images on the phone,

15   is that right?

16   A.  I would say, yeah, I looked at -- probably about ten

17   percent of --

18   Q.  Okay.

19   A.  -- the images I'd say I looked at, all the images that

20   were greater than that 1 meg which, yeah, like you

21   wouldn't -- if you're taking a picture with your phone, it's

22   not going to be less than that size.

23   Q.  So the rest of them you filtered by file type and size

24   and assumed they wouldn't be relevant and didn't look at

25   them, right?

1    A.  I think it's -- that's fairly -- fair to say.

2    Q.  Okay.  And there were also 6,227 videos on his phone,

3    correct?

4    A.  I don't remember the exact number of videos on the

5    phone.

6    Q.  Well, let me see if I can refresh your recollection

7    here.

8              MR. IAN BIRRELL:  And for the record, I'm showing

9    a Cellebrite screen graph here.

10             THE WITNESS:  Thank you.

11             (Witness reviews document)

12             THE WITNESS:  Okay.  I see that.

13   BY MR. IAN BIRRELL:

14   Q.  Okay.  Did that refresh your recollection?

15   A.  It did, yeah.

16   Q.  6,227 videos on the phone sound about right?

17   A.  Correct.

18   Q.  And again, to be fair, many of these videos didn't have

19   anything to do with the food distribution program, right?

20   A.  I think that's fair.

21   Q.  But is it fair to say that hundreds or thousands of the

22   videos did appear potentially relevant to the food program?

23   A.  There were several that were of, you know, either food,

24   like, we showed some videos, like, inside the store, which I

25   would -- you know, would have expected to have found on the

1    phone, yeah.

2    Q.  Right.  So -- and hundreds of those videos; is that

3    fair?

4    A.  I think that's fair.

5    Q.  Okay.  Okay.  Did you look at all the 6,227 videos?

6    A.  I don't think I looked at all of them, no.

7    Q.  Could you give an estimate as to how many you looked at?

8    A.  I can't recall exactly.  I know there was more than one

9    device that I looked at, so.

10   Q.  Do you think you looked at more than a thousand videos

11   from the phone or less than a thousand?

12   A.  I really -- I just -- I can't speculate.  I don't --

13   Q.  Okay.  And I think you were getting at this, but is it

14   fair to say that if there were no photos or videos related

15   to the food investigation on Mr. Farah's phone, that would

16   be strange, right?

17   A.  I guess I would classify it as I wouldn't -- I wouldn't

18   be surprised -- I wasn't surprised that there are photos on

19   the phone.  I guess I expected to find photos on the phone.

20   Q.  Right.  If you hadn't found photos or videos like that,

21   that'd probably be something you'd be telling the jury

22   about, right?

23   A.  Probably -- most likely.

24   Q.  And that's why the search -- that's one of the reasons

25   the search warrant was conducted, right, to find these --

1    these pictures, these videos, that could show these meals

2    being distributed or not being distributed, right?

3    A.  Yeah, the search was conducted to, you know, obtain any

4    evidence one way or the other to determine kind of the facts

5    of what occurred here.

6    Q.  Now, it seemed to me, and correct me if I'm wrong, but

7    it seemed to me that you were implying on direct examination

8    that it was suspicious to you that there were pictures and

9    videos on Mr. Farah's phone.  Is that -- were you trying to

10   imply that?

11   A.  I was trying to imply that it was suspicious that there

12   were pictures?

13   Q.  That there were pictures?

14   A.  I wasn't surprised that there were pictures, no.

15   Q.  Didn't you make some comment about how people take

16   pictures to, quote, "cover their tracks?"

17   A.  I don't know if that's the exact words I used.  It's

18   possible.  But I know based on my experience that oftentimes

19   when people are participating in schemes like this or some

20   other type that they would have, you know -- he would expect

21   that they would be providing, you know, at least some food.

22          If you're going to submit claims -- 18 claims for

23   18 million meals, like you're not going to do that without

24   at least providing, you know, giving the appearance as

25   though you're doing it.  You're not just going to -- there

1    has to be some degree -- you had to provide some degree of

2    that, right?

3    Q.  Right.  So you remember commenting that the pictures and

4    videos were there to provide an appearance of legitimacy?

5    Do you remember using that term?

6    A.  It could be.

7    Q.  Do you remember commenting that no one takes pictures

8    and videos of your work as an IRS law enforcement officer?

9    A.  Well, I think my comment was more that, like, I

10   generally do not take a picture of myself when I'm at work.

11   Q.  And you were implying to the jury that it was suspicious

12   that these pictures and videos were on there, right?

13   A.  I -- no, I didn't find that the videos and pictures were

14   on there suspicious.

15   Q.  The fact that they were taken was suspicious?

16   A.  I -- I expected to find pictures on the phone.

17   Q.  Then why were you commenting on that no one was taking

18   pictures and videos of you in your work?  What impression

19   were you trying to give the jury?

20   A.  I guess I'm missing the question here.

21   Q.  Well, when you made that comment that no one takes

22   pictures and videos of your work as an IRS law enforcement

23   officer --

24   A.  Sure.

25   Q.  -- were you trying to give the jury the impression that

1      it was suspicious that there were pictures and videos of the

2      food distribution on Mr. Farah's phone or were you not

3      trying to give them that impression?

4      A.   I guess my impression of the videos, based on my

5      experience, is that they appear that the pictures were, you

6      know, staged.  That they were taken to document something.

7      To go back and say, look, hey, we -- this is what we were

8      doing.

9              Similar to other types of stuff that was provided

10      in the text messages with Aimee Bock.  Some of these things

11      were provided to her --

12              MR. IAN BIRRELL:  Your Honor, I object.  That's

13      nonresponsive.  I'd move to strike.

14              THE COURT:  It's not nonresponsive, though, it's

15      overruled.

16              MR. IAN BIRRELL:  Okay.

17              THE WITNESS:  Well, there were some text messages

18      that were sent from Abdiaziz Farah to Aimee Bock, like the

19      one photo that we looked at where he sent kind of the meal

20      pattern there.

21              There was some videos, like, trying to be like --

22      my interpretation of it, it was that he was, like, showing,

23      like, hey, look, we're providing the food.  That was my

24      impression of it.

25      BY MR. IAN BIRRELL:

1   Q.  So it was suspicious if the videos weren't there, right?

2          We can agree, though, that would have been strange

3   and suspicious if the video -- if there were no videos on

4   his phone, right?

5   A.  I think -- yeah, I mean, I expected to find photos.

6   Q.  Yeah.  And then it was suspicious when you found them

7   too, right?

8   A.  Well, I think the context in what they were used for is

9   probably what made me suspicious that he's taking them.

10         You had to remember, Partners in Quality Care was

11  the sponsor.  They're the ones that were in the middle that

12  had to submit the claims to the Department of Education.  So

13  they had to -- they were submitting some of these pictures

14  and photos to the sponsor, in my interpretation, to

15  document, like, hey look, we're providing the food.

16  Q.  Was it suspicious when a driver takes a picture of his

17  payload and texts it to show it was delivered?

18  A.  I don't know what you're referencing, I guess.

19  Q.  Well, okay.

20         So there were 134,000 images on the phone.  When

21  did you start looking at these images?

22  A.  Oh, I would say it was probably, you know, like I say --

23  I started focusing on this investigation in probably

24  February.  So between February and leading up -- I believe

25  the trial started in April.  So it's sometime in that time

 1    frame.

 2    Q.  Okay.  And you looked at about 10 percent of these

 3    images after doing a filter to find the ones you hoped would

 4    be relevant, right?

 5    A.  Correct.

 6    Q.  And the government had this phone for two-and-a-half

 7    years, right?

 8    A.  To be fair, I was not the only person -- this is -- we

 9    have a very large investigative team of this.  I was not the

10    only person who was going through these devices.  I'm

11    testifying about what I personally did.  There was other

12    agents and other individuals who were also, you know,

13    looking at similar types of reports.

14    Q.  Is someone else, another agent, going to come in and

15    testify that they looked through the images and videos on

16    the phone and be subject to cross-examination about those?

17              MR. THOMPSON:  Objection, argumentative.

18              THE COURT:  Overruled.  You may answer if you can.

19              THE WITNESS:  I guess that decision isn't up to

20    me.  I don't know.

21    BY MR. IAN BIRRELL:

22    Q.  But your job was to look at the images and videos on the

23    phone, right?

24    A.  The -- one of -- one of my jobs was to go through text

25    messages and find relative images and -- and videos related

1    to those.

2    Q.  And you showed the jury 18 pictures, right?

3    A.  I don't remember the exact number but it sounds about

4    right.

5            And I think that the pictures that we showed -- I

6    mean, they were -- there were more pictures on the phone

7    that were -- we tried to, I guess, prevent -- or present

8    a -- kind of a representative sample of what was on the

9    phone.

10   Q.  Just to be clear, you've looked at many, many pictures

11   of food distribution operations on Mr. Farah's phone, right?

12   A.  That there's several pictures of food on the phone.

13   But, again, the pictures on the --

14   Q.  Right.  So several -- you wouldn't dispute that there

15   are hundreds of pictures of food distribution operations on

16   Mr. Farah's phone, right?

17           You don't know the exact number but ballpark --

18   A.  I don't know that I would agree that they were all a

19   food distribution.  I would say there maybe was hundreds of

20   pictures of food taken somewhere, someplace, sometime.

21           I don't know if that food was distributed.  I

22   don't know if that food was distributed at these 50 sites.

23   If that food was distributed to one of the several hundred

24   other sites related to the other parts.  I just don't know

25   -- I have no real context for exactly where that food was,

1   what that food was, other than I know what was in the

2   pictures was fruits and vegetables, some pasta --

3   Q.  And one of your --

4   A.  -- packed in grocery bags.

5   Q.  And one of your jobs as an IRS criminal investigator is

6   to go find that context and investigate these items, right?

7   A.  In what sense?  Maybe just clarify the question, I

8   guess.

9   Q.  When you see a picture and you don't know when it was

10  taken, one of your jobs as an IRS criminal investigator is

11  to go and try to find out when it was taken, right?

12  A.  Well, I -- I guess we -- I could have, but --

13  Q.  But you didn't, right?

14  A.  -- that information -- like, I did not rely on the

15  information as far as, like, the dates on there.  So I just

16  don't know.  It's, you know, like --

17  Q.  So you saw these pictures --

18  A.  -- I know that I did --

19  Q.  You didn't know whether --

20  A.  I know I did.  That there was some -- some pictures and

21  stuff that I reviewed that I re-received as defense exhibits

22  and, like, the dates seem to make sense because they would

23  have been after the date they were seized so.  Yeah, I don't

24  know.

25  Q.  You saw these pictures.  You didn't know when they were

1    taken.  What steps did you take to figure out when they were

2    taken?  Or did you take steps to figure out when they were

3    taken?

4    A.  I would say, I mean, just generally looking at, like,

5    you know, the weather outside and stuff like that, but as

6    far as -- you know, I don't know specifically what --

7    Q.  You don't know?

8    A.  -- you know, other than the data that was submitted with

9    the phone.

10   Q.  You saw pictures of food at lots of different physical

11   locations, right?  Fair?

12   A.  I don't know.  I mean, I guess we'd have to define what

13   lots is.  I know that there --

14   Q.  Well, dozens of different physical locations, right?

15   A.  Like, just pictures of food at physical locations?

16   Q.  Right.

17   A.  I don't know.  I mean, some of them you can't tell.

18   Like, if you look at the picture, like, some of them I can

19   clearly tell where they're taken based on we have pictures

20   where the -- you know, from doing a search warrant there.

21           For example, Empire Cuisine & Market, you could

22   tell that the pictures were taken there.  Others, like there

23   wasn't really enough background to tell if one, you know,

24   the location where, like, it's an image.  You can't tell

25   where it's at.  And two -- even if you have two images like

1   is this the same location or a different location?

2   Q.  You saw pictures of foods in -- pictures of food in

3   warehouses, right?

4   A.  There was some in the buildings, yes.

5   Q.  You saw pictures of food outside near apartment

6   buildings, right?

7   A.  Correct.

8   Q.  You saw pictures of food outside in parking lots and

9   other public areas, right?

10  A.  I don't know.  Like, I don't -- I mean, I saw them at

11  apartment buildings.  I don't know about the other public

12  areas.

13  Q.  You saw pictures of box trucks distributing food in --

14  A.  Yeah.

15  Q.  -- in multiple -- multiple different locations, right?

16  A.  I don't know if they were -- I don't know how many

17  different locations, like, I mean --

18  Q.  Well, you included one in your representative sample,

19  right?

20  A.  Yep.

21  Q.  But there were others?

22  A.  I'm just trying to think back and see if I remember.

23          I mean, I know there was more than -- there was

24  more than one picture of a food truck, you know, of the

25  box-style truck with food but I don't -- I don't know for

 1    certain, like, where -- if it was necessarily different

 2    locations, the same locations, but I think it's fair to say

 3    there was more than one location where there was a picture

 4    taken with a truck at, yes.

 5    Q.  And to some extent you looked at the metadata.  So when

 6    a phone takes a picture, sometimes it stamps that it was

 7    taken in Minneapolis near the federal courthouse, right?

 8    A.  I didn't really spend a whole lot of time looking at the

 9    metadata.

10    Q.  That wasn't important to you?

11    A.  I just -- I didn't spend a lot of time looking at it.

12    Q.  Because it wasn't important to you, right?

13    A.  I didn't -- I didn't feel I needed to look at it.  I

14    mean, I was taking -- kind of taking the photos at, you

15    know --

16    Q.  Do you feel like you had enough time to conduct your

17    investigation?

18    A.  Listen, my role in this investigation, I think, is

19    fairly limited in scope.

20            Again, you know, with this particular group, you

21    know, I focused on those two things.

22    Q.  One of your roles --

23    A.  And I would say -- sorry, didn't mean to interrupt you.

24            Like, you know, this was a larger group of people

25    who were investigating this case.  I came in later on with

1    kind of very specific tasks, so.  I was -- I would describe

2    my role as -- you know, more auxiliary and assisting rather

3    than, like, normally I would be kind of the --

4    Q.  Well --

5    A.  -- lead case agent.  I would suggest this case was more

6    of an assistance-type role leading up to trial to help

7    prepare for that.

8    Q.  You weren't the lead case agent, fair.

9         But one of your roles, and you were very clear

10   about this, was to look at the pictures and videos on Mr.

11   Farah's phone, right?

12   A.  I was not the only person doing that.

13   Q.  One of your roles was to look at them and testify as to

14   their contents to the jury, right?

15   A.  One of my roles was to look at -- look at some photos

16   and look at messages and testify.  There were also other

17   people doing that as well.

18   Q.  You -- one of your roles was to look at these photos and

19   videos, look at multiple of them, and decide which ones

20   would go to the jury and which ones were not going to the

21   jury because they weren't part of the representative sample,

22   true?

23   A.  I looked through photos, as well as other people looked

24   through photos, that were then pulled.

25   Q.  So the answer to my question is yes, that was one of

1    your roles, right?

2    A.  One of my roles was to assist in that process, yes.  I

3    was not the only person who was doing that.

4    Q.  You weren't the person --

5    A.  And other people had been working on that for, you know,

6    well before I was assisting on this portion of the

7    investigation.

8    Q.  You said on direct examination that you created a

9    representative sample, right?

10   A.  Yeah, I think -- I think it was -- I think it's a very

11   fair representative sample, yes.

12   Q.  And that that was one of your roles was to create this

13   representative sample, right?

14   A.  This -- I definitely participated and assisted in going

15   through and picking those -- those photos out as a

16   representative sample, yes.

17   Q.  So it's fair to say the answer to my question is yes,

18   right?

19           It seemed like you rephrased my question and then

20   answered it yes.  The answer's yes, right?

21   A.  I --

22           MR. THOMPSON:  Your Honor, asked and answered.

23           THE COURT:  I'm going to overrule.  You may

24   answer.

25           THE WITNESS:  I assisted in the process.

```
1     BY MR. IAN BIRRELL:

2     Q.  Okay.  You used the term "representative sample"

3     multiple times.  Remember that?

4     A.  Okay.

5     Q.  It's a -- it's a scientific term; is that fair to say?

6     A.  I -- if it is, it wasn't, I guess -- what I -- what I

7     think when I use that term "representative sample," what I

8     mean by that is there were multiple other photos.

9          Like, let's say there's a photo of, you know, a

10    bunch of groceries sitting on the floor at Empire Cuisine &

11    Market.  There were other photos either taken the same day,

12    same time or, you know, a different time, but it gives

13    the -- you know, it shows what they were.

14          There are other similar photos to those.

15    Q.  So that's --

16    A.  That's what I meant by representative is, there was a

17    picture of, say, food in, let's say, Empire Cuisine &

18    Market.  There was some food in a box truck.  Again, that

19    was not the only box truck photo out there with food.  But,

20    again --

21    Q.  So if we can back up --

22    A.  Yep.

23    Q.  -- it's used -- the term is used when there's a large

24    group of something and it's difficult to look at the large

25    group, so you look at a small group that's supposed to have
```

1    the same properties instead, right?

2    A.  I -- like again, I think we took photos.  I mean, we

3    would have been here longer to go through every single

4    photo.  So, we took --

5    Q.  So, yeah.

6    A.  I mean, like, to show this -- to show, like, you know,

7    if there's a photo, you know, taken from this angle, this

8    angle, this angle, like, it's essentially the same.

9    Q.  So --

10   A.  -- showing -- giving in it, I guess, the vibe of kind of

11   what the photo showed.

12   Q.  Yeah.  So you look at the small group and you know

13   what's in the large group, generally, right?

14   A.  Fair.

15   Q.  For example, it comes out in election polls, right?

16   Rather than polling all six million Minnesotans, KSTP might

17   poll a thousand random Minnesotans and see what they say,

18   right?

19   A.  I suppose they could do that, yeah.

20   Q.  Yeah.  And you looked at hundreds of these pictures,

21   right, that showed the food distribution options and you

22   decided, along with apparently the rest of your team, to

23   show not these hundreds of pictures but only these 18,

24   right?

25   A.  Well, I don't -- again, I don't know that they were all

1    of food distribution.  I mean, there was a -- there was

2    hundreds of photos of food.  A lot of it, was, you know --

3    it was in Empire Cuisine & Market, a lot of the pictures.

4    And it's what I would describe as groceries sitting on the

5    floor.

6            So some of those were undoubtedly based on the

7    evidence handed out, there's no question about that.  Some

8    of that for -- you know, I don't know.  Was some of that

9    used for the running of Empire Cuisine & Market, which was a

10   retail location?  Very, very possible.

11   Q.  Okay.  So you looked at many pictures and decided to

12   show the jury only this select group, 18, right?

13   A.  We showed approximately 18 photos, yes.

14   Q.  And the same with videos.  You looked at hundreds of

15   videos, not every video on the device but maybe 1,000 out of

16   the 6,000, and you ended up showing the jury three, right?

17   A.  Correct.

18   Q.  There were other videos showing food distribution that

19   you didn't show to the jury, right?

20   A.  I mean, there was -- there was other photos of various

21   things on that phone.  Some of them were, you know, videos

22   of food, some of them were videos of food distribution.

23   Q.  And you figured, we'll show the jury these three, right?

24   A.  Correct.

25   Q.  And the rest we're not showing the jury, right?

 1    A.  Those are the ones that, I guess, are being introduced

 2    through me, correct.

 3    Q.  And that was a decision you made, right?

 4    A.  That --

 5    Q.  To create this representative sample and to include

 6    these three videos of representative samples?

 7    A.  I assisted in the process, yeah.

 8    Q.  Okay.  You excluded photos -- well, there were photos

 9    on the device containing things like drivers' schedules,

10    right?

11    A.  I don't know for certain that -- I don't know for

12    certain if there were drivers' schedules on there.

13    Q.  Okay.  You don't remember drivers' schedules.  Do you

14    remember employee schedules?

15    A.  I do not.

16    Q.  Do you remember distribution times?

17    A.  I remember seeing there was some photos related to some

18    handwritten papers with some times on there.  I do remember

19    that.

20    Q.  Do you remember packaging instructions?

21    A.  I remember in one of the -- yeah, in one of the photos

22    there was a -- kind of a flyer that said similar to, I

23    guess, the stuff that was shown in that text that was sent

24    to Aimee Bock, like, hey, here's kind of what was supposed

25    to be packed in the bags.

1   Q.  But none of this made it into the representative sample

2   that you showed the jury, right?

3   A.  Correct.

4   Q.  Okay.  When did you finalize the creation of this

5   representative sample?

6           MR. THOMPSON:  Objection, relevance.

7           THE COURT:  Sustained.

8   BY MR. IAN BIRRELL:

9   Q.  Now usually representative samples are random

10  selections, right, polled to a thousand random Minnesotans;

11  is that fair?

12  A.  I don't know that that -- I don't know if that's true.

13  Q.  Regardless, you didn't make this selection of these 18

14  photos and these three videos randomly; did you?

15  A.  We went through and tried to pick photographs that kind

16  of gave an idea of the photos that were on that particular

17  device.

18  Q.  These were items that --

19  A.  They weren't all the same.  Like, the pictures that we

20  showed weren't all the same.  We showed some pictures that

21  were, like, at Empire Cuisine & Market and some that were at

22  other locations.  Some in the box truck.  Kind of various

23  different locations.

24  Q.  And you could have showed more photos and videos if you

25  had wanted to, right?

1    A.  Could have, yes.

2    Q.  Why did you decide not to include more than 18 photos in

3    more than three videos?

4    A.  I think we've gone through a lot of information and it's

5    taken a long time the way it's been.

6    Q.  Do you think the term "the prosecution team's handpicked

7    sample" gives the jury a different perspective than a

8    "representative sample"?

9    A.  I don't think that's a fair assessment.

10    Q.  The prosecution team went through and chose what photos

11    to include, right?

12    A.  Again, we went through and picked photos that showed

13    various different areas.  We didn't show pictures all of,

14    you know, just one thing trying to purport.  It was, hey,

15    here's the only spot pictures were taken.

16         We chose pictures of box truck.  We chose pictures

17    of, you know, at the market.  Were there additional pictures

18    similar to that?  Yes, there was.

19         MR. IAN BIRRELL:  Well, let's pulled up H-60,

20    page 5, which is in evidence.

21    BY MR. IAN BIRRELL:

22    Q.  Well, let's look at 4, right?  It's a picture of rotten

23    fruit, right?

24    A.  Correct.

25    Q.  5 is a picture of rotten fruit, right?

1    A.  Correct.

2    Q.  You chose these pictures to send a message to the jury,

3    right?

4    A.  We chose these pictures because these were some of the

5    pictures that were in there to show, you know, yeah, some of

6    the -- some of the food that was being distributed was not

7    edible for human consumption and, you know, that this is --

8    this is bulk, you know, type food.

9    Q.  You chose these to give the jury the impression that

10   this was a shotty operation, right?

11   A.  I don't know that we -- I don't think it was much of an

12   operation.  I mean, I think that they billed for 18 million

13   meals and most of those were not provided.

14   Q.  Did you know --

15            MR. IAN BIRRELL:  Well, I object, Your Honor.

16   That's nonresponsive.  I move to strike.

17            THE COURT:  Overruled.  The answer will stand.

18   BY MR. IAN BIRRELL:

19   Q.  Do you know the context around which these pictures were

20   taken?

21   A.  I do not.

22   Q.  Do you know that these pictures were taken and sent to

23   the supplier to complain about the quality of the food that

24   they were receiving?

25   A.  I have no information one way or the other on that.

1    Q.  You never tried to figure that out?

2    A.  Did not.

3              MR. IAN BIRRELL:  H-60, line 10.  If you could

4    pull that out.

5    BY MR. IAN BIRRELL:

6    Q.  This is another picture included to give the impression

7    that this was a shotty operation; wasn't it?

8    A.  I don't think that's a fair assessment.

9    Q.  This was just included because it's a representative

10   sample?

11   A.  It is.  This was at a different location.

12   Q.  What location?

13   A.  This is clearly in a different location unlike the

14   Empire Cuisine & Market.  So what we were trying to show is

15   that they were, you know, doing this at different spots.

16   Q.  What location --

17   A.  There was -- go ahead.

18   Q.  What location was this at?

19   A.  I don't know.

20   Q.  What did you do to try to figure that out?

21   A.  I wasn't able to do -- I wasn't able to do anything to

22   try to figure it out.

23             MR. IAN BIRRELL:  H60-11, if you could go there.

24   BY MR. IAN BIRRELL:

25   Q.  You used the word "allegedly" multiple times when

1  describing this exhibit.  Do you remember that?

2  A.  Could be.  Not specifically, but...

3  Q.  You don't remember using the term "alleged meals" or

4  "alleged food?"

5  A.  I may have said -- I don't specifically remember.  I

6  mean, I may have said "alleged meals", but it's clearly

7  food.

8  Q.  Do you remember the term "alleged food distribution"?

9  A.  In context of this?

10  Q.  Yeah.

11  A.  I don't -- I don't recall that specifically, no.

12  Q.  So to give a more clear question.  You don't remember

13  using the term "alleged meals" or "alleged food

14  distribution" when talking about this specific exhibit?

