UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-124(1) (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | **GOVERNMENT'S** |
| v.    ) | **SUPPLEMENTAL MEMORANDUM** |
| ) | **REGARDING SENTENCING** |
| ABDIAZIZ SHAFII FARAH,    ) | |
| ) | |
| Defendant.    ) | |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert, Harry M. Jacobs, and Daniel W. Bobier, Assistant United States Attorneys, submits this supplemental sentencing memorandum as a response to the sentencing paper submitted by the defendant, Abdiaziz Shafii Farah. As stated in the government's original submission, the government recommends that the Court impose a sentence of 30 years in prison.

To be clear, the government reaches this recommendation after a holistic review of the 3553(a) factors. The government stands by that recommendation as the sentence sufficient, but not more than necessary, to achieve justice even if the Court ultimately decides upon a somewhat different Guidelines calculation than the one the government and PSR both determined.

I. **THE GOVERNMENT-RECOMMENDED, WITHIN-GUIDELINES SENTENCE IS SUBSTANTIVELY REASONABLE AND NO DOWNWARD VARIANCE SHOULD BE APPLIED**

For all the reasons discussed in the government's initial pleading paper, a sentence for Mr. Farah of 30 years is appropriate. Farah was one of the early movers in the Feeding Our Future scheme. He enrolled his company, Empire Cuisine, in April 2020, and from there launched a booming business ripping off the Federal Child Nutrition Program. He participated in every stage of the scheme: creating bogus paperwork, submitting fraudulent claims, apportioning the fraud proceeds among his confederates, paying kickbacks to sponsors, and spending—extravagantly—the federal taxpayer dollars he stole. Through craft, diligence, and unrepentant artifice, Farah and his coconspirators caused nearly $48 million in losses. Farah, personally, pocketed more than $8 million of that sum.

In his sentencing position paper, Farah does not meaningfully contend with those facts. Instead, he dedicates most of his brief to a discussion of out-of-circuit cases that generally have nothing to do with benefit programs, nor with the unusually susceptible era of Covid-19, nor with the state and people of Minnesota. He invokes, for example, the Theranos case, Sam Bankman-Fried, a DOD scam from South Carolina, and the Fyre Festival scheme. Differences between those cases and this one abound. They arise from completely different facts, concern defendants whose schemes in no way resemble the benefits fraud proved here, and they occurred out of circuit, where different sentencing precedents control.[1]

---

[1] Farah's invocation of the Minnesota State Court Sentencing Guidelines is even further afield. State and federal sentences often diverge, sometimes materially, even for convictions

Section 3553 directs the Court to avoid unwarranted sentencing disparities. To that end, a far better guide than Farah's inapposite citations can be found in the sentences already imposed by this Court in this scheme (and, indeed, upon Farah's co-indicted conspirators).

Mohamed Ismail received 144 months. Though Ismail began as a co-owner, with Farah, of Empire Cuisine, he was an average scheme participant. He also did not engage in sophisticated money laundering nor in parceling out the scheme's proceeds. *See* Dkt. 645 at 28 (Ismail PSR); Dkt. 691 (Ismail Statement of Reasons (adopting PSR without change)); *see also* Dkt. 686 (Gov't's Ismail Sentencing Position). And his take, certainly, was smaller: he took home about $2.2 million to Farah's $8.1 million. Ismail's sentence also underscores the inaptness of Farah's comparator cases; he argues that Elizabeth Holmes's conduct was worse than Farah's but notes that Ms. Holmes received 135 months. See Dkt. 825 at 2, 19-25. This Court has already determined, correctly, that Mr. Ismail—a lesser participant in Farah's scheme—deserved a longer sentence.

Mukhtar Shariff received 210 months. That sentence came after Shariff testified, falsely, in his defense, insisting that he served the food he claimed. Though Farah did not so testify at trial, his conduct in this scheme is worse than Shariff's, including because Farah helmed the conspiracy, became the sole director of Empire Cuisine and Market, and chose how the conspiracy's profits would be divvied up among its participants. Farah also involved himself in or directed the activities of

---

arising from the same conduct. This Court's statutory duty, however, is to determine the just federal sentence using the federal Guidelines and the federal precedents.