15  A.  I could -- I don't specifically recall that but I very

16  well could have said alleged meals because what I see here

17  is not meals.  What I see here is bags of groceries with

18  bread, uncooked eggs, and some vegetables.

19  Q.  You weren't --

20  A.  So I don't consider this -- this meals.  So if I would

21  have said "allegedly", that's -- that would have been what I

22  was referencing.

23  Q.  You weren't trying to use it to lend doubt that this

24  alleged food distribution happened or didn't happen?

25  A.  No, I was not.  I was -- if anything, I was trying to

1  convey that this is -- these are not meals.  That this is

2  food, groceries, in bags.

3  Q.  And to be clear, you looked at many pictures somewhat

4  similar to this, right?

5  A.  There were other pictures similar to this, yes.

6  Q.  You looked at pictures like this that appear to be taken

7  at various different locations, right?

8  A.  I mean, not exactly like this, but I think we had

9  multiple pictures like this in the exhibits we did show that

10  appear to be kind of different items in the bags and

11  appear -- although I don't know where they're at, appear to

12  be at different locations.

13  Q.  Appear to be at different locations with what appears to

14  be with different people, who appear to be receiving the

15  food; fair?

16  A.  Yeah, I mean, I think there's people in this photo that

17  appear to be receiving groceries, yes.

18  Q.  And you looked at pictures with different people who

19  appear to be receiving different bags of groceries, if you

20  want to call it that, with different items inside them,

21  right?

22  A.  Yeah.  I mean, I think -- I don't know what exhibit it

23  is but I think we show that as well, yes.

24  Q.  Well, in many of them you looked at and made the

25  decision to not show the jury these items, right?

1   A.  There were other photos for certain that we -- but, I

2   mean, clearly there was food distributed no one's, you know,

3   arguing that point.  And what we're trying to show here is,

4   like, this is kind of what was on there.  Generally what was

5   on the phone.

6   Q.  And there were other pictures that you didn't show the

7   jury, right?

8           MR. THOMPSON:  Objection, asked and answered.

9           THE COURT:  Sustained.

10  BY MR. IAN BIRRELL:

11  Q.  Okay.  So you mentioned there were -- you saw in these

12  pictures warehouses where food was being packaged, right?

13  A.  I saw there was -- there was a larger building with bags

14  inside of it, yes.

15  Q.  Did it appear to you that there were multiple different

16  warehouses where there were these bags?

17  A.  I don't -- I don't know.

18  Q.  You don't know?

19  A.  I don't know the answer to that.

20  Q.  And you didn't take steps to investigate where these

21  warehouses may be?

22  A.  I don't think I saw anything that suggested to me that

23  there was multiple warehouse-type places that were packaging

24  food.

25  Q.  And you didn't -- you didn't try to investigate that one

1    way or the other because that wasn't part of your job; is

2    that fair?

3    A.  Again, I kind of started assisting in this investigation

4    a couple months ago and that was not one of my things I was

5    tasked with doing, no.

6    Q.  Okay.  You saw pictures where there were mosques -- what

7    appeared to be the inside of mosques where food was being

8    managed, right?

9    A.  Correct.  We specifically selected, I guess, not to put

10   those in just, you know, to not be offensive.  That, you

11   know, to show pictures that were taken inside of a religious

12   structure.

13   Q.  But to be clear, there were pictures of food operations

14   inside those mosques that you saw, right?

15   A.  There were pictures of food inside mosques and yes,

16   there was.

17   Q.  Yeah.  There were pictures with -- pictured -- there

18   were pictures with shipments of food being loaded up or

19   unloaded from trucks; is that right?

20   A.  I mean, are you referring to, like, the box trucks?

21   Q.  Yeah, box trucks, mostly.

22   A.  Yeah, like similar to this one, yes.

23   Q.  Well, and also shipping trucks.  Like larger, you know,

24   trucks --

25   A.  I mean --

1    Q.  -- right?

2    A.  I think they were similar trucks to, like, whatever this

3    one was is or the other one we showed but --

4    Q.  Okay.

5    A.  I mean, a lot of times you'd just see, like, a picture

6    of the back.

7    Q.  And when I say "pictures", there were videos of most of

8    these same items too, right?

9    A.  There was -- I mean, there was videos at -- pictures,

10   yes.

11   Q.  Yeah, videos at the warehouses, right?

12   A.  I believe that's correct, yes.

13   Q.  Videos at the mosques that --

14   A.  Correct.

15   Q.  Videos of the food being loaded and unloaded, right?

16   A.  I don't know if there was -- like, you mean, like, in

17   and out of the back of the truck?

18   Q.  Right.

19   A.  Like the -- yeah.  I mean, there was some videos.  I

20   think we showed one, like, that was down at the Four Seasons

21   apartments there where they were distributing it down there,

22   yeah.

23   Q.  And as to the location where these were taken, your

24   testimony -- you know there were some taken at Empire you

25   testified, right?

1    A.  Correct.

2    Q.  You know there were some taken at a mosque or mosques,

3    right?

4    A.  What I -- I mean, what I believe to be just based on the

5    surroundings, yes.

6    Q.  Mm-hmm.  There were some at a warehouse or warehouses,

7    right?

8    A.  Correct.  I don't know -- you know, I have no idea where

9    this -- where it was.

10   Q.  There were some at what appeared to be townhomes?

11   A.  There was some, yes.  But, I think, you know, it pays --

12   or it's worth providing context.  The amounts we're talking

13   about in these pictures were -- you know, these sites were

14   claiming hundreds, if not thousands, of meals.  You know, I

15   think during -- during the peak month they were claiming to

16   distribute 2 --

17          MR. COTTER:  I'll object, nonresponsive.  There

18   was no question of what context.  That can be brought up on

19   redirect.

20          THE COURT:  All right.  I'm going to sustain that.

21   You may ask another question.

22          MR. IAN BIRRELL:  Okay.

23   BY MR. IAN BIRRELL:

24   Q.  And there were pictures and videos of this food being

25   distributed at sites, right?

```
 1    A.  Small amounts.
 2    Q.  Well, you looked at one-sixth of the videos, right?  I
 3    mean --
 4    A.  What I'm suggesting is the amounts at the sites that
 5    were being distributed compared to the claims was very
 6    small.  That's what I'm saying.
 7    Q.  Well, it would have been captured in these videos,
 8    right?
 9    A.  Some of it may have been and some of it was, yes.
10    Q.  That you looked at and didn't show to the jury?
11    A.  We did show some to the jury.
12    Q.  Other than the three, you didn't show a fourth or others
13    to the jury, right?
14    A.  We did not.
15    Q.  Okay.  You talked about some of these numbers, right?
16    A.  Sure.
17    Q.  There are big numbers in the case, right?
18    A.  Very big.
19    Q.  And you know what some of these witnesses in the case
20    have testified about, right?
21    A.  Generally I talked to -- I interviewed some of them,
22    yes.
23    Q.  Well, you were given -- also given a -- did you talk
24    with them or were you briefed on their testimony after it
25    happened?
```

1    A.  I don't -- I don't know that I was.  I mean, I don't

2    know that I was really briefed on what any individual really

3    said.

4    Q.  Okay.

5    A.  I mean, I'm generally aware of, like, who testified and

6    when, but...

7              MR. IAN BIRRELL:  Clayton, could you -- Mr.

8    Carlson, could you put up N-36, please.  N, as in Nancy.

9    BY MR. IAN BIRRELL:

10   Q.  And these are -- you were asked about this on direct,

11   right?

12   A.  Correct.

13   Q.  These are big numbers, right?

14   A.  Actually, I mean, I think this here is one of the

15   smaller sites.  But as I testified before, there was three

16   other locations, like, within a very close proximity.  So

17   when you add them all up, it becomes larger numbers.

18   Q.  Look, these are big numbers, right?

19   A.  In the scheme of this case, these are very small

20   numbers.  Very small compared to other sites and the

21   overall picture.  We're talking 18 million meals that were

22   provided.

23   Q.  Okay.

24   A.  This is showing, you know --

25   Q.  You need to answer the questions that I'm asking, okay?

1    A.  Understood.

2    Q.  You've seen many forms like this, right?

3    A.  I have, yes.

4    Q.  And these forms contain big numbers.  And --

5    A.  So -- I'm sorry.

6    Q.  Other forms contain bigger numbers, right?

7    A.  Correct.

8    Q.  Other forms contain smaller numbers, true?

9    A.  There's -- there's maybe a couple that are smaller

10   numbers but --

11   Q.  Okay.  Do you know that nearly every witness who's

12   been called to this case has been asked about forms like

13   this?

14   A.  I don't independently know that, no.

15   Q.  Okay.  Do you know whether any other witness who's been

16   called to this case has had the job of looking at the videos

17   and pictures seized from the phone as evidence and

18   testifying about them?

19   A.  Can you rephrase that?

20   Q.  Do you know whether any other witness has had the job of

21   reviewing the videos and pictures seized from a phone as

22   evidence at the time these numbers were being claimed and

23   has had the job of testifying about what's in those videos?

24   A.  I know other agents looked through those videos and

25   photos and have already testified, yes.

1    Q.  Okay.

2              MR. BIRRELL:  Will you blank it out?

3              THE COURT:  Mr. Birrell, we need to break for

4    lunch.

5              MR. IAN BIRRELL:  Thank you, Your Honor.

6              THE COURT:  Thank you.  Come back at 1:40.

7         (Recess taken at 12:37 p.m.)

8                        (Jurors excused)

9              THE COURT:  If you all would be seated for a

10   moment.

11             I know that you all were informed that the jury

12   has requested information about each of the counts here such

13   that would have been provided in a preliminary instruction

14   by me.

15             You have all, I think, worked together to provide

16   a chart of counts that I am intending to give to the jury

17   over the noon hour.  They'll keep it in the jury room and

18   when they come out I'll give them the instruction that the

19   summary is simply a summary of an indictment and not

20   evidence of anything and that the defendants are presumed

21   innocent.

22             Does anyone have any objection to that procedure?

23   I think you've all seen the chart of counts.

24             Hearing none, that's what I'll do.  Thanks.  We'll

25   see you all the 1:40.

```
 1              (Recess taken at 12:39 p.m.)

 2                         *    *    *    *    *

 3              (1:42 p.m.)

 4                          IN OPEN COURT

 5              THE COURT:  You may all be seated.

 6              Mr. Birrell, you may continue.

 7              MR. IAN BIRRELL:  Thank you, Your Honor.

 8     BY MR. IAN BIRRELL:

 9     Q.  Good afternoon, Agent Pitzen.

10     A.  Good afternoon.

11     Q.  It's probably good we had the lunch break to reset,

12     right?

13     A.  Sure.

14     Q.  So I figure going forward, if you could, just try to

15     listen to my questions and answer them the best you can, if

16     that's fair?

17     A.  Sure.

18     Q.  And if my question's unfair, you can't answer, then let

19     me know that and we'll figure that out.  Okay?

20     A.  Understood.

21     Q.  Okay.  So we talked about these -- some of these

22     pictures.  I wanted to move on to talk about some of these

23     videos here.

24              MR. IAN BIRRELL:  So if you could pull up, Mr.

25     Carlson, the clicker video, which I think is H-61b.  And I
```

```
 1    will unmute it here.
 2    BY MR. IAN BIRRELL:
 3    Q.  But just -- we'll watch it in a second.  And just while
 4    you're looking at it, I want to talk about both the clicker
 5    part of it and then kind of the substance of what's
 6    happening in the video, if that's okay?
 7    A.  Sure.  I think it may be unmuted, so we'll give it a
 8    shot.
 9              (Video playing)
10    BY MR. IAN BIRRELL:
11    Q.  Okay.  And that's a short video.  I think, did we say
12    18 seconds or something like that?
13    A.  Ah, yeah, I think it might have been 16 seconds --
14    Q.  16 seconds.
15    A.  -- or so, yeah.
16    Q.  And you were -- you were asked some questions on direct
17    examination about the clicker.
18              But just to be clear, what's happening in the
19    actual video is someone is watching food being distributed
20    and taking a video of that distribution, right?
21    A.  That -- yeah, that's what they were doing, yeah.
22    Q.  Yeah.  And it shows, you know, it's -- just to kind of
23    describe it for the record, it's reasonably busy, right?
24    A.  I mean, I'd say there's a -- like, one, two, three,
25    four, five, six, seven people there.
```

1    Q.  In this still and when it panned to the other side there

2    were another handful of people; is that fair?

3    A.  That's fair.

4    Q.  And there are a number of cars in the parking lot, a few

5    dozen cars.  Not all of them might be there for the

6    distribution, right?

7    A.  Yeah, it's an apartment complex, Autumn Holdings, down

8    in Faribault.

9    Q.  Right.  So people would park there ordinarily.  Not all

10   these people are there for the food distribution probably,

11   right?

12   A.  I think that's fair.

13   Q.  And the video shows people kind of grabbing these boxes

14   of food and then presumably going to their car to drive

15   away, right?

16   A.  I guess I'd want to watch it again to say -- I mean,

17   I --

18   Q.  Yeah.

19   A.  -- there's definitely some boxes there.  I don't -- I

20   mean, there's some people hauling boxes of something away.

21              MR. IAN BIRRELL:  Let's watch it again.

22              (Video playing)

23   BY MR. IAN BIRRELL:

24   Q.  So, if you look at the back of the truck there in kind

25   of that middle portion of the video, it looks like people

1    are --

2    A.  Yeah, I -- sorry.

3    Q.  -- distributing and receiving food; is that fair?

4    A.  I see one person over here [indicating] that's walking

5    with a box.  I see when they were around the area of the

6    back of the truck, they're putting some boxes of something

7    on the tailgate there.  Presumably some bulk fruits,

8    vegetables, stuff like that like we saw in other things.

9    But in this video, I guess it doesn't depict exactly but I'm

10   guessing that's what it is.

11   Q.  You can't see exactly what's in the box but it appears

12   to be some kind of food, right?

13   A.  Most likely.

14   Q.  Yeah.  And the video shows it doesn't take too long to

15   grab a to-go box and then to move to the car; is that fair?

16   A.  Yeah.  I mean, in this video, like, I see the one

17   individual who appears to have a box walking.  That's the

18   only person that I see.  And I heard, you know, a lot of

19   clicking in 16 seconds.  That to me doesn't match up with

20   30-some meals that were being distributed during that time

21   in this video.

22   Q.  And to be fair, the video's 16 seconds long, so it shows

23   what it shows, right?

24   A.  Correct.

25   Q.  And the -- talking about the clicker --

1          MR. IAN BIRRELL:  And for the record, I'm holding

2     Government Exhibit F-20.

3     BY MR. IAN BIRRELL:

4     Q.  Which is the demonstrative clicker exhibit that you

5     clicked with on direct, right?

6     A.  Sure.

7     Q.  I think you estimated the clicker was clicked somewhere

8     30 to 40 times in the video, is that --

9     A.  Somewhere around there, yeah.

10    Q.  -- in that ballpark?

11          Do you have an understanding that families were

12    allowed to receive seven-day meal packs as part of the

13    distribution of food?

14    A.  Yes, I am.  Yes.

15    Q.  And you understand that they could receive them for

16    multiple children at one time, right?

17    A.  Yeah, I'm aware.  That's clearly not what was happening

18    in this video.  But I'm aware that -- you know, in this

19    particular video what I see is, you know, some boxes of

20    presumably food.

21          I see one individual taking one box, walking away

22    and I hear the clicker going the entire time.  That's what I

23    see here in this particular video.

24    Q.  Well, talking about -- what the boxes they're receiving,

25    it could be a seven-day meal box, right?

```
 1    A.  I guess I'd have to look at the video.  But maybe that's

 2    one.  So that would be, I guess, one seven-day meal box

 3    there.

 4    Q.  Containing, say, a breakfast and a lunch for multiple

 5    children, right?

 6    A.  Well I -- I don't think that -- I don't think that's

 7    enough food.

 8            I have two kids myself and, like, you know, my

 9    kids eat a lot of food.  That's not nearly enough food

10    for --

11            MR. COTTER:  Objection, nonresponsive.

12            THE COURT:  Overruled.  You may answer.

13    BY MR. IAN BIRRELL:

14    Q.  Well, you understand that's generally what was claimed

15    in these meal claims in this case, right?  It's --

16    A.  For some of the sites claim to be distributing seven-day

17    meal packs.  Other sites just claim to be doing individual,

18    you know, like just single serving-type meals.

19    Q.  And for the seven-day meal kit sites, if you got seven

20    days for three kids for two meals, that's 42 individual

21    servings that can be contained in one box, right?

22    A.  Yeah, I just contest the fact that there's that much

23    food in those boxes.  And I --

24    Q.  Well, again, it's -- again --

25    A.  The stuff that I've seen in the pictures is fruits and
```

1    vegetables and stuff.  It's not -- these aren't meals.

2    These are, like, groceries.

3    Q.  Sir, I'd again ask you to listen to the question I ask

4    and then answer the question, please, if you can.  Okay?

5    A.  I'm doing the best I can.

6    Q.  Okay.  And you said the clicker was clicked between 30

7    and 40 times in the video.  And it can be clicked -- well,

8    these clickers don't have ways to skip forward by 10,

9    right?

10              Some clickers have ways to, say, do 10 at once but

11   this you got to click it one time to increment it by one,

12   right?

13   A.  Well, I think you could spin it.  You know, if you want

14   to spin it, you could increase it more.

15   Q.  You could increase it by 1,111, right, at a time by

16   spinning it?  But otherwise to Count 43 meals, you gotta

17   click it 42 times, right?

18   A.  Correct.

19   Q.  Which, I mean, that takes some time to do, right?

20   [Indicating].

21              So, that's 42 clicks.  And I was going pretty

22   quick there, right?

23   A.  Yep.

24   Q.  And that could be for one box.  That's how they counted

25   it, is the number of meals not the number of --

```
1     A.  I disagree --

2     Q.  -- boxes, right?

3     A.  I disagree with that assumption.

4     Q.  You disagree that a box could contain a seven-day meal

5     kit?

6     A.  I disagree that a box contains 42 meals.

7     Q.  Well, if I may use the document camera here.  We'll try

8     to bring this over here.

9          You understand sometimes -- and my handwriting is

10    putrid so I apologize for that, but some of these were

11    seven-day meal kits, right?

12    A.  Yeah.  I don't recall specifically at this site if this

13    was a seven-day meal pack site, but some were in this case,

14    yes.

15    Q.  Some were.  And they were distributed not just for one

16    child but for multiple children at once?

17    A.  Could have been.

18    Q.  Could have been.

19          So for this example, we picked the number three

20    children, okay?  You bearing with me?

21    A.  I got you.

22    Q.  And two servings were distributed at once, so either a

23    breakfast and a lunch or a supper and a snack, depending on

24    the type of program, right?

25    A.  I understand the math, yes.
```

1    Q.  That's what was claimed.  So 7 times 3 is 21, right?

2    A.  Correct.

3    Q.  And you double that and it's 42, right?

4    A.  Correct.

5    Q.  So, the claim was for -- excuse me, for 42 servings in a

6    three-child, seven-day box, right?

7    A.  Again, I just -- the number -- I understand the numbers

8    you're using.  I understand the math there.  But, again, I

9    don't believe in what's necessarily in the box is meals,

10   much less the quantity based on my personal experience.

11   Q.  Okay.  Well, in your personal experience you didn't

12   conduct observations in the case until, you called it the

13   spring of this year, right?

14   A.  That's when I began working kind of more directly

15   related to this group, yes.

16   Q.  And then you drove up to these different sites, right?

17   A.  Correct.

18   Q.  Drive to multiple sites in one day, right?

19   A.  Sorry.  I missed -- I couldn't quite hear you there.

20   Q.  You drove to multiple sites in a day, right?

21   A.  On some occasions, yes.

22   Q.  You take a picture of the front, right?

23   A.  Or the side or where --

24   Q.  Right.

25   A.  -- sometimes multiple pictures.  Sometimes the front.

```
 1    But took pictures of the site.
 2    Q.  You take a picture of the building and take a picture of
 3    the parking lot, right, or multiple pictures?
 4    A.  Fair enough.
 5    Q.  Fair enough.  And you did that three years after these
 6    claims were submitted, correct?
 7    A.  Correct.
 8    Q.  Were you trained on how to investigate in your role as
 9    an IRS investigator?
10    A.  Yes, I was.
11    Q.  Did you ever investigate something like a car crash?
12    A.  No, I have not.
13    Q.  Okay.  Well, okay.
14         MR. IAN BIRRELL:  We can blank that out.
15    BY MR. IAN BIRRELL:
16    Q.  Let's spend some time talking about the other items on
17    Mr. Farah's phone, if you may.
18    A.  Sure.
19    Q.  Now you made some -- this comment a few times about how
20    when you were going through his phone you weren't seeing
21    evidence of him conducting business operations; is that
22    fair?
23    A.  I don't think that's fair.  No, I think -- I mean, I
24    suggested several times, like, the conversations that he had
25    with Mohamed Ismail was about business operations.  There
```

1    were also, we discussed other texts.

2    Q.  So --

3    A.  -- other texts in there also.

4    Q.  So you mentioned that it seemed to you like he was more

5    worried about money than food operations or something like

6    that.  Do you recall that?

7    A.  There was a lot of texts on there, as we've seen,

8    related to the money and splitting it up, yes.

9    Q.  Right.  So that's what you were telling the jury is

10   basically he was very worried about money, not very worried

11   about food.  Is that what you were trying to communicate

12   there?

13   A.  There was a lot of texts on there about the money, I'll

14   give you that, yes.

15   Q.  Well, I'm rephrasing your position to make sure I

16   understand it, so.  And that is that a fair understanding of

17   your position?

18   A.  My position is that there was a lot of text messages on

19   the phone related to splitting up the money.

20   Q.  Okay.  Well, we'll get to the text messages but let's

21   talk about the e-mails quickly.

22          Did you know there were over 46,000 e-mails on Mr.

23   Farah's phone?

24   A.  Yeah, that wasn't -- that was not really my primary

25   role.  Like I said before, like, we had a team, as you point

4374

1    out, this phone did have quite a bit of information on it.

2    I was not the only person solely looking -- going through

3    this phone, so.

4    Q.  But 46,000 e-mails.  You looked at some of them; is that

5    true?

6    A.  I looked at a few.

7    Q.  You looked at a few?

8    A.  But, again, it was not my primary role to look at any

9    e-mails on the phone.

10   Q.  Okay.  You could have looked if you had wanted to look,

11   right?

12   A.  There really wasn't much of a need for me to look

13   because I knew other agents were kind of handling that part

14   of dealing with the phone.

15   Q.  Do you know, and I don't know if you know this or not,

16   whether a different agent is going to come in and be

17   prepared to talk about the e-mails that were contained on

18   Mr. Farah's phone?

19   A.  Again, these are kind of decisions outside my control.

20   Q.  Okay.  So you don't know, right?

21   A.  Fair.

22   Q.  Okay.  I just needed a verbal answer?

23   A.  Sure.  Understood.

24   Q.  Yep.  But does 46,000 e-mails, does that ring a bell?

25   Do you dispute that number?

1    A.  I don't dispute it.

2    Q.  Okay.  Now, in your experience as an IRS agent, I mean,

3    you know that people conduct business operations via e-mail

4    all the time, right?

5    A.  They communicate about business via e-mail?

6    Q.  Right.

7    A.  Sure.

8    Q.  Right.

9    A.  Understood, yeah.

10   Q.  And that's what you'd expect is if you look at someone's

11   work e-mails, you see work-related communications, right?

12   A.  Yeah.  Sometimes.  I mean, I know search warrants were

13   done on other -- were also done on e-mail accounts directly

14   from, like, the provider, in addition to what's on the

15   phone.  So, like, some of that obviously would be

16   duplicative, but...

17   Q.  So you might see the same -- different e-mail in two

18   different places.  One if you look through Google and one if

19   you look on the phone, right?

20   A.  Right.

21   Q.  Okay.  But as an IRS agent, an IRS investigator, you

22   know that if you're investigating someone's work operations

23   you might get a different picture if you only look at their

24   personal texts versus looking at their work e-mails too,

25   right?

1    A.  Again, someone else was in charge of -- you know, it was

2    mainly focused -- it was focused on the e-mail stuff.

3    Q.  Well I'm asking about your experience and your

4    knowledge.  So only testify on what your experience and your

5    knowledge is, okay?

6    A.  Sure.

7    Q.  And it's fair to say that if you're looking at someone's

8    work e-mails, you get a different picture of what they do

9    for work than looking at their personal texts, right?

10   A.  There may be additional information in one place versus

11   the other.  It's possible.

12   Q.  And you've looked at some of these e-mails, but

13   generally, you know there were thousands and thousands of

14   e-mails on his device discussing business operations, right?

15           MR. THOMPSON:  Objection, beyond the scope.

16           THE COURT:  Overruled.  You may answer.

17           THE WITNESS:  No, I'm not aware of that.

18   BY MR. IAN BIRRELL:

19   Q.  Okay.  Do you recall looking at e-mails in which there

20   were discussions of finding food suppliers?

21   A.  Again, as I testified before, like, the e-mails was not

22   my -- that was not my role.  I was not -- I did not go

23   through a bunch of e-mails.