3

virtually all of this conspiracy's fraudulent food sites. Shariff's conduct was chiefly limited to one. And as with Ismail, Shariff's take is dwarfed by Farah's: Shariff made out with $1.4 million, Farah got over $8.1 million.

The government respectfully recommends a sentence of 30 years. Nothing in the case evidence nor Farah's submission justifies a downward variance here, let alone the "major" one Farah suggests.

## II. FARAH'S OBJECTIONS TO THE GOVERNMENT'S AND THE PSR'S SHARED GUIDELINES CALCULATION SHOULD BE REJECTED

### A. The Government and the PSR Correctly Determine the Loss Amount Enhancement

Farah next contends the government and the PSR are wrong to use in their shared Guidelines calculation a loss amount of about $40 million. Dkt. 825 at 10-12. He maintains that figure is a "gross loss" calculation, failing to account for the food Farah and his conspirators bought and distributed. From this premise he argues that it would be legal error for the Court to adopt the government's Guidelines calculation. He is wrong.

First, the case evidence established an intended loss of more than $49 million. Exs. N-3, N-5. Of this, MDE paid out approximately $47.9 million to the entities that sponsored the defendants' participation in the program, Partners in Nutrition and Feeding Our Future. Those sponsors, in turn, retained approximately $5.6 million in administrative fees. The sponsors then paid over $42.4 million to Empire Cuisine & Market, ThinkTechAct, and other entities owned or controlled by Farah and his conspirators, including more than $21 million to ThinkTechAct and more than $12 million to Empire Cuisine & Market.

4



Flow of Money from MDE to Site Recipients

Even so, Farah wants a discount because, like many of the fraudulent operators charged in the broader scheme, he bought some real food in the course of his fraud. The Court should not give him that credit. The government presented evidence at trial that such purchases were window dressing—designed to help conceal the fraud and make more plausible the defendants' claims of serving thousands of meals to children every day. The government submits that such purchases were made in service of furthering the fraud and thus make Farah's conduct worse, not better; he should not receive a discount for trying to conceal his scheme.

5

Second, even if Farah were right or if the Court were inclined to discount the loss amount by the quantity of food purchased, from a Guidelines perspective, it wouldn't matter.

| USES OF FUNDS | Total Withdrawals |
|---|---|
| Legal Order - Bank Account Seizures | $ (7,632,616.23) |
| Related Parties | $ (6,959,229.57) |
| Defendants' Personal Accounts | $ (5,325,678.91) |
| Food Expense | $ (5,094,088.82) |
| Assets - Real Estate Purchases and Construction | $ (4,805,311.00) |
| Defendants' Other Entities | $ (4,172,909.88) |
| Foreign Transfers | $ (3,185,563.20) |
| Payments to Other Individuals | $ (2,815,602.08) |
| Misc. Other Expenses | $ (1,201,263.74) |
| Transportation and Logistics Companies | $ (1,080,258.73) |
| Assets - Vehicle Expenses and Purchases | $ (733,759.33) |
| Cash Out | $ (522,302.33) |
| Rent Expense | $ (517,932.97) |
| Commercial Equipment and Supplies | $ (506,667.86) |
| Personal Non-Food Expense | $ (273,000.00) |
| Ikram Y. Mohamed | $ (250,000.00) |
| Investment Income | $ (210,000.00) |
| Undetermined Category | $ (176,000.00) |
| Travel Expenses | $ (160,662.26) |
| Mizal Consulting LLC / Hadith Ahmed | $ (140,250.00) |
| Restaurant Supplies / Equipment | $ (132,057.00) |
| Mind Foundry Learning Inc. | $ (117,131.85) |
| Truck Rental | $ (89,203.52) |
| Star Distribution LLC | $ (51,300.00) |
| Xogmaal Production | $ (12,500.00) |
| Domino's | $ (12,331.30) |
| Entertainment | $ (12,014.34) |
| Grand Total* | $ (46,189,634.92) |

Exhibit M-1.[2] Evidence presented at trial showed that, across Farah and his conspirators' four chief entities used in the scheme, the conspirators spent about $5.1 million on food. Even that amount, however, is a generous calculation. That figure

---

[2] Exhibit M-1 summarizes the information from admitted Exhibits M-6, M-10, M-13a, and M-30.

includes all food purchases by those entities, including a significant amount of money spent on "food" that had nothing to do with the federal child nutrition program.