24   Q.  So you don't remember seeing mails or not seeing e-mails

25   about finding food suppliers?

```
1    A.  Again, I just did not.  That was not my role.

2    Q.  Okay.  So it sounds like "no" is the answer, right?

3    A.  No.

4    Q.  Okay.  And this might be "no" for a lot of these?

5    A.  Sure.

6    Q.  But do you recall e-mails, seeing e-mails seized from

7    the phone about price negotiations?

8    A.  Again, I didn't really review the e-mails.

9    Q.  Okay.  How about discussions about delivering quantities

10   of food, terms of delivery, delays in delivery.  Do you

11   recall seeing those?

12   A.  Again, that was not my role.

13   Q.  Okay.  Do you recall seeing e-mails about getting

14   sanitation companies and ordering dumpsters?

15   A.  Again, that was not my role.

16   Q.  Okay.  Do you recall seeing e-mails about buying and

17   renting box trucks and reefer trucks?

18   A.  Again, I didn't really review e-mails.

19   Q.  Did the word "reefer" come up in the investigation?

20   A.  I have seen that, yes.

21   Q.  What's your understanding of what a "reefer" is?

22   A.  My understanding is a reefer refers to, like, a

23   refrigerated-type of truck.

24   Q.  It probably comes from the reefer, reefer refrigerated,

25   right?
```

1    A.  Could be.

2    Q.  I always thought that's what it was, at least.

3            Do you recall seeing e-mails about talking with

4    nutritionists about creating compliant menus?

5    A.  In the e-mails?

6    Q.  In the e-mails, correct.

7    A.  Yeah, I didn't -- I didn't really look at -- review the

8    e-mails.  That wasn't my role.

9    Q.  Okay.  Well, I could ask you, do you recall seeing

10   anything remarkable in the e-mails or was that not really

11   your role?

12   A.  That was not really my role.

13   Q.  Okay.  Now you saw some of these items in the text

14   messages, though; is that fair?

15   A.  Yes.

16   Q.  Okay.  And you didn't mean to imply that work-related

17   activity was not occurring in these text messages, right?

18   A.  There was some work activity in the text messages, yes.

19   Q.  And what you did when you looked at these text

20   messages -- well, there were tens of thousands of text

21   messages on the phone; is that true?

22   A.  Yeah, I don't remember the exact number but there was

23   over 10,000.

24   Q.  Over 10,000 text messages on the phone.  And you, I

25   assume, did not look at every text message; is that true?

1    A.  I think it's fair to say I didn't look at every one,

2    yes.

3    Q.  And the main focus of your investigation or the way you

4    conducted the text message investigation was you ran

5    searches for terms that you picked to be relevant to return

6    information that you were looking for, right?

7    A.  I think we searched for conversations between

8    individuals that we knew were, you know, pertinent to the

9    investigation.

10   Q.  And then did you also do keyword searches for terms like

11   "money" or "transfer"?

12   A.  The main focus of my research was based on my

13   conversations between individuals.

14   Q.  And when you selected a conversation between an

15   individual like Mr. Abdiaziz Farah and Kara Lomen, did you

16   review all the text messages they sent and received to each

17   other?

18   A.  I reviewed a very -- very many of them.  I don't know if

19   I reviewed every single one of them, but a lot of them.

20   Q.  Did you try to review basically all of them, is that --

21   A.  There was -- again, I wasn't the only the person

22   reviewing them.  I think like that particular one that you

23   referred to there was, like, maybe, I don't know, a couple

24   thousand text messages on there.

25           And so, again, we had additional people that were

4380

1    kind of working together to review stuff.

2    Q.  So you might or might not have looked at all of the

3    e-mails between Mr. Farah and Kara Lomen?

4    A.  I didn't look at any of the e-mails related to those

5    two.

6    Q.  My apologies.  You might or might not have looked at all

7    the text message communications between Mr. Farah and Kara

8    Lomen?

9    A.  Correct.

10   Q.  Okay.  And when I say "text message", I'm sort of using

11   text message and WhatsApp interchangeably, right?

12   A.  I think that's fair.

13   Q.  And the reason is they're basically -- they're very,

14   very similar things, right?

15   A.  They're both messaging-type applications.  One, you

16   know, the WhatsApp one is, like, an encrypted version of it

17   but essentially the same thing.

18   Q.  And the main difference is that text messages

19   traditionally use the cell network, right?  So you need cell

20   service to send or receive a text message?

21   A.  I think if it's a -- if it has a video attached it -- I

22   mean, I think -- yeah, they all use the cell towers.  I'm

23   probably getting a little outside my lane here on exactly.

24   But I know if it's a just a straight text message it would

25   be SMS, which I believe goes over the call and the other one

1    would be, like, more over the internet side of things

2    because if it's a picture --

3    Q.  Right.

4    A.  -- it would be larger.

5    Q.  So at least traditionally, text messages were sent and

6    received through, like, the Verizon network, right?  Rather

7    than the internet, right?

8    A.  Well, I --

9    Q.  Or do you know?

10   A.  I don't -- I'm not -- it's kind of outside of my lane.

11   Q.  Then do you know that WhatsApp does use the internet.

12   Do you -- or do you not have an understanding of that

13   either?

14   A.  I don't know exactly, no.

15   Q.  Do you have an understanding that people who are

16   traveling to other countries frequently use WhatsApp because

17   text messages are harder to send and receive when you're

18   traveling internationally?

19   A.  I don't know that.

20   Q.  Okay.  But there's nothing suspicious about using

21   WhatsApp, right?

22   A.  I think people use it all the time.

23   Q.  Yeah.

24   A.  Yeah.

25   Q.  Okay.  I know it's encrypted but, you know, we have the

1   WhatsApp messages, right?  They were sent and received,

2   right?

3   A.  Understood.

4   Q.  Okay.  So, with these Kara Lomen texts.  On direct

5   examination this morning you talked a bit about some

6   conversations with Mr. Farah and Kara Lomen about financial

7   issues, right, about money?

8   A.  I think there was some of the conversation.  I think

9   most of it was about the food program and about the meal

10  packs and about -- I think there was some conversation

11  about, kind of like, his level of profit in there.

12  Q.  And to be clear, Mr. Farah and Ms. Lomen talked about

13  the operations of the food program very frequently, right?

14  A.  Yeah.  I mean, I think there was -- there was definitely

15  a conversation back and forth with, you know, invoices that

16  were being sent back and forth and claims data and then,

17  yes.

18  Q.  And about the day-to-day operations of running a food

19  business, right?

20  A.  The -- I guess the day-to-day operations of submitting

21  meal claims.

22  Q.  And running a food business, no?

23  A.  Well, I mean, certainly there was conversation about

24  distributing food, yes.

25  Q.  Well let me see if I can clear this up.

1          MR. IAN BIRRELL:  If you could pull up -- I think

2   H-53t was what was put into evidence, which were some texts

3   on, I believe it's July 20th, 2021, between Mr. Farah and

4   Ms. Lomen.

5          (Off-the-record discussion.)

6          MR. THOMPSON:  Do you want me to pull it for you?

7          MR. IAN BIRRELL:  Yeah, just put it on the

8   document cam.

9          (Off-the-record discussion.)

10          MR. IAN BIRRELL:  Okay.

11   BY MR. IAN BIRRELL:

12   Q.  And I just want to show the date on these is -- first

13   one is, yeah, July 20th, 2021, right?

14   A.  Correct.

15   Q.  Okay.  And I think you mentioned -- reading this text,

16   you called -- you said this word was "sugar", but I think

17   it's sukar, which is a different -- different sort of thing,

18   right?

19   A.  Fair enough.

20   Q.  Okay, yeah.  And I don't want to, you know, attack you

21   for your reading.

22          If you skip to the last page of this.  This is all

23   July 20, 2021, right?

24   A.  It is, correct.

25   Q.  And --

```
 1                    MR. IAN BIRRELL:  You can take that down.

 2      BY MR. IAN BIRRELL:

 3      Q.  Just between -- we'll argue where a few days before,

 4      five days before, Mr. Farah and Ms. Lomen were talking about

 5      struggles with menus, meal substitutions, how suppliers were

 6      struggling to meet quantities.  Do you remember seeing

 7      those?

 8      A.  I recall generally stuff relating to that.

 9      Q.  But you don't remember it specifically?

10      A.  Correct.

11                    MR. IAN BIRRELL:  If you could pull up, Mr.

12      Carlson, H-53, page 68.  This is not in evidence.  So just

13      to refresh your recollection.  And this is a Cellebrite

14      report.

15                    If you could enlarge the bottom text and then the

16      next page as well.  If you could enlarge the first.  Okay.

17      And then blank it out.

18      BY MR. IAN BIRRELL:

19      Q.  Does that refresh your recollection on whether July 15th

20      you saw these people discussing struggles with suppliers

21      meeting quantities and menus and meal substitutions?

22      A.  I see that on there, yes.

23      Q.  Okay.  And that's something that was not included in

24      this excerpt, right?

25      A.  That is correct.
```

1    Q.  Okay.  Do you recall on July 17th, so three days before

2    the excerpt that's in evidence, Mr. Farah and Ms. Lomen

3    talking about starting with skim milk, finding enough skim

4    milk.  Complementing skim milk with other ingredients.  And

5    for summer, whether it was okay to change skim milk to two

6    percent as a substitution.  Do you recall that?

7    A.  I didn't -- I didn't memorize these hundreds of text

8    messages.  I mean, fair to say there was -- well, a lot.

9             MR. IAN BIRRELL:  Well, let's show page 115 of

10    that document to the witness.

11             And again, this is H-53, page 115.

12             THE COURT:  This is not in evidence.

13             MR. IAN BIRRELL:  Not in evidence.

14             And then on the next page, the second one.  Okay.

15    And then blank it out.

16    BY MR. IAN BIRRELL:

17    Q.  So that -- does that refresh your recollection of

18    whether those discussions occurred on July 17th?

19    A.  Yes.

20    Q.  Okay.  And they did, right?

21    A.  They did, yes.

22    Q.  And that wasn't included on the excerpt, right?

23    A.  Correct.

24    Q.  And then a few days after the July 20th excerpt do you

25    remember a discussion about the posters that needed to be

1    displayed as part of the food program between Mr. Farah and

2    Ms. Lomen?

3    A.  I do recall.

4    Q.  Okay.  And that was not included in the excerpt, right?

5    A.  It was not in those ones we -- correct.

6    Q.  Do you recall that same day on July 23rd, discussions

7    about whether instant rice was okay to be -- whether it was

8    permissible under the terms of the program to serve instant

9    rice or basmati rice and whether Somali people generally

10   prefer basmati rice versus instant rice?

11   A.  I recall something to that effect, yes.

12   Q.  Okay.  And that wasn't included in these excerpts too?

13   A.  Correct.

14   Q.  So what really happened with these excerpts is --

15            MR. THOMPSON:  Your Honor, I'm going to object and

16   ask for a sidebar.

17            **(At sidebar)**

18            THE COURT:  Go ahead.

19            MR. JACOBS:  Your Honor, I'm going to object as

20   hearsay.  These are statements, out-of-court statements,

21   offered apparently for the truth of the matter asserted.

22            The suggestion -- if the defense wants to make an

23   argument under the rule of completeness, they should do that

24   but they should do that outside the presence of the jury.

25   It's not proper to do this in front of the jury.

1      We are allowed to select excerpts subject to that

2  rule and to put in statements of a party-opponent and

3  coconspirator statements.  They're not allowed to put in

4  their own statements -- their own hearsay statements or Kara

5  Lomen's hearsay statements.

6      THE COURT:  Mr. Birrell.

7      MR. IAN BIRRELL:  First of all, Your Honor, I

8  think they would be admissible under the rule of

9  completeness but I'm not offering them.

10     I think it's fair to have the jury hear them and

11  for him to discuss them.  He left the jury with the

12  impression that all Mr. Farah and Ms. Lomen talked about was

13  money.  And it's fair for the jury to hear that they talked

14  about all sorts of different things in these text messages.

15  And there are other text messages that I plan or hope to get

16  into, at least, where Mr. Farah was doing all kinds of

17  food-related work.

18     THE COURT:  How is this not hearsay?

19     MR. IAN BIRRELL:  It's not offered for the truth

20  of the matter asserted.  It's offered to impeach his

21  statement and to show the jury that what he said when all

22  they talked about all Mr. Farah did is text people about

23  money on his phone isn't true.

24     THE COURT:  My recollection is that there was

25  testimony about the fact that there were many texts about

```
1    food and that this was a selection.

2              If I'm wrong about that -- Mr. Thompson, do you

3    recall?

4              MR. THOMPSON:  That's absolutely, right, Your

5    Honor.  In fact, he just said it about three minutes ago.

6              There's been no suggestion that they only spoke

7    about money.  The suggestion was that Abdiaziz Farah and Mr.

8    Ibrahim and Abdiaziz Farah and Abdimajid Nur spoke lots

9    about money and the distribution of the cut of the proceeds.

10             He's said no such things about the conversations

11   with Kara Lomen.

12             MR. IAN BIRRELL:  And these are -- I think these

13   are important to provide context for the government's

14   evidence.  I mean, these are texts between these people

15   three days after the excerpt.

16             THE COURT:  They're self-serving hearsay.  I don't

17   know a way around the fact that they are self-serving

18   hearsay.  I'm sustaining the objection.

19             (In open court)

20             THE COURT:  Objection is sustained.

21   BY MR. IAN BIRRELL:

22   Q.  Okay.  But to be clear, Mr. Farah and Ms. Lomen didn't

23   only talk about money and profit and anything like and --

24   we'll call it the business side of the Federal Food Program

25   in these texts, right?
```

1    A.  Ms. Lomen was Executive Director of Partners in Quality

2    Care, so.  I mean, that's where the claims were being

3    submitted through, so I would expect that.

4    Q.  Right.  So they talked about the day-to-day operations

5    of what needs to be in these bags.  To be compliant.  What

6    kind of rice is appropriate to include.  What kind of rice

7    is not appropriate to include.  What kind of milk is

8    appropriate to include.  What kind of milk is not

9    appropriate to include, et cetera, right?

10   A.  Sure.

11   Q.  And that's -- that's as you would expect, right?

12   A.  Yes.

13   Q.  And to be fair, I think there are thousands of texts

14   between Mr. Farah and Ms. Lomen and they're not all included

15   in the excerpt, right?

16   A.  Correct.

17   Q.  Okay.  Now you mentioned that you looked at texts

18   between Mr. Farah and some of the other people on trial

19   here, right?

20   A.  Correct.

21   Q.  Do you recall whether you looked at text messages and

22   WhatsApp messages between Mr. Farah and suppliers in this

23   case?

24          First of all, do you know what I mean when I say

25   "supplier"?

1     A.  Maybe you can clarify.

2     Q.  Okay, yeah.  So when I say "supplier", I'm talking about

3     the wholesale food suppliers he purchased food from.

4          You understand that Mr. Farah wasn't making his

5     own food, he was purchasing it from other people and then

6     distributing it, right?

7     A.  Understood.

8     Q.  Okay.  Did you look at the text messages between him and

9     people involved in these wholesale food suppliers where he

10    was purchasing food from?

11    A.  I personally don't know.  Again, we had a team of people

12    who were kind of going through these messages, so I

13    personally don't know that.

14    Q.  Okay.  Do you recall seeing messages between him and

15    anyone at either Sahal Wholesale or Gold Star Distribution?

16    A.  I recall seeing a Sahal Wholesale invoice in one of them

17    but I don't believe that was, like, with that particular

18    person.  But, again, my main focus was on kind of the

19    individuals involved and that was where I was looking at

20    those particular messages.  But other people were also

21    looking through the messages too.

22    Q.  So you may or may not have seen texts between these

23    sorts of people; is that what you're saying?

24    A.  I'm uncertain.  I know I did see Sahal -- a Sahal

25    invoice in one of the -- one of the text strings.

1    Q.  Okay.  Well, let me -- just for the witness, I'm going

2    to ask you about whether you've seen a document that's not

3    in evidence.

4            MR. IAN BIRRELL:  And if you could, Mr. Carlson,

5    go to page 39 of Exhibit D-1253 and blow up the top message

6    on February 16th, 2021.

7            If you'll blank that out, Mr. Carlson.

8    BY MR. IAN BIRRELL:

9    Q.  Do you recall -- have you seen that document, that text

10   message before?

11   A.  I recall seeing something similar but it could have been

12   that was then forwarded later.  I'm uncertain.  I don't --

13   yeah, I don't know.  But I've seen one similar to that.

14           MR. IAN BIRRELL:  Your Honor, may I have a brief

15   sidebar?

16           THE COURT:  You may.

17           **(At sidebar)**

18           THE COURT:  Mr. Birrell.

19           MR. IAN BIRRELL:  Your Honor, I think it's

20   appropriate for me to ask him questions about this exhibit

21   generally.  I don't want to make it look like I'm, you know,

22   playing any games with the witness.  It's a hearsay

23   objection.

24           But I do think it's appropriate for me to ask him

25   some of these questions about whether he's seen text

4392

1    messages talking about distribution schedules, distributing

2    to locations and for, you know, a significant number of

3    pallets and cases of food.

4          But I figured I'd ask the Court's permission

5    rather than do it in front of the jury.

6          THE COURT:  Mr. Thompson, are you going to object

7    to that line of questioning?

8          MR. THOMPSON:  Your Honor, I am on both hearsay

9    and foundational grounds.

10          This is, as Your Honor put it, the most

11    self-serving of hearsay.  The defendants' pretending to run

12    a food operation.  They bought some food.  They sold some

13    food.  They distributed some food.  And that's not the

14    question here.  The question is whether or not that their

15    claims are fraudulent.

16          If they want to call someone from Sahal Wholesaler

17    to talk about the food that they distributed or milk that

18    they sold, they're welcome to do that.  But they're not

19    welcome to put in text messages between the defendants and

20    other people to avoid cross-examination and in violation of

21    hearsay rules.

22          MR. IAN BIRRELL:  And I don't intend to put it

23    into evidence.  But I do think it's appropriate for me to

24    ask him general questions as to whether he's seen text

25    messages coordinating delivery schedules to site locations

1    for pallets of food.

2              THE COURT:  I just don't think there's a basis for

3    it under the rules.  So I'm -- I won't allow it.

4              MR. IAN BIRRELL:  Understood, Your Honor.

5              **(In open court)**

6    BY MR. IAN BIRRELL:

7    Q.  Okay.  So you might or might not have seen something

8    like that before, correct?

9    A.  Yes.

10   Q.  At least as contained in these text messages?

11   A.  Yes.

12   Q.  Okay.  And you understand in conducting these

13   Cellebrite -- in investigating the content of text messages,

14   you know, when you're looking through 20,000 text messages,

15   it's difficult to do, right?

16   A.  I think that it's fair.  It takes a group of people

17   it's -- yeah.

18   Q.  And one of the things you're able to do and you're

19   trained on is using search terms to search for particular

20   words that could be relevant, right?

21   A.  Cellebrite does offer that functionality, yes.

22   Q.  Right.  So you could have looked through and seen every

23   time the word "pallet" was contained in these 20,000 text

24   messages, right?

25   A.  It may have sorted that way, yes.  Again, my focus was

```
 1    on, you know, kind of focused on individuals.  But, yes, I
 2    think you could have done that.
 3    Q.  Right.  That's something you could have done but chose
 4    not to do?
 5    A.  Well, again, that wasn't my role, so.
 6    Q.  But you could have -- you could have done that, right?
 7    A.  I could have, but that wasn't my role.
 8    Q.  Same thing.  You could have searched for the word
 9    "delivery" and seen not 20,000 text messages but some other
10    number of text messages where these words come up, right?
11    A.  Again, that wasn't my role in this case.
12    Q.  Right.  So you could have done that but chose not to?
13    A.  It just wasn't my role to do.
14    Q.  Do you know -- well, so you don't know the extent to
15    which those text messages would be included in the
16    Cellebrite report, right?
17    A.  I'm not understanding the question.
18    Q.  Well, if you would have searched for "pallet" and seen
19    the results.  There could have been a thousand text messages
20    talking about pallets and there could have been zero text
21    messages talking about pallets, right?
22    A.  Could be, if you searched that way.
23    Q.  Right.  And because the search wasn't conducted by you,
24    you're not able to opine on that, right?
25    A.  It was not --
```

```
1    Q.  Yeah.

2    A.  I didn't personally do that search.

3    Q.  Right.  You didn't personally search for "delivery",

4    right?

5    A.  I did not.

6    Q.  Didn't personally search for "milk", right?

7    A.  Again, my role was -- was to look, you know -- if those

8    searches would have come up in kind of the strings I was

9    reviewing.

10   Q.  If they would have come up in the strings talking about

11   money, they would have been put forward here, right?

12   A.  Well, they would have -- they would have been part of, I

13   guess, the exhibit or the larger Cellebrite report, but I

14   didn't -- I didn't specifically search for those words.

15   Q.  Did you specifically search for any words?

16   A.  I don't think I did, no.

17   Q.  Okay.  You didn't search for "profit" or "money sign" or

18   anything like that?

19   A.  I do not think I did.

20   Q.  Okay.

21   A.  No.

22   Q.  Okay.  But the text messages that were portrayed here,

23   we talked about representative samples earlier, not to

24   rehash the subject, but the text messages that were

25   portrayed here are not intended to be a representative
```

1    sample of what's on the phone, correct?

2    A.  The text messages here are not -- it's not the entire

3    Cellebrite report for that.  It's excerpts that we pulled

4    out of there, correct.

5    Q.  These are specific excerpts that the prosecution team,

6    yourself included, are showing to the jury to attempt to

7    prove the case, right; is that fair?

8    A.  There -- there were messages that we pulled out that

9    show kind of the flow of money, where the money went.

10   Q.  Okay.

11   A.  How it was used in discussion of the funds, yes.

12   Q.  So there are many, many other text messages that aren't

13   part of these excerpts, right?

14   A.  There are.

15   Q.  Okay.

16   A.  Other text -- other messages that aren't part of these

17   particular --

18   Q.  Okay.

19   A.  -- excerpts, yes.

20   Q.  Okay.  Including potentially text messages about

21   delivering food.  You don't know because you didn't

22   really -- that wasn't part of your role was to look for

23   those sorts of text messages, right?

24   A.  That was not my role, correct.

25   Q.  Your role was to look for text messages about the money,

```
1    right?

2    A.  My role was to kind of, you know, to go through and then

3    a team of us searched generally, you know, through the

4    entire text strings, yes.

5    Q.  And what you were you trying to do was follow the money,

6    right?

7            MR. THOMPSON:  Objection, asked and answered and

8    misstates the testimony.

9            THE COURT:  Overruled.  You may answer.

10           THE WITNESS:  As far as -- I mean, I think follow

11   the money more refers to the bank records, right?  Like,

12   that's where you would see kind of the money come in and the

13   money go out.

14           The text messages are a little different, I think,

15   but...

16   BY MR. IAN BIRRELL:

17   Q.  Well, you were still -- you said the text messages, you

18   were trying to follow the flow of money, right?  That's what

19   you were trying to do?

20   A.  I don't think we were trying to follow the flow of the

21   money through the text messages per se, just identify

22   discussion about kind of where some of the money was --

23   went.  But the bank records are really the main -- the main

24   way you would do that.

25   Q.  And someone else is going to talk about the bank
```

1  records, right?

2  A.  Correct.

3  Q.  At least that's your understanding?

4  A.  Correct.

5  Q.  Okay.  Through these -- through your investigation of

6  the text messages and -- well, through not looking at the

7  e-mails on the phone, you were not attempting to follow the

8  -- follow the food, right?

9  A.  I mean, I think -- if you follow the money, it kind of

10  leads where the money goes if the money -- you know.

11  Q.  Well, your role in this case was not to try to track the

12  flow of food from these suppliers to wherever it went,

13  right?

14  A.  My role was not to track the money or the suppliers, no.

15  Q.  The money or the supply of food, right?

16  A.  That was not my role.

17  Q.  Okay.  Just briefly, we looked at a lot of these text

18  messages and there are just a few I want to talk about.

19        MR. IAN BIRRELL:  If you could pull up, Mr.

20  Carlson, H-59, page 75.  And this should be in evidence for

21  the jury.

22  BY MR. IAN BIRRELL:

23  Q.  Text message where Mr. Farah sends a W-9, right?

24  A.  That's what it appears, yes.

25  Q.  And a W-9 as an IRS investigator is a document you're

1   well familiar with, right?

2   A.  Well, being that I'm on the criminal side of things,

3   like, we don't get too involved really with, you know, like,

4   the issue.  I mean, I'm generally aware of this.  But, you

5   know, far from an expert in dealing with business

6   registrations, anything like that.  That's just not my --

7   not what I do.

8   Q.  Well, high level then.  What a W-9 is is a request for

9   taxpayer identification, right?

10  A.  Correct.  That's my understanding of it.

11  Q.  And the reason a person does a W-9 is so you can issue a

12  1099, right?

13  A.  Well, it's to -- I guess to register your business with

14  the IRS.

15  Q.  And it's a request -- it's a request to another

16  business, please give me your taxpayer identification

17  number, right?

18          MR. IAN BIRRELL:  If you could zoom in on part

19  one.  No, just below that.  There you go.  It's pretty

20  blurry.  That might not help.