For example, Empire Cuisine & Market operated a small halal deli and market located in a strip mall in Shakopee, Minnesota. As depicted in Exhibit M-1, the market had more than $1 million in credit card receipts during the time of the fraud scheme. In other words, regular customers spent more than $1 million buying food at Empire Cuisine & Market. As FBI Forensic Accountant Pauline Roase testified at trial, the funds credited to "food" on Exhibit M-1 included money spent to purchase food and other items (such as halal meat and baby formula) for sale at the market. And as the Court saw, many of the defendants' food invoices were for the purchase of these types of items unrelated to the food program. *See, e.g.,* Ex. D-72 at 62-63, 82 (Lincoln Trading International invoices for the purchase of goat meat, lamb kidney, and other halal meats to sell at Empire Cuisine & Market); Ex. D-73 (Gold Star Distribution invoices for the purchase of non-food items to be sold at Empire Cuisine & Market); Ex. Q-46 (Capital Imports invoices showing purchase of food unrelated to the federal child nutrition program). Nevertheless, Ms. Roase testified that, to be conservative in her calculations, she credited the purchases of such items, though plainly unrelated to the food program, as "food expenses."

Regardless, even if the Court credited Farah that full amount, the intended loss amount would drop from about $49 million to about $43.9 million—resulting in a figure still well within the Guidelines loss range of $25 million to $65 million. U.S.S.G. § 2B1.1(b)(1).

7

### B. Farah's Conduct Warrants the "Organizer or Leader" Enhancement

Farah insists he was a "roughly co-equal participant" in this scheme with his conspirators. The case evidence shows otherwise.

First and foremost, Farah received a much bigger cut of the spoils than anyone else, personally pocketing more than $8.1 million. Mohamed Ismail pocketed about $2.2 million. Abdimajid Nur got about $940,000. Hayat Nur only $31,000.[3]

**Food Money Received by Each Defendant**

| Defendant | Time Period From | Time Period To | Total Food Money Received |
|---|---|---|---|
| Abdiaziz Shafii Farah | 5/18/2020 | 1/19/2022 | $ 8,116,375.29 |
| Mohamed Jama Ismail | 5/26/2020 | 1/10/2022 | $ 2,225,015.28 |
| Mahad Ibrahim | 11/20/2020 | 2/25/2022 | $ 2,255,239.45 |
| Abdimajid Mohamed Nur | 2/8/2021 | 12/29/2021 | $ 937,628.50 |
| Said Shafii Farah | 11/27/2020 | 1/21/2022 | $ 1,035,579.17 |
| Abdiwahab Maalim Aftin | 10/19/2020 | 1/12/2022 | $ 435,107.68 |
| Mukhtar Mohamed Shariff | 2/18/2021 | 6/14/2022 | $ 1,387,577.47 |
| Hayat Mohamed Nur | 6/21/2021 | 1/18/2022 | $ 31,130.00 |
| **Total Received by Defendants** | | | **$ 16,423,652.84** |

Second, Farah owned the Empire Cuisine and Market, which he used to chart the course in the Feeding Our Future fraud scheme. His was one of the first entities to enroll as a fraudulent food site. From his perch atop Empire, he decided how the fraud proceeds would be distributed within the conspiracy. And the extreme claims his for-profit business submitted were part of MDE's rationale in changing the

---

[3] This chart summarizes the information from some of the extensive bank account records admitted at trial.

8

Program rules in autumn 2020 to (try to) force for-profit restaurants out of the Program.