21  BY MR. IAN BIRRELL:

22  Q.  I guess, so, you don't know the specific purpose of a

23  W-9, but generally these are IRS forms that people are

24  required to follow, right?

25  A.  Correct.  I'm not -- I'm not an expert in them.

4400

1    Q.  Okay.  And generally this is the process a person does

2    to follow the IRS regulations is get W-9s and fill them out,

3    right?

4    A.  I think that's fair.

5    Q.  Okay.

6              MR. IAN BIRRELL:  And if you could pull up H-54q,

7    page 3, please.  Which is also in evidence.

8              And let's start at page 4 actually and then go

9    backwards.

10   BY MR. IAN BIRRELL:

11   Q.  Okay.  So what this is is the person in blue -- and you

12   talked about this on direct.  Do you remember that?

13   A.  I do, yes.

14   Q.  So the person in blue, Mr. Ibrahim, is telling Mr. Farah

15   that he told Kara Lomen, right -- the Kara Lomen's the "she"

16   in this; is that right?

17             MR. IAN BIRRELL:  It might help to go back one

18   page to 3, not to bounce back and forth.

19   BY MR. IAN BIRRELL:

20   Q.  So you see there --

21   A.  Oh, yeah, I see that.

22   Q.  Kara?  Okay.

23             So the person in blue is saying -- to give some

24   context to this, "Kara Lomen conducted a site visit at Top

25   Park."  Right?

1    A.  Correct.

2              MR. IAN BIRRELL:  And if you turn to page 4.

3    BY MR. IAN BIRRELL:

4    Q.  That Mr. Ibrahim told Kara to say, Hey, your team did a

5    site visit, tell MDE you saw the distribution, right?

6    A.  That's what it says, yes.

7    Q.  And this is entirely consistent with Ms. Lomen or

8    someone from her team going to the site, seeing food

9    distributed during a site visit, right?

10   A.  I can't really provide con -- I mean, I'm not going to

11   interpret what it says.  It says, "Tell MDE you saw the

12   distribution," is what I --

13   Q.  Right.  And I suppose to be fair to you, you don't know

14   if Ms. Lomen saw that distribution or not, right?

15   A.  I do not.

16   Q.  Okay.  Last, to briefly talk about real estate

17   transactions.  Just very briefly.

18             MR. IAN BIRRELL:  On J-160, please, at page 3.

19   Okay.  Let's go one more page.

20   BY MR. IAN BIRRELL:

21   Q.  So you talked about this on direct examination.  Do you

22   remember this?

23   A.  I do.

24   Q.  What this is is a real estate deal, right?

25   A.  It appears to be, yeah, some sort of a sales agreement.

4402

```
 1    Q.  In which Mr. Farah was purchasing some kind of real
 2    estate, right?
 3    A.  It appears that's what it states.
 4    Q.  And if you zoom in on page -- or on paragraph 2, he used
 5    his passport to purchase this, right?
 6    A.  I don't know if he used his passport to purchase it.  I
 7    mean, I see his passport number is listed there.
 8    Q.  His passport number is listed as a form of -- presumably
 9    of identification, right?
10    A.  Could be.
11    Q.  And there's a written contract here that we're looking
12    at?
13    A.  Yes.
14    Q.  Right?
15            MR. ANDREW BIRRELL:  If you pull up H-52k.  Well,
16    that's the wrong one, so blank it out.
17    BY MR. IAN BIRRELL:
18    Q.  Well, regardless, you recall he hired a legal firm to
19    make sure it's legitimate?  That there was a legal -- a
20    Kenyon legal team involved in this real estate contract?
21    A.  I remember that there was a lawyer on the documents.
22    Q.  Right.  And Mr. Farah wired money using U.S. Bank where
23    he went in in person and provided ID, right?  Do you
24    remember that from the documents?
25    A.  I don't remember the exact bank on that specific one
```

1   where it went from, but...

2   Q.  And from a United States-based bank, not necessarily

3   U.S. Bank, right?

4   A.  Oh, sure.

5   Q.  Yeah.

6   A.  Sorry.

7   Q.  Yeah, that's my apologies.

8           But he went into a United States-based bank in

9   person, provided ID to effectuate a wire transfer, right?

10  A.  I think that's right.

11          MR. IAN BIRRELL:  And if you pull up H-52f,

12  page 2.

13  BY MR. IAN BIRRELL:

14  Q.  You see there were two engineers at the bottom of this.

15          MR. IAN BIRRELL:  If you can zoom in on the last

16  bubble.

17  BY MR. IAN BIRRELL:

18  Q.  There were two engineers involved in this project,

19  apparently?

20  A.  That's what this states.  It says that he has talked to

21  a civil and structural engineer and a mechanical electrical

22  engineer.

23  Q.  Did you talk to Uthman H.?

24  A.  I personally did not, no.

25  Q.  Do you know who he is?

```
 1   A.  I personally do not, no.

 2   Q.  Okay.  Well, isn't this -- this was a pretty openly

 3   conducted transaction, right?

 4           It was a real estate deal.  He used his passport.

 5   Involving a legal firm.  Multiple engineers involved and

 6   wired money from a U.S. Bank in person, right?

 7   A.  I think that is fair.

 8   Q.  Nothing was being concealed or hidden in any way during

 9   this transaction; is that fair?

10   A.  I guess I wouldn't -- I don't know all the deals

11   surrounding this transaction, like, I haven't, like, looked

12   into every aspect of exactly how it happened.

13   Q.  But from the -- from the information you have, you're

14   not aware of anything being hidden or concealed from this

15   transaction, fair?

16   A.  I am not.

17   Q.  Okay.

18           MR. IAN BIRRELL:  May I have a moment, Your Honor?

19           THE COURT:  You may.

20           MR. IAN BIRRELL:  Nothing further.  Thank you,

21   Agent Pitzen.

22           THE COURT:  Cross-examination, Mr. Mohring.

23           MR. MOHRING:  Thank you, Your Honor.

24           May I have just a minute to set up?

25           THE COURT:  Sure.
```

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MR. MOHRING |
| 3 | Q.  Good afternoon, Agent. |
| 4 | A.  Good afternoon. |
| 5 | Q.  My name's Andrew Mohring.  I represent Mukhtar Shariff, |
| 6 | one of the names that you've testified about over the last |
| 7 | number of days, yes? |
| 8 | A.  Yes. |
| 9 | Q.  Okay.  Well, I'm want to start -- a few questions about |
| 10 | your background.  It was some time ago, but I think you |
| 11 | testified that you had some -- you spent some time at the |
| 12 | Carlson School of Management? |
| 13 | A.  I did, yes. |
| 14 | Q.  That's the U of M's business school? |
| 15 | A.  That's correct. |
| 16 | Q.  Tell us, how long were you there? |
| 17 | A.  I believe it was four years. |
| 18 | Q.  And did you get a specific degree from the Carlson |
| 19 | School? |
| 20 | A.  I did, yes. |
| 21 | Q.  And what degree was that? |
| 22 | A.  It was a bachelor's degree in finance. |
| 23 | Q.  And when were you there? |
| 24 | A.  Back a few years -- you guys are dating me here. |
| 25 | Q.  I'm not trying to fish out how old you are -- |

```
1    A.  Yeah.

2    Q.  -- but what --

3    A.  Yeah, yeah.  As I would have graduated there in 2003.

4    Q.  So '99 to --

5    A.  That's right.

6    Q.  -- 2003-ish?

7    A.  Correct, correct.

8    Q.  Did you study at all or have any contact with Professor

9    Paul Vaaler while you were there?

10   A.  The name doesn't ring a bell to me.

11   Q.  Okay.  I'm a little unclear and so let's see if we can

12   get a little clearer about the time frame of your

13   involvement in the investigation about which you've been

14   testifying --

15   A.  Sure.

16   Q.  -- for the last couple of days, okay?

17   A.  Sure.

18   Q.  So I understand that there were a number of searches

19   that were done on January 20th, 2022, and January 21st,

20   2022, right?

21   A.  Correct.

22   Q.  And you participated in some manner in some of that?

23   A.  I assisted on, it would have been the second day, so

24   January 21st in some capacity.

25   Q.  Okay.  And then you had some involvement -- I mean, a
```

 1    number of cases in a large investigation, right, of which

 2    you were a part?

 3    A.  Correct.

 4    Q.  Did your involvement in that large investigation begin

 5    with that search activity or before?

 6    A.  It would have probably -- like, that was just an

 7    assistance role, I guess, so...

 8    Q.  I'm just asking when you're -- I'm not asking about your

 9    assistance role --

10    A.  Yeah.

11    Q.  -- I think we understand that.  I'm asking about when

12    you're involvement --

13    A.  Yeah, I don't -- I don't know that I had anything to do

14    with the investigation prior to that point.

15    Q.  Okay.

16    A.  I don't think I was involved at all.

17    Q.  Okay.  So let's focus on after.  Then after that time, I

18    believe from your testimony on direct examination and on

19    cross-examination, you were involved in various ways in the

20    large investigation of which this particular set of charges

21    in this courtroom was just a part, right?

22    A.  Really from, I guess, January 21st, 2022, until, say,

23    January 2023, I didn't have any part of this investigation.

24    I wasn't involved at all.  It was a kind of a --

25    January 21st, 2022, was kind of, I think, more of a one-day

1    thing.  And then when I was reassigned to the case after the

2    original agent had left, then that's when I was reassigned

3    this case.

4    Q.  And when you say "this case", are you talking about this

5    specific --

6    A.  The bigger, case.

7    Q.  Let me finish, please.

8    A.  Yes.

9    Q.  This specific group of seven people or this case, this

10   investigation, including but not limited to these seven

11   people?

12   A.  It would be the second.

13   Q.  Okay.  Thank you.

14         And it sounds like you were at least present for

15   some witness interviews, at least one that we heard about;

16   is that true?

17   A.  I was.

18   Q.  Did you testify in front of the grand jury?

19   A.  I did not.

20   Q.  Okay.  I understand big investigation, including lots of

21   stuff of which this -- the seven people that we're here with

22   is just a part.

23         I want to now ask about your involvement

24   specifically on this case, the one that we're here in this

25   courtroom about.  When did that start?

```
1    A.  So that would have been --
2    Q.  When did you zero in on this set of charges, this
3    investigation?
4    A.  So, prior to this time I was -- I would say that
5    probably began in February.  Prior to that time I was
6    assigned to a different trial preparing for a different
7    matter.  And then when that matter was resolved, I then
8    transferred or kind of transitioned probably around February
9    of 2024 to help assist with this matter.
10   Q.  Okay.  So your active involvement as an agent, I
11   understand limited role, but your active involvement as an
12   agent in this specific case began around February of 2024,
13   February of this year?
14   A.  I think that's fair, yes.
15   Q.  Okay.  You talked about a search on January 21st, 2022,
16   that you participated in.
17            How many searches did you participate in in that
18   time -- in the January 20th, 21st?
19   A.  That would have been just one.
20   Q.  Okay.
21   A.  And it was a fairly limited capacity that day, my role.
22   Q.  Okay.  And you're aware, though, that there were a bunch
23   of searches that were conducted January 20th and 21st of
24   2022?
25   A.  I am aware of that, yes.
```

1   Q.  Are you aware of any of those searches that focused on

2   property -- the physical location -- physical locations

3   connected with Mukhtar Shariff?

4   A.  Not to my knowledge.

5   Q.  Are you aware -- so to conduct a search typically, at

6   least, you need a search warrant, right?

7   A.  Typically, yes.

8   Q.  That can be like emergency circumstances, but at least

9   as far as you know it's fair to say that all of the searches

10  that were done on January 20th and 21st, those were all

11  searches that had been authorized by search warrants, right?

12  A.  As far as I know, yes.

13  Q.  And to get a search warrant, you have to demonstrate

14  that there's probable cause for the search, right?

15  A.  Yeah.  Generally what happens is an agent would type up

16  what's called an affidavit and they would lay out facts.

17  They'd present that affidavit to a magistrate judge to

18  review to determine whether or not there was probable cause

19  to issue a search warrant.

20  Q.  Are you aware of any applications claiming to offer

21  probable cause to search any physical location associated

22  with Mukhtar Shariff?

23  A.  Not -- not to my knowledge, but that was -- even if

24  there was one, I may be -- I very well may not have.

25  Q.  Not to your knowledge, right?

```
 1    A.  Correct.

 2    Q.  Okay.  Okay.  I'm going to take us back to Wednesday --

 3    was it Wednesday morning that you started testifying?

 4    A.  I believe it was --

 5    Q.  Was it?

 6    A.  -- Tuesday afternoon, I believe.

 7    Q.  Maybe even a Tuesday afternoon.  And I'm not, at least

 8    for a bit, going to talk about text exchanges.  We'll get

 9    there.

10            But you were asked a set of questions about a

11    person named Mahad Ibrahim.  Do you recall --

12    A.  I do.

13    Q.  -- him as at least a subject of some of your testimony?

14    A.  I do.

15    Q.  Okay.  And you were shown some Secretary of State

16    documents relating to entities associated with Mahad

17    Ibrahim?

18    A.  I recall that.

19    Q.  Do you recall that?  Okay.  I want to ask you some

20    questions about that.

21            I believe that the -- so first I want --

22    ThinkTechAct, do you recall that as a name of a business --

23    A.  I'm familiar with that, yes.

24    Q.  -- of a business entity that was associated with Mahad

25    Ibrahim?
```

```
 1     A.  Yes.

 2     Q.  Okay.  I want to -- and I think you were shown some

 3     Secretary of State filings about ThinkTechAct?

 4     A.  I think that's correct.

 5     Q.  Okay.

 6              MR. MOHRING:  Can we pull up B?

 7     BY MR. MOHRING:

 8     Q.  I'm going to ask you some questions about those and

 9     dates on those.  Would it help to see those again?

10     A.  It would.

11              MR. MOHRING:  And I think it's been admitted as

12     Exhibit B-1.  I think we got it.

13     BY MR. MOHRING:

14     Q.  Okay.  Showing you -- can you see that?

15     A.  I can, yes.

16     Q.  Okay.  So this is Office of the Secretary of State

17     Certification Record, a Secretary of State of Minnesota

18     document.

19              (Off-the-record discussion.)

20              MR. MOHRING:  You got it?

21              JUROR:  Yes.

22              MR. MOHRING:  Great.

23     BY MR. MOHRING:

24     Q.  And this is a multi -- there are multiple pages of this,

25     but this is a certification record that relates to --
```

```
 1              MR. MOHRING:  I think if we have to go to the
 2    second page, maybe the third.
 3    BY MR. MOHRING:
 4    Q.  Relates to ThinkTechAct Foundation?
 5    A.  Correct.
 6    Q.  And the initial document here on page 3 is a Certificate
 7    of Incorporation?
 8    A.  That's what it appears to me, yes.
 9    Q.  And this was filed for the -- filed on August 2nd, 2016.
10    Does that sound right?
11    A.  It looks like that's the initial filing, yes.
12              MR. MOHRING:  Okay.  And then if we can go back to
13    the first page, please.
14    BY MR. MOHRING:
15    Q.  On the first page, there's a summary of the dates and
16    types of filings that have happened with respect to this
17    particular entity?
18    A.  I think that's correct, yes.
19    Q.  And this entity, are we clear, is ThinkTechAct?
20    A.  Correct.
21    Q.  ThinkTechAct Foundation.
22              MR. MOHRING:  And if we can go -- I want to come
23    back to 1, but if we can go to page 4, please.
24    BY MR. MOHRING:
25    Q.  Page 4 gives both the corporate name, the registered
```

1    office and agents and incorporators of ThinkTechAct.  Do you

2    see that?

3    A.  I do see that.

4    Q.  And those are all Mahad Ibrahim, right?

5    A.  That's what this document says, yes.

6    Q.  Okay.  Do you have any understanding that that's not

7    accurate?

8    A.  I do not.

9    Q.  Okay.

10           MR. MOHRING:  Let's go back to the first page,

11   please.

12   BY MR. MOHRING:

13   Q.  Okay.  So the original filing of ThinkTechAct was on --

14   in August of 2016, right?

15   A.  Correct.

16   Q.  And then there was an involuntary -- a brief involuntary

17   dissolution, it looks like, in March of 2018?

18   A.  That's the way it appears, yes.

19   Q.  And then a reinstatement, an annual reinstatement, on

20   March 25th of 2018, right?

21   A.  That's what it says, yes.

22   Q.  And then two annual renewals in December and -- of 2019,

23   and January 2021, right?

24   A.  Correct.

25   Q.  Okay.  So ThinkTechAct as a legal entity in the State of

```
 1    Minnesota began as a legal entity of Mahad Ibrahim -- began

 2    in August of 2016, right?

 3    A.  Correct.

 4    Q.  And continued until at least June of 2021, correct?

 5    A.  It appears so, yes.

 6    Q.  Okay.  So that's ThinkTechAct.  Then there was another

 7    entity that you testified about that I want to go a little

 8    -- into a little more detail about.  And that's Mind

 9    Foundry.  Do you recall that name?

10    A.  I do, yes.

11    Q.  And I'm going to ask you some of the same questions.

12    Would it help to see the document itself?

13    A.  Sure.

14            MR. MOHRING:  Okay.  Can we pull up B-3, please.

15            Actually, I'm sorry to do this to you, Ms. Falk.

16    Can we go -- a couple more questions about ThinkTechAct.

17    Can we go back to B-1?

18    BY MR. MOHRING:

19    Q.  Okay.  One of the documents that is included in the

20    collection of records from the Secretary of State are the

21    Articles of Incorporation themselves.

22            MR. MOHRING:  I think we have to go to page --

23    maybe page 14.  Let's try that.

24    BY MR. MOHRING:

25    Q.  Okay.  So, do you see where on page 14, this is a
```

4416

 1    document that talks about Amendments to Articles of

 2    Incorporation.  Do you see that at the top?

 3    A.  I do see that, yes.

 4    Q.  And this is for ThinkTechAct Foundation?

 5    A.  Correct.

 6    Q.  And then down in paragraph 5, do you see that there's a

 7    typed-in name on the field of signature of authorized person

 8    or authorized agent?

 9    A.  I do see that.

10    Q.  And that name is Bianca Scott, right?

11    A.  I see that.

12    Q.  And then if you go -- if we skip back to page 17, so two

13    pages further.  There's also a signature line and what

14    appears to be a written signature, right?

15    A.  Correct.

16    Q.  Underneath of which is typed, Bianca Scott, Executive

17    Director?

18    A.  That's what it says, yes.

19    Q.  Right.

20    A.  Yep.

21    Q.  Executive Director of ThinkTechAct Foundation?

22    A.  Correct.

23    Q.  Okay.  And, I mean, we can page through but would you

24    accept my representation then, Mukhtar Shariff is not named

25    in any of the Secretary of State documents as having a

1    connection or association with ThinkTechAct Foundation?

2    A.  I -- I guess I don't -- I don't know that to be true or

3    not.

4    Q.  Okay.  It's in evidence.  At least not that you know of?

5    A.  Correct.

6    Q.  Okay.  Now, I have some questions, similar questions,

7    about Mind Foundry.

8              MR. MOHRING:  So can we go to B-3.

9    BY MR. MOHRING:

10   Q.  By way of introduction then, Mind Foundry is also a

11   registered business entity associated with Mahad Ibrahim,

12   right?

13   A.  Correct.

14   Q.  And registered with the Minnesota Secretary of State?

15   A.  I believe that's correct, yes.

16   Q.  Okay.  Looking at a document that has been admitted as

17   Government Exhibit B-3, does this appear to be the same type

18   of records that we were looking at for ThinkTechAct, but

19   these ones --

20             MR. MOHRING:  If we go to maybe the third page, if

21   that's consistent.

22   BY MR. MOHRING:

23   Q.  These ones relate to Mind Foundry Learning Foundation,

24   right?

25   A.  Correct.

1    Q.   Okay.  So Mind Foundry Learning Foundation.  At the top

2    of this page it says, "Certificate of Assumed Name."  Do you

3    see that?

4    A.   I do.

5    Q.   So can you tell us your understanding of what that

6    means?

7    A.   I think it's relating to its association with

8    ThinkTechAct, but...

9    Q.   Okay.

10   A.   But I'm not 100 percent certain.

11   Q.   Okay.  So anyway, this is a certificate of assumed name

12   and the assumed name is Mind Foundry Learning Foundation?

13   A.   That's what it lists, yes.

14   Q.   And its principal place of business, 1942 Washburn

15   Avenue North.  Do you recognize that address from the

16   ThinkTechAct documents?

17   A.   I recognize it from the prior documents.  I don't have

18   any independent knowledge of that address.

19   Q.   Okay.  And the name holder that this certificate of

20   assumed name is connecting with is ThinkTechAct Foundation?

21   A.   I see that.

22   Q.   And it's signed by Mahad Ibrahim, right?

23   A.   It appears to be, yes.

24            MR. MOHRING:  And then if we can go to the first

25   page.

1    BY MR. MOHRING:

2    Q.  This was originally the assumed -- this assumed name

3    document was originally filed in February of 2018, right?

4    A.  It appears that's what it says, yes.

5    Q.  Do you have any indication that that would not be true?

6    A.  I do not.

7    Q.  And then there were annual renewals in December of 2019

8    and January 2021, right?

9    A.  Correct.

10   Q.  All associated with Mahad Ibrahim?

11   A.  I don't know who did those annual renewal, I don't know

12   who they were associated, but with that entity.

13   Q.  Okay.

14          MR. MOHRING:  Well, we can go to that.  Let's see.

15   BY MR. MOHRING:

16   Q.  Okay.  The initial certificate of assumed name that we

17   were looking at, that's Mahad Ibrahim, right?  Do you

18   remember?

19   A.  Correct.

20          MR. MOHRING:  If we could go to page 2.

21   BY MR. MOHRING:

22   Q.  Right?

23   A.  Yes.

24   Q.  Not Mukhtar Shariff, right?

25   A.  Correct.

4420

```
 1                 MR. MOHRING:  And then if we go two pages back, so

 2      page 4.

 3      BY MR. MOHRING:

 4      Q.  Does this appear to be the 2019 renewal year?

 5      A.  It does.

 6      Q.  Mind Foundry again.  The same address, correct?

 7      A.  Correct.

 8      Q.  And that was 4.

 9                 MR. MOHRING:  Page 6, please.

10      BY MR. MOHRING:

11      Q.  2020 renewal, right?

12      A.  That's what it appears, yes.

13      Q.  Mind Foundry.  Same assumed name and same address?

14      A.  Correct.

15      Q.  Right?  Okay.

16                 Okay.  Now I do want to ask you some questions

17      about some of the texts.  And I want to go into a little

18      more detail than on your direct examination but still

19      looking at text exhibits that were admitted that you were

20      looking at.

21                 MR. MOHRING:  So let's start with H-54s, please.

22      BY MR. MOHRING:

23      Q.  Okay.  So, this is one of the texts that you testified

24      about at least on direct examination.  Do you recall?  We

25      can --
```

```
1   A.  I do, yes.

2   Q.  Okay.  And this is a text interaction that begins on

3   December 28th of 2021?

4   A.  Correct.

5   Q.  And I think it's two pages long.  Let's see.

6        MR. MOHRING:  Can we go to page 2?  Is that the

7   extent of it?  Okay.

8   BY MR. MOHRING:

9   Q.  So, there's a discussion and there was some talk about

10  this, but one of the people talking to each other -- and

11  Mukhtar Shariff is not on this interaction, right?

12  A.  Correct.

13  Q.  There's a discussion about, "I think we should drop

14  Mukhtar Shariff contribution."  Do you see that?

15  A.  I see where it says that, yes.

16  Q.  "He hasn't even contributed his proper share to A&E."

17  Right?

18  A.  I see where it says that, yes.

19  Q.  And then the next reaction is, "I'm game."

20  A.  Correct.

21  Q.  It kind of sounds like he's being cut out?

22  A.  I guess I wouldn't dare to interpret but...

23  Q.  Fair enough.  "Hasn't contributed" and "We should drop."

24  Right?

25  A.  Correct.
```

```
 1    Q.  Okay.

 2              MR. MOHRING:  Thanks.  You can take that down.

 3    BY MR. MOHRING:

 4    Q.  I want to dial in a little more underneath the surface

 5    of some your testimony when the prosecution was asking you

 6    questions.  And I think -- I think this was Wednesday,

 7    but -- but I'm not positive.

 8              So, there were a number of -- a number of times

 9    when you were asked to review sections of interchanges that

10    had been taken out of the Cellebrite source.  Are you with

11    me so far?

12    A.  Yep.

13    Q.  That talked about money going to different entities,

14    right?

15    A.  Correct.

16    Q.  Okay.

17              MR. MOHRING:  The first one I want to start with

18    is H-51g, please.

19    BY MR. MOHRING:

20    Q.  And right here -- so right here on the first page, do

21    you see a list of entities and dollar numbers on the top of

22    the page?

23    A.  I do, yes.

24    Q.  The question that was asked -- and you -- was, "These

25    are companies controlled by the defendants in this case?"
```

```
 1    And you said yes.

 2    A.  Okay.

 3    Q.  Do you recall testimony along those lines?

 4    A.  I do recall somewhat similar to that, yes.

 5    Q.  Okay.  I want to ask you about Mukhtar Shariff.

 6            So entities controlled by the defendant --

 7    companies controlled by the defendants in this case.  Are

 8    any of these companies, to your knowledge, controlled by

 9    Mukhtar Shariff?

10    A.  I don't -- not that I'm aware of on any of those.

11    Q.  Okay.  So it would have been more accurate to say these

12    are companies controlled by some of the defendants in this

13    case, not all?

14    A.  Sure.

15    Q.  At least -- at least as you're testifying here, and I am

16    asking this question again, to your knowledge, none of these

17    are controlled by Mukhtar Shariff, yes?

18    A.  I think that's accurate.

19    Q.  Okay.

20            MR. MOHRING:  Okay.  We can take that down.

21    BY MR. MOHRING:

22    Q.  Okay.  I think a little later in your testimony there

23    was talk about a number of sites in Faribault?

24    A.  Correct.

25    Q.  Right?  And I think the testimony was that those sites
```

1    were characterized as six Faribault sites involving this

2    group?