Third, Farah spent his proceeds like a kingpin. With the more than $8 million Farah personally pocketed, he bought five luxury vehicles, including over $300,000 for a Porsche, a GMC truck, and a Tesla, he purchased real estate for over $4.2 million, and he diverted over $700,000 to a Kenyan real estate partnership.

Finally, the scheme Farah spearheaded was extensive, and it involved at least five other participants—satisfying each of the independent grounds for application of the leader/organizer enhancement. U.S.S.G. § 3B1.1(a). The government introduced ample evidence at trial of Farah's coordination of his co-conspirators. That evidence included communications in which Farah directed the flow of funds among the scheme's participants.



9



Trial evidence also included many examples of Farah effecting those intra-scheme transfers himself, from accounts he controlled—as in the example below.



But Farah's role in the scheme, and specifically in leading and directing it, was not merely financial. Farah also instructed his co-conspirators in the creation of bogus documentation, including fake invoices and fake rosters.



11

> From: abdiaziz farah <aazizfarah@gmail.com>
> To: Hayat Nur <hayatnur861@gmail.com>
> Subject: Fwd: ALBRIGHT AND CROSSING VALLEY
> Date: Thu, 30 Dec 2021 08:08:05 -0600
> Attachments: ALBRIGHT_TOWN.xlsx; CROSSING_VALLEY.xlsx
>
> FYI.
>
> Need to be updated asap.
>
> Thank you!
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> From: First Nameabdiwahab Aftin <abdiwahabmaalim@yahoo.com>
> Date: December 30, 2021 at 12:08:29 AM CST
> To: Aazizfarah <aazizfarah@gmail.com>
> Subject: ALBRIGHT AND CROSSING VALLEY
>
> Hello!
> I have attached both sites roster (Albright town homes and Crossing valley).

Ex. E-83. And, because Farah was involved in this scheme at every step, trial evidence also showed that he personally submitted fraudulent claims.

> From: abdiaziz farah <aazizfarah@gmail.com>
> To: Kara Lomen <kara@partnersinqualitycare.org>, Dan Smeriglio <dan@partnersinqualitycare.org>
> Cc: Mahad Ibrahim <mahad.ibrahim@gmail.com>
> Subject: Invoice & Total Monthly attendance
> Date: Mon, 01 Nov 2021 17:26:47 -0500
> Attachments: SKM_C45821110118440.pdf
>
> Kara and Team,
>
> Please see attached invoice and total monthly attendance for TTA sites. All menus and FRP records has been completed.
>
> Please let me know if you have any questions.
>
> Sent from my iPhone

GOVERNMENT EXHIBIT L-9
22-CR-124 (NEB/TNL)

12

Abdiaziz Farah led the defendants charged in this indictment. He directed the scheme and his co-conspirators both logistically and financially. And when time came to divide the spoils of their efforts, time and time again it was Farah who decided who got what. His conduct meets the rule and spirit of the leader/organizer enhancement. The government submits that a just sentence requires its application.

### C.     The "Major Disaster" Enhancement Applies

The Court has found in each of the four other sentences imposed so far in this broader scheme that the "major disaster" enhancement applied. Indeed, at the May 5, 2025, sentencing of Sahra Mohamed Nur, the Court explained in detail how the at-issue scheme—namely fraud upon the Federal Child Nutrition Program—qualifies as offense conduct under 18 U.S.C. § 1040 and so requires application of the enhancement. For the same reasons, the enhancement should be applied here, too.

### D.     The "Sophisticated Means" and "Sophisticated Laundering" Enhancements Apply

The sophisticated means and sophisticated laundering enhancements apply. Extensive case evidence chronicled how Farah and his conspirators used shell entities to receive, launder, and spend the fraud proceeds. Though Farah is responsible for the foreseeable acts of his coconspirators, his own actions subject him to this enhancement, too, including because he created in April 2021 a shell called Empire Enterprises which he used to receive and launder proceeds.