3    A.  Okay.

4    Q.  That's what I wrote down.  Does that sound --

5    A.  Sounds close.

6    Q.  -- close.  Okay.  I want to dial under -- dial -- in the

7    same way I want to dial underneath that.

8            So I think there was, Autumn was one location.

9    Four Seasons was another.  Am I right?

10   A.  Well, I think Autumn and Four Seasons were really the

11   same, I think, physical place --

12   Q.  Okay.

13   A.  -- but they were two site --

14   Q.  Okay.  Lifestyle Apartments.  Was that another one?

15   A.  Correct.

16   Q.  Medina Market?

17   A.  Correct.

18   Q.  SCRS.  That's Somali Community Resettlement Services,

19   right?

20   A.  That's correct.

21   Q.  In Faribault.  That was another one of the Faribault

22   locations?

23   A.  Correct.

24   Q.  I understand that there were other Somali Community

25   Resettlement places elsewhere but there wasn't one in

1    Fairbault, right?

2    A.  There was one in Faribault, yes.

3    Q.  And that was one of the six that you were talking about

4    as involving this group?

5    A.  Correct.

6    Q.  All right.  Sunrise Motor Home Park was another?

7    A.  That -- I mean, that was, I think, separate from the six

8    we were talking about, but...

9    Q.  Okay.  Cannon River Motor Home Park?

10   A.  Yes.

11   Q.  Is that not --

12   A.  Again, that was an additional -- additional site that

13   was established later on in 2021.

14   Q.  Okay.  So let's -- the six Faribault sites involving

15   this group, do you have any information that Mukhtar Shariff

16   submitted claims for any of those six sites?

17   A.  Independently I wouldn't have.  As my role, I wouldn't

18   have done that.

19   Q.  And I'm not asking you about your role.  I understand

20   that part.

21   A.  Sure.

22   Q.  But are you aware of any information that would suggest

23   that Mukhtar Shariff submitted claims for any of those six

24   Faribault sites that you testified were sites involving this

25   group?

1    A.  I don't personally know either way.

2    Q.  So to your knowledge, six Faribault sites involving this

3    group is -- does not include Mukhtar Shariff, right?

4    A.  I'm talking just generally the individuals involved in

5    this particular case, like, when I say that.

6    Q.  Okay.  Let me ask the question again --

7    A.  Sure.

8    Q.  -- and if it's confusing, which I'm quite capable of,

9    let me know.

10          Six Faribault sites involving this group does not

11   include Mukhtar Shariff, right --

12   A.  Well, I think --

13   Q.  -- to your knowledge?

14   A.  I think the sense in which he would be included is maybe

15   not necessarily in -- related to the submission, but the

16   money would then come out of -- when the money would come

17   out, involved in kind of the whole process, not necessarily

18   just the submission of the claims.

19   Q.  Okay.  At least we're clear, are we not, that you have

20   no -- you're not aware of any evidence that would suggest

21   that Mukhtar Shariff participated in submitting claims for

22   any of those six Faribault sites that you testified involved

23   these groups; is that true?

24   A.  True.

25   Q.  Okay.  Okay.  There was a long list of sites that was

 1    sent in H-59, Pages 1 to 3.  I promise I'm not going to ask
 2    you about every one of them.
 3              MR. MOHRING:  But if we could pull those up.
 4    BY MR. MOHRING:
 5    Q.  Okay.  Do you remember these and being asked about
 6    these?
 7    A.  I do, yes.
 8    Q.  Okay.  First, actually I want to take a step back and
 9    ask about just an aspect of this formatting.
10              So, this is an example of the texts, or we've been
11    calling them texts, but the communications that were lifted
12    out of the Cellebrite extraction reports, right?
13    A.  Correct.
14    Q.  That were themselves lifted out of the image that was
15    created of the electronic device.  Do I have that right?
16    A.  I think that's fair.
17    Q.  So electronic device imaged, an extraction report is
18    create from that, and these are excerpts from that
19    extraction report?
20    A.  That's my understanding as well.
21    Q.  Going the other direction.  Okay.
22              Do you see how in the upper right [sic] there's a
23    number at WhatsApp.net?
24    A.  I do, yes.
25    Q.  And then there's a name underneath that, right?

1    A.  I see that, yes.

2    Q.  And then there's another name in parenthesis.  Do you

3    see that?

4    A.  On the left side there?

5    Q.  Yeah.  I'm sorry.  Did I say upper right?  I meant upper

6    left.

7    A.  Yeah, I see that.

8    Q.  Thank you.

9            Okay.  So the name that's in parentheses, can you

10   tell us how that's generated -- is that something that is

11   cut and pasted from the Cellebrite report?

12   A.  That is not.  That's information that we -- when we

13   research who that phone number's associated to, that that's

14   how we know.

15           The top name is how it's saved within Mr. Abdiaziz

16   Farah's phone.

17   Q.  Top name meaning the WhatsApp number and then the

18   writing underneath that that's not in parentheses?

19   A.  That's my understanding, yes.

20   Q.  Okay.  So parentheses are in addition to the Cellebrite

21   report, not something that's directly in the Cellebrite

22   report; is that fair?

23   A.  That's my understanding, yes.

24   Q.  Okay.  Okay.  Back to the document then.

25           MR. MOHRING:  On this page and the next page, if

1    we can.  And actually even going onto the third page after

2    that are a long list -- I guess just barely -- well, a

3    little bit under the third page.

4    BY MR. MOHRING:

5    Q.  A long list of sites.  I saw St. Cloud, right?

6    A.  I did see St. Cloud sites, yes.

7    Q.  And also Waite Park, which is near St. Cloud?

8    A.  Correct.

9    Q.  Amphitheater there?

10   A.  I'm not exactly familiar with Waite Park.  I just know

11   generally where it's at.

12   Q.  There's a cool outdoor amphitheater.

13         Okay.  Do you have any information -- are you

14   aware of any information that Mukhtar Shariff participated

15   in submitting claims for any of those sites on those

16   two-and-a-half pages or two-and-a-quarter pages of this

17   e-mail?

18   A.  I don't know that most of these sites actually became

19   site locations.  It was -- La Cruz was but I don't -- I

20   don't know his association with them particularly, no.

21   Q.  Okay.  So that was a longer answer, but are you aware of

22   any participation by Mukhtar Shariff in submitting claims

23   for any of these sites?

24   A.  I am not, no.

25   Q.  Okay.

4430

```
 1    A.  I don't think any claims were submitted for most these

 2    sites.

 3    Q.  Well, there is a discussion on page 3.

 4             MR. MOHRING:  Can we go there?

 5    BY MR. MOHRING:

 6    Q.  Do you see that there's a request for, "I need top five,

 7    please"?

 8    A.  I see that, yes.

 9    Q.  And then at the bottom there are three sites in a

10    response, right?

11    A.  I see that.

12    Q.  And 10:58, 10 -- oh, it's the next day, okay.

13             Are you aware of Mr. Mukhtar Shariff having any

14    involvement in the submission of claims from any of the top

15    three sites -- top five, top three sites, that are

16    identified on that page?

17    A.  I do not.

18             MR. MOHRING:  Can we go to page 49.  Same

19    document.  Thank you.

20    BY MR. MOHRING:

21    Q.  So do you see that there's -- it looks like there's a

22    screen capture of some sort in the top half of this page,

23    "Somali Resettlement Meal Counts and Invoice."  Do you see

24    that?

25    A.  I see that, yes.
```

```
 1    Q.  And there are one, two, three, four, five, six, seven,
 2    it looks eight documents of maybe different types, PDFs, and
 3    maybe a couple spreadsheets?
 4    A.  That looks correct.
 5    Q.  And then there's actually -- at least what was copied
 6    has an attachments, maybe that you see at the bottom?
 7    A.  I do see -- yeah, I see something.
 8    Q.  But it looks like this is a picture of something that
 9    had an attachment to it.  Does that sound right?
10    A.  Could be.  It looks like a -- kind of like a screenshot
11    of someone's phone.
12    Q.  Okay.  And this was -- the timestamp that we have on
13    this is 12:41:44?
14    A.  Correct.
15    Q.  Do you see on the top?
16            Is that a Central Time time?
17    A.  I believe that is, yes.
18    Q.  Okay.  So there's -- Cellebrite makes an effort to
19    have the dates or the times reflect the time that this
20    happened in -- maybe it's a -- you could change the time
21    zone, but...
22    A.  Well, I think that the UTC-5 usually to me indicates --
23    UTC's like kind of the Universal Time and then minus 5 is
24    the time zone for Central, I believe.
25    Q.  Okay.  Greenwich, England.  But anyway, you think that
```

1    that's an accurate Minnesota timestamp?  Central time zone

2    stamp?

3    A.  I think so.

4    Q.  As far as you know?  Okay.

5            So there's a list of sites.  Same question.  Do

6    you have any information, are you aware of any information,

7    that Mukhtar Shariff participated in submitting claims for

8    those sites?

9    A.  I do not.

10   Q.  Okay.  Okay.  I have a few more questions about just

11   some clarifications.

12           I think it was yesterday that we looked at some

13   texts where the letters "DAR" were written.  Do you recall

14   seeing that --

15   A.  I do, yes.

16   Q.  -- in any of the materials?

17           And you opined that DAR, in at least in your

18   opinion, was a reference to Dar al-Farooq?

19   A.  That was my understanding from other things I've seen in

20   the case.

21   Q.  Okay.  Are you aware that there's another mosque site,

22   Darul Uloom?  D-A-R, next word [sic], U-L, next word,

23   U-L-O-O-M, although I understand that that's taking into our

24   alphabet things that were written in a different alphabet so

25   the exact letters may vary.  But are you aware of a

1    different DAR site?

2    A.  I'm aware of a mosque named Darul Uloom --

3    Q.  Okay.

4    A.  -- generally, yes.

5    Q.  Okay.  One of the documents that we looked at, I think

6    yesterday, texts -- the texts -- whatever, the discussion

7    back and forth bubbles that we looked at yesterday, talked

8    about check readiness of the Dar al-Farooq -- of a Dar

9    al-Farooq check.  Do you remember discussions about that?

10   A.  I do.  Generally, yeah.

11   Q.  Okay.  I've got a question.

12            MR. MOHRING:  So maybe we can pull up H-51j,

13   please.  So I think if we scroll to the bottom.  Let's see.

14   Oh, let's go to page 3, please.

15   BY MR. MOHRING:

16   Q.  So page 3, do you see in the middle and Dar al-Farooq,

17   they are saying, "May is not ready"?

18   A.  I see that.

19   Q.  "Aimee's not answering her phone."  Right?

20   A.  I see that, yes.

21            MR. MOHRING:  And then the next page, please.

22   BY MR. MOHRING:

23   Q.  "Dar al-Farooq check for May is nothing here."  Do you

24   see that?

25   A.  I do.

4434

 1    Q.  Now, this is -- neither of the participants in this

 2    discussion is Mukhtar Shariff, right?

 3    A.  Correct.

 4    Q.  And there's not a discussion of Mukhtar Shariff being

 5    involved in collecting that check, right?

 6    A.  Not to my knowledge.

 7    Q.  Okay.  Okay.  So I'm going to ask about some of the

 8    texts that we saw this morning in which someone at least

 9    identified as Mukhtar Shariff is one of the actual

10    participants in the discussion?

11    A.  Okay.

12    Q.  Okay.  Do you recall that testimony?

13    A.  I do, yes.

14    Q.  Okay.

15            MR. MOHRING:  So can we go to -- let's start with

16    H-50a, just as an example.

17    BY MR. MOHRING:

18    Q.  So focusing on the identification of people at the top

19    of this, on the upper left this time, there's a number,

20    right?

21    A.  Correct, yes.

22    Q.  It looks to be a phone number?

23    A.  Correct.

24    Q.  1-207-344-5571, right?

25    A.  Correct.

1    Q.  And then there's a name underneath -- or there's writing

2    underneath that, right?

3    A.  Correct.

4    Q.  And then there's a name in parentheses, right,

5    underneath that?

6    A.  There is, yes.

7    Q.  And so based on what we talked about before, am I right

8    that -- so the number is a number that is identified as the

9    number that at least one side of this discussion was

10   happening with, right?

11   A.  Correct.

12   Q.  And this is -- that's actually a phone number?

13   A.  Correct.

14   Q.  We think, right?

15   A.  Well, I mean, I know that's a phone number that Mukhtar

16   Shariff uses.

17   Q.  Okay.  Okay.  And then underneath that is the name that

18   on whatever device this was lifted from.  Do you know which

19   device this was?

20   A.  This was Abdiaziz Farah's phone.

21   Q.  Okay.  So, is the what's typed under -- right underneath

22   that phone number in the upper left, is that whatever that

23   phone that this was taken from, a name that was supplied in

24   connection with that phone number?

25   A.  So the Mukhtar Dar --

1    Q.  Yeah.

2    A.  -- is the information that was saved into Abdiaziz

3    Farah's phone for that contact.

4    Q.  Okay.

5    A.  And then the Mukhtar Shariff was put in there is that's

6    the phone number that's associated -- that we have

7    associated with him through bank records.

8    Q.  Okay.  So the Mukhtar Shariff is a law enforcement in

9    addition to this.  The other stuff was there on the phone?

10   A.  Correct.

11   Q.  And as far as what the name that's right underneath the

12   phone number -- so, you know, my text to my mother, if my

13   mother in my contacts is "mom", it would be that number --

14   her number and then "mom" underneath that, right?

15   A.  Yes.

16   Q.  Okay.  Okay.

17            MR. MOHRING:  You can take that down.  Thanks.

18   BY MR. MOHRING:

19   Q.  So we looked at -- and I'm not going to take you through

20   them all but I do have some questions.

21            We looked at a bunch of texts selections that

22   included invoices, right?

23   A.  Yes.

24   Q.  And actually, I got tell you, I want to talk about the

25   exchanges that focused on Kenya and financial activity,

```
1    business activity, whatever, Kenya stuff, okay?

2    A.  Sure.

3    Q.  Okay.  So in connection with those, we looked at some

4    invoices, right?

5    A.  We did, yes.

6    Q.  And also some pictures of money -- what appear to be

7    records of money being transferred?

8    A.  Correct.

9    Q.  And I think that there may have been some receipts,

10   right?

11   A.  Correct.

12   Q.  Or --

13   A.  Money transfer receipts or something, yes.

14   Q.  Yeah.  And then also -- there were some purchase

15   agreements?

16   A.  Correct.

17   Q.  Discussions of shares and property and things like that?

18   A.  Correct.

19   Q.  Okay.  Okay.  I want to go through just some of the time

20   frames in this particular set of exchanges.

21            MR. MOHRING:  So can we start with H-53b, as in

22   boy, page 4, please.  Let's see if I got this right.

23   BY MR. MOHRING:

24   Q.  So this is H-53b, page 4.  So you see here this is --

25   there's a shares purchase agreement.  Do you see that?
```

```
 1    A.  I do, yes.

 2    Q.  It's not -- and this looks like it's a screen capture of

 3    some sort, right?

 4    A.  Correct.

 5    Q.  And this was sent not by Mr. Shariff, right?

 6    A.  Correct.

 7    Q.  But sent to Mr. Shariff on May 25th of 2021, right?

 8    A.  Correct.

 9    Q.  Okay.  Are you aware from your or your team's review of

10    the Cellebrite extraction reports, including the one that

11    this was extracted from, of any invoices to Mukhtar Shariff

12    related to this share purchase agreement that was sent to

13    him on May 25th of 2021?

14    A.  As I sit here right now, I don't have independent

15    knowledge of that, no.

16    Q.  Okay.  What about any records of money transfers to or

17    from Mukhtar Shariff in connection with this share purchase

18    agreement that was sent to him on May 25th, 2021?

19    A.  I can't recall off the top of my head, no.

20    Q.  Okay.  Okay.  Let's go to another time frame.

21              MR. MOHRING:  I think H-50a, please, page 4.  We

22    can start with H-50a.

23              So, well, actually start with the first page just

24    for a second just to orient us.

25    BY MR. MOHRING:
```

```
 1    Q.  So this is another of the extractions from Cellebrite of

 2    an interaction between Mukhtar Shariff's phone number and

 3    another person, right?

 4    A.  Correct.

 5    Q.  And this is a document that you either prepared or at

 6    least -- is it that you -- let me ask.  Did you prepare this

 7    or --

 8    A.  This particular one I did not.

 9    Q.  Okay.  But you were part of the team that did, right?

10    A.  Correct.

11    Q.  And you have access to them, you could ask them

12    questions if you wanted to, you know who they are?

13    A.  I do.

14    Q.  Okay.  I'm not going to ask for names, but...

15              MR. MOHRING:  Okay.  Let's go to page 4.

16    BY MR. MOHRING:

17    Q.  So, in this one there's a picture -- I think you called

18    these renderings.  Does this look like a rendering?

19    A.  It does to me.

20    Q.  Okay.  It's not an actual photograph, doesn't look like?

21    A.  It does not look like an actual photograph to me.

22    Q.  Okay.  And this was sent to Mr. Shariff, not by him,

23    right?

24    A.  That is correct.

25    Q.  I can compress the question rather than taking you
```

1    through each of them, but are you aware of any invoices to

2    Mukhtar Shariff, any money transfer records to or from

3    Mukhtar Shariff, any receipts of payments to Mukhtar Shariff

4    or any purchase agreements involving Mukhtar Shariff that

5    relate to this property, the picture of which was sent on

6    Bastille Day, July 14th, 2021?

7    A.  I don't know what specific property this specifically

8    is, I guess.

9    Q.  Okay.  So let me ask.  Are you aware of any of those

10    types of documents appearing in any of your review of these

11    Cellebrite extractions, invoices, money transfers, receipts,

12    purchase agreements in the time frame of this picture,

13    middle of July 2021, where Mukhtar Shariff was on either the

14    sending or receiving end?

15    A.  Not off the top of my head, no.

16    Q.  Okay.  Okay.  Another time frame that appears.

17         MR. MOHRING:  Let's go to -- I don't know, it

18    might be -- actually it might be the same page.  Let's --

19    sorry about that, Ms. Falk.  Can we scroll down another

20    page?  Is that the end of it?

21    BY MR. MOHRING:

22    Q.  Okay.  Well, let me just ask him the more global

23    question.

24         We saw invoices involving other people in some of

25    the text extractions, right?

4441

1    A.  We did.

2    Q.  In connection with Kenya and activity in Kenya?

3    A.  Correct.

4    Q.  Kenya/Kenya.  Money transfer records, sending/receiving,

5    right?

6    A.  Correct.

7    Q.  Receipts, money transfer receipts, purchase agreements.

8         In your review, you -- and I mean, to your

9    knowledge, your review and the review of the rest of the

10   people who are working on extracting stuff from the

11   Cellebrite records, did you see any of those types of

12   documents for which Mr. Mukhtar Shariff was a party?

13   A.  Not from my recollection on Abdiaziz Farah's phone.

14   Q.  Okay.  And, in fact, there was evidence that suggested

15   otherwise, right?

16   A.  Can you repeat the question.

17   Q.  There was evidence that suggested the opposite, right?

18   Do you recall a discussion question of, "When are you going

19   to bring me in?"  To the --

20   A.  I recall something similar to that, yes.

21   Q.  Okay.  And that was sometime in December, right, of

22   2021?

23         MR. MOHRING:  We can go there.  H50-b, please.

24   Page 18.

25   BY MR. MOHRING:

4442

1    Q.  Okay.  December 21st, 2021, there's a question asked

2    from Mukhtar Shariff -- actually now it's a WhatsApp net

3    phone -- or account, right?

4    A.  Yes.

5    Q.  That indicates that he was not a participant in any of

6    this stuff.  "When are you going to bring me in?"  Right?

7    A.  That's what he says in this particular text message.

8    Q.  Do you have any evidence to the contrary that he was

9    already there?

10    A.  I do not.

11    Q.  Okay.

12          MR. MOHRING:  Okay.  I want to ask about an

13    exhibit that is marked but not in evidence.  So before we

14    pull it up -- but this will be H -- there's some confusion

15    but I think it's H-85, at least we have it as H-85.  I think

16    in the latest exhibit list it's referred to as H-83.  I'll

17    give you a copy.  It's --

18          THE COURT:  Can you confer off the record for just

19    a moment?

20          MR. MOHRING:  I'm sorry.

21          (Counsel conferring)

22          THE COURT:  Actually here's what we're going to

23    do.  We're going to take our afternoon break.  So we need to

24    do that anyway.  We'll come back at 3:30.

25          (Recess taken at 3:16 p.m.)

1                              *    *    *    *    *

2          (3:33 p.m.)

3                          **IN OPEN COURT**

4              THE COURT:  You may all be seated.

5              Mr. Mohring, you may continue.

6              MR. MOHRING:  Thank you, Your Honor.

7    BY MR. MOHRING:

8    Q.  So, I want to ask you about the Cellebrite report but

9    just to get there, I want to place the Cellebrite reports in

10   the kind of developmental chain of the evidence that we've

11   been looking at.  Okay?

12   A.  Sure.

13   Q.  So do you know that an agent who was a forensic --

14   digital forensic analyst, I think was the title, has

15   testified in this case?

16   A.  I'm aware of that, yes.

17   Q.  And are those people that you work with, you have

18   contact with in your work as an IRS criminal investigator?

19   A.  Generally.  I mean, sometimes, yes.

20   Q.  Not your area of specialty, but they're part of the law

21   enforcement team that you're a part of too?

22   A.  Correct.

23   Q.  And so what we learned was that -- I think the testimony

24   may have been a hundred or more, but really hundreds of

25   devices of various types were seized and obtained by law

4444

```
1    enforcement in this larger investigation of which we're a

2    part.  Does that sound right?

3    A.  I don't have any independent knowledge of how many.

4    Q.  Okay.  But you know the devices were seized?

5    A.  I do.

6    Q.  Including phones, right?

7    A.  Yes.

8    Q.  And not phones, laptops?

9    A.  Correct.

10   Q.  Tablets?

11   A.  Correct.

12   Q.  Thumb drives?

13   A.  Correct.

14   Q.  Apple watches?

15   A.  Could be.

16   Q.  Okay.  Anyway, so electronic devices are seized and as

17   we heard it, but I'm asking if this is your understanding

18   also if this is accurate, that the first step in the process

19   of working with those types of devices is that you make an

20   image of it, right?

21   A.  I'm not an expert in the process, but I -- yeah, my

22   understanding is they kind of copy image the device, yes.

23   Q.  Okay.  And that's -- at least one reason is because you

24   don't want to be messing with the original source of

25   evidence, right?
```

4445

```
 1    A.  Sure.
 2    Q.  Okay.  So an image is made, some of the devices were
 3    imaged, some were not.  Is that your understanding?
 4    A.  I'm not certain what was imaged and what was not imaged.
 5    Q.  Okay.  So is it fair to say that the decisions about
 6    what to image and what not to image, you weren't a part of
 7    that?
 8    A.  I was not.
 9    Q.  Okay.  Of what was imaged then some are processed and
10    some are not.  Were you a part of that decision process?
11    A.  I was not.
12    Q.  Okay.  One of the processing formats programs is
13    Cellebrite, right?
14    A.  Correct.
15    Q.  C-e-l-l-e-b-r-i-t-e.  And so that's a way of taking an
16    image of an electronic device and being able to parse the
17    data that appears on that device; is that fair?
18    A.  That's fair.
19    Q.  Okay.  So some of the devices were seized.  Some were
20    imaged.  Devices -- images were processed including with
21    Cellebrite.  You weren't a part of any of those
22    decisionmaking processes, right?
23    A.  I was not.
24    Q.  But you did, you were involved and one of a number of
25    people, as I understand it from your testimony, were
```

4446

1    involved in extracting, in reviewing the Cellebrite data,

2    right?

3    A.  Correct.

4    Q.  And deciding what ones to extract and what ones not to?

5    A.  Well I think, like, the Cellebrite was extract -- was

6    the extraction.

7    Q.  So the Cellebrite's an extraction, but what we've been

8    looking at is not Cellebrite records, we've been looking at

9    exhibits that were prepared from those Cellebrite records,

10   right?

11   A.  Correct.

12   Q.  Okay.  So you -- and you were one of the agents, not the

13   only one I understand it from your testimony, tell me if I

14   got this right, you were one of the agents who actually --

15   or were actively involved in that process, right?