The Court rightly applied the sophisticated means enhancement when sentencing Farah's conspirator Mukhtar Shariff, including because Shariff used shell companies to launder his fraud proceeds. The same should occur here.

13

### E.     The "Charitable Organization" Enhancement Applies

Farah contends the Guidelines' "charitable organization" enhancement cannot apply where, as here, the defendant uses a charitable organization in the commission of the offense by "acting in a business capacity." Dkt. 825 at 17. Put differently, Farah argues that where a defendant "represent[s] [his] endeavor is profit-seeking"—even, apparently, where that endeavor uses a charitable organization to acquire its fraud proceeds—the enhancement is inapplicable. This makes no sense.

The enhancement applies whenever a defendant represents that he "was acting to obtain a benefit" on behalf of a charitable or educational organization while intending "to divert all or part" of that benefit to himself, for personal gain. U.S.S.G. § 2B1.1, App. Note. 8(B). That is what happened here. Farah and his conspirators initially defrauded the food program through a for-profit business. When their runaway claims, along with other fraudsters', prompted MDE to constrain Program participation to non-profits, Farah and his conspirators shifted their focus to using them. Farah and his conspirators used ThinkTechAct Foundation, among other nonprofits, to further bilk the system. They used ThinkTechAct to open numerous fraudulent food sites and thereby received more than $21 million. Ex. M-30. More than $12 million of those funds were sent from ThinkTechAct to Abdiaziz Farah's company, Empire Cuisine & Market, and another $3 million went to a related entity created by Abdiaziz Farah, Empire Enterprises.[4]

---

[4] At trial, the government introduced records of the various bank accounts opened in the name of Empire Cuisine & Market, Exs. O-7, O-8, O-9, as well as a chart summarizing all the funds that flowed into, and out of, the account, Ex. M-13a. Financial records related to

Farah's argument seemingly calls back to the defense he and some codefendants deployed at trial: that the Program was poorly designed and that an enterprising participant could lawfully and legitimately profit. The case evidence, including testimony from MDE representative Emily Honer, showed otherwise. In any event, Farah and his co-conspirators used nonprofits to participate in the program and enlarge their fraudulent take. That is, they sought access to federal benefits (i.e., federal food program reimbursements) available only to charitable organizations. They did so intending to steal those funds for their personal gain. That falls squarely within the enhancement language. It should be applied.

### F.   Farah Fails to Identify Any Impermissible Double Counting Under the Guidelines

Farah does not identify any particular enhancements whose applications would constitute double counting. He identifies none because there are none.

### G.   The Obstruction Enhancement Applies Because Farah Attempted to Flee Prosecution and He Committed Passport Fraud To Do So

Farah concedes that the obstruction of justice enhancement applies, but he argues it applies because he tried to bribe a juror in this case and not because of his attempted flight from prosecution and related passport fraud. Dkt. 825 at 9-10 & n.4. To be clear, the government contends this enhancement applies solely because of that earlier conduct—not because of Farah's attempted bribery. The government intends

---

Empire Enterprise's bank accounts were introduced at trial as Exhibits M-13z, O-11 and O-12, as were records of ThinkTechAct's bank account, as Exhibit O-17.

to seek just punishment for Farah's bribery separately, in his pending bribery prosecution before Judge Doty.

Farah's attempted flight from prosecution and passport fraud, however, is more than enough to justify application of the obstruction enhancement. Indeed, the Court applied the enhancement to Mohamed Ismail on the basis of substantially identical conduct. Dkt. 645 at 28 (Ismail PSR); Dkt. 691 (Ismail Statement of Reasons (adopting PSR without change)).

### III. CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose upon Mr. Farah a sentence of 30 years in prison.

Dated: July 23, 2025                                Respectfully Submitted,

                                                    JOSEPH H. THOMPSON
                                                    Acting United States Attorney

                                                     */s/ Daniel W. Bobier*
                                              BY:   MATTHEW S. EBERT
                                                    HARRY M. JACOBS
                                                    DANIEL W. BOBIER
                                                    Assistant U.S. Attorneys