16   A.  I did partake in that process, yes.

17   Q.  And when I say "that process" and we say "that process"

18   let's make sure, the process of reviewing the Cellebrite

19   records, the mother lode, and deciding which subparts of

20   that to lift out of that and put into the types of exhibits

21   that we have been looking at for the last number of days,

22   right?

23   A.  Correct.

24   Q.  Okay.  Okay.  Let --

25            MR. MOHRING:  Can we see H-85, please.  Just for

1      the witness.

2      BY MR. MOHRING:

3      Q.  Showing you what has been marked but not yet admitted as

4      Government Exhibit H-85.

5              Does this appear to be an example of a Cellebrite

6      report or a subpart of a Cellebrite report?

7      A.  It does.

8      Q.  Okay.  And this is one that is -- reflects an

9      interaction, a communication, between a phone number.  Do

10     you see that among the participants at the top?

11     A.  I do, yes.

12     Q.  And that number is 1-207-344-5571; is that right?

13     A.  Correct.

14     Q.  And that's the phone number that through other

15     investigative techniques was associated with Mukhtar

16     Shariff?  Does that sound right?

17     A.  Correct.

18     Q.  Okay.  And is this a type of Cellebrite report that --

19     or is this an example of the Cellebrite reports that you and

20     the rest of the team that were doing what you did for this

21     part would look at?

22     A.  It looks similar, yes.

23     Q.  And did look at?

24     A.  Yes.

25     Q.  Okay.

```
1              MR. MOHRING:  I'd move the admission of Government

2     Exhibit H-85, please.

3              THE COURT:  Any objection?

4              MR. THOMPSON:  No objection.  We're stipulating to

5     the admission of this one, Your Honor.

6              THE COURT:  H-85 is admitted.

7     BY MR. MOHRING:

8     Q.  Okay.  So this the sort -- this is the raw -- this is at

9     least closer to the raw data.  This is the Cellebrite report

10    of this particular interaction, right?

11    A.  Correct.

12    Q.  And what you would do in preparing the exhibits, the

13    type that we've been looking at is to take the actual -- the

14    substance of the communication and lift that out and put

15    that into a separate document?

16    A.  Correct.

17    Q.  Okay.  So let's look at this one.  This is an

18    interaction between a phone number associated with Mukhtar

19    Shariff, right?

20    A.  Correct.

21    Q.  And somebody else, right?

22    A.  I believe this is from Mohamed Ismail's phone, I

23    believe.

24    Q.  Okay.  And so -- and this is a communication that

25    happened, I'm looking for the date, January 9 -- at least
```

 1    the beginning of the communications are January 9th, 2021,

 2    right?

 3    A.  Correct.

 4    Q.  For 02-44?

 5    A.  Correct.

 6    Q.  And delivered and read at the same time, right?

 7    A.  That's what it says.

 8    Q.  And so this is interesting.  So at least some of the

 9    time the Cellebrite -- the actual Cellebrite extraction

10    reports can tell you when a communication was sent and

11    whether or not it was actually opened or received.  Is that

12    what we can infer from this?

13    A.  I don't know.  I don't know if the accuracy of that

14    information, it's not something that I -- I guess I've ever

15    played with.

16    Q.  The delivered and receipt -- or delivered and read?

17    A.  I guess I've never -- never really dealt with the read

18    portion of it.

19    Q.  Oh.  Okay.  In this interaction, Mukhtar Shariff asks

20    about "Delivery tonight" and asks "What time should we

21    expect it?"  Do you see that?  Looking at the blue --

22              MR. MOHRING:  Can we zoom in on the --

23              THE WITNESS:  Sure.  Yeah, I see that.

24    BY MR. MOHRING:

25    Q.  Okay.  So a question about delivery, right?

```
1    A.  Correct.

2    Q.  And there's an answer.  "My driver's going to be there

3    next hour."  Right?

4    A.  That's what it says, yes.

5    Q.  Okay.

6              MR. MOHRING:  Then if we can go to the next page.

7    Let me know if that works, right?  We can zoom in on the

8    green.

9              THE WITNESS:  Correct.

10             MR. MOHRING:  Okay.

11   BY MR. MOHRING:

12   Q.  And then a final response, "That works."  Right?

13   A.  Correct.

14   Q.  And then in this particular exhibit, the next -- the

15   next communication is July 24th -- actually it's hard to

16   read the date on that.

17             I'm looking at the bottom one on this page.

18             MR. MOHRING:  Can we zoom in on just the bottom

19   one.  Thank you.

20   BY MR. MOHRING:

21   Q.  Looks like July 23rd or 24th, 2021, right?  I'm looking

22   at the both the bottom --

23   A.  Correct.

24   Q.  -- and the red time frame?

25   A.  Correct.
```

1   Q.  Okay.  And this is a question about, "Trying to turn on

2   reefer.  Can you help, please?"

3   A.  Well, it says -- yeah, that's what it says.

4   Q.  And there was some questioning.  I mean, when we're

5   talking about reefer, we're not talking about, like, reefer

6   madness, we're talking -- at least the implication is this

7   is a refrigeration question, right?

8   A.  I think so, yes.

9   Q.  Okay.  So the discussion -- discussions that relate to

10  logistics, right?  "What time is the truck going to be here?

11  How do we turn on the refrigeration unit or the reefer?"

12  Right?

13  A.  Yeah, I don't know specifically what it's relating to,

14  but yeah, there's discussion of a delivery.

15  Q.  Okay.  Okay.  I understand that -- well, I think I

16  understand that your first involvement in any of this was as

17  one of -- as an agent who participated, along with a bunch

18  of other agents, in a search on January 21st, 2022, right?

19  A.  That's what I recall, yes.

20  Q.  Okay.  But you're -- you were aware -- are you aware now

21  that an active federal investigation into this whole arena

22  of activity began the previous spring sometime?

23  A.  I -- I don't recall exactly when it began, but that

24  sounds about right.

25  Q.  Okay.  So, but you weren't a part of it -- you didn't

1    join into any of that activity until January 21st, 2022, or

2    at least shortly before that, right?

3    A.  Correct.

4    Q.  Okay.  You took a bunch of pictures this spring, as I

5    understand it, just this spring, 2024, right?

6    A.  Correct.

7    Q.  Let's --

8            MR. MOHRING:  And an example of those, C-154,

9    please.

10   BY MR. MOHRING:

11   Q.  So your testimony was that you took this picture in

12   March.  Do you want to rethink that?

13            I mean, it was a weird winter but I don't think it

14   was that weird.

15   A.  I remember I was out between February and April of 2024.

16   Q.  Okay.

17   A.  That's when I remember being out taking pictures.

18   Q.  Okay.  And I think we looked at the pictures, a number

19   of pictures, I'm not going to take you through all of them,

20   but we looked at pictures at least the way they were

21   presented was in connection with various areas where sites

22   operated.  So we looked at pictures from Faribault.  We

23   looked at pictures from St. Paul.  Other locations.  Do you

24   remember that?  I mean --

25   A.  I do.

 1    Q.  -- we did here with your testimony, right?

 2    A.  I do.

 3    Q.  And those are taken -- those were pictures of places

 4    where the investigation indicated sites had operated in 2020

 5    and 2021?

 6    A.  Correct.

 7    Q.  Okay.  But the investigation and your pictures were in

 8    2024, right?

 9    A.  Correct.

10    Q.  Are you aware of any surveillance activities of the

11    locations that you photographed in Faribault in 2021?

12    A.  I wasn't part of the investigation back then, so I -- I

13    don't know.

14    Q.  Not that you know of then, right?

15    A.  I just, I guess I wouldn't know either way.  I wasn't

16    involved with the investigation back at that time so

17    there -- I wasn't part of it.

18    Q.  I understand that you weren't part of it and that you

19    weren't involved, but do you have any knowledge of any site

20    surveillance of any of the places that you took pictures of

21    in 2024 when the sites were actually supposedly operating?

22    A.  There may have or may have not been.  I know that

23    surveillance was done at some sites related to the scheme.

24    I don't know specifically which ones.  I don't independently

25    know that.

1    Q.  So to your knowledge you're not -- you do not know of

2    any specific surveillance of any of the sites that you

3    photographed in 2024 happening when the sites were either

4    operational or not.  Is that a true statement?

5    A.  I don't know one way or the other.  I don't know that it

6    wasn't done, I don't know that it was done.  I just don't

7    know.

8    Q.  Okay.  You don't know that it was done, true?

9    A.  I do not.

10             MR. THOMPSON:  Your Honor, asked and answered.

11   He's said he wasn't involved in the investigation at that

12   time.

13             THE COURT:  You're moving on, right?

14             MR. MOHRING:  I am moving on.  I disagree but I am

15   moving on.

16   BY MR. MOHRING:

17   Q.  Okay.  You took pictures of sites in St. Paul, right?

18   A.  Correct.

19   Q.  Bloomington, Burnsville, Shakopee.  I think we looked at

20   some Shakopee pictures?

21   A.  Correct.

22   Q.  You, yourself, had not been to any of those sites

23   before, is this true, before actually taking the pictures at

24   one point or another in the spring of 2024, right?

25   A.  I had not been.

1    Q.  Okay.  And so you're not able to testify about whether

2    those pictures even look like what the sites looked like

3    back in 2021 or 2020, right?

4    A.  They may have changed slightly from their original

5    configuration.  I mean, those are the pictures as of 2024.

6    That's what I can say.

7    Q.  And you have no knowledge of what those places looked

8    like when this all was actually happening, right?

9    A.  Correct.

10   Q.  Okay.  Last set of questions that I have.

11          There were -- you were asked some questions and

12   you offered -- I mean, correct me if I'm wrong, but it

13   sounded to me like you offered an opinion that's -- that

14   pictures that were extracted from cell phones in the process

15   that you did participate in looked staged.  Do you remember

16   using the word "staged"?

17   A.  I may have.

18   Q.  Okay.  I'd like to --

19          MR. MOHRING:  I'd like for you to take -- for us

20   to take a look at what's been admitted as D-7-47.

21          No?  Oops.  Okay.  How about some pictures?

22   D-7-79.  And if we can, let's just scroll through to D-7-91.

23   BY MR. MOHRING:

24   Q.  So we're looking at D-7-80.  A picture of people with a

25   pallet of round, maybe apples, maybe onions.  Do you see

4456

1     that?

2     A.  I do.

3     Q.  Does this look staged?

4     A.  I don't know.

5     Q.  Okay.

6              MR. MOHRING:  Let's go to the next one, 81.  Next.

7     Next.  Thank you.  Let's just keep going if we can, 84.

8     BY MR. MOHRING:

9     Q.  When we get to one that looks staged, you tell me, you

10    see --

11    A.  I just don't understand the -- I guess, the purpose of,

12    you know, why the photos were taken.

13    Q.  I'm asking.  I mean, you characterized images that you

14    and others like you extracted from a cell phone and cell

15    phone data to show to this jury and you used the word

16    "staged" to characterize at least some of those pictures,

17    right?

18    A.  Yeah.  I mean, that's my -- my interpretation is that

19    they were taking pictures to try to document what was going

20    on because they had sent pictures, again, from themselves

21    up through the sponsor to show, hey, like, stuff's being

22    done.

23    Q.  Okay.  You don't have an understanding that these

24    pictures were sent to sponsors, right?

25    A.  Not this particular one, no.

```
 1    Q.  Okay.  We're looking at D-7-87.  There's a person with a

 2    clipboard outside of a car standing in front of a sign that

 3    says, "free" it looks like maybe part of food supplies.

 4    You're saying this is -- does this look like a staged

 5    picture?

 6    A.  I don't know where this photo's from.

 7    Q.  Does this look like a staged picture?

 8    A.  I just don't know.  I mean, I don't even know what this

 9    photo relates to.

10    Q.  That's not my question.  I'm not asking you if you know

11    what this photo relates to, I'm asking you if this looks --

12    if you would put this in the category of staged pictures

13    that you had identified in your testimony.

14    A.  Yeah, I just don't know.

15              MR. MOHRING:  Let's do two more.  So that was 87.

16    88.  Let's go to 89.

17              Thank you, Agent.  I have no further questions.

18              THE COURT:  Mr. Cotter, cross-examination.

19                        CROSS-EXAMINATION

20    BY MR. COTTER:

21    Q.  I almost never get to raise this thing.  I'm just doing

22    it to feel cool.  All right.

23              My name's Patrick Cotter.  I represent Mohamed

24    Ismail, Agent Pitzen.

25    A.  Nice to meet you.
```

1    Q.  Nice to meet you.

2          My colleagues have asked a lot of questions and

3    covered a lot of topics, so I'm going to endeavor to not to

4    rehash them.

5    A.  Sounds good.

6    Q.  Although lawyers tend to do that.  So I'm just going to

7    cover a couple of areas with you.  And again, I'm just

8    looking for what you know, not your opinion; fair?

9    A.  Fair.

10   Q.  All right.  Just a tad bit about your training.  You

11   work for the IRS.  Did you start off as an IRS agent of some

12   sort before you moved into the criminal division?

13   A.  I was -- I started through a, kind of like an internship

14   program.  That was a non-law enforcement role, which I did

15   for a year and then transferred to a law enforcement special

16   agent position after that.

17   Q.  All right.  I'm assuming because your agency is the IRS

18   a lot of what you deal with, though, is related to

19   financial-related investigations; is that a fair statement?

20   A.  I think that's fair.

21   Q.  All right.  And so I'm assuming you've been trained a

22   lot regarding things like invoices, purchase agreements,

23   financial statements and documents, things of that nature.

24   Is that a fair statement?

25   A.  I don't know that I've -- really would say I've received

1    a lot of training.  I mean, I've seen a lot of that stuff

2    through --

3    Q.  Okay.

4    A.  -- throughout my career.  But as far as, like, I don't

5    know that they train us on, like, hey this is an invoice

6    or -- I mean, I know what they generally are but I don't

7    think I received a bunch of training about them.

8    Q.  Got it.  Well, let's talk about, I mean, did you get

9    basic investigative training, like how to interview a

10   witness?

11   A.  We did.

12   Q.  When to interview a witness?

13   A.  Yeah.

14   Q.  That it's ideal to get information in as close in time

15   to when an event happened as possible; fair?

16   A.  I think in an ideal world that's fair.

17   Q.  Right.  And you've also been trained on how to gather

18   evidence, is that correct?  Physical evidence.

19   A.  Yes.

20   Q.  How to execute and collect evidence during a search

21   warrant?

22   A.  Yes, I have.

23   Q.  You've been involved in the collection of evidence

24   during a search warrant?

25   A.  I have.

1    Q.  The cataloging of that evidence so it can be preserved

2    to be presented in a courtroom?

3    A.  Yes, I've participated in that process before.

4    Q.  All right.  And have you participated in the process of

5    making sure that forensic evidence, things like cell phones,

6    iPads, computers, are both retrieved and preserved?

7    A.  Usually that information -- we have computer

8    investigative specialists who kind of -- if we find a

9    electronic device, we hand it off to them.  They receive

10   specialized training to deal with those devices.

11   Q.  Right.  And that was the forensic analysis analyst we

12   talked about, they do that, right?

13   A.  Correct.

14   Q.  All right.  But you have been given some training on how

15   to review a Cellebrite report, which is what is the end

16   product of mapping something from a phone or an electronic

17   device, that's correct?

18   A.  I've worked with Cellebrite before, yes.

19   Q.  All right.  Quite a bit?

20   A.  No, I wouldn't say quite a bit.  It's the -- I guess

21   digital era is, you know, more recent.  When I started, it

22   wasn't quite as common.  As a matter of fact, when I started

23   I think I had a pager still.  So we've come a long ways in

24   the past 20 years.

25   Q.  Sure.  But I'm sure Cellebrite's been around for a good

1    decade or more, right?

2    A.  I could be --

3    Q.  Okay.

4    A.  I don't -- I don't recall when I first seen it.

5    Q.  And you --

6    A.  I have no reason to believe otherwise.

7    Q.  Got it.  In any event, the reason I'm kind of getting to

8    this is you've had some training on how to interpret

9    Cellebrite reports and obviously assist in extracting what

10   information you believe may be relevant from one of those

11   reports to present as evidence, correct?

12   A.  I would describe it as on-the-job training.  I mean,

13   kind of learn-as-you-go type of -- not formal training or

14   anything like that.

15   Q.  Well, I just said training so --

16   A.  Yeah.

17   Q.  -- you're describing it as on-the-job training?

18   A.  As opposed to, like, you know, I've never taken a class

19   on Cellebrite or, you know, anything along those lines.

20   Q.  Well, you're here testifying under oath about working

21   with Cellebrite, so you have enough to be able to come in

22   and testify about what you do, right?

23   A.  Correct.  I know how to generally use it and how to

24   extract stuff out of there and review those documents.

25   Q.  Got it.  Now, talking about there was a bit of

 1    discussion earlier in this trial about essentially just the

 2    process of an investigation.  That essentially there was a

 3    hypothesis or a belief that maybe a criminal law had been

 4    violated and an investigation seeks to obtain evidence to

 5    support that hypothesis.  Would you agree with that?

 6    A.  This is something that I asserted or this is --

 7    Q.  No.  That's been testified to previously.  I'm asking

 8    you if you'd agree with that as an IRS criminal

 9    investigation agent?

10    A.  Maybe you could rephrase or reask.  I'm not sure I

11    followed it here for you.

12    Q.  Fair enough.  I'm simply asking you, do you agree that

13    as an agent here you have -- were working to essentially

14    secure or ascertain evidence that may support a hypothesis

15    that a crime had been committed by one or more individuals?

16    A.  I think -- I mean, I joined this investigation later,

17    but my role was to gather the facts.  So like, I went to do

18    site interviews, site witness interviews --

19    Q.  Yep.

20    A.  -- and ask questions and get answers.  So it's, I

21    guess, to support or refute an hypothesis, I guess you would

22    say.

23    Q.  Okay.  Well, let's talk about that.

24              So you do have an absolute obligation then to look

25    at potential evidence that may refute the hypothesis that a

4463

1    crime was committed.  That's part of your job, right?

2    A.  Correct.

3    Q.  All right.  And so let's talk about -- I'm not going to

4    go back through but my understanding of your direct

5    examination is there was at least 3,000 photographs from Mr.

6    Farah's phone that may have had some relevance to this

7    investigation.  Do you recall that testimony?

8    A.  I think at the time I contested the fact that all 3,000

9    of those had relevance to this investigation.

10   Q.  But maybe you agreed there was at least hundreds?

11   A.  I think there was potentially hundreds, yes.

12   Q.  Got it.  And before we go any further, you then later

13   testified quite a bit about there being a team that was

14   involved in the review of the Cellebrite records.  Do you

15   recall that?

16   A.  Yes.

17   Q.  How many people were on that team?

18   A.  I don't know, maybe four, five, six people.

19   Q.  All right.  And were they fellow IRS agents?  Were they

20   FBI agents were they other --

21   A.  Some of -- some of both, yes.

22   Q.  Okay.

23   A.  Other law enforcement agents, yes.

24   Q.  Did you meet with this team on a regular basis to

25   debrief about what you were doing?

1    A.  It was I'd say more of kind of just a working rolling

2    thing, working together.  Again, when I came onto this

3    investigation it was, you know, only a couple months ago, so

4    we didn't have, like, a bunch of formal meetings set up, if

5    you will.

6    Q.  Well, that's not quite accurate.  You were at least on

7    the broader investigation for well over a year ago, but

8    you --

9    A.  I'm -- specifically relating to this, but yes.

10   Q.  Relating to this particular group that's on trial here,

11   you really drilled down on things just in the past few

12   months, is that what your testimony is?

13   A.  Correct.

14   Q.  And you worked with a group of other agents.

15        Now I'm talking specific to your review of the

16   Cellebrite extractions.  I'll talk about from my client's

17   phone, Mr. Ismail, but any of the devices that are related

18   to this investigation.  There was how many agents involved

19   in that process?

20   A.  A handful.  A handful of us.

21   Q.  A handful.  Is that six?

22   A.  I'd say, like I say, probably three, four or five of us,

23   something like that.

24   Q.  Three or four or five of you?

25   A.  Yeah.

```
1    Q.  And you've testified at some points that your role was

2    primarily to review the WhatsApp messages; is that correct?

3    A.  Correct.

4    Q.  Which agent's role was it to review the hundreds of

5    photographs that may have had some relevance to this

6    investigation that were extracted off of the phones?

7    A.  Rephrase the question.

8    Q.  The question --

9    A.  I went through -- I'm sorry --

10   Q.  The question is --

11   A.  Yeah.

12   Q.  -- which agent responsibility was it to review and

13   provide a evidentiary report like we've seen from text

14   messages, the photographs?

15   A.  Yeah, that was -- again, that was a kind of a team

16   effort.  I reviewed several of the photos, as I talked about

17   before, as well as other people have done that as well.

18   Q.  Well, there was a bunch of times where you said that

19   wasn't really my role.  "My primary role," your testimony,

20   as I understood it, was to review the WhatsApp messages.  So

21   I'm trying to ascertain who took on the laboring oar, if you

22   will, regarding the photographs?

23   A.  Well, I testified earlier today that I went through --

24   Q.  You went through some?

25   A.  Right.
```

1   Q.   Okay.  Was there other agents that went through them?

2   A.   There was, yes.

3   Q.   All right.  And of the hundreds of photographs, you made

4   the decision to -- was it you or you as well as the

5   prosecution team that decided to present 18 of those

6   photographs in this trial?

7   A.   It was a team effort.

8   Q.   All right.  And was there other members of your

9   investigation team that assisted not the prosecutors, the

10  agents that were working on the Cellebrite reports that

11  assisted in making that decision?

12  A.   Yeah, I think there was, yes.

13  Q.   Who was it?

14  A.   Special Agent Kary assisted with going through some of

15  that.

16  Q.   All right.  And there was also some testimony about

17  those photographs and you generally agreed that there was a

18  lot of photographs of food items, correct?

19  A.   There was.

20  Q.   There was photographs of distribution of food, correct?

21  A.   There was.

22  Q.   There was photographs of box trucks and other types of

23  -- or some sort of vehicles that would be used to deliver

24  food, correct?

25  A.   There was, yes.

1   Q.  There was photographs where individuals were receiving

2   food that was being distributed, correct?

3   A.  I think that's fair.  There were some of those, yes.

4   Q.  All right.  And of the -- I'm not going to pull them all

5   back up, but several of the photos you did choose to use

6   were at the Empire Cuisine & Market location in Shakopee,

7   correct?

8   A.  Some where, yes.

9   Q.  And you agree that there appeared to be a market where

10  food was on shelves as well as food that was packaged or in

11  bags and boxes and things of that nature?

12  A.  It's my understanding that Empire Cuisine & Market was a

13  retail-style market and kind of deli, if you will.  So there

14  was both, yes.

15  Q.  So it had both a restaurant side and a market side,

16  correct?

17  A.  Correct.

18  Q.  All right.  And that was how it -- the state that it was

19  in back in when those photographs were taken, right?

20  A.  Correct.

21  Q.  All right.  Which member of this team of individuals

22  that assisted in reviewing the Cellebrite reports was

23  involved in reviewing each and every one of the videos that

24  may have had some relevance to this investigation?

25          MR. THOMPSON:  Your Honor, objection.  Could I get

1   a sidebar?

2           THE COURT:  You may.

3           **(At sidebar)**

4           THE COURT:  Mr. Thompson.

5           MR. THOMPSON:  Your Honor, I'm going to object to

6   the continued insinuation that we cherry-picked evidence,

7   whether it be the WhatsApp messages or photographs.

8           The defense has these exhibits.  If they think

9   there's things that are relevant, they're welcome to put

10  them in.  This puts us in a tough spot because we don't want

11  a burden shift to the defense and suggest that they should

12  be -- if they have had proof they should bring it.  But it's

13  unfair to the agent.

14          There's been constant suggestions that there's all

15  these images out there or text messages that are relevant to

16  the investigation that he didn't put in.  That's not true.

17          If they think there's a rule of completeness

18  issue, they should make a motion to the Court or talk to

19  the government about it outside of the presence of the

20  jury.

21          MR. COTTER:  Your Honor.

22          THE COURT:  Mr. Cotter.

23          MR. COTTER:  Your Honor, the scope of the direct

24  examination was broad.  This agent testified extensively

25  about what he did but he also offered a lot of opinion

1   regarding various aspects of the food distribution.  How the

2   food distribution was done.  Whether or not the food that

3   was provided was, in fact, a sufficient quantity within the

4   items served to establish what the government needs to prove

5   in terms of meals.

6           I'm not shifting -- if anything, I'm asking this

7   agent.  He routinely in one at breath would testify about --

8   kind of more broadly about the Cellebrite extraction reports

9   and then in another breath he'd say that wasn't really

10  wasn't my role and he'd limit it to the WhatsApp messages.

11          So there's clearly a whole bunch of other aspects

12  of these reports that he's insinuated are out there that

13  he's testified to on a more broad basis and then when he's

14  chosen to, he's indicated that it wasn't his role to have

15  looked at those things.

16          And I'm asking, well, whose role was it?  There's

17  no -- I'm not shifting any burden whatsoever.

18          THE COURT:  I know you're not shifting the burden,

19  but the concern is that he has said there are more out there

20  and the government is either going to put those in or not

21  and you can either put those in or not.

22          I think the concern was that the government is now

23  being put in the position of shifting the burden.

24  Regardless, the name of the agent is irrelevant so he

25  doesn't need to answer the question on name of the agent.

```
1                    MR. COTTER:  All right.

2                    THE COURT:  But -- and I don't think this is

3         outside the scope, but I do think you've made your point

4         that there are others out there.  That there are photographs

5         of food and food distribution.  He's answered that.

6                    MR. COTTER:  All right.

7                    THE COURT:  So I think the proper question --

8                    MR. COTTER:  I'll move on.

9                    THE COURT:  Yeah, I think moving on is the best

10        way to go.

11                   MR. COTTER:  I'll move on.

12                   MR. IAN BIRRELL:  Your Honor, this is Ian Birrell.

13                   Just very briefly, I'm concerned about the burden

14        going the other way.

15                   I'm concerned when the agent got up and testified

16        and said, Here are the three videos you're being shown.  The

17        other videos you're not being shown, are not being put into

18        evidence, are similar to these three videos.  I think that's

19        a form of burden shifting.  I don't think there's any issue

20        that this Court needs to resolve right now, but it's

21        something I think is appropriate to consider when resolving

22        further future objections.

23                   THE COURT:  If there's an objection made, I'll

24        rule on it.

25                   **(In open court)**
```

```
1                    THE COURT:  All right.

2                    MR. COTTER:  All right.

3                    THE COURT:  Mr. Cotter, next question.  We're

4         going to move on.

5                    MR. COTTER:  Absolutely.

6         BY MR. COTTER:

7         Q.  Next I just want to touch briefly.  Of course you don't

8         work or have never worked for the United States Department

9         of Agriculture, correct?

10        A.  That's correct.

11        Q.  You don't work for the Food Nutrition Services?

12        A.  I do not.

13        Q.  You're not well-versed in the Federal Code of

14        Regulations regarding the food programs?

15        A.  I would say I'm certainly not an expert.  I've learned

16        several aspects of it related to this case based on

17        interviews I've participated in and documents that I've

18        reviewed, but...

19        Q.  Prior to this case, you didn't have any specific

20        knowledge regarding those programs, correct?

21        A.  I did not, but that's not unusual --

22        Q.  That was the answer to my question.  You didn't prior to

23        this case, right?

24        A.  I did not.  But, again, it's not unusual for an

25        investigation that I work -- as part of a IRS criminal
```

4472

1    investigation we work financial crimes.  Financial crimes

2    run the gamut.  I've worked on drug investigations.  I've

3    worked on --

4    Q.  All right.  You've made your point.

5    A.  Okay.

6    Q.  The question was answered.

7    A.  Okay.

8    Q.  So I want to talk to you about the Minnesota Department

9    of Education.  Of course, during the pandemic you weren't

10   working there, right?

11   A.  I was not.

12   Q.  All right.  You weren't part of the inner workings of

13   what was going on and the communications that were going on

14   between the various parties at the Minnesota Department of

15   Education during the period of March of 2020 and January of

16   2022, were you?

17   A.  I was not.

18   Q.  All right.  And, of course, you at that time frame were

19   not versed in the 113 waivers that had been put in place as

20   to how the food program was going to be administered,

21   correct?

22   A.  I've since generally become aware of some of them, but

23   at the time, no.

24   Q.  Right.  And you certainly aren't aware of how that was

25   being communicated between MDE and various sponsors at that

1    time, right?

2    A.  I was not.

3    Q.  And you're not aware of specifically how those rules

4    changes were being communicated directly to sites or food

5    vendors?

6    A.  I do not have any independent knowledge of that, no.

7    Q.  All right.  What we do know from H-53t, which I'm not

8    going to pull back up, it's been pulled up twice, is that

9    there was communication where Mr. Farah was specifically

10    showing Kara Lomen what he was doing, right?

11    A.  Correct.

12    Q.  All right.  And this was a year some in -- this was like

13    in July of 2021, right?

14    A.  I don't remember the exact -- are you talking about the

15    one where he sent her the picture of kind of --

16    Q.  Yeah.

17    A.  -- of the food --

18    Q.  Of the food.

19    A.  -- and she said you can't do that or MDE will disallow

20    the meals?

21    Q.  Yup.  And then she said she talked to MDE about his

22    concerns.  Do you recall that?

23    A.  I think she said she was going to.  I don't think she

24    said she did.

25    Q.  Yup.  That's what I meant.  She said she was going to,

1    right?

2    A.  Correct.

3    Q.  And you recall he was actually saying.  "I want to do it

4    right."  Or something to that effect?

5    A.  I can reread it if you want.  I don't remember him

6    saying that, but...

7    Q.  It's in evidence.

8    A.  Sure.

9    Q.  In any event, you also didn't have any specific

10   knowledge or information of what was communicated about

11   sites and how sites were being opened or allowed to be

12   opened between March of 2020 and January of 2022, correct?

13   A.  I did not.

14   Q.  You weren't aware that essentially they were a longitude

15   and latitude at a particular location as determined by MDE

16   during that time?

17   A.  Can you rephrase that or say it again, maybe, so I

18   understand correctly.

19   Q.  Were you aware that they were essentially determined to

20   be a longitude, a latitude, an address, a location by MDE

21   during that time frame?

22   A.  That you're -- I guess I don't have any independent

23   knowledge how they were --

24   Q.  Okay.  That's all I'm asking.  You didn't have any

25   independent knowledge about that, right?

4475

1    A.  Correct.

2    Q.  All right.  And the various sites that you went out to

3    and took photos of, that happened within the last couple of

4    months prior to this trial, right?

5    A.  Correct.

6    Q.  Did you actually during that exact time frame go in and

7    talk to each one of the residents or did you and other

8    agents about this investigation when you went out and took

9    those photographs?

10   A.  Again, I didn't talk to each one of the residents.  Now

11   we did talk to some of the residents who lived there too.

12   Yes, we did.

13   Q.  All right.  And so any relevant information, did you

14   document that into a report?

15   A.  Yes.  If we would have talked to someone, that would be

16   in our report.

17   Q.  Got it.  As it pertains to -- as it pertains to -- just

18   lost my train of thought.  Oh, sorry.

19           As it pertains to Mr. Ismail, obviously you were

20   able to obtain several cell phones and/or -- the

21   investigation you learned that several cell phones were able

22   to be obtained during the search of his home?

23   A.  Correct.

24   Q.  And you were able to review and extract any information

25   you thought would be relevant to this investigation from his

 1   devices, correct?

 2   A.  I did review some of the Cellebrite reports from those

 3   devices, yes.

 4   Q.  I think you testified, you know, the vast, vast majority

 5   of information on his phone related to logistics regarding

 6   the Empire Cuisine & Market site itself, the restaurant, and

 7   the store; fair?

 8   A.  I think it's fair to say the majority of his were

 9   with -- Abdiaziz Farah were between kind of operations,

10   logistics of the retail store, yes.

11   Q.  In any event, if there was anything that you felt was

12   relevant to this investigation, you had the opportunity to

13   extract that and make it available to the prosecution team,

14   correct?

15   A.  Correct.

16          MR. COTTER:  I don't have any other questions.

17   Thank you very much.

18          THE COURT:  Mr. Garvis.  Cross-examination.

19          MR. GARVIS:  Thank you.

20                    **CROSS-EXAMINATION**

21   BY MR. GARVIS:

22   Q.  Agent Pitzen, I'm Andrew Garvis.  I represent Abdiwahab

23   Maalim Aftin.

24   A.  Nice to meet you.

25   Q.  Nice to meet you.  I think maybe we can agree upfront

1   that on these phones that you sort of took the Cellebrite

2   extraction there was a lot of data.  Is that a fair

3   statement?

4   A.  I think that's fair.

5   Q.  Okay.  And I think we can also agree that we're not

6   presenting all that data in this case.  That's a fair

7   statement?

8   A.  Correct.

9   Q.  I think we can probably further agree that at least as

10  to the text messages, you know, we can agree that maybe

11  contextually we don't necessarily know what things are

12  meaning when they're being said.  Is that a fair statement?

13  A.  I think that's fair.

14  Q.  Okay.  Now --

15  A.  Sometimes -- I mean, I think sometimes it's pretty

16  clear, right?  Other times you -- there could be context

17  needed, yes.

18  Q.  Of course, right?  And I'm -- and we're not going to go

19  through a bunch of me reading and you reading text messages,

20  okay?

21  A.  Thank you.

22  Q.  And, I mean, obviously we -- there was lots of, you

23  know, I love yas and bros that we don't need to go back

24  over, correct?

25  A.  Agreed.

4478

```
1    Q.  All right.  But as far as the -- in a general sense, as

2    far as what was presented as far as the text messages, is it

3    fair to say that my client was not a party to these

4    conversations.  Is that a fair statement?

5    A.  I think it was discussed but not specifically a party,

6    yes.

7    Q.  Right.  I think, yes, he was "referenced" might be the

8    word?

9    A.  That might be a better word, yes.

10   Q.  Okay.  In fact, you're not aware that any type of search

11   was done as it relates to his phone or along that line.  Is

12   that a fair statement?

13   A.  Not that I'm aware of, yes.

14   Q.  All right.  But let's just try to sort of -- maybe you

15   and I can kind of synthesize sort of what we've done over

16   the last three days as far as your testimony, okay?

17   A.  Sure.

18   Q.  And maybe just big picture stuff, right, I mean, fair

19   enough that the -- maybe the text messages and the

20   conversations related to connections, people.  Is that a

21   fair statement?

22   A.  Yeah.  Sure.

23   Q.  I mean, obviously family relationships, right?  There's

24   conversation -- you know, there's conversations between Said

25   Farah and Abdiaziz Farah, right?
```

4479

1   A.  Correct.

2   Q.  There was conversations related to, you know, friends or

3   people who maybe were friends or from, you know -- from, you

4   know, from the home country.  Is that a fair statement?

5   A.  I believe so, yes.

6   Q.  And there was obviously working relationship

7   conversations, right?

8   A.  Correct.

9   Q.  Right.  And I mean, obviously, in doing the

10  investigation, even from the time frame that you're in it, I

11  think we kind of understand that, you know, many of these

12  individuals came to this country, they weren't born here.

13  Is that a fair statement?

14  A.  I think that's fair.  I have no reason to believe

15  otherwise.  But I don't have independent knowledge, I guess.

16  But I think that's true.

17  Q.  All right.  And I want to just sort of in a general --

18  this is what I'm saying in a general sense we're talking,

19  right?  I mean, this is sort of the concept of the immigrant

20  coming to the country and they come here and they generally

21  interact with each other.  Is that a fair statement?

22  A.  I think, yeah.

23  Q.  I mean, it's sort of as old as the United States, would

24  you not agree with me in that sense, right?

25  A.  Yeah, I agree with you.

```
1    Q.  Right.  I mean, unless you came on a slave ship or
2    you're indigenous, you came here from somewhere else, right?
3    A.  Correct.
4    Q.  And then you generally then interact and work and live
5    maybe in a community of your peers, right?
6    A.  Fair.
7    Q.  Right.  I mean, that's why we -- I mean, Minnesota's
8    full of maybe Germanic and Scandinavians.  Is that a fair
9    statement?
10   A.  I think that's fair.
11   Q.  Right.  But -- and obviously there's a Hmong -- a big
12   Hmong culture that's in St. Paul, right?
13   A.  There is, yes.
14   Q.  I mean, we have Little Italies, we've got, you know,
15   Chinatowns all over, right?
16   A.  I guess I'm not familiar with those two but I'll take
17   your word for it.
18   Q.  Well, I'm just saying around the country.
19   A.  Oh, sure.  Okay.
20   Q.  No, I wasn't saying necessarily here.
21        What I'm getting at is that people end up living
22   and working together that they are familiar with, right?
23   A.  I think that's fair.
24   Q.  At the same time, they might be here.  They might also
25   still have a foot back in the home country.  Is that another
```

1    fair statement?

2    A.  Yes.

3    Q.  And I think that was pretty evident here, right?

4    A.  I mean, I think there was definitely -- they definitely

5    traveled back and forth, yes.

6    Q.  I mean, there's families at home --

7    A.  Yes.

8    Q.  -- is that right?

9    A.  I think that's true, yes.

10    Q.  All right.  Because we didn't -- I mean, we talked about

11    that.  We talked about the fact that there was text messages

12    of people traveling to Kenya?

13    A.  Sure.

14    Q.  Right?  All right.

15            And obviously the -- you know, the text messages

16    also then covered the aspects of the businesses, right?

17    A.  Yes.

18    Q.  I mean, you talked about Empire Cuisine & Market, right?

19    A.  Yes.

20    Q.  You talked about Empire Enterprises, right?

21    A.  Yeah.

22    Q.  We talked about Bushra Wholesalers?

23    A.  Correct.

24    Q.  Afrique?

25    A.  Correct.

1      Q.  Nur Consulting?

2      A.  Right.

3      Q.  And not to belabor what we've just done repeatedly over

4      the last maybe hour, we've talked about the fact that

5      business -- the text messages encompassed business being

6      done.  Is that a fair statement?

7      A.  Businesses and various -- yeah, forms.  Sure.

8      Q.  Well, I mean, you talked about food.  We talked about

9      logistics.  We talked about delivery.  That it was all --

10     A.  Correct.

11     Q.  -- document --

12     A.  Retail market.

13     Q.  Right.

14     A.  We talked about --

15     Q.  Right.

16     A.  -- everything, yeah.

17     Q.  And documentation obviously of invoices and bills,

18     right?

19     A.  Correct.

20     Q.  All right.  And I think some of it also, the text,

21     talked about the struggles related to, obviously, maybe the

22     sponsors and MDE.  Is that a fair statement?

23     A.  Maybe frustrations or struggles, I suppose.

24     Q.  Okay.  Frustrations.  But, I mean, obviously you gave

25     some testimony, this might have been on Tuesday at this

4483

1    point in time, but there was obviously testimony related to

2    the lawsuit between Feeding Our Future and MDE, correct?

3    A.  Correct.

4    Q.  And how there was that stop payment that stopped the

5    payments coming in, right?

6    A.  That's correct, yes.

7    Q.  Right.  And then how that was then eventually at the end

8    of April of 2021, lifted.  Right?

9    A.  I believe that's correct.

10   Q.  Yes.

11   A.  Right.

12   Q.  And then there was obviously then conversations as it

13   related to the fact that MDE then required individual --

14   basically that required the sponsors to produce then the

15   supporting documentation going forward, correct?

16   A.  Yeah, I don't know exactly how they played out --

17   Q.  Right.

18   A.  -- and what -- related to what program they require and

19   what for, but yes.

20   Q.  But a lot of what was conversation -- you know, that you

21   brought up in the text messages was obviously distribution

22   of money, correct?

23   A.  There was a lot of conversation about that, yes.

24   Q.  Right.  And the timing of those.  The timing and the

25   year that it was taking place was obviously in the time

```
1    frame for the most part of June and July, if you recall, of

2    this -- of 2021, correct?

3    A.  I think it was pretty wide-ranging.  There was a lot of

4    conversation later, you know, even -- a lot of those

5    messages were --

6    Q.  Right.

7    A.  -- I guess before that and all the way up until, I think

8    the last text message we read was January 20th of 2022.

9            So I think it was, you know, over a pretty

10   wide-ranging time frame where they were discussing those

11   financial transactions.

12   Q.  The gist of the issue, though, is that those involved

13   had to put, right, forward food out, as far as buying it and

14   then bringing it to various sites, and then submitting that

15   claim to the sponsor, correct?

16   A.  My understanding of the program, it was a reimbursement

17   program.  So you were supposed to provide the meals first

18   and then would be reimbursed for the claims that you

19   submitted.

20   Q.  Right.  And so then that information then for them to

21   verify the claims was then delayed, right, you didn't get

22   paid right away?

23   A.  Correct.  Correct.

24   Q.  Right.  So some of the conversations about distribution

25   of money and where it should go is after the fact when money
```

1    was -- when money's been already been put out by these

2    individuals and then the money has come in later at a

3    different time.  Is that a fair statement?

4    A.  Yeah.  And I think, you know, once you kind of look at

5    the overall financial picture, which again, unfortunately

6    was not my role, I think it becomes more clear to show how

7    that really was laid out.

8    Q.  Okay.  The other thing that we obviously went over was

9    investments, we'll call it, how about that?  Investments in

10   Kenya, I think was a -- was the concept, right?

11   A.  Okay.

12   Q.  Well, I mean, we spent about a day to go over text

13   messages between, you know -- you know, related to that.  Is

14   that a fair statement?

15   A.  We did, yes.

16   Q.  Okay.  All right.  And --

17             MR. GARVIS:  Would you just pull up J-160, please.

18   Thank you.

19   BY MR. GARVIS:

20   Q.  Now, this was offered through you.  Is that a fair

21   statement?

22   A.  Yes.

23   Q.  Now this was not derived from a phone extract, right?

24   A.  This was not.  I believe this was received as pursuant

25   to a subpoena, I believe.

1    Q.  Well actually, would it surprise you that it actually

2    was just provided by Mr. Aftin as far as in the matter of

3    this case?

4    A.  It was provided before my time, you know.

5    Q.  I mean it -- fair to say it's sort of a cobbled together

6    exhibit.  Is that a fair statement?

7    A.  It could be.  I don't know for certain.

8    Q.  Well, I mean, we went through it and obviously -- it's

9    obviously a, you know, a view of a prospectus of basically

10   of an apartment.  Is that a fair statement?

11   A.  Yes.

12   Q.  And then part of this document was obviously a purchase

13   agreement of Abdiaziz.  That was as part of this document,

14   right?

15   A.  Correct.

16   Q.  And then part of it was also the document showing who

17   actually formed Capital View Apartments.  Is that a fair

18   statement?

19   A.  Correct.

20   Q.  And then part of the document was also the fact of what

21   my -- in essence, you know, what the initial money that my

22   client sent over from Bushra was supposed to be used for?

23   A.  I guess I'd want to go back and look and see

24   specifically --

25            MR. GARVIS:  Maybe we could pull up, I think maybe

```
 1   page 14.  Oh, I'm sorry.  Well, maybe it's 15.  Is it?
 2                MR. THOMPSON:  15.
 3                MR. GARVIS:  15.  Apologize.
 4   BY MR. GARVIS:
 5   Q.  So this would be extract of the board meetings, right,
 6   that --
 7   A.  Correct.
 8   Q.  -- where it articulated that my client had sent over
 9   $200,000, right?
10   A.  Correct.
11   Q.  He sent that through the wire?
12   A.  Correct.
13   Q.  In his own name, right?
14   A.  Correct.
15   Q.  That was out of the TruStone account, right?
16   A.  Correct.
17   Q.  And then when the -- when it was clear that there was no
18   way for them to get any type of product, they then -- he
19   then converted this, in essence, to his own share into that
20   -- into the property.  Is that a fair statement?
21   A.  Yeah, I don't know what the initial intent was.  The end
22   result I think is correct, yes.
23   Q.  Okay.  All right.  Now, in a general sense, just as far
24   as the documents that we went through as it relates to
25   either Capital View Apartments or the Donholm, you know,
```

4488

1    project, right, we talked a lot about those, right?

2    A.  We did.

3    Q.  Right.  And, I mean, whether we're doing this in Nairobi

4    or in, like, south Florida, right, if we're going to do a

5    project and we're going to build something, like we're going

6    to build condos, okay, we're going to build condos, we need

7    to have, obviously, some type of working plan.  Is that a

8    fair statement?

9    A.  Before you start, yes.

10   Q.  Right.  You might want to have formation documents.  You

11   might want to have a business, right?

12   A.  Correct.  Fair.

13   Q.  Right.  You might want to have contracts, right?

14   A.  Yup.

15   Q.  You probably need to have access to at least buy the

16   land or at least hopefully purchase land, right?

17   A.  Correct.

18   Q.  And you might need a project manager?

19   A.  You may.  You could choose to do that or do it yourself,

20   I suppose, but...

21   Q.  Right.  So, you know, in this instance, obviously, in

22   particular Mr. Abdiaziz Farah is in the United States and

23   this project was being done in Nairobi, Kenya, it's not

24   necessarily easy to do halfway across the world, right?

25   A.  Correct.

1    Q.  So you might actually utilize somebody who's there,

2    right?

3    A.  Sure.

4    Q.  Right.  And as it relates to that, just in the sense of

5    individuals maybe being, you know, being -- there was

6    documentation about this being offered or shown to other

7    individuals in this case.  Is that a fair statement?

8    A.  Yes.

9    Q.  Okay.  Agent, do you remember Amway?

10   A.  Can you repeat that?

11   Q.  Do you remember Amway, you know, the American Way,

12   Amway?

13   A.  Vaguely familiar, but you're stretching the limits here.

14   Q.  Well, just in the general sense, right?  That, you know,

15   that somebody was going off and they were selling you bulk

16   items and, generally speaking, when they were doing it,

17   right, they would generally hit up their friends and family

18   first, right?

19   A.  I'll take your word for it.  I mean, I --

20   Q.  All right.

21   A.  Yeah.

22   Q.  Okay.  So it's maybe not out of the ordinary that

23   somebody might actually address other people, either family

24   or friends, to try to get them to buy into this.  Is that a

25   fair statement?

1    A.  It's possible you could do it that way.

2    Q.  Okay.  The only other real question I have is in that

3    entire conversation that was -- I think was H-52 with -- I'm

4    going to apologize, I'm going to butcher the name, Ahmednaji

5    Maalim Aftin Maalim Aftin -- I apologize for that, there was

6    obviously testimony as it relates to money being sent over,

7    right?

8    A.  Correct.

9    Q.  Various aspects of it, correct?

10            But there was no -- there was nothing in that text

11   chain as to the source of those funds, was there?

12   A.  I think there was -- where it was coming from, the

13   individuals who it was coming from.

14   Q.  Right.

15   A.  Yes.

16   Q.  But not necessarily the underlying nature of where that

17   money came from, right?

18   A.  Correct.

19            MR. GARVIS:  I have nothing further.

20            THE COURT:  Mr. Sapone.

21            MR. SAPONE:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23   BY MR. SAPONE:

24   Q.  Good afternoon.

25   A.  Good afternoon.

```
1    Q.  My name is Edward Sapone.  I represent Abdimajid Nur.

2    A.  Nice to meet you.

3    Q.  Nice to meet you too.  Do you prefer to be called agent

4    or sir?

5    A.  Whatever works for you, I'm easy.

6    Q.  Okay.  I won't call you, bro.

7    A.  I appreciate it.

8    Q.  Sir, I'm not going to ask you to speculate or to guess

9    or to tell me how things seemed to you, I'm only going to

10   ask you for your personal knowledge, okay?

11   A.  Fair enough.

12   Q.  Now, you're a number's guy but I want to start talking

13   about food, okay?

14   A.  Okay.

15   Q.  You don't know the numbers of dollars that the vendors

16   spent on food in 2021; do you?

17   A.  I have a vague -- a general understanding on that.

18   Q.  Not vague or general, you don't know that number; fair?

19   A.  Rephrase it one more time so I make sure I get this

20   answer correct for you.

21   Q.  You don't know how much money the vendors spent on food

22   in 2021.  You don't know that number?

23   A.  And I know generally the amount of money that was spent

24   from those bank accounts.

25   Q.  Sure.  Specifically you don't know?
```

```
1    A.  The exact number?

2    Q.  Right.

3    A.  I don't know the exact number, but I know generally.

4    Q.  Okay.

5    A.  An approximate amount.

6    Q.  Do you know what Sysco is?

7    A.  I do, yes.

8    Q.  What's Sysco?

9    A.  Sysco is a food wholesaler, I guess.

10   Q.  Did you review any Sysco invoices in connection with

11   this investigation?

12   A.  I did not.

13   Q.  Do you know from your investigation here that the

14   vendors bought food from Sysco?

15   A.  Generally aware of that, yes.

16   Q.  Do you know the number of pounds of food that was bought

17   from Sysco in 2021?

18   A.  I do not.

19   Q.  Do you know from your investigation here that the

20   vendors bought food from other major food suppliers like

21   Sysco?

22   A.  Again, I'm generally aware but, again, my -- that was

23   not the focus of my investigation here.  I was very --

24   fairly limited in what I did, so.

25   Q.  That's okay.  I didn't ask you about the focus, I just
```

1    asked you whether or not you knew that?

2    A.  Sure.

3    Q.  Okay.  You don't know the number of pounds of food

4    bought from the other food suppliers, right?

5         MR. THOMPSON:  Your Honor, I'm going to object as

6    beyond the scope.

7         THE COURT:  Overruled.  You may answer that one.

8         THE WITNESS:  I do not.

9    BY MR. SAPONE:

10   Q.  Did you testify concerning one invoice alone that showed

11   $139,000 spent on pinto beans?

12   A.  Which invoice are we referring to, I guess?

13   Q.  As you sit here right now, you have a recollection of

14   having testified in the last couple of days concerning an

15   invoice, one invoice alone that showed $139,000 spent on

16   pinto beans alone.  Do you recall that?

17   A.  Yeah, I remember an invoice but I don't remember exactly

18   what was on it.  But I do remember an invoice, yes.

19   Q.  You testified, I think, about one box truck; am I right?

20   A.  What do you mean as far as one -- I mean, there was

21   multiple box truck in some of the photos.

22   Q.  And so you saw evidence of multiple box trucks used by

23   these men, yes?

24   A.  Correct.

25   Q.  But you don't know how much food was transported in

```
 1    those box trucks.  You don't know, let's say, the number of
 2    pounds, right?
 3    A.  I know generally how much money was spent on food --
 4    Q.  Do you know my question --
 5    A.  -- in comparison.
 6    Q.  -- which is the number of pounds transported in the box
 7    trucks?
 8    A.  I do not know the number of pounds.
 9    Q.  Do you know how many box trucks they owned?
10    A.  Not exactly, no.  I know it was -- I don't know
11    exactly.
12    Q.  Did you review a document in connection with your
13    investigation here that showed that only two box trucks used
14    cost more than $100,000 spent by these men?
15    A.  Rephrase that.
16    Q.  Did you see an invoice for the purchase of two box
17    trucks that reflected more than $100,000 spent on the two
18    box trucks?
19    A.  I guess I'd want to refresh my memory on that one.
20    Q.  You don't remember?
21    A.  I don't independently remember that specific invoice,
22    no.
23    Q.  Do you recall testifying about warehouses?
24    A.  Yes.
25    Q.  But you don't know the number of pounds of food stored
```

4495

 1    in the warehouses, right?

 2    A.  I don't know the exact number of pounds, no.

 3    Q.  Let's talk about meals, okay?

 4    A.  Sure.

 5    Q.  You testified about meal count forms, yes?

 6    A.  Yes.

 7    Q.  And on the meal count forms it reflects the sites at

 8    which the meals were delivered, right?

 9    A.  Correct.

10    Q.  The type of meal, for example, breakfast, lunch, snack,

11    supper, yes?

12    A.  Correct.

13    Q.  It reflected days of the week.  On a Monday how many

14    meals were delivered.  On a Tuesday.  All the way from

15    Monday to Sunday, yes?

16    A.  Correct.

17    Q.  And then there was a total for the week all the way in

18    the right-hand column, if you recall?

19    A.  Correct.

20    Q.  Now you testified that you went to some of those sites

21    that were reflected on the meal count forms, yes?

22    A.  Correct.

23    Q.  But, of course, that was not in the year 2021, right?

24    A.  It was not.

25    Q.  How many years later did you go to some of those sites?

1    A.  It was earlier this spring.

2    Q.  Meaning in the spring of 2024, right?

3    A.  Correct.

4    Q.  You don't know the numbers of meals that were packaged

5    in 2021, right?

6    A.  Well, that's part of the reason why we did the

7    interviews of the site witnesses because I wasn't there in

8    2020, 2021.

9    Q.  Which means, you don't know the numbers of meals

10   packaged in 2021, right?

11   A.  I don't know the exact number of meals packaged in 2021,

12   but I know that the --

13   Q.  Well, you've answered the question.

14   A.  -- meals that --

15   Q.  That's all I asked is if you know the number.

16   Respectfully, sir, I just asked if you know the number.

17           You testified, if you recall, about -- I'm going

18   to call it the clicker video.  Do you recall that?

19   A.  Sure, yes.

20   Q.  And you said that you didn't think that 42 meals would

21   be in each of those boxes that we saw in the video.

22   Remember that?

23   A.  Yes.

24   Q.  I'm not asking about what you think, I'm asking about

25   what you may have seen.

```
 1              We could agree that, of course, you didn't see
 2       inside the boxes, right?
 3       A.  Correct.
 4       Q.  May I ask you how long you've known Mr. Thompson?
 5       A.  Approximately ten years.
 6       Q.  Have you testified in cases where Mr. Thompson was the
 7       prosecutor prior to this case?
 8       A.  I have, yes.
 9       Q.  How many times?
10       A.  I don't -- maybe probably three times would be a guess.
11       Q.  How many meetings did you have with Mr. Thompson or
12       other prosecutors in connection with your anticipated
13       testimony in this case?
14       A.  Like it was -- we were kind of all working in a group, a
15       room together.  I don't know.  There were, like, specific
16       meetings set up specifically.
17       Q.  Did you say there were not specific meetings set up
18       specifically?
19       A.  For what purpose, I guess?
20       Q.  Prior to your testimony in connection with your
21       testimony in this case, how many times did you meet with
22       members of the U.S. Attorney's Office?
23       A.  I'd say, like, specifically relating to what I was going
24       to testify about or just --
25       Q.  In connection with the case?
```

4498

```
1    A.  How many times have I met with them to -- anything
2    related to the case?
3    Q.  Correct.
4    A.  I mean, I guess -- so, every day that I was working over
5    there related to this case, would that count for you?
6    Q.  Yes.
7    A.  Okay.  So I would say, you know, two months worth, so
8    potentially 60 times.
9    Q.  Can you -- can you approximate the number of hours?
10   A.  Well, I mean, like sometimes they'd be in another room
11   and I'd be in one room working, like, you know, we weren't
12   always working, like, directly together with each other.
13   Q.  We can count that.
14   A.  Count that as hours?
15   Q.  Yes.
16   A.  So maybe, I don't know, for -- say, 40 hours a week
17   times 160 times -- 320 hours, potentially.
18   Q.  This is not the first time you've testified you've said
19   with Mr. Thompson alone.  It was three other times, right?
20   A.  Correct.
21   Q.  How many times have you testified total in your career?
22   A.  I don't recall exactly.  I don't know for certain.
23   Q.  Is it over 100?
24   A.  No, it's not.  It's probably less than -- yeah,
25   approximately -- approximately ten.
```

```
 1   Q.  And that's trials, right?
 2   A.  Trials in some form, yes.
 3   Q.  What about grand jury?
 4   A.  Testified, you know, more than ten times in grand jury
 5   settings.
 6   Q.  How about hearings?
 7   A.  I've testified in some hearings as well.
 8   Q.  So it's fair to say that you've been called as a witness
 9   by the government many times, yes?
10   A.  I have, yes.
11   Q.  How many times have you been called as a witness for the
12   defense?
13   A.  Myself?  I don't know that I -- I'm trying to think if
14   there was a time I did.  I know other agents have but I
15   don't know that I ever have.
16   Q.  I was asking about you.
17   A.  Yeah, I was just trying to think out loud, sir.  I don't
18   think I've ever been called as a defense witness.
19   Q.  Sir, you've been with the IRS for many years, right?
20   A.  Approximately 20 years, yes.
21   Q.  And how long with criminal investigations?
22   A.  Say, the entire time.
23   Q.  So you have lots of training and lots of on-the-job
24   experience, right?
25   A.  Yeah, I've worked here for about approximately 20 years,
```

1   yes.

2   Q.  So you know that agents can apply for a search warrant,

3   yes?

4   A.  Correct.

5   Q.  And they need probable cause to have a judge sign off on

6   that warrant, let's say to search a man's house, right?

7   A.  Correct.

8   Q.  Or a person's house, right?

9   A.  Correct.

10  Q.  Was Abdi Nur's house searched in this case?

11  A.  I do not believe it was.

12  Q.  Was his cell phone seized in this case?

13  A.  I do not believe it was.

14  Q.  And so you don't have and you didn't review any of his

15  text messages from his phone, right?

16  A.  I did not, no.

17  Q.  WhatsApp messages from his phone, right?

18  A.  Not from his phone, no.

19  Q.  And you know that from your training and experience over

20  20 years that text messages, including WhatsApp messages,

21  can be stored on the Cloud, right?

22  A.  I don't know if I -- exactly how WhatsApp works.  If

23  those messages are stored in the Cloud or if they're just --

24  I know they go between phones and it allegedly cannot be

25  intercepted by anyone in the middle.  So I don't know if it

4501

1    gets stored in the Cloud or not.

2    Q.  But yet you testified about scores of WhatsApp messages

3    in this case, right?

4    A.  Correct.

5    Q.  Is it your testimony that you don't know whether or not

6    text messages and WhatsApp messages could be backed up on

7    what they call the Cloud?

8    A.  They could be backed up on the Cloud.  I just don't know

9    for certain if they routinely are.

10   Q.  Was any search warrant sought in this case for the Cloud

11   with respect to Abdi Nur?

12   A.  Again, that wasn't -- I wasn't on the investigation at

13   the time, so I don't have any independent knowledge of that.

14   Q.  What about for toll logs, that is, outgoing calls and

15   incoming calls to a certain cell phone?  Was a warrant

16   sought to get the toll logs for Abdi Nur?

17   A.  Again, I wasn't on the investigation at the time and I

18   do not know.

19   Q.  But you know that you weren't involved in that, right?

20   A.  Correct.

21   Q.  Do you recall answering questions regarding monies paid

22   by the MDE in connection with this case?

23   A.  I do, yes.

24   Q.  You know that the MDE pays sponsors, right?

25   A.  That's my understanding, yes.

4502

```
1    Q.  Not vendors, right?

2    A.  That's my understanding.

3    Q.  Who is it that submits the meal counts to the MDE?  Is

4    it sponsors?

5    A.  Correct.

6    Q.  And is that through a computer system known as CLiCS?

7    A.  That's my understanding, yes.

8    Q.  And it's the sponsors and the sponsors only that have

9    access to the CLiCS, right?

10   A.  I don't know if other people have access or if you can

11   provide a login to other people that have access or -- I

12   don't know how that exactly works on that end of it.

13   Q.  You have no information or evidence that something like

14   that happened here, right?

15             MR. THOMPSON:  Objection, Your Honor, beyond the

16   scope.

17             THE COURT:  Sustained.

18   BY MR. SAPONE:

19   Q.  You know that Abdimajid Nur worked helping one of the

20   vendors with food distribution, right?

21   A.  I know he worked with Abdiaziz Farah.  I don't know what

22   his exact role was, exactly what he did.

23   Q.  You saw photos of food at distribution sites, right?

24   A.  Yes.

25   Q.  You said that you weren't surprised because, according
```

1   to you, people often give the appearance of legitimacy.  Do

2   you recall that testimony?

3   A.  I do, yes.

4   Q.  Can we agree that photos of food can also be photos of

5   food actually given out?

6   A.  Yes.  I mean, that there was clearly food that was

7   distributed in this case.

8   Q.  Thank you.  You saw --

9   A.  Not the amount -- we're not -- I mean, I think we're

10  arguing what the amounts were and are these meals.

11  Q.  I didn't ask you about amounts, right?

12  A.  Sure.

13  Q.  You saw videos that showed distribution of meals in this

14  case, right?

15  A.  There were some, yes.

16  Q.  You testified about invoices that were submitted and

17  checks paid for the meals delivered, yes?  Or for meal

18  counts, right?

19  A.  Correct.

20  Q.  Some of the sites that you testified about are Four

21  Seasons, Lifestyles, Greenwood, and Autumn Holdings, yes?

22  A.  Those are four, yes.

23  Q.  Speaking of numbers, you don't know actually of the

24  numbers of meals that were delivered at those sites, right?

25  A.  I know that the number of meals that were provided --

4504

```
1    Q.  I just want to know if you know the numbers.

2    A.  I know that the evidence in this case suggests that

3    those number of meals were not provided.

4    Q.  I didn't ask you about that, sir.  I asked you if you

5    knew, as a testifying witness, the numbers of meals at those

6    sites, delivered at those sites.  Either you know the

7    numbers or you don't.

8    A.  I don't have the exact numbers that were sent there.

9    Q.  You testified about invoices to Nur Consulting.

10   Remember that?

11   A.  Yes.

12   Q.  You know that Nur Consulting was incorporated in April

13   of 2021, right?

14   A.  I believe that's correct, yes.

15   Q.  And that was here in Minnesota, right?

16   A.  I believe that's correct, yes.

17   Q.  You have no personal knowledge of all the hours that

18   Abdi Nur worked; do you?

19   A.  I do not.

20   Q.  And concerning the checks that he was given that you

21   testified about, you don't know whether those checks were

22   given to him for the hours he worked in a month, right?

23   A.  Correct.

24   Q.  Or money that he laid out, right?

25   A.  What do you mean by laid out?
```

1   Q.  Money that he laid out and was being reimbursed for.

2   You don't know that, right?

3   A.  I do not.

4   Q.  Or money that he paid to certain workers.  You don't

5   know that either, right?

6   A.  I don't have any independent knowledge.  That wasn't

7   what I was doing in this case.

8   Q.  And so concerning the money paid out by the MDE, you

9   know from your investigation here that the sponsors got 10

10  to 15 percent of the paid claims, right?

11  A.  I believe that's correct.

12  Q.  That's the same sponsors who had access to, sole access

13  to, the CLiCS system, from them to the MDE, right?

14  A.  I don't know if it's -- I don't know who all has access

15  to that system.

16  Q.  But it's sponsors, right?

17  A.  I believe sponsors have access.  I don't know if anyone

18  else does as well or if anyone else can.

19  Q.  You don't know, right?

20  A.  I do not.

21  Q.  But it's sponsors that send to the MDE through that

22  system the meal counts, right?

23  A.  Based on information that's provided to the sponsors.

24  Q.  That's what you're saying but it's the sponsors that

25  actually do it, right?

```
 1                    MR. THOMPSON:  Objection, asked and answered.

 2                    THE COURT:  Sustained.

 3     BY MR. SAPONE:

 4     Q.  You testified, if you recall, about someone writing in

 5     one of the WhatsApp texts or texts, "Tell the MDE you did a

 6     site visit."  Do you recall that?

 7     A.  Yes.

 8     Q.  But neither of those people wrote that the site visit

 9     wasn't done, right?

10     A.  They did not.

11     Q.  Was a site visit done?

12     A.  I do not know.

13                    MR. SAPONE:  Could someone put up H-51a, please.

14                    THE COURT:  Is it in evidence?

15                    MR. SAPONE:  That's in evidence, Your Honor.

16     H-51a, government exhibit.

17     BY MR. SAPONE:

18     Q.  Do you see that, sir?

19     A.  I do, yes.

20     Q.  You came to learn that that photo and the ones that

21     follow it are photos from a wedding, right?

22     A.  I don't -- I don't know that.

23                    MR. SAPONE:  Could we go to the next one, please.

24     BY MR. SAPONE:

25     Q.  Did you ever investigate to see what the photograph that
```

```
 1    you testified about depicted?

 2    A.  I did not do an independent investigation of that, no.

 3              MR. SAPONE:  You can take it down.  Thank you.

 4    BY MR. SAPONE:

 5    Q.  You testified about multiple checks that were written

 6    from Partners in Nutrition to Mind Foundry.  Do you recall

 7    that?

 8    A.  Yes.

 9    Q.  And in the memo of one of the checks it says,

10    "Broadway."  Do you recall that?

11    A.  I do.

12    Q.  You know that Broadway is a site, right?

13    A.  I do.

14    Q.  And you testified about Partners in Nutrition checks to

15    Mind Foundry where "Tot Park" was in the memo, right?

16    A.  Correct.

17    Q.  And you know that Tot Park was a site, right?

18    A.  I'm aware that that was a site that was registered, yes.

19    Q.  And other checks where "Winfield" was put in the memo,

20    right?  Winfield.

21    A.  Correct.

22    Q.  Winfield was a site, right?

23    A.  It was a site.

24    Q.  Plymouth was a site, yes?

25    A.  I don't know if that was the exact name of it, but
```

1   something similar to that, yes.

2   Q.  Do you recall testifying about the screenshot of an

3   e-mail in which Beta, B-E-T-A, Fan F-A-N, Oromo, O-R-O-M-O,

4   Church was listed in the memo?

5   A.  I remember that one.

6   Q.  That's another site location, right?

7   A.  It is, yes.

8   Q.  We can agree that people use WhatsApp all the time and

9   you've learned that in your years of investigating, right?

10  A.  I haven't really dealt much with WhatsApp but I have --

11  I know -- I know people frequently use WhatsApp.

12  Q.  And you know it's frequently used when folks are

13  traveling or overseas, yes?

14  A.  I don't have any independent knowledge of that but I

15  don't have any reason to dispute it.

16  Q.  And do you know that on WhatsApp people do not pay for

17  each text message?

18  A.  I don't know how the billing works for it.

19  Q.  So you have no knowledge that one pays for the text

20  messages on the WhatsApp application, right?

21  A.  I do not.

22  Q.  You came to learn during your investigation that Abdi

23  Nur was picking up checks and sending checks and determining

24  which entities get checks.  Do you recall that testimony?

25  A.  Based on the text message or the WhatsApp messages that

4509

```
1    were sent back and forth, yes.

2    Q.  And the lion's share of those messages were when Mr.

3    Farah was overseas in Kenya, right?

4    A.  I don't independently know that that aligns or doesn't

5    align.  I don't know when he was -- Mr. Abdiaziz Farah was

6    out of the country and when he's here right now.

7    Q.  But you know that there was a time when he was out of

8    the country, right?

9    A.  I am aware that at some point he was out of the country

10   but I don't recall what dates those were.

11   Q.  Do you recall testifying about a purchase agreement

12   regarding a hospital?

13   A.  I do, yes.

14           MR. SAPONE:  And can we pull up H-51p, please.

15           Just for the record, Government Exhibit H-51p in

16   evidence is being shown to the witness.

17   BY MR. SAPONE:

18   Q.  Sir, do you recall that?

19   A.  I do recall this document, yes.

20   Q.  And that has to do, as you testified, with a share

21   purchase agreement related to 20 ordinary shares in a

22   hospital, right?

23   A.  That's what this document indicates, yes.

24   Q.  You testified that a lawyer was involved in that?

25   A.  That's what it says on the bottom of this page, yes.
```

1    Q.  Did Abdi Nur invest in that hospital?

2    A.  I do not know for certain.

3    Q.  And you saw no document with his signature on it

4    concerning shares in that hospital, correct?

5    A.  If -- I don't know if his signature's on this.  I'd have

6    to page through it and see but I don't recall that.

7            MR. SAPONE:  Could we go to the signatory page,

8    please.

9    BY MR. SAPONE:

10   Q.  Do you see a signature there?

11   A.  I just -- I see the typed name there but, yeah, there's

12   no signature there.

13   Q.  Do you see a line for a signature?

14   A.  I see a line there, yes.

15   Q.  With no signature on it, right?

16   A.  I do not see a signature there.  I see his name printed

17   there -- or typed there.

18   Q.  And you know and you testified that the purchase price

19   was 20 million Kenyan Schillings, right?

20   A.  I think that's what the document said, yes.

21   Q.  Which would come out to roughly 200,000 U.S. Dollars,

22   right?

23   A.  I believe that's correct, yes.

24   Q.  Which Abdi Nur did not send, right?

25   A.  I don't personally know whether or not that money was

1    sent or not.

2    Q.  That's all I'm asking.

3          You said on direct, I think, that you were not

4    involved on the day of the January 20 of '22 -- 2022,

5    search, right?

6    A.  Correct.

7    Q.  Truth be told, and you may have said this, you've been

8    involved in this investigation for only in the last couple

9    to few months, right?

10   A.  Related to this specific group, yes.

11   Q.  But you did interview Hadith Ahmed back in February of

12   2023, right?

13   A.  Correct.  I was part of that interview then, yes.

14   Q.  When answering a question on cross-examination from Ian

15   Birrell regarding photos that you saw, you said, "I don't

16   know if that food was distributed to the 50 sites."  Do you

17   recall that testimony?

18   A.  I believe I said that, yes.

19   Q.  And, in fact, and in fairness to you, you weren't

20   involved back then, but you were not at any of the 50 sites

21   back in 2021, right?

22   A.  I was not.

23   Q.  You testified that you didn't spend a lot of time

24   looking at metadata, right?

25   A.  Correct.

4512

1    Q.  But you know in your 20 years as a person who has been

2    an agent working with the IRS specifically in the criminal

3    investigations division that that could be a useful tool,

4    right?

5    A.  It could be a useful tool, I'm just not familiar with --

6    when we have questions related to that, that's where we

7    would get our digital forensics team to kind of handle those

8    types of issues because they receive specialized training on

9    it.

10   Q.  And what are the types of things that metadata could

11   tell us?

12   A.  I guess it could potentially -- depending on what type

13   of metadata it is, I don't -- I mean, there's -- probably

14   could tell you various things, but I don't know specific to

15   messages or pictures, like, it could be different, I think,

16   depending on what you're referring to.

17   Q.  Let's say a person's electronic signature is on a

18   document that's purportedly sent to someone else through the

19   internet, through the computer.  Could metadata tell us more

20   about that, for example, where it was sent from?

21   A.  It may.  I just don't know.

22   Q.  Could it tell us the time and date it was sent?

23   A.  It's possible.  It probably depends on how it's sent or

24   how it's done.  I don't know what you're -- what one you're

25   referring to, I guess.

4513

```
 1    Q.  And could it tell us who logged into the system?

 2    A.  Depending on the system, it's possible.  I don't know.

 3    Q.  Do you recall testifying and you used a term "alleged

 4    meals."  Do you remember saying that?

 5    A.  Yes.

 6    Q.  You're aware from your investigation here that in 2021

 7    there was a category of meal known as dry foods, right?

 8    A.  Generally aware of that issue.

 9    Q.  Are you claiming to know what a quote/unquote, "meal"

10    consisted of in 2021 per the USDA?

11    A.  I know vague -- I know generally what it consisted of,

12    what it was supposed to consist of.  It was supposed to be

13    five -- five items had to be part of the specific meal plan,

14    is my understanding.

15    Q.  So you said you know generally, right?

16    A.  Correct.

17    Q.  But in fairness, you're not an expert on the two federal

18    food programs, right?

19    A.  I would say I'm not an expert but I have, as part of

20    this case, learned that there has to be a protein.  There

21    has to be a fruit.  There has to be a grain.  There has to

22    be a milk.  There's a whole host of things that in order to

23    be considered a meal it would need to meet those things.

24    But, again, I'm not an expert on that, correct.

25    Q.  And, of course, you didn't watch one meal get handed out
```

1    back in 2021 to know what was given to each person because

2    you weren't there, right?

3    A.  I was not present in 2021.

4    Q.  You said just now that you know about the two federal

5    food programs, right?

6    A.  Correct.

7    Q.  How many waivers were there in 2021?

8    A.  I don't know the exact number.

9    Q.  Can you give us a general number?

10   A.  I think someone else said there was 100 -- 100 and some

11   waivers, but I don't have any independent knowledge of that.

12   Q.  You said that part of your role was to look for text

13   messages that showed flow of money, right?  Do you remember

14   saying that?

15   A.  I don't know that I was specifically looking for text

16   messages to show the flow of -- I mean, I've looked at text

17   messages generally and part of that showed, you know, money

18   being distributed, I guess.

19   Q.  We can agree that you were not focused on following the

20   flow of food, right?

21   A.  I mean, I think I was -- definitely, as it would come up

22   as far as, like, meal counts and stuff like that, comparing

23   that to, like, site data, the stuff that was submitted in

24   CLiCS, would have reviewed some of that, but...

25   Q.  You can use words to do so specific searches if you want

1    to, right?

2    A.  Could.

3    Q.  Did you ever type in the word "food"?

4    A.  I did not.  I did not personally search specific words.

5    That wasn't really my role in what I was tasked with doing.

6    Q.  And just to be clear, everything I'm asking you is about

7    you specifically, all right?

8    A.  Understood.

9    Q.  Did you type in the word "meal"?

10   A.  I did not.  I did not do any specific searches, like

11   word searches.

12   Q.  And the last one on that.  Did you type in the word

13   "distribution"?

14   A.  I did not.

15   Q.  And we can agree that there was nothing stopping you

16   from doing that, meaning you could have done that had you

17   chosen to, right?

18   A.  I could have.

19            MR. SAPONE:  Sir, thank you.  No further

20   questions.

21            THE WITNESS:  You're welcome.

22            THE COURT:  Thank you.

23            We're going to break for today and we'll come back

24   on Monday at 9:00.

25            One minute before you all go.

1          First, with the parties' agreement, you've been

2     given a chart that summarizes the counts of the indictment,

3     and this is to the Members of the Jury, and that's to assist

4     you to follow the testimony.  So it summarizes the charges

5     in the indictment, the counts.

6          You should understand and I'll instruct you again

7     on this at the end, that an indictment is simply an

8     accusation.  It's not evidence of anything.  The defendants

9     have pleaded not guilty and are presumed to be innocent

10    unless and until proved guilty beyond a reasonable doubt.

11    There's my instruction on the indictment.

12         And then again I'll remind you, because we're

13    breaking for the weekend of my recess instruction, which

14    is -- includes no investigation or looking at media about

15    this case.

16         With that, I hope you have a great weekend.  Thank

17    you.  All rise.

18              (Jurors excused)

19              THE COURT:  All right.  We're off the record.

20              (Court adjourned at 5:00 p.m.)

21              *              *              *

22

23

24

25

1                           **REPORTER'S CERTIFICATE**

2

3              I certify the foregoing pages of typewritten
      material constitute a full, true and correct transcript of
      my original stenograph notes, as they purport to contain, of
4     the proceedings reported by me at the time and place
      hereinbefore mentioned.

5

6                          /s/Lynne M. Krenz
                           Lynne M. Krenz, RMR, CRR, CRC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25